November 11, 2004    Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D.
7896                  Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW    Document 254-19    Filed 11/07/2005    Page 1 of

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

VERA EASTER, individually*

and as Next Friend of    *

JORDAN DELANEY EASTER,    *

a minor,            * CIVIL ACTION NO.:

                    * 5:03-CV-141

        Plaintiff,    * Jury

    v.            * Assigned to Judge Ward

AMERICAN HOME PRODUCTS    *
CORPORATION, d/b/a WYETH,*
et al.,            *

        Defendants.    *

    *   *   *   *   *   *   *   *   *   *   *

    Videotape deposition of MARK R. GEIER, M.D.,

Ph.D, taken on Friday, November 12, 2004, at

9:52 a.m., at Orrick, Herrington & Sutcliffe,

L.L.P., 3050 K Street, NW, Washington, D.C.,

before Christine Thomas, Notary Public.

    *   *   *   *   *   *   *   *   *   *   *

Reported by:  Christine Thomas, RPR

Page 2

1  APPEARANCES:
2
3  On behalf of the Plaintiff:
4     JONATHAN SMITH-GEORGE, ESQUIRE
5     The Law Offices of Jonathan Smith-George
6     10231 Warwick Boulevard
7     Newport News, Virginia 23601
8     757-223-1275
9
10
11  On behalf of Defendant Wyeth:
12     DANIEL J. THOMASCH, ESQUIRE
13     JOSEPH EVALL, ESQUIRE
14     Orrick, Herrington & Sutcliffe, LLP
15     666 Fifth Aveue
16     New York, New York 10103-0001
17     212-506-3755
18
19
20
21

Page 3

1  APPEARANCES:  (Continued)
2
3  On behalf of Defendant Merck:
4     PAUL R. ELLIOTT, ESQUIRE
5     Baker Botts, LLP
6     One Shell Plaza
7     910 Louisiana Street
8     Houston, Texas 77002-4995
9     713-229-1226
10        and
11
12     STEPHEN E. MARSHALL, ESQUIRE
13     Venable, LLP
14     Two Hopkins Plaza
15     Suite 1800
16     Baltimore, Maryland 21201-2978
17     410-244-7404
18
19
20
21

Page 4

1  APPEARANCES:  (Continued)
2
3
4  On behalf of Defendant Aventis Pasteur, Inc.:
5     M. DIANE OWENS, ESQUIRE
6     Swift, Currie, McGhee & Hiers, LLP
7     1355 Peachtree Street, N.E.,
8     Suite 300
9     Atlanta, Georgia 30309-3238
10     404-888-6158
11
12
13  On behalf of Defendant GlaxoSmithKline:
14     TAMAR HALPERN, ESQUIRE
15     Phillips, Lytle
16     3400 HSBC
17     Buffalo, New York 14214
18     716-847-5441
19
20
21

Page 5

1  APPEARANCES:  (Continued)
2
3
4  On behalf of Defendant Eli Lilly & Company:
5     MARIE S. WOODBURY, ESQUIRE
6     WILLIAM F. NORTHRIP, ESQUIRE
7     Shook, Hardy & Bacon
8     2555 Grand Boulevard
9     Kansas City, Missouri 64108-2613
10     816-474-6550
11
12
13
14  ALSO PRESENT:  Michael Gerard Gay, Videographer
15           Kenneth Y. Turnbull, Esquire
16
17
18
19
20
21

Deposition of -MARK R. GEIER, M.D., Ph.D- Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 3:03-cv-00141-TJW    Document 231-1Page 4 of 40-Page ID #:  Filed 12/07/04    Page 4 of 40-Page ID #: 2004    November 11, 2004
7899

Page 6

1      P R O C E E D I N G S
2      --------------------
3      MR. SMITH-GEORGE:  We're here at the
4  deposition of Dr. Mark Geier, yesterday morning
5  there was a subpoena duces tecum filed in this
6  case, we filed an objection to it.  I'd mark the
7  objection as the first exhibit to the deposition.
8  Despite the fact we objected to the subpoena, we
9  have produced documents here, and I wanted to
10 catalog for the record what those documents are.
11      First, we have a packet of documents,
12 starts with a letter dated November 9th, 2004
13 from Monica Furino to -- I'm sorry.  Here it is,
14 from Monica Furino to Dr. Mark Geier, it's dated
15 November 2nd, 2004, which enclosed the medical
16 records pertaining to Jordan Easter.  Dr. Geier
17 is not here to offer specific opinions about the
18 Easter case, but he requested to see the records
19 so we sent them to him.
20      We then have three pages which
21 consist of Dr. Geier's billing records in this

Page 7

1  case.  We then have a packet of 40 or so pages,
2  which is a series of e-mails between Dr. Geier
3  and the attorneys at Waters & Kraus and myself.
4      We then have a stack, which is about
5  six inches, seven inches thick, which is the
6  various generations of his report, beginning with
7  a letter from Dr. Geier to Senator John Kerry
8  dated September 26th, 2004, which was the genesis
9  of the report.  Although, we don't think that all
10 of the accompanying documents constitute drafts,
11 in the abundance of precaution we had the doctor
12 print out whatever he had related to his reports,
13 hence this stack.
14      We then have an e-mail from Robert
15 Bodily to Mr. Waters and myself attaching some
16 various reporting that Dr. Geier has reviewed.
17      We then have a series of notebooks,
18 the first notebook is entitled Thimerosal
19 Notebook No. 1, which contains the Simpsonwood
20 presentation transcript, as well as various
21 medical articles, Power Points that were

Page 8

1  presented to the -- by the CDC.
2      We then have a second Thimerosal
3  Notebook No. 2, it encloses a series of different
4  medical articles.  We have Thimerosal Notebook
5  No. 3, which again has a series of medical
6  articles.  We have somewhere here -- do you know
7  where No. 4 is.
8      THE DEPONENT:  No, but it's one of
9  those.  That's No. 5.
10      MR. SMITH-GEORGE:  Oh, yeah.  We have
11 Thimerosal Notebook No. 4, again contains more
12 articles.  Thimerosal Notebook No. 5, which also
13 contains a series of medical articles.  Is that
14 five the max?
15      THE DEPONENT:  Actually, there's a
16 list right there.  I tried to catalog what we're
17 doing.
18      MR. SMITH-GEORGE:  So there's a
19 Mercury Notebook No. 1, that is this one.  That
20 again contains some medical articles.
21      MR. THOMASCH:  Is there an

Page 9

1  identification on each of these binders that
2  matches what you're now saying?
3      MR. SMITH-GEORGE:  Yeah.
4      MR. THOMASCH:  Okay.  Thank you.
5      MR. EVALL:  What did you say that
6  contains?
7      MR. SMITH-GEORGE:  That was Mercury
8  Notebook No. 1.  Then we have a series of DPT
9  notebooks.  One and two are in the same volume,
10 three and four in the same volume, five and six
11 in the same volume.  Then there's a volume seven.
12 We have an Autism Epidemic Notebook No. 1.  A
13 publicity notebook.  And is that related to the
14 1970 --
15      THE DEPONENT:  Yes.
16      MR. SMITH-GEORGE:  Related to
17 Dr. Geier's work in the early 1970 --
18      MS. OWENS:  Publicity?
19      MR. SMITH-GEORGE:  Correct.
20 Newspaper clippings and accolades he received for
21 his early genetic work.  Then we have a CDC

**Page 10**

1 document notebook. This is DTP one, two, three,
2 four.
3     MR. THOMASCH: How many CDC notebooks?
4     MR. SMITH-GEORGE: That's what I'm
5 looking for now. Do you know where that one is?
6     THE DEPONENT: No.
7     MR. SMITH-GEORGE: Is that A?
8     THE DEPONENT: Where's my list?
9     MR. SMITH-GEORGE: Oh, you just have
10 Notebook A separate. This is a notebook
11 containing -- Notebook A is containing articles
12 concerning Dr. Geier's research relating to
13 mercury.
14     MS. OWENS: I'm sorry, research
15 relating to what?
16     MR. SMITH-GEORGE: Mercury. Various
17 magazine articles that have quoted him.
18     MR. THOMASCH: What happened with
19 the CDC notebooks?
20     MR. SMITH-GEORGE: I'm looking.
21 Here it is. Just one notebook.

**Page 11**

1     MR. THOMASCH: Just one.
2     MR. SMITH-GEORGE: And the only other
3 thing is we brought a copy of a television
4 program called WXYZ tape where Dr. Geier
5 appeared. He's free to answer questions about
6 that. I just wanted to detail for the record
7 what we did produce for this deposition.
8     THE DEPONENT: And if anybody wants
9 copies of these, these are originals, we will
10 take requests and if, you know, you paid for the
11 time and copying, we'll copy them. But we don't
12 want to let these out, we've had too many bad
13 experiences of people mixing them up. We won't
14 use a copy service, I want them copied by my
15 private secretary.
16     MR. SMITH-GEORGE: As long as you mark
17 what you want copied.
18     MR. THOMASCH: We want a set of all
19 of them. It's our typical practice to send it to
20 a copy service. We're happy to pay a reasonable
21 charge for copies, but not time charges.

**Page 12**

1     MR. SMITH-GEORGE: I understand.
2     MS. WOODBURY: Is there an index?
3     THE DEPONENT: Some of them have an
4 index.
5     MR. SMITH-GEORGE: Some of them are
6 just a collection of articles. It's a way for
7 him to keep his library together. As I
8 understand, these proceedings are being taken in
9 the Easter case, which is a case pending in the
10 Texas Federal Court. And you all have seven
11 hours. And I would like the court reporter to
12 note, and I guess we can go on the tape time.
13 But we'd like to get this accomplished today.
14 We're ready to go.
15     One last thing, there's an article
16 from Bradford Hill entitled, "Environment and
17 disease association of causation," should be in
18 one of the notebooks, it's loose but it's one of
19 his articles.
20     THE VIDEOGRAPHER: This video deposition
21 is being taken in accordance with the Federal

**Page 13**

1 Rules of Civil Procedure on November the 12th,
2 2004, at approximately 9:52 a.m. We are at 3050
3 K Street, Washington D.C. Our court reporter is
4 Christine Thomas with CRC-Salomon. My name is
5 Michael Gay, I'm with Legal Video Solutions. The
6 caption of the case is Easter versus Wyeth, et
7 al. The party giving notice of this deposition
8 is Daniel J. Thomasch. Will all attorneys
9 present please identify themselves and who they
10 represent.
11     MR. THOMASCH: I'm Daniel Thomasch,
12 Orrick, Herrington and Sutcliffe, representing
13 Wyeth.
14     MR. EVALL: Joseph Evall, Orrick,
15 Herrington and Sutcliffe, Wyeth.
16     MS. HALPERN: Tamar Halpern, Phillips,
17 Lytle, Hitchcock, Blaine & Huber, for
18 GlaxoSmithKline.
19     MR. ELLIOTT: Paul Elliott, Baker Botts,
20 for Wyeth.
21     MR. MARSHALL: Stephen Marshall,

Deposition of - MARK R. GEIER, M.D., Ph.D. Multi-Page™ November 12, 2004
Vera Easter v. American Home Products, Corp.

Case 3:03-cv-00141-TJW    Document 254-18    Filed 12/07/04    Page 6 of 11 PageID # 7901

Page 14

1 Venable, for Merck.
2        MR. ELLIOTT:  Excuse me, Merck.
3        MS. OWENS:  Diane Owens with Swift,
4 Currie, McGhee & Hiers, for Aventis Pasteur, Inc.
5        MR. NORTHRIP:  William Northrip, Shook,
6 Hardy & Bacon, for Eli Lilly.
7        MS. WOODBURY:  Marie Woodbury, Shook,
8 Hardy & Bacon, for Eli Lilly.
9        MR. SMITH-GEORGE:  Jonathan Smith-George
10 for the plaintiff.
11        THE VIDEOGRAPHER:  Our witness today is
12 Dr. Mark R. Geier and will now be sworn by our
13 court reporter.
14        MARK R. GEIER, M.D., Ph.D.,
15 The deponent herein, being first duly sworn to
16 testify to the truth in the above cause, was
17 examined and testified on his oath as follows:
18        E X A M I N A T I O N
19 BY MR. THOMASCH:
20    Q.  Good morning, Dr. Geier.
21    A.  Good morning.

Page 15

1    Q.  Before you were sworn in, did you hear
2 Mr. Smith-George, counsel for the plaintiffs,
3 indicate that we had seven hours to conduct this
4 deposition?
5    A.  Yes, I did.
6    Q.  And you understand the scope of the
7 material that we have to cover that relates to
8 your expert report and your opinions in this
9 subject matter is relatively broad; would you
10 agree with that?
11    A.  Yes.
12    Q.  Would you do me the courtesy of trying
13 to answer my questions as directly as possible so
14 we can conserve time, and if the question doesn't
15 appear to have a direct answer, let me know and
16 I'll try to rephrase it; is that all right with
17 you?
18    A.  I'll do my best, sir.
19        MR. THOMASCH:  I'd like to mark as
20 Exhibit 1 to this deposition a letter to Mr.
21 Waters from Winstol D. Carter, Jr., dated

Page 16

1 November 10, 2004, attached to which is a Notice
2 of Intention to Take Oral Videotaped Deposition
3 of Dr. Mark R. Geier.
4        MR. SMITH-GEORGE:  That would be
5 Exhibit No. 2.  My objection to subpoena is
6 offered as the first exhibit.
7        MR. THOMASCH:  All right.  We'll do it
8 your way, save time.
9        (Deposition Exhibit No. 1,
10 objection to the subpoena, and No. 2, Notice of
11 Intention to take Oral Videotaped Deposition of
12 Dr. Mark R. Geier, were marked.)
13    Q.  (BY MR. THOMASCH)  Dr. Geier, I'll show
14 you what's been marked as Exhibit 2 of this
15 date, ask you just to take a look at that.  And
16 in particular, past the cover letter to the
17 notice of deposition.  Have you seen this
18 document before?
19    A.  Yes.
20    Q.  And if you flip to page 5 you'll see,
21 I'm sorry, page 6 you'll see a series of document

Page 17

1 requests.  Have you seen those before?
2    A.  Yes.
3    Q.  Now, on the first page of the subpoena
4 it indicates a case caption, Vera Easter versus
5 American Home Products Corporation, doing
6 business as Wyeth, et al.; do you see that?
7    A.  Yes.
8    Q.  Do you understand that to be the case
9 that we are taking your deposition in today?
10    A.  Yes I do.
11    Q.  Now, today is Friday, November 12th,
12 2004.  When did you first have an intention or an
13 expectation of being deposed today?
14    A.  When did I know that this was the date?
15    Q.  When did you know that you were going to
16 have your deposition taken on November 12th?
17    A.  A few weeks ago.
18    Q.  All right.
19    A.  At least it was tentative.  I didn't
20 know for certain until a couple days ago.
21    Q.  But you had a tentative date a few weeks

November 01, 2004 | Case 8:03-cv-02141-TJW   Document 254   Filed 02/03/04   Page 7 of 40 PageID #: 7902

Multi-Page™   Deposition of - MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 18

1 ago, correct?

2   A. Yes.

3   Q. That was well in advance of receiving

4 the Easter notice of deposition; is that correct?

5   A. Yes.

6   Q. Are you familiar with a case with the

7 name, first plaintiff's name of Skevofilax?

8   A. Not off the top of my head.

9   Q. Are you familiar with a case pending in

10 state court in Baltimore involving

11 thimerosal-containing vaccines in which you have

12 been identified as an expert witness?

13   A. I know of the case. I haven't done a

14 lot of work on that case.

15   Q. All right.

16   A. I've heard there's a case in Baltimore.

17   Q. Were you aware that that case was the

18 case in which you were originally scheduled to

19 appear for a deposition today?

20   A. No.

21   Q. All right. Let me show you what we'll

Page 19

1 mark as Exhibit 2.

2   MR. EVALL: Three.

3   Q. (BY MR. THOMASCH) Three, thank you,

4 which is an October 20th, 2004 letter from

5 Kenneth Y. Turnbull to Paul W. Spence, re

6 Skevofilax versus Aventis Pasteur, Inc.,

7 attaching vaccine defendants' notice of

8 deposition relating to Mark R. Geier, M.D., Ph.D.

9 We'll have this marked as Exhibit 3, please.

10       (Deposition Exhibit No. 3, vaccine

11 defendants' notice of deposition, was

12 marked.)

13   Q. (BY MR. THOMASCH) Dr. Geier, I'll show

14 you what's been marked as Exhibit 3, and ask you

15 to flip through, particularly past the cover

16 page to the notice of deposition and Skevofilax

17 case, do you see on the first page that you are

18 identified as the deponent?

19   A. Yes.

20   Q. That the date is Friday, November 12th,

21 2004?

Page 20

1   A. Yes.

2   Q. And the location of these offices?

3   A. Yes.

4   Q. Were you aware of this document having

5 been served in the Skevofilax case?

6   A. No. What I was told was to prepare to

7 be a general causation witness. And that the

8 plaintiff's attorneys would determine -- I don't

9 know exact time, but a number of weeks ago would

10 determine which of the two cases I would appear

11 in. I was aware there was a case in Texas and a

12 case in Baltimore. And I was subsequently

13 notified that the case that would be done at this

14 time would be the case in Texas. That's my only

15 knowledge of this.

16   Q. Okay. When you were notified you,

17 understood you were going to have a deposition in

18 these offices on this date in one of those two

19 cases; is that correct?

20   A. That's correct.

21   Q. Now this Exhibit 3 is dated October

Page 21

1 20th, 2004; is that about the time that you

2 learned that you would be deposed on this date?

3   A. I believe that's around the time.

4   Q. Okay. And did you know that the

5 defendants had requested you to bring certain

6 documents with you to the deposition as of that

7 date?

8   A. No, but I, you know, having done these

9 before, I had in my mind that you would be

10 wanting the documents, but I hadn't any specific

11 request at the time.

12   Q. Mr. Smith-George has read into the

13 record information pertaining to what you brought

14 with us, I just want to see if I can summarize.

15 As I understand it in addition to various packets

16 of information that have been identified on the

17 record there were five notebooks that related to

18 Simpsonwood and various medical articles, a

19 mercury notebook, four DTP notebooks, an autism

20 epidemic notebook, a publicity notebook.

21   A. What he has handed you is my personal

Deposition of - MARK R. GEIER, M.D., Ph.D. Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 1:03-cv-00141-HJW    Document 254-18    Filed 12/07/04    Page 8 of 11
7903

November 11, 2004

---

**Page 22**

1 list. It's really a lot of material so I tried
2 to make a list before I came so that I'd have
3 this ready for you
4     Q. All right. We'll mark this as Exhibit 4
5 of this date.
6        (Deposition Exhibit No. 4,
7 handwritten list of documents, was marked.)
8     Q. (BY MR. THOMASCH) Am I correct there
9 are 14 notebooks that you've identified as
10 bringing with you today?
11     A. Yes, that's correct.
12     Q. Okay. And how did you physically get
13 them here?
14     A. In a car.
15     Q. Did you have them in banker's boxes or
16 how did you carry them all?
17     A. In the trunk of my car.
18     Q. Would you consider the material that is
19 indexed on Exhibit 4 as referenced by Mr.
20 Smith-George to be your complete file in this
21 matter?

---

**Page 23**

1     A. Yes.
2     Q. Are there any other materials that
3 you're aware of that relate to the opinions that
4 you intend to express in this case that you
5 possess but did not bring with you today?
6        MR. SMITH-GEORGE: Just for point of
7 clarification, we sent out yesterday, November
8 9th, a series of Power Points printed out, they
9 were sent to all counsel, we didn't produce them
10 today because we sent them out to defendants.
11     Q. (BY MR. THOMASCH) All right, we'll put
12 that in as part of your file in this case, those
13 Power Points, are you familiar with them?
14     A. I'm familiar with the Power Points. I
15 don't know what you want to do with them.
16     Q. Would they be considered part of the
17 file in this case upon which your opinions --
18 that reflect your opinions?
19     A. Well, they're Power Points from various
20 talks I've given on this subject. It's hard to
21 say I rely on them. I mean, I wrote them.

---

**Page 24**

1 They're my work product and you requested them.
2 So I'm not positive I have every talk I have ever
3 given still stored, but I went through my
4 computer to find any ones that I had and put them
5 on a CD and gave them to Mr. Smith-George.
6     Q. Those Power Points, do they relate to
7 the subject matter of your testimony here today?
8     A. Yes.
9     Q. All right. Did anyone assist you in
10 attempting to locate documents that relate to
11 your opinions in this case?
12     A. Yes.
13     Q. Who was that?
14     A. My son, David Geier. And I guess to
15 some extent my secretary, Eleanor Hoke, H-O-K-E.
16        MR. THOMASCH: May I see the
17 correspondence with the witness?
18     Q. (BY MR. THOMASCH) Dr. Geier, one of
19 the things you brought with you is
20 correspondence. Anything you brought with you,
21 if at any time today you would like to refer to,

---

**Page 25**

1 in order to be able to answer a question, by all
2 means you may do so; you understand that?
3     A. Thank you. Yes, sir, I do.
4     Q. Can you tell me, sir, when were you
5 retained in the Easter matter?
6     A. It may be in the correspondence, but it
7 was a couple months ago. I don't know if it
8 indicates it or not. The top cover sheet here is
9 a letter to me dated September 9th asking or
10 discussing retaining me. So that's an
11 approximate date.
12     Q. And that's September 9 of 2004?
13     A. Yes.
14     Q. The letter is from Mr. Waters; is that
15 correct?
16     A. Yes.
17     Q. Prior to receiving this letter had you
18 met or known Mr. Waters?
19     A. Yes.
20     Q. When did you first meet him?
21     A. Oh, a year ago, I don't remember the

---

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

November 03, 2004 | Case 1:03-cv-03141-TJW | Document 254-10 | Filed 12/07/04 | Page 9 of 40 PageID #: 7904

Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

---

Page 26

1  date, but quite a while ago, at least a year ago.
2      Q.  What were the circumstances of your
3  first meeting him?
4      A.  He was interested in what I knew about
5  thimerosal, the thimerosal issue, we had some
6  discussions of it just in general.
7      Q.  Did he retain you to work with him in
8  any respect?
9      A.  No.
10     Q.  At that time?
11     A.  No.
12     Q.  When did you agree to be retained in
13  this case?
14     A.  I think at the time of that cover
15  letter.
16     Q.  Can you tell me what you were told
17  about the case, what you knew as of the time you
18  were retained?
19     A.  At that time I hadn't been retained for
20  a specific case.  I was told that I was to be
21  general causation to share with the Court,

Page 27

1  whatever court it turns out to be, my knowledge
2  about thimerosal issues and problems with
3  vaccines.  And that at some future time I would
4  be shown individual cases which I would review.
5  And I made it clear, as you probably remember
6  from all the years that you've worked with me, I
7  required that I see a case and agree to the case
8  even if I'm not going to be a specific witness.
9      Q.  And when you say see a case you mean
10  see the medical records in the case; is that
11  correct?
12     A.  Yes.
13     Q.  And so is it my understanding that the
14  way you approach this is you like to form an
15  individual or specific causation opinion in your
16  own mind, to be comfortable with that, before you
17  agree to testify even if you're not testifying on
18  specific causation?
19     A.  That's correct.
20     Q.  And you did that in this case?
21     A.  Yes.

Page 28

1      Q.  Now, what materials did you receive
2  from plaintiff's counsel in this case?
3      A.  I think he has a packet of them.
4  The medical records.
5      Q.  Are there any other materials that you
6  received?
7      A.  Well, you have the other packet with
8  the e-mails that we've exchanged.
9      Q.  And is there anything else that you
10  received from plaintiff's counsel?
11     A.  That's the only thing that I recall.
12     Q.  What are your fee arrangements for this
13  matter?
14     A.  $250 an hour, for time or travel.  He
15  paid me a retainer of $7500.  And when the
16  retainer is used up, I contact him to make up the
17  difference and give me a small advance based on
18  what we think the hours will be.
19     Q.  And what individual or entity is
20  actually paid for the time you spend on this
21  case?

Page 29

1      A.  Mr. Waters, I'm not sure what his --
2      Q.  Who are the checks made out to, you
3  personally or some corporate entity or --
4      A.  To me personally.
5      Q.  Now, do one of the 14 notebooks or more
6  than one of the 14 notebooks contain
7  publications concerning the subject matter of
8  thimerosal-containing vaccines where you are the
9  author or a coauthor of the paper?
10     A.  Yes.
11     Q.  Is there a separate binder of those?
12     A.  I don't think so, I don't know if we've
13  actually copied all of my publications on this.
14  But I think there are some of them in those
15  notebooks.
16     Q.  All right.  But was any attempt made in
17  gathering materials to come here today, to bring
18  with you all of your original articles on the
19  subject matter of thimerosal-containing
20  vaccines?
21     A.  I don't recall you requesting that so I

Page 30

1  don't think so.

2      MR. SMITH-GEORGE:  I just want the
3  record to reflect we have provided an extensive
4  library of medical articles that have been marked
5  as exhibits in this case and provided to the
6  defendants.  Among them are many of Dr. Geier's
7  publications.

8      Q.  I understand, but as I further
9  understand it, sitting here now, you are not
10  confident that you have brought with you all
11  articles that you are an author of that relate to
12  the subject matter of thimerosal in vaccines; is
13  that correct?

14      A.  I think they are all in that
15  bibliography but we'd have to check it.

16      Q.  When you say that bibliography, what
17  are you referring to, sir?

18      A.  The list of articles that plaintiff's
19  counsel has assembled with our aid, of articles
20  that we're using.

21      MR. SMITH-GEORGE:  In your e-mail

Page 31

1  packet there's some e-mails discussing the
2  bibliography.  They should be attached there as
3  well.

4      MR. THOMASCH:  All right.  I'm going to
5  mark this packet of e-mails as our next exhibit,
6  please.

7      (Deposition Exhibit No. 5, packet of
8  e-mails, was marked.)

9      Q.  (BY MR. THOMASCH)  Dr. Geier, I'll show
10  you Exhibit 5 of this date, which has been
11  described as a packet of e-mails.  This is a
12  small subset of the materials that you brought
13  with you today.  And I'm holding it open for your
14  convenience to a section that begins with a
15  sheet that says bibliography.  Do you see that?

16      A.  Yes.

17      Q.  Is that the bibliography to which you
18  were referring?

19      A.  Yes.

20      Q.  Tell me what that is, what that
21  represents.

Page 32

1      A.  It's a list of articles on which I rely
2  and I believe in order to make this easier, that
3  the plaintiff's attorneys have copied you with
4  all those so we don't have to keep bringing
5  those.  That's not to say that some of these
6  aren't in those notebooks.  Some of them are.
7  It's been represented to me that you have copies
8  of all of these.

9      MR. THOMASCH:  Okay.  Mr. Smith-George,
10  are you able to tell, put on the record when
11  these actual articles were provided to
12  defendants?

13      MR. SMITH-GEORGE:  All I can tell you is
14  that I'm aware there have been a series of
15  articles that have been listed as exhibits and
16  provided to defendants but I have not been privy
17  to when they were provided.  But I know that
18  there's at least 1500 articles, if not more, that
19  have been marked as exhibits.

20      Q.  (BY MR. THOMASCH)  Just so we can be
21  clear, I want to differentiate between the mass

Page 33

1  of articles upon which you rely and your
2  scholarship that relates to this subject.  What
3  I'm really interested in at the moment are
4  articles that you have written as an author or
5  coauthor.  All right?

6      A.  That would be in my CV, which we
7  provided to you.

8      Q.  Are all the articles that you have
9  authored in the field of thimerosal-containing
10  vaccines identified on your CV?

11      A.  Yes.

12      MR. SMITH-GEORGE:  Here, just to make
13  sure, I've copied the CV, just so he can review
14  it to make sure he's got them all listed.

15      A.  Yes.  This is an updated copy that
16  includes anything that has been published or
17  accepted for publication.

18      MR. THOMASCH:  All right.  I ask the
19  court reporter to mark this as our next exhibit.

20      (Deposition Exhibit No. 6, Dr.
21  Geier's CV, was marked.)

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

November 31, 2004 1:41-TJW    Document 254-16    Filed 03/07/06    Page 11 of 40    PageID #: 7906

Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 34

1  Q. (BY MR. THOMASCH)  We've marked as
2 Exhibit 6 of this date a curriculum vitae for
3 Mark Robin Geier, it has a fax line on the top
4 that says 11-11-2004; can you tell me when this
5 was last updated?
6  A. Within a couple days of 11-11, I don't
7 know exactly.
8  Q. So within the last week or so?
9  A. Yes.
10  Q. And so it is, to the best of your
11 knowledge, now accurate and complete?
12  A. Yes.
13  Q. Thank you.  I'll ask the reporter to
14 mark as our next exhibit a document approximately
15 25 pages in length, with a fax cover sheet from
16 Waters & Kraus dated November 8th, 2004.
17 Followed by a letter from Monica Furino, legal
18 assistant to C. Andrew Waters, to all known
19 counsel of record dated November 8th, 2004,
20 attached to which are, is a document in this case
21 entitled Plaintiff's Second Supplemental

Page 35

1 Responses to Disclosures.
2      (Deposition Exhibit No. 7,
3 Plaintiff's Second Supplemental Responses to
4 Disclosures, was marked.)
5  Q. (BY MR. THOMASCH)  If you turn to the
6 Plaintiff's Second Supplemental Response to
7 Disclosures, which begins at the third page of
8 Exhibit 8 (sic); do you see that?
9  A. Yes.
10  Q. And the caption indicates that it is in
11 the Easter case that we're here today for; is
12 that correct?
13  A. Yes.
14  Q. Have you seen this document before?
15  A. No.
16  Q. I'll ask you to turn to page 6 of the
17 supplemental disclosures.  Do you see a
18 document?
19  A. Okay.
20  Q. Within the document, page 6,
21 there's a disclosure of expert witnesses

Page 36

1 beginning with Mark Geier, M.D., Ph.D.?
2  A. Yes, I see that.
3  Q. And that would be you?
4  A. Yes.
5  Q. And I would just ask you to look
6 through the next four and a quarter pages, pages
7 6 through 10 of the document, to look at the
8 disclosure made about you in this case, and all I
9 want to know at the moment, sir, is whether
10 you've seen this before?
11  A. No.
12  Q. Were you aware that this disclosure was
13 being provided to defense counsel?
14  A. In a general sense, again, because I've
15 been in a number of cases I know there's usually
16 something like this written.  But in the
17 specific, you know, did I know that on such and
18 such date they were writing this thing, no.
19  Q. Did you have any role in the drafting of
20 this document?
21  A. Other than just general, I had some

Page 37

1 discussions about my views on thimerosal and on
2 the issues, but I did not have any role in
3 drafting it.
4  Q. And to this date you have not read this
5 document; is that correct?
6  A. That's correct.
7  Q. I'd like to direct your attention in
8 the first paragraph, down five lines, on the
9 right-hand side of the 5th line begins a sentence
10 with the words "in certain."  Tell me when you
11 reach that point?
12  A. Yes, I'm there.
13  Q. And the sentence reads and correct me if
14 I'm wrong, in certain instances the witness may
15 testify as to medical and/or scientific articles
16 brought to his attention by counsel for the
17 plaintiff, do you see that?
18  A. Yes.
19  Q. Were there any medical or scientific
20 articles brought to your attention by counsel for
21 the plaintiff that you're relying on here?

**Page 38**

1   A. Not that I know of. What I've -- what
2 they supplied me with that I hadn't seen that
3 wasn't mine was some company documents, a couple
4 of them.
5   Q. Do you have a list of those documents,
6 sir?
7   A. No.
8   Q. Are those documents part of what you
9 would consider to be your file in this case?
10   A. Yes.
11   Q. Did you bring those with you today?
12   A. I think they're somewhere in this.
13   MR. SMITH-GEORGE: There's a packet
14 floating around somewhere somebody's looking at.
15   MS. OWENS: A packet or notebook?
16   MR. ELLIOTT: What's it called?
17   MR. SMITH-GEORGE: They're individual,
18 it was a group of documents that were not in the
19 notebook.
20   MR. MARSHALL: Were they attached to
21 the letter to Senator Kerry?

**Page 39**

1   MR. SMITH-GEORGE: No, that was --
2   MS. OWENS: I don't believe they're
3 here.
4   MR. SMITH-GEORGE: They should be here
5 because they were here this morning.
6   MS. WOODBURY: It's not something you
7 identified.
8   THE DEPONENT: If you look at my list,
9 in addition to the notebooks that were
10 identified there were, this is from your Exhibit
11 4, three other things identified, a pile of draft
12 reports with Kerry on top, a pile of others with
13 a phone number on top, which unfortunately I
14 removed the phone number, and the WXYZ tape, I
15 needed the phone number to call so he could come
16 down and get my notebooks. So I'm not sure what
17 the top page is but I'm sure we can find it.
18   MS. OWENS: Is that where the company
19 documents are?
20   THE DEPONENT: I think so.
21   MR. SMITH-GEORGE: I thought there was a

**Page 40**

1 list of loose exhibits.
2   THE DEPONENT: I think that's in the
3 loose exhibits.
4   MR. THOMASCH: Okay. Suggest we just go
5 off the record for a moment and take a look and
6 see if we can just organize for a minute.
7   THE VIDEOGRAPHER: Time now is 10:19.
8 We're now going off the record.
9   (A recess was taken from 10:19 a.m.
10 to 10:22 a.m.)
11   THE VIDEOGRAPHER: The time now is
12 10:22. We are now back on the record.
13   Q. (BY MR. THOMASCH) All right.
14 Dr. Geier, we had a short conversation among
15 counsel while off the record. Let me just
16 summarize, and correct me if I'm wrong, but it
17 appears that as part of your file there exists
18 certain company documents that were provided to
19 you by Mr. Waters, or his office, and by the term
20 "company documents," I mean certain documents
21 that various of the corporate defendants produced

**Page 41**

1 in connection with this or other cases in which
2 Mr. Waters is counsel. Some of those were
3 produced to you, made part of your file in this
4 action, you intended to bring them with you
5 today and indeed believe you did, but we don't
6 seem to have them at the table; is that fair
7 enough?
8   A. Yes.
9   Q. So my understanding is that clearly I'm
10 not in a position at the moment to question you
11 about those documents because they're not here,
12 but you or Mr. Smith-George will see if they can
13 be located during the day and we'll move on; is
14 that all right?
15   A. Yes.
16   Q. Just by way of volume, can you give me a
17 sense of how many documents it was, these
18 company documents that you brought with you?
19   A. I think the packet was about an inch,
20 inch and a half.
21   Q. Is that the totality of documents that

Page 42

1 you -- company documents that you received from
2 plaintiff's counsel or is that a selection of the
3 documents?
4    A.  Those are the only ones I had.
5       MS. OWENS:  I'm sorry, I did not hear
6 the last.
7       MR. THOMASCH:  Those are the only ones I
8 had.
9       MS. OWENS:  The only ones he looked at
10 was the question.
11    Q.  (BY MR. THOMASCH)  No, what I wanted to
12 do was to see whether or not there are other
13 company documents besides the inch-and-a-half
14 pile that you were attempting to bring with you
15 today that you received from Mr. Waters, and my
16 understanding is there aren't, you were bringing
17 everything with you?
18    A.  That's right, that I received from Mr.
19 Waters, that's right.
20    Q.  If you would just look at Exhibit 8,
21 continuing on the disclosure, at the bottom of

Page 43

1 the first paragraph, do you see the sentence in
2 addition to the witness's report, see the Power
3 Point presentations related to his opinions on
4 these matters?
5    A.  Yes.
6    Q.  And I'll ask the court reporter to mark
7 as our next exhibit a letter from Monica Furino,
8 legal assistant to C. Andrew Waters, to all known
9 counsel of record, dated November 9, 2004, to
10 which is attached Dr. Geier's Power Point
11 presentations.
12       (Deposition Exhibit No. 9,
13 Dr. Geier's Power Point presentations, was
14 marked.)
15    Q.  (BY MR. THOMASCH)  Dr. Geier, I'm going
16 to show you what is marked as Exhibit 9 and just
17 ask whether those are the Power Point
18 presentations that are being referred to in the
19 disclosures?
20    A.  Yes, they are.
21    Q.  All right.  And now, if we look at the

Page 44

1 items that are on listed on Exhibit 4, together
2 with Exhibit 9, the Power Point presentations,
3 and assume that we ultimately receive the company
4 documents that we've discussed but we don't have
5 with us at the moment, will that constitute your
6 complete file in this case, or are there
7 additional documents not here?
8    A.  This is everything that I have on this
9 case.  We didn't mention the tape, but the
10 tape's around here somewhere too.
11    Q.  Correct.  Thank you for pointing that
12 out.  And that, to the best of your knowledge,
13 that will make us complete?
14    A.  Yes.
15    Q.  One of the packets of loose papers that
16 have been clipped together and identified on
17 Exhibit 4 are medical records of Jordan Easter;
18 is that correct?
19    A.  Yes.
20    Q.  Do you understand those to be the
21 complete medical records of Jordan Easter?

Page 45

1    A.  No.
2    Q.  Tell me how it is that you came to
3 receive some of the medical records and whether
4 they're by -- particular records by your request
5 or not?
6    A.  I asked that I be given enough medical
7 records so I could understand the case and
8 determine whether or not I was in agreement.  I
9 did not request the entire medical record, and
10 this was what was sent to me and it fulfilled any
11 necessities.  You know, since I'm not testifying
12 and I can't tell you that there's not another
13 record there that says something else, but these
14 told me the story and gave me enough that I was
15 confident to be involved in the case.
16    Q.  All right.  And the phrase specific
17 causation is one you're familiar with, correct?
18    A.  Yes.
19    Q.  And that would be distinct from general
20 causation in that specific causation would relate
21 to the injury to the minor plaintiff in this

Deposition of - MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW    Document 254    Filed 12/07/04    Page 14 of 40 PageID #:
7909

Multi-Page™

November 1, 2004

Page 46

1  case, Jordan Easter, correct?
2      A.  Yes.
3      Q.  And am I completely clear on this that
4  at a trial on this action, it is not your
5  intention to testify about specific causation
6  with regard to the minor plaintiff, Jordan
7  Easter?
8      A.  That's correct.
9      Q.  What was it you were looking for in the
10 medical records to in a sense satisfy yourself?
11     A.  I have an ethical requirement, for
12 example to be, you know, extreme -- I believe,
13 you know, in the problems about thimerosal which
14 I'm sure we're going to discuss today.  But I
15 would not be willing to come and testify to that
16 or any problems that I had with any of the myriad
17 of representatives for the companies here if for
18 example the case was a child that was run over by
19 a truck.  I don't think that's appropriate, even
20 though I believe there are problems, if I didn't
21 think it was related to this case, it would not

Page 47

1  be within my ethical standards to come and, you
2  know, criticize what your companies have done
3  unless I thought the case was relevant and it fit
4  into my criteria.
5      Q.  So am I correct, you were attempting to
6  verify that indeed Jordan Easter received
7  vaccines that contain the preservative
8  thimerosal?
9      A.  Yes, and that he had, you know,
10 reactions and damage that fit into what the
11 literature looks like and that he, you know, he
12 didn't have a diagnosis of a brain tumor or some
13 other kind of thing that would make it so that I
14 would be testifying in a case that I would be
15 embarrassed to be testifying in.
16     Q.  All right.  Let me ask you a couple
17 questions in this regard.  Did you make any
18 attempt to calculate the amount of thimerosal
19 from vaccines to which the plaintiff, Jordan
20 Easter, was exposed?
21     A.  I don't recall adding that up.

Page 48

1      Q.  Did it matter, would it matter to you?
2      A.  Yes.  But not numerically.  I mean, if I
3  looked at -- that was another thing I wanted to
4  look at.  If I looked at the child's records and
5  he received no thimerosal-containing vaccines, of
6  course it would matter to me.  I would refuse to
7  be in a case.  If he received maybe only one, I
8  would have a problem.  But what I saw he received
9  a whole series of thimerosal-containing vaccines.
10     Q.  Is there a minimum number of
11 thimerosal-containing vaccines that you would in
12 a sense require to have been administered to the
13 child before you would be prepared to testify in
14 a thimerosal-containing vaccine product liability
15 action?
16     A.  I haven't thought about a specific
17 minimum.  It's just my general impression.
18     Q.  Were you looking for a particular type
19 of injury to see whether that was consistent with
20 your understanding of potential adverse
21 reactions to thimerosal-containing vaccines?

Page 49

1      A.  Yes.
2      Q.  What is your understanding of the
3  injury that minor plaintiff Jordan Easter has?
4      A.  That he has a neurodevelopmental
5  disorder.
6      Q.  Is he autistic to your understanding?
7      A.  Yes.  That's not a requirement for me,
8  but he is autistic.  And I also would be looking
9  for, you know, did I think that there was obvious
10 damage at birth.  I mean, if a child was damaged
11 at birth, it would change my opinion.
12     Q.  But am I correct that in that
13 regard -- or in regard to any nonvaccine-related
14 potential causation, you're looking to see
15 whether it was reflected in the medical records.
16 You didn't make an independent determination of
17 the existence or nonexistence of anything else;
18 is that correct?
19     A.  That's correct, and I wasn't asked to
20 do that, in this case anyway.
21     Q.  Have you reviewed any manufacturing

Page 50

1 records of any of the defendants relating to
2 vaccines given to Jordan Easter?
3    A. No.
4    Q. Has plaintiff's counsel made any
5 request of you to consider or testify regarding
6 issues concerning a possible manufacturing defect
7 in any vaccine given to Jordan Easter?
8    A. It depends what you mean by
9 manufacturing defect. Can you tell me what
10 you --
11    Q. Yes. When I use the term manufacturing
12 defect, what I mean is a vaccine that was made
13 that was materially different from the design
14 specifications that were used to make the
15 vaccine. In other words, somewhere along the
16 line it wasn't made as intended. Do you
17 understand that term?
18    A. Yes. I did not -- I have not been
19 asked to render that opinion.
20    Q. Would you be capable of reviewing
21 manufacturing records to determine the existence

Page 51

1 of a manufacturing error in the manufacturing
2 process?
3    A. Yes.
4    Q. But it is not your intention to opine on
5 that subject matter in this case; is that
6 correct?
7    A. I wasn't asked to do that; that is
8 correct. And I wasn't supplied with the records
9 to do it with.
10    Q. Are there any -- going back for a
11 moment to the types of injuries that you look for
12 in order to be willing to testify in a case
13 generally, are there any types of autism that
14 would be outside the area that you would be
15 willing to testify in, such as a case of autism
16 associated with Fragile X syndrome?
17    A. Yes. That's the exact example that I
18 was going to suggest. Another one would be if
19 the person had fetal alcohol syndrome comes to
20 mind, that wasn't caused by the vaccines. If the
21 person had rubella syndrome, that wasn't caused

Page 52

1 by the vaccines. And as you said, Fragile X
2 wasn't caused by the vaccines.
3    Q. So if you saw that in the medical
4 record, notwithstanding that the child was
5 autistic and received thimerosal-containing
6 vaccines, you would be unwilling to take the case
7 on; is that correct?
8    A. That's correct.
9    Q. Now, we differentiated earlier specific
10 and general causation. Are we correct, are we
11 speaking the same language when I say I
12 understand by the term general causation to mean
13 the possibility -- let me withdraw that. The
14 propensity of a drug or product to cause a
15 particular type of reaction?
16    A. Yeah, that it can cause.
17    Q. It can cause, doesn't mean it did in
18 any particular case, but it can in some cases; is
19 that the idea?
20    A. That's my understanding, yes.
21    Q. All right. And is it my understanding

Page 53

1 that you are intending at a trial of this action,
2 if one is to take place, to testify on the
3 subject of general causation?
4    A. Yes.
5    Q. And that would be in regard to opinions
6 that you have that children vaccinated with
7 vaccines containing the preservative thimerosal
8 can develop neurodevelopmental delays or autism
9 as a result of the thimerosal in the vaccines
10 they receive; is that correct?
11    A. That's correct.
12    Q. And that subject matter we generally
13 can call general causation, all right?
14    A. Yes.
15    Q. Now, looking at page 6 of the
16 disclosures which have been marked as Exhibit 8,
17 would you take your eye down to the third
18 paragraph, please?
19    A. Okay.
20    Q. All right. Dr. Geier, I believe I've
21 misidentified the exhibit number. It appears

Deposition of - MARK R. GEIER, M.D., Ph.D Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-FJS Document 294-Page Filed 12/07/04 Page 16 of 40 PageID # 2004
7911 November 11, 2004

Page 54

1 that the, it is Exhibit 7 that we're talking
2 about, the disclosures.
3    A. I'm sorry, mine doesn't have an exhibit
4 number on it, so I was accepting your number.
5    Q. My number was incorrect, so let's just
6 make sure we're clear that what we're talking
7 about is the plaintiff's second supplemental
8 response to disclosures, which begin at page 6
9 with a disclosure concerning Mark Geier, M.D.,
10 Ph.D., 14 Redgate Court, correct?
11    A. Yes.
12    Q. Sticking with that document and moving
13 down to the third paragraph, I want to read into
14 the record the first sentence, and if you'll
15 follow along with me, quote, it is anticipated
16 that the witness will testify that exposure to
17 thimerosal in vaccines either causes or
18 substantially contributes to cause neurological
19 and/or neurodevelopmental injury, comma,
20 including some injuries subsumed within the
21 autism spectrum, comma, to a small percentage of

Page 55

1 susceptible children, do you see that?
2    A. Yes.
3    Q. And that indicates to all who read it
4 that you are prepared to testify on the subject
5 of general causation in this case, correct?
6    A. Yes.
7    Q. Now, I want to focus on the phrase to a
8 small percentage of susceptible children, do you
9 see that?
10    A. Yes.
11    Q. Are there more than one factor that
12 would cause a child to be susceptible to injury
13 from thimerosal-causing vaccines in your opinion?
14    A. Yes.
15    Q. Can you identify the various factors
16 that you think could make a child susceptible to
17 injury from thimerosal-containing vaccines,
18 ranking them in declining order, so start with
19 the most important factor for making a child
20 susceptible and working down from there?
21    A. I'll try.

Page 56

1    Q. Thank you.
2    A. That's complex. But these children
3 have a general category of genetic
4 susceptibility, which I think is the most
5 important, and there's quite a bit of literature
6 now published on it. And it explains why most
7 children in the 1990s in this country received
8 large doses of thimerosal from their childhood
9 vaccines, most children did not become autistic,
10 most children did not develop neurodevelopmental
11 disorders, in fact, about one in six children
12 developed neurodevelopmental disorders according
13 to the CDC's Autism Alarm.
14       I believe that the main -- the most
15 important reason as to why these children that
16 developed the problem were different from the
17 ones that didn't involved various genetic
18 susceptibilities, susceptibilities to the ability
19 to eliminate mercury as a general category, and
20 there were various ones that were potential
21 candidates and have been studied.

Page 57

1    Q. Before you move on, I'm sorry to
2 interrupt your answer, I do apologize, but I want
3 to clarify, you indicated the most important
4 susceptibility factor is a genetic
5 susceptibility; correct?
6    A. Yes.
7    Q. And I believe, and I am peeking here at
8 the transcript here as it's coming up on the
9 court reporter's screen, you said in the 1990s
10 about one and six children developed
11 neurodevelopmental harm; is that what you
12 intended to say?
13    A. Yes, one in six children have a
14 neurodevelopmental or behavioral problem, and the
15 reference for that is the Autism Alarm published
16 in January 2004 from the CDC. I like to rely on
17 the CDC because if they say it, it's -- that's
18 certain a minimum. I've heard higher estimates
19 but that's a good source for that opinion, I
20 believe.
21    Q. Okay. And that neurodevelopmental harm

Page 58

1  is something that could be diagnosed by a
2  doctor, correct?
3      A. Yes.
4      Q. In other words, there's a clinical
5  manifestation, the child is doing less well than
6  the child would otherwise be doing?
7      A. Yes.
8      Q. Now, just holding with regard to the
9  genetic susceptibility for a moment. What
10  percentage of children have the genetic
11  susceptibility?
12      A. Of those -- of the overall population?
13      Q. Of the overall population, if you take
14  all the children born in the United States in
15  1995, do you have an opinion as to how many of
16  those children possessed a genetic susceptibility
17  that would put them at higher risk if they
18  received thimerosal-containing vaccines compared
19  to children without that genetic susceptibility?
20      A. Yeah, I think somewhere around the one
21  in six, I don't think every one of those has a

Page 59

1  genetic susceptibility that we know of, and we
2  don't know of all the genetic susceptibilities,
3  but I think that's a reasonable estimate of the
4  population.
5          The reason I answer it that way is you
6  have to understand the genetic susceptibility is
7  a moving target. I don't think anybody would
8  disagree that if you gave enough thimerosal
9  you'll kill everybody. So in a sense we're all
10  susceptible. I don't think it's in dispute that
11  thimerosal can kill people if you gave massive
12  doses. So we got down and what happens is some
13  people are very susceptible and they have a
14  problem at very low doses, and some people are a
15  little less susceptible and they have a problem
16  at a higher dose. As I say, eventually you'll
17  reach a dose at which everybody's susceptible. I
18  think the level that was given, that one in six,
19  is a good estimate of the children with
20  susceptibility to that level of mercury.
21      Q. Okay. So in discussing the very

Page 60

1  concept of toxicology or potential reactions to a
2  pharmaceutical product, dose matters; is that
3  correct?
4      A. Dose matters.
5      Q. And when we're talking about genetic
6  susceptibility, I want to see if we can get on
7  the same page, children in the 1990s could have
8  been exposed to certain quantities of thimerosal
9  if they received a full schedule or even a
10  partial schedule of recommended childhood
11  vaccines in the United States; is that correct?
12      A. Yes.
13      Q. Do you have an opinion or understanding
14  as to what the maximum amount of thimerosal a
15  child could have received if they received a full
16  schedule of immunizations during say their first
17  two years of life in the 1990s?
18      A. Just from the vaccines?
19      Q. Just from the vaccines.
20      A. It approached 300 micrograms.
21      Q. For purposes of my question now I want

Page 61

1  to assume that -- well, I don't want to assume, I
2  want to ask you, are there some children who
3  could, you would expect receive 300 micrograms of
4  thimerosal over the course of their first two
5  years of life from vaccination and not experience
6  any adverse injuries?
7      A. Of the type we're talking about, that's
8  right.
9      Q. No neurological injuries or
10  developmental delay; is that correct?
11      A. I believe the majority of children did
12  not receive neurological damage. I adamantly,
13  hopefully believe that. I'm optimistic that the
14  others were not significantly damaged.
15      Q. And those that we have no evidence that
16  they were damaged, we can call those the
17  nonsusceptible children, is that okay?
18      A. Yes.
19      Q. So when we're talking about
20  susceptibility, we're talking about the potential
21  to have a reaction from quantities of thimerosal

Deposition of - MARK R. GEIER, M.D., Ph.D Multi-Page ™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-HJW    Document 254-16    Filed 12/07/04    Page 18 of 40 PageID #: 7913

November 11, 2004

Page 62

1 in the range of 25 to 300 micrograms of
2 thimerosal, not large, large quantities; all
3 right?
4    A. From the vaccines.
5    Q. From the vaccine.
6    A. We haven't talked about other sources
7 yet of mercury.
8    Q. I understand.
9    A. Yeah, that's what I mean.
10    Q. All right. And if a child received his
11 only exposure to mercury derivatives from
12 vaccines, are there still children that could be
13 harmed by the quantity of thimerosal in the
14 routine schedule of vaccines that was used in the
15 1990s, in your opinion?
16    A. Yes.
17    Q. Now, the children who we're calling
18 genetically susceptible actually have some
19 genetic mutation that makes them different from
20 the children who are not genetically susceptible;
21 is that correct?

Page 63

1    A. Yes, I like to refer to it as a
2 polymorphism because, as to distinguish it that
3 they don't have a defect absent the mercury. In
4 fact, they may even have advantages. As a
5 general statement everybody in this room has a
6 variety of different genes. If I were to try to
7 poison you, God forbid, with various poisons, I
8 would find some of you were more susceptible to
9 one poison, some of you might be more susceptible
10 to another poison. None of you necessarily has
11 any defect whatsoever, and in fact, some of these
12 susceptibilities might actually be related to
13 things that, absent the poisons, are actually
14 good. So I don't want to leave the impression
15 that these kids are genetically defective. They
16 happen to be unable to handle this particular
17 insult.
18    Q. Understood. I did not use the phrase
19 defective or genetically defective. I used the
20 term different.
21    A. I was just trying to make it clear.

Page 64

1    Q. But the children who are genetically
2 susceptible are different from the children who
3 are not genetically susceptible; correct?
4    A. Yes.
5    Q. That is because of a polymorphism in the
6 genetically susceptible children; correct?
7    A. Yes.
8    Q. Is that a specific polymorphism? Is
9 there a name for it or is it one of a variety of
10 polymorphisms?
11    A. It's one of a variety, not all of which
12 are discovered, but some of which have been
13 discovered.
14    Q. Are there any that you could identify by
15 name?
16    A. The -- there's a susceptibility that is
17 related to ApoE, 2, 3 and 4, with types 3 and 4,
18 but particularly 4 being more sensitive to
19 mercury. That's been published by a group in New
20 Zealand and others. I'm a little bit vague on
21 the answer because it's not as simple as a type

Page 65

1 4. You have two genes for ApoE. So you have one
2 from your mother and one from your father. So
3 since there are three flavors, 2, 3 and 4, you
4 can be 2-4, 2-3, 4-4. So the tendency to have
5 more 4s, or more 3s, but 4 is worse, tends to
6 make you more susceptible to mercury, and that's
7 what the literature shows.
8    Q. When you say "susceptible to mercury,"
9 do you mean susceptible to mercury because you
10 are unable to metabolize it as quickly as
11 children who do not have that polymorphism?
12    A. No, that's a very important -- that's a
13 reasonable statement you made for almost any
14 toxin, but it's wrong for mercury, I want to
15 clarify.
16    Q. What would be a clarification.
17    A. Most poisons in the body -- I'm sure
18 you're an experienced person, that's why you said
19 it that way -- are metabolized. That is, the way
20 we detoxify is usually our liver and other organs
21 chop them up into things that aren't dangerous.

Page 66

1 The problem with the mercury poisons is that the
2 mercury atom is poisonous. And you can't chop up
3 an atom, because by definition you need a nuclear
4 furnace to change mercury. So although you can
5 chop the ethyl group off, you can't get rid of
6 the mercury. The only defense in this particular
7 situation is elimination. You can't metabolize
8 mercury. No one can. No creature can.
9   Q. All right. Are the children with the
10 polymorphism slower to eliminate mercury than the
11 children without the polymorphism?
12   A. Yes. That's the basis of the
13 polymorphisms that we understand. ApoE is a
14 system that has an ApoE-2 -- there are two
15 subhydrogroups that combine mercury. Mercury is
16 eliminated -- I'm sorry. There are two
17 subhydrogroups on an ApoE-2 molecule that are
18 capable of binding mercury. On ApoE-3 there is
19 only one because one has been replaced. And on
20 ApoE-4 there are none. So this is one of the
21 molecules that helps eliminate mercury by binding

Page 67

1 it. And if you can't bind it that makes you more
2 susceptible. Each of the others that have been
3 studied is similar. They're different molecules,
4 but they have to do with how well you can make
5 subhydrogroups to bind the mercury to eliminate
6 it.
7   Q. Let me ask you, sir, you made reference
8 to a paper from New Zealand. Can you identify
9 any of the authors on that paper?
10   A. It's in the list. I don't recall the
11 name.
12   Q. Would it be in the bibliography that's
13 marked as an exhibit here?
14   A. As far as I know, yes.
15   Q. If I can show you that bibliography I'll
16 ask you to see if you can identify it. The
17 Bibliography would be part of Exhibit 5, I
18 believe, which is the exchange of e-mails with
19 counsel.
20   A. My quick scan through I didn't find it,
21 but perhaps I could find it if I had the Power

Page 68

1 Point.
2   Q. All right. Power Point is Exhibit 9?
3   A. Yeah. Because I believe --
4   Q. If you're unable to easily find it
5 we'll move on, that's all right. But if you want
6 to take a quick look, that's also okay.
7      MR. MARSHALL: Can you refresh my
8 recollection what we are looking for?
9      MR. THOMASCH: The authors on the New
10 Zealand article referred to with respect to the
11 ApoE-2, 3, 4 polymorphism.
12   A. Yes, here it is. Godfrey, M.E., from
13 -- et al., from the Journal of Alzheimer's
14 Disease, 2003, volume 5, pages 189 to 195. I
15 don't know if you want to check on the
16 bibliography to see if it's in that.
17   Q. No, that's all right. Is there a page,
18 though, that you're referring to within Exhibit
19 9?
20   A. It's page 7, but unfortunately they're
21 multiply numbered, so if you want, I'll show you

Page 69

1 the spot, maybe you can identify it in some way.
2 It's probably in multiple of the talks. I don't
3 guarantee that every time we talk we use that
4 slide. But it's often used by us.
5   Q. All right. But It's on page 7 of slides
6 that begin with Autism Alarm?
7   A. And there's a picture there, a
8 demonstration of what I showed you about the two
9 binding sites, the one binding site, and the no
10 binding sites.
11   Q. All right. Thank you. What I'd like to
12 clarify, are you aware of any study that reflects
13 what percentage of children possess this
14 particular polymorphism?
15   A. I think HEATH studied adults in that
16 one. So you can get the percentage of adults,
17 the percentage of children should be the same.
18 They grow up.
19   Q. Understood. What's your understanding
20 of the approximate percentage of the population
21 that has this particular polymorphism?

Deposition of - MARK R. GEIER, M.D., Ph.D.  Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW    Document 181-5 Filed 12/07/04    Page 20 of 40 PageID #: 7915

November 11, 2004

Page 70

1    A. Well, again, it's more complicated
2  because as I said, there's 4-4, there's 4-3,
3  there's 4-2, there's 3-3, so there's all
4  different combinations. What he did was he
5  showed a statistically increased tendency to have
6  more 4s, but there isn't -- in other words, if
7  your question is it's a polymorphism, if it was a
8  single gene, it would be simple. You can say a
9  percentage. But this way, the percentage that
10 has 4-4s is much lower than those that has 4-X,
11 that is 2 or 3 with it.
12    Q. I understand, but does 4-X make you
13 genetically susceptible in your opinion?
14    A. 4-X makes you more susceptible than 2-X,
15 but 4-4 makes you more susceptible than 4-2.
16    Q. I understand, and I don't want to get
17 into gradations of susceptibility for this other
18 than to say that the child has some polymorphism
19 of this type within this group that would make
20 them susceptible, where a child without that
21 polymorphism would not be susceptible to

Page 71

1  neurological or neurodevelopmental delay from
2  thimerosal-containing vaccines; all right?
3    A. Yes.
4    Q. Can you estimate for me the percentage
5  of the population that has that type of
6  polymorphism in any of its variations?
7    A. Just with ApoE you're talking about?
8    Q. Yes, just with ApoE?
9    A. I think 15 percent or 20 percent have
10 that tendency, but I think a person's overall
11 susceptibility is a sum of all the different
12 things that eliminate mercury, and you asked me
13 for one and I showed you one.
14    Q. Understand. Can you identify any other
15 polymorphisms by name that would be part of this
16 genetic susceptibility group?
17    A. Yes, Dr. Borris from New York has
18 published recently using DNA chip analysis
19 various polymorphisms in the MFTHR gene. There
20 have been a number of studies in genes in the
21 pathway. So far we talked about ApoE so let me

Page 72

1  talk about another pathway. There's a pathway
2  that generates glutathione and cysteine. These
3  are molecules that bind mercury. The pathway has
4  a number of different enzymes so you can have
5  defects anywhere along that pathway and the
6  prediction you would have lower levels of
7  cysteine and glutathione, and that is one of
8  those that has been studied, the DNA. Now, Jill
9  James --
10    Q. Would the ramification of that be a
11 diminished capacity to eliminate mercury?
12    A. Yes. And Jill James has published a
13 study. So Borris has looked at the DNA. Jill
14 James -- actually, I don't think ours has been
15 published yet. Jill James has looked at the
16 actual measurements of those substances, whereas
17 Borris has looked at the DNA. It's an
18 interesting differentiation because it's fairly
19 well established that children who have this
20 unfortunate reaction have a lower -- lower levels
21 of each step in the glutathione-cysteine pathway,

Page 73

1  but you could argue that maybe the mercury
2  damaged the molecules and lowered it as opposed
3  to it being lowered and therefore susceptible.
4  And the way you determine that is you look at the
5  genes. Because the mercury didn't cause the
6  mutations in the genes. It's been found that at
7  least the majority of it are due to polymorphisms
8  that can be identified by DNA, direct DNA
9  analysis using the new DNA chip technology, and
10 both of those are related and both of those are
11 related to that same pathway.
12    Q. Let me see if I can coalesce around that
13 answer for just a minute. You say the new DNA
14 chip analysis. When did that, when was that
15 discovered?
16    A. That's been available for the last
17 seven or eight years. I don't know that it's
18 been applied to this particular topic beyond the
19 last couple years.
20    Q. You referenced Jill James; is that a
21 doctor at the University of Arkansas?

Page 74

1  A.  Yes, and Bill Slicker is her coauthor
2  from the FDA.
3  Q.  Have you been involved in any joint
4  research efforts or collaborations of any type
5  with Dr. Jill James?
6  A.  I've met her and talked to her.  I'm
7  not collaborating with her.  But my group with
8  Dr. Bradstreet happened to have looked at, not as
9  broadly, not as many of the substances in that
10 pathway, but we looked at a couple and we got
11 within a percent the same numbers that she got,
12 on the ones that we looked at.
13 Q.  You used, when you referred to
14 Dr. Jill James in your original answer, you used
15 the phrase "and we."  Who were you referring to
16 by "we"?
17 A.  In that case I was referring to myself,
18 my son, Dr. Bradstreet, Dr. John Adams from the
19 University of Arizona, and there's one other
20 author I think on that paper that I've forgotten
21 who that was.  It's Dr. Bradstreet's second in

Page 75

1  command.
2  Q.  Who is the lead author on the paper?
3  A.  Bradstreet I think on that version.
4  There are various pieces of that being used
5  elsewhere.  He's the lead author on that.  I will
6  be the lead author.  I'm not sure that one's been
7  accepted yet.
8  Q.  Was Dr. Kartzinel involved?
9  A.  Yeah, that's the other, he's what I call
10 his second in command, yes.
11 Q.  Dr. Kartzinel is Dr. Bradstreet's second
12 in command?
13 A.  Yes.
14 Q.  And then there's yourself and your son,
15 David Geier, and who is James B. Adams?
16 A.  He's a professor at Arizona or Arizona
17 State, I always get them mixed up, of nail
18 toxicology or something like that.
19 Q.  All right.  And the five of you have
20 published one or more papers in the past,
21 correct?

Page 76

1  A.  Yes, we published, that group published
2  a paper on the amount of mercury that was seen in
3  children with autism after three days of a
4  chelation challenge compared to normal children
5  with a three-day chelation challenge.
6  Q.  But what you're referring to now is
7  different work, correct, in a different article?
8  A.  I think there may be a couple more
9  authors on the later paper.  The first one had
10 everyone that I just said.  The one that has to
11 do with the measurements of the biochemical
12 levels also may involve a couple more doctors but
13 I don't recall the others.
14 Q.  And has that more recent paper that
15 relates to the measurements of the biochemical
16 levels been published?
17 A.  I don't think so.  I only brought it up
18 because it confirmed what James has -- I think
19 Jill James' has been accepted.  I don't know if
20 it's actually come out yet.  But her paper has
21 been accepted for publication.  There's a

Page 77

1  pre-press release or something but I don't think
2  the formal one is out.  I could be wrong on that.
3  Q.  Again going back to the phrase of
4  genetic susceptibility, are all the cases of
5  genetic susceptibility some type of polymorphism?
6  A.  Yeah, in the broader sense, the way
7  polymorphism is used, yeah, they're a different
8  form of genetics, yes.
9  Q.  Okay.  And in the aggregate, for all
10 known polymorphisms that could render a person,
11 render a child genetically susceptible to
12 neurological or neurodevelopmental delay from
13 thimerosal-containing vaccines, can you give me
14 an estimate of approximately what percentage of
15 the population contains, possesses one of those
16 or more than one of those polymorphisms?
17 A.  Of the affected population or the
18 general population?
19 Q.  No, of the general population, without
20 regard to vaccination, on the day children are
21 born?

Page 78

1    A.  I think a good estimate is the one in
2  six.
3    Q.  Approximately one in six have that
4  poly -- have one of the polymorphisms?
5    A.  Yes, one or more.  And we haven't talked
6  about all of them and not all of them are known,
7  but yes, one or more susceptibilities.
8    Q.  Okay.  And what percentage of those
9  children in your opinion will actually be
10 neurologically or neurodevelopmentally harmed as
11 a result of receiving, let us say more than one
12 thimerosal-containing vaccine?
13   A.  Well, as you go up to more than one
14 you'll get a higher and higher percentage, but a
15 significant portion of those will be harmed,
16 because almost all the children in this country
17 were vaccinated and the vast majority of them had
18 more than one or many sources at least during the
19 '90s.
20   Q.  What percentage of children who receive
21 multiple thimerosal-containing vaccinations and

Page 79

1  have one or more of these polymorphisms in your
2  opinion will develop autism?
3    A.  I don't know the percentage.  I think a
4  significant portion of them.  I don't know the
5  percentage.
6    Q.  All right.  I want to take you back to
7  Exhibit 7, in that third paragraph, where it
8  says that you will testify that exposure to
9  thimerosal in vaccines either causes or
10 contributes to cause neurological and/or
11 neurodevelopmental injury, including some
12 injuries subsumed within the autism spectrum to a
13 small percentage of susceptible children.
14   A.  Okay.
15   Q.  And I want to -- I read that to mean
16 not to all susceptible children, not to most
17 susceptible children, but to a small percentage
18 of susceptible children, but it sounds to me as
19 though your testimony's different than that and I
20 want to see if I'm hearing you correctly.
21   A.  The majority of them will not develop

Page 80

1  full blown autism.
2    Q.  The majority of susceptible children
3  will not?
4    A.  Right.  But if you include the universe
5  of neurodevelopmental disorders, it becomes much
6  bigger, the percentage.  Autism, going back again
7  to the same reference, which was the FDA's or
8  CDC's Autism Alarm, they said one in six for
9  overall neurodevelopmental.  They said 1 in 166
10 for what they're calling autism.  That's a much
11 smaller percentage.
12   Q.  Just to be clear, I'm not asking for
13 the percentage of children that are going to be
14 harmed.  All I'm concerned about are the
15 percentage of susceptible children, i.e.,
16 children with the polymorphism who then are
17 vaccinated.  In that subgroup, do you have an
18 opinion, to a reasonable degree of medical or
19 scientific certainty, as to what percentage of
20 those susceptible children, if receiving multiple
21 thimerosal-containing vaccines, will develop

Page 81

1  neurological and/or neurodevelopmental delays?
2    A.  Yes, a significant portion of them will
3  develop neurodevelopmental delays.  A much
4  smaller portion will develop full blown autism.
5    Q.  What about autism spectrum disorders?
6    A.  Intermediate.  The more severe that
7  you're asking, the less percentage will be in
8  that group.
9    Q.  Can you give me any sort of ballpark
10 percentages what you mean by intermediate?
11   A.  Well, if you assume that slightly more
12 than one in six children have these disorders,
13 and the reason I can't give you the number is we
14 don't know, not disorders, but polymorphisms, I
15 can't give you the number because we don't know
16 all the polymorphisms.  But if we were to assume
17 let's say that it was one in, you know, one in
18 five or one in four had the polymorphisms, we
19 ended up with, we keep score, at the end almost
20 all of them had the vaccines, okay, because of
21 our vaccine programs.

Page 82

1 So one in six of them ended up with the
2 more mild neurodevelopmental disorders and one in
3 166, if you accept their statistics, ended up
4 with autism. And if you ask me for severe
5 autism, it may be less than one in a thousand.
6 So it's a running total. So that's why I said I
7 think the majority of them who had the
8 susceptibilities had some damage, but as you go
9 to more and more damages, a smaller and smaller
10 proportion will be fitting into those categories.
11 And that's I think a reasonable medical viewpoint
12 for toxicity.
13 Q. All right. You identified the number
14 one susceptibility factor as a genetic
15 susceptibility, and qualified that to say there
16 are a range of polymorphisms, known and unknown,
17 that would fall into that category, is that
18 correct?
19 A. Yes.
20 Q. Let's move along a little quicker now.
21 What would be second on your list of

Page 83

1 susceptibility factors?
2 A. Other sources of mercury, whether it be
3 RhoGam, environmental, mother's dental amalgams,
4 fish consumption, power plants, those are the
5 ones that come to mind. Obviously someone, at
6 least it's obvious to me that someone that had a
7 very high environmental exposure has more of a
8 tendency to go over the top on the vaccines than
9 someone who's never been exposed.
10 Q. Okay. What would No. 3 be?
11 A. Other things that are going on. There's
12 an association with the use of antibiotics. So
13 whether they were on antibiotics. Timing, that
14 is whether you get the vaccines grouped together,
15 you know, some people get a makeup and they get
16 five in one day, some get it at 2, 4, 6 months,
17 but then others got it at two months and, gee,
18 they gave it at three months instead of four
19 months. So grouping may make a difference.
20 Weight of the child may make a difference.
21 Prematurity may make a difference. Because the

Page 84

1 vaccine doses are standard. You give the same
2 dose to a big child as a small child, obviously
3 the thimerosal dose varies with the weight of the
4 child. So those are the things that come to mind
5 anyway of other factors.
6 Q. In the early 1990s, was the genetic
7 susceptibility of some individuals to diminish
8 their capacity to eliminate mercury recognized in
9 the medical literature?
10 A. Yes. But not worked out as far as we
11 have today, and will be worked out even further
12 in the future, but yes, even back to the 1950s,
13 it was recognized that different individuals had
14 different susceptibilities and it was recognized
15 by a number of different people. But to give
16 you an example, we used to use mercury-containing
17 teething powders and we ended up with a problem,
18 and we know that it only occurred in about 1 in
19 500, and the, I've forgotten the author's name,
20 but the author who published on this pointed out
21 that obviously it depends on to susceptibility of

Page 85

1 the child to mercury. So he was well aware in
2 these mercury poisoning reports where there are
3 industrial poisoning, the authors were aware that
4 some people, two people might get the same dose
5 and one of them was severely affected and one
6 wasn't. I think it's been known for a long time
7 in general that there's a big variation in the
8 susceptibility of mercury toxicity.
9 Q. Would you agree with me that
10 individuals in the medical community first
11 inferred the likely existence of a genetic
12 susceptibility before they identified any of the
13 particular genes that would be responsible for
14 that?
15 A. Yeah, I don't think the author in the
16 '50s had any idea of the genes. He just knew
17 that there were some individuals that were more
18 susceptible than others.
19 Q. Okay. Now let's go to the genes, the
20 polymorphisms themselves. When to your
21 understanding was the first specific polymorphism

Page 86

1  identified that would be among those that could
2  lead to a lessening of the ability to eliminate
3  mercury?
4      A.  I think that's within the last few
5  years.
6      Q.  Can you get a little more specific for
7  me?  Are we talking --
8      A.  Three, four years.  I don't think
9  people, until this became a big issue with our
10  enormous epidemic, I don't think people were
11  spending a great deal of time studying that.
12  I'll qualify the answer that there has been some
13  attempt by the NIH people to map autism as if
14  they think it's a genetic disease, and of course
15  it can't be a genetic disease -- well, there are
16  some rare forms that there are.  But in general
17  it can't be a genetic disease.
18          And what they've done is they've mapped
19  the people with autism to about eight or ten
20  different chromosome locations.  And what they
21  have in reality done is map some of the locations

Page 87

1  of susceptibilities.  I'm not sure they
2  understood that that's what they were doing.  So
3  they had some knowledge of it before the specific
4  measuring of these things.
5      Q.  Okay.  Dr. Geier, let me ask you as
6  clearly as I can, among all autistic children who
7  were born in the 1990s, do you have an opinion as
8  to approximately what percentage of those
9  children had their autism caused or significantly
10  contributed to by vaccination with
11  thimerosal-containing vaccines?
12      A.  Yes.
13      Q.  What is your opinion?
14      A.  Heavy majority.
15      Q.  Can you give me some --
16      A.  In the range of at least 80 percent.
17  And the basis for that is the actual epidemic
18  itself, that is, the number of cases when we
19  triple the -- approximately triple the amount of
20  thimerosal by giving more shots.  And as you're
21  sure aware, I'm provaccine, so I wasn't against

Page 88

1  the shots.  But when we tripled that, which
2  occurred somewhere around 1990, 1991, our autism
3  rate went up at least 10-fold.  That tells you
4  that that contributed, when you analyze other
5  alternate causes, that tends to indicate that
6  something like 80 or 90 percent of the cases were
7  caused by the vaccine.  If they weren't, then you
8  would not have seen, based on that change, such a
9  big change in the population.
10      Q.  Have you yourself ever administered
11  childhood vaccinations?
12      A.  If I did, it was when I was a medical
13  student or a resident.  I don't have a specific
14  recollection of doing it but I may have done it.
15      Q.  During the 1990s did you ever
16  administer childhood vaccinations?
17      A.  Not to children.  I ran a laboratory,
18  and so I gave hepatitis B vaccines, which are
19  childhood vaccines given to adults is one way of
20  viewing it.  I did administer those as was
21  required, that we offer those to laboratory

Page 89

1  workers that work with blood products.  But I did
2  not give any to children.
3      Q.  To your knowledge, were those
4  thimerosal-containing vaccines; to your knowledge
5  today?
6      A.  Yes.
7      Q.  At the time were you aware that there
8  was thimerosal in those vaccines?
9      A.  No.
10      Q.  Did you care?
11      A.  I didn't know enough to care.
12      Q.  Was the fact that there was thimerosal
13  in those vaccines indicated in the product
14  labeling?
15      A.  Probably.  I mean I don't have a label
16  now, but from what I've seen of labels at that
17  time, they usually indicate that there was
18  thimerosal in the ones that have thimerosal.
19      Q.  You are a medical doctor; correct?
20      A.  Yes.
21      Q.  You have a Ph.D. in genetics;

Page 90

1  A. Yes.
2  Q. In the 1990s were you aware that
3  thimerosal contained a mercury derivative?
4  A. No.
5  Q. When did you first learn that?
6  A. In maybe 2001 we were doing some work,
7  and you can see from my CV what work we were
8  doing, we were studying vaccines and some adverse
9  reactions to them. Actually working with the
10  CDC, that is they were giving us denominators and
11  that kind of thing. And we were giving talks
12  on -- and again, remember, we're provaccine, so
13  we were showing good effects and bad effects of
14  vaccines and where we thought they should be
15  improved. And we gave some talks and some
16  parents and some lawyers came up to us and they
17  said, you know, the amount of vaccines and
18  thimerosal -- we said thimerosal, what's that? --
19  went up in 1990 and the autism rate went up in
20  1990, and our initial reaction was the amount of
21  television probably went up, that doesn't show

Page 91

1  anything, go away, it can't be. We were actually
2  listed among the parents and among a number of
3  the groups as the number one opponents to the
4  idea that thimerosal could cause problems.
5  Q. Where were you so listed, sir?
6  A. For example, Lyn Redwood, who's
7  SAFEMINDS, was so upset with us, she's the head
8  of SAFEMINDS, that's one of the action groups,
9  one of the conservative action groups, I mean,
10  they're not antivaccine or anything, was so upset
11  with us that when we spoke at a vaccine
12  convention, she wouldn't be in the room, we made
13  her sick, she left and would go in the hall. And
14  I know that because she happened to hear one talk
15  that we mentioned thimerosal and she contacted
16  us. And the parents --
17  Q. What talk was that?
18  A. I think in the international conference
19  on vaccines sponsored by Barbara Fischer's group
20  in 2001, I think, I'm not sure of the year, but I
21  think that's right. And parents kept bothering

Page 92

1  us and some of the lawyers like Cliff Shoemaker
2  kept bothering us, because we were working with
3  them on the Vaccine Compensation Act, on what we
4  call legitimate vaccine cases at the time. And
5  they kept bothering us and we kept saying, look,
6  you're not helping. We're trying to fix the
7  vaccines. We love vaccines. We want to make the
8  program better. You keep running around saying
9  these things, you know, this tiny bit of
10  thimerosal -- which after they mentioned it we
11  looked up is mercury -- is causing a problem, we
12  don't believe it, so stop muddying the waters and
13  let us fix the real problems in vaccines like, as
14  you're aware of from your history with me, like
15  getting rid of whole-cell DTP to make it
16  acellular.
17  And they kept bothering us and my son
18  actually was fairly aggressive with them and told
19  them, you know, if you keep bothering me, we're
20  going to testify that it doesn't cause and you're
21  really hurting the issue. And I told him, you

Page 93

1  know, these women, they're wrong, but after all,
2  they do have affected children, you have to be
3  polite, you have to be nice. One day we agreed
4  to sit down with them and we said if we help you
5  a little bit, will you go away? So they said we
6  know you won't study it, but would you tell us,
7  since you know how to study vaccines, how you
8  would do a theoretical study.
9  So we said, look, if you promise to
10  leave us alone, we'll give you a theoretical
11  study. And here's the theoretical study. You
12  take millions of children with
13  thimerosal-containing vaccines, you take
14  millions of children with no vaccines, you
15  compare the autism rate or whatever rate you
16  think it causes, and if you see a difference,
17  there it is. But it's unethical to not vaccinate
18  children. So you can't do the experiment. Now
19  go away, don't bother us anymore. That's the way
20  it actually stood for a long time. We were the
21  No. 1 people they were angry at.

Deposition of - MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00741-HJW   Document 254-18   Filed 12/07/04   Page 26 of 40   PageID #: 7921

Multi-Page™

November 11, 2004

Page 94

1    Q. All right. Let me move on and ask you
2 whether or not during the 1990s you were
3 familiar with a product called RhoGam?
4    A. Yes, that's one I give, gave, and have
5 given and continue to give myself personally.
6    Q. And in the 1990s when you gave that
7 product, were you aware whether that product
8 contained thimerosal?
9    A. No, I wasn't, and I very much regret
10 it.
11    Q. To your knowledge was the presence of
12 thimerosal in that product indicated on the
13 product -- in the product labeling?
14    A. Yes.
15    Q. Did you read the product labeling
16 before you gave the product to patients of yours?
17    A. Yes, and it didn't mean anything to, me
18 unfortunately.
19    Q. Were you -- and did it indicate that
20 there was thimerosal in the product?
21    A. I believe it did, I mean, I don't have a

Page 95

1 specific recollection, but looking back it seems
2 that those inserts did mention that, yes.
3    Q. And did they indicate that thimerosal
4 was a mercury derivative?
5    A. Some of them did, some of them didn't
6 is my recollection.
7    Q. And were you aware that mercury could
8 have deleterious effects on humans?
9    A. In the general sense, yes, but I had
10 thought that at that kind of level they must have
11 done the safety testing, it must be okay. There
12 was no warning of this substance has been found
13 to cause reproductive effects like the
14 Californians had. There was no warning of any
15 adverse effects ever reported related to
16 thimerosal. So I was not, unfortunately and
17 mistakenly, not sensitive to this, and I gave a
18 lot of RhoGams and unfortunately I'm afraid I
19 caused some damage.
20    Q. When was the earliest point in time
21 that you believe there was evidence that showed a

Page 96

1 link between thimerosal-containing vaccines and
2 autism?
3    A. In retrospect now?
4    Q. Yes.
5    A. In the '50s.
6    Q. And that's a link between
7 thimerosal-containing vaccines and autism;
8 correct?
9    A. Yeah, I mean, I may have missed
10 something, but the doctor who was writing about
11 the mercury-containing powders, teeth powders,
12 and the problems that they cause actually
13 mentioned that he thought it was also caused by
14 thimerosal-containing vaccines. It's in his
15 paper. Or maybe contributed to, I forget the
16 exact wording. Exactly how he knew that, I'm not
17 sure at this point. So I think you can trace it
18 to some people knowing it at that point.
19    Q. All right. So you would say in your
20 opinion you could go back to the 1950s to see in
21 the medical literature at least the suggestion

Page 97

1 that thimerosal could be linked with autism; is
2 that correct?
3    A. Or at least with symptoms like autism,
4 autism-like symptoms, yes.
5    Q. Now I want to talk specifically about
6 thimerosal-containing vaccines.
7    A. Okay.
8    Q. To your knowledge, when is the earliest
9 point in time that there was evidence in the
10 medical literature demonstrating a link between
11 immunization with thimerosal-containing vaccines
12 and autism?
13    MR. SMITH-GEORGE: Object to form. He
14 just answered the question.
15    A. I think I just answered that. Either
16 that or I didn't understand your previous one.
17 He said in that article that although the article
18 was written mostly about the mercury-containing
19 dental product, he also looked at children that
20 had childhood vaccines with mercury in it and
21 they had symptoms like autism.

Page 98

1    Q. (BY MR. THOMASCH) And do you recall
2  the name of the author?
3    A. Not off the top of my head, but
4  again, I think it's probably in our list.
5    Q. Apart from that particular
6  reference, can you tell me what other early
7  references you're aware of that would show a link
8  between thimerosal-containing vaccines and
9  autism.
10    MR. SMITH-GEORGE: If you want to
11  look at your paper, feel free.
12    MR. THOMASCH: Feel free to look at
13  anything.
14    I see we're just about to run out of
15  time on the videotape, we have less than five
16  minutes. Why don't we go off the record.
17    THE VIDEOGRAPHER: The time now is
18  11:21. We are going off the record. This is the
19  end of videotape 1.
20    (A recess was taken from 11:21 a.m.
21  to 11:26 a.m.)

Page 99

1    THE VIDEOGRAPHER: The time now is
2  11:26. We are now back on the record. This is
3  the beginning of videotape No. 2.
4    Q. (BY MR. THOMASCH) Is there a pending
5  question?
6    (The pending question was read.)
7    A. I wanted, before I answer that, can I
8  complete the previous question for you, it's
9  Warkany and Huber, 1953.
10    Q. I'm sorry, we have a plane going by.
11  Can you just spell the first name of the author
12  for the court reporter, please.
13    A. W-a-r-k-a-n-y.
14    Q. And --
15    A. And Huber, H-u-b-e-r, 1953, was the
16  paper that I was talking about with mercurials
17  and dental problems. Now, I'll try to answer
18  your other question. The actual association --
19  the association between thimerosal and autism
20  specifically probably doesn't occur until the
21  '90s. However -- and the reason for that is

Page 100

1  because of the epidemic. However, the knowledge
2  that thimerosal causes neurological problems and
3  that mercury causes neurological problems is
4  extremely old, it goes back to 600 B.C. or
5  something.
6    Q. Let me stick with the very specific
7  issue of childhood vaccines and autism. And by
8  autism I'll use the -- I'll use it to include
9  autism spectrum disorder. You understand what
10  that is; correct?
11    A. Yes.
12    Q. Prior to July of 1999, are you aware of
13  anywhere in the published scientific or medical
14  literature where there was a hypothesis raised or
15  a suggestion that vaccination with
16  thimerosal-containing vaccines could cause
17  autism?
18    A. No, not in those terms. As I say
19  there's a very long, an extremely extensive
20  history on mercury and even -- and also very long
21  history on thimerosal causing neurological

Page 101

1  damage, death, and all kinds of problems, but
2  whether they specifically said autism, there may
3  have been some mention of it, but it was not
4  prominent because the United States didn't have
5  an autism epidemic.
6    Q. Can you identify any --
7    MS. OWENS: Object to the answer as
8  nonresponsive.
9    Q. Can you identify any specific individual
10  who raised a hypothesis in the medical literature
11  that immunization with thimerosal-containing
12  vaccines could cause autism prior to Lyn Redwood?
13    A. No, I don't have a specific link with
14  the term autism. As I said, I have a big link
15  with that it causes neurological problems that
16  sound like autism, but I don't have a specific
17  association with the word "autism."
18    Q. And I'm asking you about autism so
19  we're on the same page here.
20    A. Yes.
21    Q. And you have identified Lyn Redwood in

Deposition of : MARK R. GEIER, M.D., Ph.D., Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-FJW    Document 123    Filed 12/07/04    Page 28 of 40 PageID #: 7923

November 11, 2004

Page 102

1 prior public speeches as the first to come up
2 with that hypothesis, haven't you?
3    A. Yes, and I disagreed with it.
4    Q. And that was in 2001?
5    A. I think that's correct. I have to look
6 at a paper, but yes, I think it was published.
7    Q. You're aware of cases of studies
8 involving high dose exposure to methylmercury,
9 are you not?
10    A. To methylmercury and ethylmercury, yes.
11    Q. To both?
12    A. Yes.
13    Q. In any of those studies, can you
14 identify cases of autism that were identified by
15 the author in the study resulting from high doses
16 of either methyl or ethylmercury?
17    A. Again, I think they identified
18 neurodevelopmental problems. I don't know that
19 they called them autism.
20    Q. All right. Moving back to just the
21 general subject matters of your testimony in this

Page 103

1 case, we've agreed, we have a common
2 understanding, am I correct, that you are not
3 testifying with regard to specific causation, you
4 are not testifying with regard to any issue
5 involving the potential of a manufacturing
6 defect. You are testifying with regard to
7 general causation, correct?
8    A. Yes.
9    Q. You are also affirmatively prepared to
10 testify on the subject matter of product defect
11 and unreasonably dangerous products; is that
12 correct?
13    A. Yes.
14    Q. And it is my understanding that it is
15 your general opinion, sort of overarching
16 opinion, that childhood vaccines that contain the
17 preservative thimerosal were in the 1990s
18 unreasonably dangerous and defective products?
19    A. Yes.
20    Q. And thus should not have been
21 administered to children; is that correct?

Page 104

1    A. They shouldn't have been made with the
2 thimerosal. I'm in favor of administering the
3 vaccines, but I'm not in favor of having a well
4 known neurotoxic in there.
5    Q. You are prepared to testify on the
6 subject of the negligence of vaccine
7 manufacturers; is that correct?
8    A. Yes.
9    Q. You are prepared to testify on the
10 subject of the purported inadequacies of warnings
11 that accompanied thimerosal-containing vaccines
12 in the 1990s; is that correct?
13    A. Yes.
14    Q. Dr. Geier, in your opinion, is there any
15 warning that could have been given in connection
16 with thimerosal-containing vaccine that would
17 then make the thimerosal-containing vaccine not
18 unreasonably dangerous?
19    A. Indirectly, yes. If the correct
20 warning were applied, doctors and patients
21 wouldn't use the vaccines that had it and you

Page 105

1 wouldn't be able to sell it. Which would be
2 unfortunate, by the way, because again, I repeat,
3 I'm strongly in favor of the childhood vaccine
4 program. But if you put, for example, the
5 California warning on there, which California
6 actually tried to do, and if that warning were
7 displayed in a way that the parents would see
8 that and the doctors would see that, you'd have a
9 lot of trouble getting people to take the
10 vaccines.
11    Q. All right. As I understand the subject
12 matter of your testimony with regard to
13 unreasonably dangerous products and defective
14 warnings, you feel that the vaccines should not
15 have been designed with thimerosal in them,
16 correct?
17    A. That's right. Mercury should never be
18 in a human product.
19    Q. So the mere presence of thimerosal in
20 those vaccines in and of itself renders them
21 unreasonably dangerous in your opinion, correct?

November 01, 2004 2:41-TJW    Document 254-10    Filed 12/03/04    Page 29 of 40 PageID #: 7924

Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D
Vera Easter v. American Home Products, Corp.

Page 106

1  A. Yes.
2  Q. You further believe that the labeling
3  was defective, in that it didn't point out the
4  presence and dangers of thimerosal in the
5  vaccine; is that correct?
6  A. Yes.
7  Q. Am I further correct that the only
8  adequate warning in your mind would have been one
9  that effectively told parents not to use this
10 drug, not to use this vaccine?
11 A. I mean, that's the ultimate best thing,
12 but I think the warnings could have contributed
13 and they could contribute today. I'll give you
14 an example. Most parents are still not aware of
15 this issue. And if they were warned that this
16 particular product, let's say it's an influenza
17 vaccine, has the thimerosal and that there are
18 other influenza vaccines without thimerosal, the
19 parents will demand the one without thimerosal.
20 And therefore it makes a difference. There also
21 are of course people who have to weigh, the

Page 107

1  doctors and the patients have to weigh the risks
2  and the benefits.
3       And so, you know, if there was a, god
4  forbid, a giant flu epidemic that was killing the
5  country and the vaccine that was made happened to
6  work against it and all you could get was
7  thimerosal-containing, then it would be up to the
8  patient and the doctor to weigh the risk of this
9  versus that and I might in that situation use the
10 one with thimerosal. So I think the warnings
11 have relevance, but the product is defective
12 anyway.
13 Q. Were there any such flu epidemics in
14 the United States, the type you're referring to
15 now, in the 1990s?
16 A. No.
17 Q. Were there any type of epidemics at all
18 of that magnitude in the 1990s in the United
19 States?
20 A. No.
21 Q. In the 1990s in the United States, in

Page 108

1  your opinion, sir, was there any warning that
2  the manufacturers could have put on the product
3  that would have allowed for the safe use of the
4  product?
5  A. I think that if they had warned
6  correctly, they would have allowed people to do
7  what they're entitled to do, which is to make an
8  informed consent, and that's a matter of opinion
9  between the patient and the doctor using the
10 product. There's no doubt in my mind that these
11 childhood vaccines have efficacy and they have a
12 benefit. So although being as terrified as I am
13 now, knowing about the epidemic, I might have
14 chosen not to use them some people might have
15 chosen to use them. So the defect -- the hubris
16 of the defect would have been much less had the
17 people been warned and some of them might have
18 said, okay, I'm willing to take the risk because
19 I don't want my child to develop diphtheria,
20 tetanus, pertussis, whatever the disease is. So
21 personally, would I currently take a vaccine and

Page 109

1  give it to a young child with thimerosal? No,
2  but I recognize there's a weighing to be done,
3  and no weighing was done because there was no
4  warning.
5  Q. If today for any reason the only
6  available vaccine to protect against the diseases
7  of diphtheria, tetanus and pertussis was a
8  thimerosal-containing vaccine, would you or would
9  you not recommend administering such a vaccine to
10 a healthy infant?
11 A. Personally I would not give a vaccine
12 that had the full dose, I'm not talking about the
13 trace, of thimerosal to any infant. I couldn't
14 in good conscience do that anymore.
15 Q. All right.
16 A. That's personal. And I recognize a
17 parent's right and another doctor's right to say,
18 well, there's some risk I've been told, but
19 pertussis I agree is a bad disease and diphtheria
20 is a bad disease, and they might come to a
21 different conclusion.

Deposition of - MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-FJW   Document 254-19e   Filed 12/07/04   Page 30 of 40 PageID #: 7925   November 11, 2004

Multi-Page™

Page 110

1   Q. I want to come back to the 1990s again,
2 in the medical landscape as you recall it.
3 Without regard to what any other parent might
4 think, I want your professional opinion, do you
5 believe that a thimerosal-containing vaccine
6 could have been made not unreasonably dangerous
7 by virtue of any particular warning that might
8 have been put on the product?
9   A. No, I don't. I said that twice, three
10 times. No, I don't think it could have, but I do
11 think the warning should still have been there.
12   Q. But the real reason the warning would
13 have been there in your mind, the real value the
14 warning would have had would have been to cause
15 people to not take the vaccine, correct?
16   MR. SMITH-GEORGE: Object to form.
17   A. The ultimate value of telling the truth
18 about one's product is if you have a product that
19 has a lot of efficacy and you have some danger,
20 you'll be under tremendous pressure to fix the
21 danger without giving up the efficacy. So it's

Page 111

1 not just that I wanted them not to take it.
2 Because, as I said, in my heart I don't want them
3 not to take it. I don't want infectious disease.
4 What would have happened is there would have been
5 a demand to get the damn stuff out of there,
6 which there is now. But the people didn't know
7 to make that demand and that's the most important
8 part of the warning. Also there is the informed
9 consent issue because any time you have efficacy
10 and danger, people are entitled to know the
11 efficacy and the danger and you can't hide the
12 danger and expect them to make an informed
13 consent decision.
14   Q. But it's okay with you to keep the
15 danger in the vaccine as long as you disclose it?
16   A. No, I didn't say that. I said that
17 that's an additional defect and I believe that
18 there's a relationship. You asked me what I
19 ultimately wanted, did I ultimately want the
20 children not to be vaccinated. No, I ultimately
21 wanted your company to make the correct vaccine

Page 112

1 so we could have neither chronic disease nor
2 infectious disease. I don't think we should have
3 to choose between those two.
4   Q. Was there any warning that could have
5 been given in the 1990s that would have allowed
6 doctors and parents to make a determination that
7 this vaccine is only dangerous to a susceptible
8 child and I can simply do a genetic
9 susceptibility test to see whether it's okay for
10 my child or not?
11   A. I think that's conceivable, that is,
12 there's some talk that you could inject a small
13 bit of mercury and see if people had a bigger or
14 smaller reaction to it. I think on a population
15 level -- on an individual level you could
16 probably do that. On the population level it
17 would make the vaccine program very difficult to
18 administer. To suggest that every child had to
19 be tested for mercury susceptibility before they
20 got the vaccines.
21   I think again to go into your question,

Page 113

1 you're also asking for a yes or no answer, so for
2 example -- there's more than a yes or no answer.
3 You asked me personally. Okay. For example, I
4 would start looking at the shots that I didn't
5 consider to be so important, so critical, for
6 example the at-birth dose of hepatitis B, if I
7 knew that that had thimerosal, I certainly
8 wouldn't give it, because if I knew the mother
9 was hepatitis B negative, there's virtually no
10 risk.
11   Now when I got to a vaccine where there
12 was risk like pertussis, which you know I have a
13 long history of, worries me a lot. So the people
14 would make different decisions. What happened is
15 the people had the wool pulled over their eyes
16 thinking there's no decision to be made, these
17 vaccines are only good, they're not bad, so
18 everybody should take them. That made sense.
19 The minute you know there's a risk, now you start
20 thinking, hmm, has there been any pertussis in
21 this state? Do I need the hepatitis B when I

Page 110 - Page 113

November 11, 2004     Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D.
Case 1:03-cv-20541-TJW    Document 254-10    Filed 07/07/04    Page 31 of 40 PageID #: 7926
Vera Easter v. American Home Products, Corp.

Page 114

1 know that I'm not at risk because my husband and
2 I have been together forever and I'm hepatitis B
3 negative? People would start making, and in fact
4 doctors did make that decision when it came out
5 for a while, they didn't give the birth dose of
6 hepatitis B, and obviously the birth dose one of
7 the most dangerous because the kids are the
8 smallest, and so the dose is high. So what you
9 did is you took away the power of doctors and
10 patients to make intelligent decisions.
11     MR. THOMASCH: I'll move to strike that
12 answer as nonresponsive.
13     Q. (BY MR. THOMASCH) Dr. Geier, you have
14 indicated that you thought that in the 1990s
15 thimerosal-containing vaccines were unreasonably
16 dangerous and also that they were inadequately
17 labeled?
18     A. Yes.
19     Q. Do any of your opinions in that regard
20 differ from manufacturer to manufacturer or from
21 vaccine to vaccine, or do you consider all of

Page 115

1 them to have been similarly defective?
2     A. I'm sure they differ. Who's here from
3 SmithKline?
4     MR. THOMASCH: We have representatives
5 from SmithKline.
6     A. SmithKlineBeecham in 1997 made a DTaP
7 that contained no thimerosal. Used
8 2-phenoxyethanol. Applause to them. Of course
9 that wasn't as defective, that was wonderful.
10 And in fact that was what allowed people to
11 determine how much damage there was. So of
12 course there were differences.
13     Q. What I was asking, I may not have been
14 as precise as I should have been with my
15 question, among the thimerosal-containing
16 vaccines, vaccines that used thimerosal as a
17 preservative in the 1990s, do any of your
18 opinions on product defect or inadequate labeling
19 differ from manufacturer to manufacturer or
20 product to product or do you consider them all
21 similarly defective?

Page 116

1     A. No, again, I gave you one example, I'll
2 give you another one. It depended on how much
3 thimerosal you were exposing the children to.
4 Those who made DTP, because there wasn't aP at
5 the time, for reasons you and I are familiar
6 with, those who made DPTH as opposed to DTP comma
7 H, lowered the thimerosal risk. And again I
8 applaud that. But by putting the four together
9 you only gave one shot instead of two shots you
10 cut 25 micrograms off the dose. So yes, there
11 were variations. Also there were companies that
12 made --
13     Q. Can I just interrupt you for a moment
14 for clarification. You said DTPH. Do you mean
15 the combination of diphtheria, tetanus and
16 pertussis and Haemophilus influenzac type B?
17     A. Yes.
18     Q. So the DTP/Hib combination vaccine?
19     A. Was safer with regard to thimerosal
20 than those who made DTP and H Hib separately.
21 Because the thimerosal was added to two vials so

Page 117

1 you got 50 from one and 25 from another.
2     Q. The DTPH vaccine that combined DTP and
3 Haemophilus influenzac contained thimerosal,
4 correct?
5     A. Yes.
6     Q. At all times, correct?
7     A. But the dosage that the child got, if
8 they used the combination was less than the
9 dosage that the child would have gotten had they
10 not used the combination. Therefore, you asked
11 me if there were different levels of guilt, and
12 the answer is whoever the DTPH had less
13 thimerosal and therefore they caused less damage.
14     Q. In your opinion, in the 1990s, was the
15 combination diphtheria-tetanus-pertussis and
16 Haemophilus influenzac type B vaccine a defective
17 product?
18     A. Yes, but not as defective as the DTP
19 separate from the Hib.
20     Q. But defective?
21     A. Yes.

Deposition of - MARK R. GEIER, M.D., Ph.D Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-FJW   Document 294-1   Filed 12/07/04   Page 32 of 40 PageID 2004
7927

Page 118

1   Q. Was it inadequately labeled?
2   A. Yes, but not as inadequately labeled.
3 It didn't have as big a dose.
4   Q. Were there any routinely administered
5 childhood vaccines in the United States that
6 contained thimerosal used as a preservative that
7 in your opinion were not defectively designed?
8   A. No.
9   Q. Were there any such vaccines that in
10 your opinion were not inadequately labeled?
11   A. No, except the one that didn't have it,
12 I mean, as I mentioned --
13   Q. I'm only dealing with those that had
14 it.
15   A. Yes, they all should have labeled it.
16   Q. You have had certain communications
17 with plaintiff's counsel about this case,
18 correct?
19   A. Yes.
20   Q. You have reviewed certain medical
21 records pertaining to Jordan Easter, correct?

Page 119

1   A. Yes.
2   Q. And you have prepared a report in this
3 case, various drafts of which and the final
4 product you brought with you today; is that
5 correct?
6   A. Yes.
7   Q. Is there any other specific work on
8 this case that you can identify having done since
9 you were retained?
10   A. No.
11   Q. What was the first -- when did you
12 first get retained in a litigated matter in any
13 court involving alleged injuries from
14 administration of thimerosal-containing vaccines
15 where the allegation related to the thimerosal
16 component?
17   A. I think this is the first case that
18 I've done in civil litigation. There may have
19 been a couple of cases that are filed in the
20 Vaccine Compensation Act that I wrote a report
21 supporting, although they're all on hold and I'm

Page 120

1 not sure you need support at this point, but a
2 couple people asked me to briefly say they their
3 case had validity.
4   I don't believe there are other -- I
5 believe that I was retained in an odd sort of way
6 by a Canadian group, it's really odd because we
7 didn't want to be retained but their law
8 apparently required that I agree to take a small
9 retainer before they could get me approved, and
10 they have no cases, so I'm sort of retained, and
11 their interest is in thimerosal, and apparently I
12 don't understand the system, but apparently to be
13 an expert under their socialized law system you
14 have to first retain the guy, then you have to
15 get him approved as an expert, and then you're
16 going to have cases. So I know nothing of their
17 cases. And I told them, I made it very clear
18 that if I don't like the cases, I'm not
19 testifying in them.
20   Q. For the balance of my questions I'll
21 stick to the United States. Other counsel may be

Page 121

1 interested in Canada.
2   A. Okay.
3   Q. In the United States we can talk about
4 cases in the civil courts, state and federal
5 courts, as distinct from the vaccine court; is
6 that fair?
7   A. Yes.
8   Q. And you are very familiar with the
9 vaccine court proceedings, correct?
10   A. Yes.
11   Q. You're also familiar that in those
12 proceedings, there's no requirement that any form
13 of product defect of inadequate labeling be shown
14 in order to receive compensation, correct?
15   A. That's correct. They're no-fault.
16   Q. The only thing that needs to be shown is
17 an injury resulting from a vaccination; correct?
18   A. Correct.
19   Q. So the extent you have served or are
20 serving as an expert witness in cases in vaccine
21 court, it would relate to the issue of causation;

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

Page 122

1 is that correct?
2    A. That's correct.
3    Q. And is it general causation, specific
4 causation, or both, that you have been involved
5 in in those cases?
6    A. I guess both, but as I said, these
7 cases really haven't gone anywhere, so basically
8 I wrote a letter saying it can cause this and I
9 think it did in this case, but it's been very
10 brief, no hearings on these cases yet.
11    Q. Were you approached in those instances
12 by the parents directly or counsel?
13    A. By counsel.
14    Q. What counsel were you approached by?
15    A. I don't recall. Also I'm not sure I am
16 allowed to tell you until I either give a
17 deposition or appearance.
18    Q. Are there other cases in state or
19 federal courts besides this case in which you
20 understand that you are retained to provide
21 testimony for the plaintiffs at some future date?

Page 123

1       MR. SMITH-GEORGE: On thimerosal only?
2       MR. THOMASCH: This relates to
3 thimerosal-containing vaccines where the subject
4 matter of the lawsuit relates to thimerosal.
5    Q. None come to mind. And again, if there
6 were, I'm not sure I'm allowed to identify them
7 until I give a deposition or am formally named.
8    Q. (BY MR. THOMASCH) we can save our
9 disagreement on that if, you certainly can tell
10 me, are you aware of any such cases without
11 naming them?
12    A. No, I'm not aware of any such cases. To
13 be fully disclosing this, I do not want to
14 mislead you, I've had a number of conversations
15 with various law firms who vaguely have an
16 interest in this topic. Most of them go away and
17 that's fine. But I haven't specifically been
18 hired by anyone.
19    Q. Have you been retained by any law firm
20 or anyone to do legal consulting work that
21 relates to the subject matter of

Page 124

1 thimerosal-containing vaccines other than by
2 Mr. Waters' law firm?
3    A. Outside of the Vaccine Compensation
4 Act?
5    Q. And outside of the Vaccine Compensation
6 Act.
7       MR. SMITH-GEORGE: Just in the interest
8 of full disclosure, I don't know, I think this
9 might have been sent to you all, but part of the
10 requirements is we give you a list of cases that
11 Dr. Geier has worked on, and I just wanted to
12 make sure you all received that. This is a list
13 generally of the cases he's been involved in.
14       MR. THOMASCH: I think this is a list of
15 the cases he's been deposed in.
16       MR. SMITH-GEORGE: Right.
17       MR. THOMASCH: I think my question was
18 markedly broader than that.
19       MR. SMITH-GEORGE: I understand, but the
20 requirement under the rules is that we provide
21 that list, and I just want to make sure that the

Page 125

1 record reflects that I did give you that, because
2 I don't know if it's been provided to you
3 earlier.
4       MR. THOMASCH: Ask the reporter to mark
5 as our next exhibit a one-page document entitled
6 "Statement by Mark and David Geier regarding
7 their analysis of VSD thimerosal data."
8       (Deposition Exhibit No. 10, statement by
9 Mark and David Geier regarding their analysis of
10 VSD thimerosal data, was marked.)
11    Q. (BY MR. THOMASCH) Dr. Geier, why don't
12 I trade with you and give you your original
13 exhibit for your use.
14    A. Okay.
15    Q. You have in front of you what was
16 marked as Exhibit 10?
17    A. Yes.
18    Q. Do you recognize it?
19    A. Yes.
20    Q. What is it?
21    A. It's a statement about what happened

Deposition of - MARK R. GEIER, M.D., Ph.D Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-JW    Document 253-3    Filed 12/07/04    Page 34 of 40 PageID #: 7929

November 11, 2004

## Page 126

1 with the VSD, some of what happened with the VSD.
2    Q.  Did you prepare it in whole or in part?
3    A.  Yes.
4    Q.  When did you prepare it?
5    A.  I don't recall.  I think I had
6 something to do with preparing it.
7    Q.  The second paragraph indicates, the
8 results of this new study will be published in
9 December in the peer-reviewed scientific/medical
10 journal of Expert Review of Vaccines, and it goes
11 on from there.  Do you see that?
12    A.  Yes.
13    Q.  What year is being referred to there?
14    A.  I guess it was last year.
15    Q.  December 2003?
16    A.  I think so.
17    Q.  Was that article indeed published in
18 the Expert Review of Vaccines?
19    A.  Indeed not.
20    Q.  Was it submitted for publication?
21    A.  Let me explain this to you.

## Page 127

1    Q.  Let me just ask the question --
2    A.  I can't answer that because you don't
3 understand the journal.
4    Q.  If you can't answer it, then I'll
5 withdraw the question.
6    A.  The way you asked it, I can't answer.
7    Q.  Fair enough.  If that happens you just
8 let me know, and I'll take the question back.
9 You submitted the article for publication,
10 correct?
11    A.  We were invited to submit the article
12 by the --
13    Q.  Did you do so?  Did you provide them
14 with a copy?
15    A.  Yes.
16    Q.  Has it appeared in the published
17 journal?
18    A.  No, and it will not appear.  It was
19 accepted and then interfered with, but it will
20 not appear.
21    Q.  And has not?

## Page 128

1    A.  And has not, and will not.
2    Q.  All right.  Now, the statement begins
3 with the term "independent researchers," and I
4 take it that statement made by you is intended
5 to refer to yourself and your son, David Geier;
6 is that correct?
7    A.  Actually the term was referred to and
8 invented by the Congress people.  We are their
9 example of independent researchers.  That's what
10 they presented to the CDC, that they were going
11 to provide independent researchers, namely David
12 and Mark Geier, and I believe our computer
13 programmer.
14    Q.  So that would be Congressman Burton or
15 individuals working with him?  Is that who you
16 are referring to?
17    A.  Burton and Weldon.  Dr. Weldon is the
18 one we worked with most closely.
19    Q.  One or the other of them represented to
20 CDC that yourself and your son were, quote,
21 independent researchers; is that correct?

## Page 129

1    A.  Yes.
2    Q.  What does that term mean to you?
3    A.  Means that we don't take funds from the
4 drug companies or the CDC.  We don't have a
5 particular direction of looking at this issue.
6 Certainly did not have a direction at that time.
7    Q.  What is the Genetic Centers of America?
8    A.  It's my set of clinical practices.
9    Q.  Is it a partnership, a corporation, or
10 is it --
11    A.  I think it's a corporation.
12    Q.  Who are the shareholders?
13    A.  Myself, Dr. John Young, Y-o-u-n-g, Dr.
14 Michael Trigg, T-r-i-g-g.
15    Q.  Have you done any work with either Dr.
16 Young or Dr. Trigg with regard to legal matters
17 concerning thimerosal-containing vaccines?
18    A.  No.
19    Q.  When was Genetic Centers of America
20 formed?
21    A.  The corporate entity I think was formed

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

Page 130

1 around '98 or '99.  Before that -- it contains
2 other elements of our practice.  The practices
3 begun in 1980.
4     Q.  What is your position?
5     A.  President.
6     Q.  Are there other officers of the
7 corporation?
8     A.  Yes.
9     Q.  Who are they?
10    A.  Dr. Young and Dr. Trigg.
11    Q.  And what are their positions?
12    A.  I think Dr. Young is vice president and
13 I think Dr. Trigg is treasurer or
14 treasurer-secretary, but I'm not certain.
15    Q.  What is the nature of the business of
16 Genetic Centers of America?
17    A.  Does clinical consultation in the
18 fields of genetics and high risk OB sonography
19 and genetic assessment of risk for cancer and
20 other disorders.
21    Q.  Does any part of the business of Genetic

Page 131

1 Centers of America concern issues related to this
2 litigation?
3     A.  No, not directly.
4     Q.  What is MedCon, Inc.?
5     A.  It's a corporation that is, the
6 president is David Geier.
7     Q.  Who is your son?
8     A.  Who's my son and coauthor on many
9 papers.
10    Q.  You said that was a corporation?
11    A.  Yes, I believe so.
12    Q.  Who are the shareholders of that
13 corporation?
14    A.  He is, I'm not.  I think he's the only
15 shareholder.
16    Q.  When was that formed?
17    A.  Three or four years ago, maybe five
18 years ago.  I don't recall.
19    Q.  Has it been known by any other names?
20    A.  No.
21    Q.  Now, you receive compensation from

Page 132

1 Genetic Centers of America, correct?
2     A.  Yes.
3     Q.  In the form of salary?
4     A.  In the form of dividends and sometimes a
5 salary, yes.
6     Q.  Do you receive any form of compensation
7 from MedCon, Inc.?
8     A.  No.
9     Q.  What is the nature of MedCon, Inc.'s
10 business?
11    A.  It does consulting work for plaintiffs
12 and defense attorneys and other interested
13 parties in issues that have to do with medicine
14 and manufacturing medical areas.
15    Q.  Does MedCon, Inc. have any employees?
16    A.  No.
17    Q.  I want to show you your CV again
18 previously marked as Exhibit 6.  If I could just
19 briefly take you over to page 2?
20    A.  Okay.
21    Q.  Looking at the area of the resume

Page 133

1 entitled other positions, do you see that?
2     A.  On page two?
3     Q.  On page two, second page of seven.  Your
4 version may be slightly different than mine.
5 After education and work experience, state
6 licenses and board certifications, do you have
7 something called other positions on that version
8     A.  Looks like a piece of this version has
9 been cut off.
10    Q.  May I see the original exhibit?
11    A.  Sure.
12    Q.  Okay.  On this version which is marked
13 as Exhibit 6, let me direct your attention to the
14 top of page three.  Do you see that?
15    A.  Yes.
16    Q.  Am I correct that from 1980 to the
17 present, you've been codirector of Genetic
18 Consultants of Maryland?
19    A.  Yes, which is now part of the Genetic
20 Centers of America.
21    Q.  It's now part of the Genetic Centers of

Page 134

1  America?
2    A. Yes. Remember I told you that we had
3  other entities before we put them together into
4  the Genetic Centers of America.
5    Q. Okay. Does it still currently exist or
6  has it simply been subsumed within Genetic
7  Centers of America?
8    A. We still use the name. I don't know
9  the legal standing but we still use the name.
10  That's the name of our Bethesda practice
11  basically.
12    Q. Is the business any different than the
13  business of Genetic Centers of America that you
14  described?
15    A. No.
16    Q. From 1980 to the present, you've been
17  laboratory director of Molecular Medicine, is
18  that correct?
19    A. It actually should read, I guess in the
20  latest one it does, that ended in 2003.
21    Q. All right. What was --

Page 135

1    A. We sold Molecular Medicine in 2003.
2    Q. What was Molecular Medicine?
3    A. A laboratory that did genetic testing to
4  support our practices and some commercial
5  laboratory testing and other practices.
6    Q. Do you still do lab -- withdrawn.
7  At that time, 1980 to 2003, did you in fact do
8  yourself laboratory testing relating to genetic
9  matters?
10    A. Yes.
11    Q. Were you capable of testing for the
12  types of polymorphisms that you earlier
13  referenced in your testimony?
14    A. No, I knew how, but our lab wasn't set
15  up to do that.
16    Q. Who did you sell molecular medicine to?
17    A. Genzyme.
18    Q. Genzyme?
19    A. Genzyme, Inc. I'm not sure how the Inc.
20  goes, but Genzyme.
21    Q. All right. The next entity that's

Page 136

1  identified on your resume, at least the version
2  I'm looking at, is the Institute for
3  Immuno-Oncology and Genetics, and do you
4  recognize that entity?
5    A. Yes.
6    Q. What is it?
7    A. It's a nonprofit organization which we
8  set up in case we wanted to fund some nonprofit
9  things, and I think early on in the early or
10  middle '80s we did some funding of some research
11  projects. I don't think it's been active in the
12  last 10, 12 years. But it still exists and might
13  in the future become active.
14    Q. Was it engaged in any revenue-
15  generating activities at any time?
16    A. No, it's not set up as a revenue-
17  generating corporation.
18    Q. What is Genetic Counseling and
19  Research, Inc.?
20    A. That's another arm of what is now the
21  Genetic Centers of America, that's the

Page 137

1  corporation that contains our Baltimore office,
2  at one time it contained our Frederick office, it
3  also contains the Ultrasound Institute of
4  Baltimore. I think at one time it even contained
5  for a brief time an office presence in Salisbury,
6  Maryland.
7    Q. Is that entity different from Genetic
8  Counseling and Research, Inc., T/A the
9  Ultrasound Institute of Baltimore, Maryland?
10    A. No, as I told you it contains that one.
11  That's one of the branches.
12    Q. So all of those entities are also
13  involved in clinical work on women who are or
14  seek to become pregnant?
15    A. Not necessarily women, but it does
16  prenatal genetics, couples that have some
17  infertility problems, and it also does risk of
18  various kinds of cancer. So it can be a man.
19    Q. Are there any activities that go on in
20  any of those entities that relate to your legal
21  consultations?

Page 138

1    A.  No.  And they're all part of the
2 Genetic Centers of America now.  That was just
3 sort of a legal reorganization of the
4 corporations that some lawyer did I don't know
5 much about.
6    Q.  Okay.  As I understand it, both you and
7 your son, David Geier, at times are involved in
8 the field of legal consulting; is that correct?
9    A.  Yes.
10    Q.  To the extent that your son is, revenues
11 for that go to MedCon, Inc., correct?
12    A.  Yes.
13    Q.  To the extent you are, they come to you
14 personally, is that right?
15    A.  Yes.
16    Q.  Is there any corporate capacity or
17 other type of entity that receives revenues as a
18 result of your legal consulting efforts?
19    A.  No.
20    Q.  Has David Geier played any role in
21 connection with the Easter case?

Page 139

1    A.  He's helped me in preparing some of the
2 documents and in preparing the report.
3    Q.  Are there any particular parts of the
4 report that he is in a sense primarily
5 responsible for?
6    A.  No, we just did it together, and of
7 course indirectly he's a coauthor on, if you look
8 at my CV, on quite a number of the papers and I
9 believe on all the thimerosal papers.  And the
10 Power Points that you have that we gave you,
11 those are generally, I can't guarantee a hundred
12 percent, but generally that talk is given jointly
13 by us.  There have been times when one of us
14 couldn't make it but it's generally our joint
15 talk.  We share the microphone and use those
16 slides together.  So we prepare the slides
17 together.
18    Q.  Have you been compensated for any of
19 the consulting work that you have conducted in
20 connection with cases pending in vaccine court
21 that relate to alleged autism-related -- alleged

Page 140

1 thimerosal-related injuries?
2    A.  We may have -- or I may have been paid a
3 small fee to write a couple of these letters to
4 help them submit, although, as I said, I don't
5 think the Court requires it, but I think one or
6 two law firms wanted a letter saying I thought
7 the case was valid.  It might have been a small
8 amount.  I charge hourly.  Actually, even that's
9 incorrect, because I'm not compensated by them.
10 I'm compensated by the Court.  I think by rule,
11 again, I'm not a lawyer, but by rule, I think the
12 lawyers -- that the all the experts have to be
13 paid by the government.
14    Q.  You received some amount of
15 compensation out of vaccine court?
16    A.  Correct.
17    Q.  You've received some amount of
18 compensation from Mr. Waters in connection with
19 your work on this matter; correct?
20    A.  Yes.
21    Q.  To your knowledge, did you do any work

Page 141

1 that was unique to the Skevofilax case in which
2 you had previously been designated by Mr. Waters
3 as a testifying expert?
4    A.  No, I just did the general causation, so
5 I guess it applies to any case that I accept.  I
6 haven't accepted that one yet.
7    Q.  Did you receive any revenues in
8 connection with the work you did in connection
9 with the Canadian case?
10    A.  Yes, a small retainer, something like
11 $500, which, as I said, they had to give me or
12 they couldn't apply for me in the future.
13    Q.  All I want to know is whether apart
14 from the work in the Canadian case, the work for
15 Mr. Waters, and the work in vaccine court, Have
16 you been involved in any other activities that
17 relate to alleged injuries from thimerosal
18 vaccines for which you have been compensated?
19    A.  No.  Some of our expenses have been paid
20 or will be paid for the visiting the vaccine, the
21 VSD, but that's really related to the VCA,

Page 142

1 Vaccine Compensation Act.

2    Q. And who will be paying those expenses?

3    A. There's an omnibus group that
4 represents the people that filed, there's a
5 group -- it's my understanding there's a group of
6 attorneys that together are doing discovery. And
7 they're authorized to have some experts help
8 them. And so since we have permission to go to
9 the VSD and since it costs, I don't know, $3,000
10 a day, they've agreed to pay our expense money to
11 go and do that.

12    Q. Have any of those payments occurred to
13 date?

14    A. No, I don't think so. Maybe there was
15 one that was made, I'm not sure.

16    MR. THOMASCH: All right. Might be a
17 convenient time for a break. We haven't had one
18 this morning.

19    THE VIDEOGRAPHER: Time now is 12:07.
20 We are off the record.

21    (A recess was taken from 12:07 p.m.

Page 143

1 to 12:21 p.m.)

2    THE VIDEOGRAPHER: The time now is
3 12:21. We are now back on the record.

4    MR. THOMASCH: I'll ask the reporter to
5 mark as our next exhibit a statement on
6 thimerosal at the World Health Organization
7 dated August 2003.

8    (Deposition Exhibit No. 11, statement on
9 thimerosal at the World Health Organization dated
10 August 2003, was marked.)

11    Q. (BY MR. THOMASCH) Dr. Geier, I'm going
12 to show you what has been marked as Exhibit 11, I
13 ask you to take a look at that. Have you had a
14 chance --

15    A. I believe I've seen it before.

16    Q. You've done certain searches of the
17 worldwide medical literature on thimerosal; is
18 that correct?

19    A. Yes.

20    Q. As a consequence of any of those
21 searches, have you previously seen what has been

Page 144

1 marked as Exhibit 11?

2    A. I believe I've seen this or something
3 similar to this before.

4    Q. Are you familiar with an organization
5 called the World Health Organization?

6    A. Yes.

7    Q. What is it?

8    A. It's a branch of the United Nations
9 that does, among other things, vaccines for third
10 world mostly. Has as its most famous
11 accomplishment wiping out smallpox from the face
12 of the earth.

13    Q. Through vaccinations?

14    A. For which I applaud.

15    Q. Through vaccinations?

16    A. Through vaccinations.

17    Q. The document seems to be captioned
18 Statement on Thimerosal and dated August 2003,
19 correct?

20    A. Yes.

21    Q. It refers to the Global Advisory

Page 145

1 Committee on Vaccine Safety. Have you ever heard
2 of that organization?

3    A. Vaguely.

4    Q. Do you have some sense of what they do?

5    A. They advise on vaccine policy mostly
6 for the third world.

7    Q. And advise the World Health
8 Organization?

9    A. Yes.

10    Q. The first sentence of the text of the
11 document, under the bolded captioned material,
12 states, in 1999, concerns were raised in the
13 United States about exposure to mercury following
14 immunization, do you see that?

15    A. Yes.

16    Q. Do you agree with that statement?

17    A. Yes.

18    Q. Have you reviewed the second paragraph
19 of this document with regard to data that was
20 presented to the Global Advisory Committee on
21 Vaccine Safety in June 2002?

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

November 11, 2004    Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D
Case 3:03-cv-00141-TJW    Document 254-11    Filed 04/20/2005    Page 39 of 40    7934
Vera Easter v. American Home Products, Corp

Page 146

1  A. Yes.
2  Q. Did you per chance attend that
3 presentation?
4  A. No.
5  Q. Are you familiar with what data was
6 presented to the Global Advisory Committee on
7 Vaccine Safety in June of 2002?
8  A. No.
9  Q. Do you see in the text of Exhibit 11
10 that it indicates that such data, quote, indicate
11 that the pharmacokinetic profile of ethylmercury
12 is substantially different from that of
13 methylmercury. Do you see those words?
14  A. Yes.
15  Q. Do you understand the term
16 pharmacokinetic profile?
17  A. Yes.
18  Q. Do you understand there are differences
19 between ethylmercury and methylmercury?
20  A. Yes.
21  Q. Are the subjects, the pharmacokinetic

Page 147

1 profile of ethylmercury and the pharmacokinetic
2 profile of methylmercury, within the scope of the
3 matters on which you expect to testify in this
4 case?
5  A. Yes.
6  Q. It indicates further, quote, the
7 half-life of ethylmercury is short (less than one
8 week) compared to methylmercury (1.5 months),
9 making exposure to ethylmercury in blood
10 comparatively brief. Did I read that correctly?
11  A. Yes.
12  Q. Do you agree with that sentence?
13  A. No.
14  Q. Can you tell me as succinctly as
15 possible what references or authority you base
16 your disagreement with that sentence on?
17  A. I think in my report I have a whole
18 section that discusses the similarities between
19 ethylmercury and methylmercury. This is one of
20 the indefensible defense points that has been
21 raised against the thimerosal issue. First --

Page 148

1 there are numerous things wrong with it. First
2 of all --
3  Q. Are they captured in your report?
4  A. Yes.
5  Q. Then I'll hold off for the moment.
6  A. Sure.
7  Q. It also indicates that two
8 independently conducted epidemiological studies
9 have been conducted in the United Kingdom. Do
10 you see that?
11  A. Yes.
12  Q. Do you know what that's relating to?
13  A. I believe that's Elizabeth Miller's
14 work.
15  Q. All right. And the second paragraph of
16 Exhibit 11 concludes with a statement by the
17 World Health Organization, quote, these studies
18 further support the safety of
19 thimerosal-containing vaccines in infants in the
20 amounts used in existing vaccines. Did I read
21 that correctly?

Page 149

1  A. Yes.
2  Q. Do you agree with that statement?
3  A. No.
4  Q. Do you believe that that conclusion of
5 the Global Advisory Committee on Vaccine Safety
6 of the World Health Organization was come to
7 honestly by that group?
8  A. No.
9  Q. What do you believe accounts for the --
10 withdrawn. You disagree with the conclusion and
11 believe it's wrong, correct?
12  A. I believe it's wrong.
13  Q. And you don't believe it was honestly
14 come by; correct?
15  A. That's correct.
16  Q. What do you believe has provoked the
17 Global Advisory Committee on Vaccine Safety to
18 have dishonestly concluded that studies further
19 support the safety of thimerosal-containing
20 vaccines?
21  A. That they've been giving and poisoning

Deposition of - MARK R. GEIER, M.D., Ph.D Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW    Document 254-10    Filed 12/07/04    Page 40 November 4, 2004
7935

Page 150

1 children, either knowingly or unknowingly, for a
2 long time, that makes it really hard to admit
3 that you're wrong.  Also their whole policy as
4 I've discussed in numerous articles, many of
5 which we've put in our report, their policy
6 requires thimerosal be maintained in the
7 vaccines they feel because of lack of
8 refrigeration for the third world.
9        They  additionally have put out a memo
10 signed off by our boys at the CDC, including Dr.
11 Chen, that not only do they need thimerosal in
12 third world vaccines, they need to strongly
13 advocate that we continued to keep it in our
14 vaccines, because if we don't have it in our
15 vaccines, the third world is going to refuse to
16 take it.  Therefore they're willing to damage
17 American children in order to help the third
18 world.  And incidentally, I'm strongly third
19 world.  I would be willing to, if I had my power,
20 I would give U.S. money to help them with their
21 vaccine program.  But I will not, would not

Page 151

1 approve damaging U.S. children to help them.
2    Q.  All right, we're running astray.
3    A.  Well, you asked me why they had reason
4 to give incorrect information.  I gave you some
5 of it.
6       MR. ELLIOTT:  Object to the
7 responsiveness.
8    Q.  (BY MR. THOMASCH)  Let me take you to
9 the third paragraph which indicates that the
10 Global Advisory Committee on Vaccine Safety
11 reviewed certain pharmacokinetic study data on
12 June 11th and 12th of 2003; do you see that?
13    A.  Yes.
14    Q.  Were you at that meeting where such
15 data was presented?
16    A.  No.
17    Q.  Are you aware of what data was
18 presented?
19    A.  Yes.
20    Q.  In the 4th paragraph it states, in the
21 first sentence, on the basis of the foregoing,

Page 152

1 the GACVS concluded that the latest
2 pharmacokinetic and developmental studies do not
3 support concerns over safety of thimerosal
4 (ethylmercury) in vaccines.  Do you see that?
5    A.  Yes.
6    Q.  And the GACVS is the Global Advisory
7 Committee on Vaccine Safety, correct?
8    A.  Yes.
9    Q.  Am I correct that you disagree with
10 their conclusion that the latest pharmacokinetic
11 and developmental studies do not support
12 concerns over the safety of thimerosal in
13 vaccines?
14    A.  I disagree.
15    Q.  Do you believe that the opinion that
16 they reached, the conclusion that they reached in
17 that regard was honestly come by?
18    A.  No.
19    Q.  Is it my understanding that you believe
20 that they know and understand these statements to
21 be false?

Page 153

1    A.  Yes.  False in the sense that they were
2 justified by saying that their vaccines in the
3 third world do more good than harm and they
4 can't admit the harm or perhaps the good would be
5 undone, but they are false.
6    Q.  I'm not --
7    A.  And they know they're false.
8    Q.  I'm not asking about policy
9 ramifications or whether it's justifiable to be
10 inaccurate.  You're stating that the conclusions
11 are inaccurate, correct?
12    A.  Yes.
13    Q.  And that the World Health Organization's
14 Global Advisory Committee on Vaccine Safety knows
15 that to be the case and is saying it anyway?
16    A.  That's my opinion.  Obviously I can't be
17 in their head.  But it's my opinion that they're
18 saying it anyway, that's correct.
19    Q.  Do you have an opinion as to whether
20 any part of the World Health -- withdrawn.  So in
21 layman's terms, the Global Advisory Committee on

Page 150 - Page 153