Page 154

1  Vaccine Safety is deceiving anyone in the public
2  that reads this statement; is that correct?
3      A. Yes.
4      Q. And you have explained some of the
5  reasons that you think they might be, in their
6  mind, justifying that deception; is that correct?
7      A. Yes.
8      Q. Do you have any opinion that there was
9  anything done by any of the vaccine
10  manufacturers to provoke this public deception
11  that you testified to?
12      A. Yes.
13      Q. And what if anything do you suggest or
14  opine that vaccine defendants did to provoke
15  this public deception?
16      A. The World Health Organization, our CDC,
17  and the vaccine manufacturers are all members of
18  the Brighton Collaboration, into which pours
19  enormous amounts of money, some from the CDC,
20  largely from the drug companies, and that
21  Brighton Collaboration is set up to control and

Page 155

1  define vaccine adverse reactions and to control
2  basically how vaccines are going to be used, and
3  I believe that they're heavily influenced by the
4  fact that they're funded and the fact that the
5  members on that group are members of the vaccine
6  producers, and that's not the only place, but
7  that's the place where the World Health
8  Organization is so heavily involved. I believe
9  they feel that they rely on the manufacturers for
10  their money and I don't think it would be looked
11  very favorable if they came up with something
12  that was very damaging to the companies.
13      So I think that those that are supposed
14  to be advising and those who are supposed to be
15  regulating are in bed with those who are being
16  regulated and taking money from those who are
17  being regulated, and that has an appearance of
18  conflict of interest, and appearance is enough.
19  We can't have appearance of conflict of interest
20  in our vaccines and that's what's happening here.
21      Q. Okay. Could you briefly explain to me

Page 156

1  your understanding of what the Brighton
2  Collaboration is?
3      A. It's a corporation, I don't have it in
4  front of me exactly, I'm not a legal thing, I
5  forgot the name of the type of corporation, but
6  it's a nongovernmental corporation which exists
7  physically inside of the CDC's location in their
8  building in Atlanta, Georgia, which has meetings
9  all over Europe and they have posted on their
10  website results of the meetings and they have
11  people -- they set up committees to define
12  vaccine -- well, I'd say the reactions but that's
13  not really true. It started out reactions, then
14  it was adverse events, and now it's just events.
15  Pretty soon it won't be anything.
16      But in any case, they have meetings with
17  and they use drug company people and vaccine
18  producing people to help define what is and isn't
19  a reaction, and therefore will control in their
20  plan which things are considered to be related to
21  vaccines, and a whole vaccine policy is

Page 157

1  controlled by that group. And it's an unethical
2  organization. The people from CDC can't take
3  money and they do take money. In fact, they take
4  salaries from this organization which is funded
5  by the drug company. They cannot take money from
6  those who they are supposed to regulate. Even if
7  it doesn't affect their opinion, it looks like it
8  affects their opinion, and there's very good
9  precedent that conflict of interest can't even
10  look like conflict of interest.
11      Q. Okay. I want to take you back now to
12  Exhibit 11 and the specific motivation for
13  deceiving the public in regard to the Global
14  Advisory Committee on Vaccine Safety's August
15  2003 statement, all right?
16      A. Okay.
17      Q. As I understand part of what you've
18  said, the World Health Organization is part of
19  this Brighton Collaboration. It received -- that
20  collaboration receives funding from
21  pharmaceutical companies and the World Health

Page 158

1 **Organization has an interest in maintaining that**
2 **funding level; is that correct?**
3    A. Yes, and the cooperation of all the
4 people involved.
5    Q. **I further thought I heard you indicate,**
6 **correct me if I'm wrong, that the World Health**
7 **Organization may well be concerned that if they**
8 **were to take a position contrary to what's set**
9 **forth in this statement, that might affect the**
10 **funding?**
11    A. Yes.
12    Q. **Is it your statement that -- is it your**
13 **opinion that the pharmaceutical companies have**
14 **purposefully attempted to cause the World Health**
15 **Organization to deceive the public through its**
16 **funding?**
17    A. Yes. I think this is a crucial issue to
18 the vaccine companies. Their very existence is
19 on the line potentially, and I think they're
20 using their money to influence positions of these
21 organizations.

Page 159

1    Q. **So in your opinion the matter is not**
2 **simply an appearance of a conflict of interest,**
3 **but it is actually a conflict of interest, right?**
4    A. Yes.
5    Q. **And by conflict of interest, you are**
6 **saying that the pharmaceutical companies involved**
7 **in the manufacture of childhood vaccines have**
8 **made payments to the World Health Organization**
9 **for the purpose of having the World Health**
10 **Organization issue deceptive and false statements**
11 **about the safety of thimerosal in vaccines; is**
12 **that correct?**
13    A. Well, you went further than I went. I
14 didn't say that. I said that the pharmaceutical
15 companies and the vaccine manufacturers were
16 making payments to the Brighton organization, and
17 the Brighton organization is attempting to limit
18 the damage to -- with this, I don't know
19 specifically if any pharmaceutical company said
20 here's a payment for you to do this specific
21 thing, but I think it's fairly well understood

Page 160

1 that if you're heavily funded by companies and
2 there's something really bad for those companies
3 happening and you come out and you make a
4 statement like this, you know, saying that the
5 literature supports when, they quote like three
6 papers and there are thousands of papers on the
7 other side, it's very obvious that they're being
8 influenced.
9    Q. All right. The conclusion is set forth
10 in bold under the caption, correct, the
11 conclusion in this document by the World Health
12 Organization is, and I quote, the Global Advisory
13 Committee on Vaccine Safety concludes that there
14 is no evidence of toxicity in infants, children,
15 or adults exposed to thimerosal (containing
16 ethylmercury) in vaccines?
17    A. And that's a false statement by
18 anybody's position. Because it says -- it
19 doesn't say they didn't believe the other
20 evidence. It says there is no evidence, implying
21 that there aren't these articles. And you can

Page 161

1 look at the articles and they're there. You can
2 say, well, I'm not convinced by the articles.
3 But this statement is on its face prima facie
4 false. There are articles throughout the
5 literature from big name people around this
6 country and around the world, numerous articles
7 that make this false.
8    Q. Right. Let's just take this in bite
9 size increments if we can.
10    A. Okay.
11    Q. You would agree that the bolded
12 statement that I just read into the record was
13 accurately read and constitutes the conclusion of
14 the World Health Organization; correct?
15    A. Yes.
16    Q. And you would state that that is
17 objectively false; is that right?
18    A. Yes. No one would agree with that
19 statement or that it was objective.
20    Q. And I understand it to be your opinion
21 that Global Advisory Committee on Vaccine Safety

November 11, 2004    Case 3:03-cv-00441-TJW   Document 254   Multi-Page™ 08/03/04   Page 3 of 40 PageID #: 7938    Deposition of MARK R. GEIER, M.D., Ph.D

Vera Easter v. American Home Products, Corp

Page 162

1 knows that statement to be false, correct?
2     A. Sure. Those articles can be found in
3 ten seconds on PubMed.
4     Q. Is it your testimony that in your
5 opinion that the pharmaceutical companies that
6 manufacture childhood vaccines containing
7 thimerosal know that statement to be false?
8     A. Yes.
9     Q. And is it your testimony that the
10 pharmaceutical companies have funded the Brighton
11 Collaboration in part to produce statements from
12 the World Health Organization that falsely state
13 that thimerosal-containing vaccines are safe?
14     A. It's a little stronger than what I
15 would say. They funded the Brighton organization
16 to limit the damage to the vaccine program and to
17 themselves by involving and funding World Health
18 Organization and CDC individuals and other
19 researchers around the world to try to limit the
20 damage.
21     Q. Do you believe there's an agreement or

Page 163

1 understanding between the pharmaceutical
2 companies and the World Health Organization that
3 this is the goal, the goal being to deceive
4 people into believing there is no danger when in
5 fact there is in your opinion?
6     A. I would put it on their behalf that the
7 goal is to limit people's concerns about
8 vaccines so they can continue the programs. And
9 that involves -- if that involves fooling them
10 and slightly modifying and lying about the data,
11 yeah, that's fine.
12     Q. It's more than slightly modifying.
13 You're testifying to a belief that this is
14 objectively false and they know it to be so;
15 correct?
16     A. Yes, and it is.
17     Q. Is this statement in your opinion the
18 product of a conspiracy or a joint agreement or
19 understanding between any pharmaceutical
20 companies that manufacture vaccines and the
21 World Health Organization?

Page 164

1     A. I don't have a written agreement. I
2 can't know what's in a verbal agreement. All I
3 know is that they're funded by the companies and
4 they've taken an obviously objectively false
5 position that favors the companies.
6     Q. I'm not asking you now about the
7 evidence you have to support it but whether or
8 not you hold the opinion that this is in fact a
9 conspiracy, among others, between the
10 pharmaceutical companies and the World Health
11 Organization to deceive the public. Is that your
12 opinion?
13     A. I'm not sure what you mean by
14 conspiracy. I believe that --
15     Q. An agreement or understanding between
16 the parties to consciously deceive the public by
17 issuing false statements about the alleged safety
18 of thimerosal when both parties know that to be
19 false in your opinion?
20     A. Yes.
21     Q. That is your testimony?

Page 165

1     A. Yes.
2      MR. THOMASCH: Let me ask the reporter
3 to mark as Exhibit 12 a document entitled "What
4 Parents Should Know About Thimerosal," from the
5 American Academy of Pediatrics.
6      (Deposition Exhibit No. 12, What
7 Parents Should Know About Thimerosal, was
8 marked.)
9     Q. (BY MR. THOMASCH) I'm going to show the
10 witness what has been marked as Exhibit 12 for
11 identification. I don't need you to read through
12 this full document, but just in a sense eyeball
13 it to see if you recognize this. And even before
14 that let me ask you, Dr. Geier, do you see that
15 the document is captioned What Parents Should
16 Know About Thimerosal from the American Academy
17 of Pediatrics?
18     A. Yes, I do.
19     Q. Do you recognize the entity the
20 American Academy of Pediatrics?
21     A. Yes.

Page 166

1   Q. What is it?

2   A. It's the academy that board-certifies

3 pediatricians in the United States.

4   Q. Okay. Do they have a publication?

5   A. Yes, Pediatrics. They have a journal,

6 Pediatrics.

7   Q. All right. Do they also issue the red

8 book?

9   A. I think one of their committees does,

10 the advisory committee does, yes.

11   Q. Committee on immunization practices?

12   A. Yes.

13   Q. And does that give guidelines for

14 vaccination practices in the United States?

15   A. Yes.

16   Q. Are you aware that the American Academy

17 of Pediatrics has a website?

18   A. Yes.

19   Q. Do you see that this document appears to

20 be from that website?

21   A. Yes.

Page 167

1   Q. It's dated 11-11-2004 on the date it

2 was printed off the website. Do you see that at

3 the bottom of both pages?

4   A. Yes, I see that.

5   Q. If you return to the second page in the

6 text it says, copyright 2002 by the American

7 Academy of Pediatrics; revised August 2004. Do

8 you see that?

9   A. Yes.

10   Q. So do you understand this to be a

11 statement of the American Academy of Pediatrics

12 that was revised in 2004 and remains publicly

13 available today on the website of the American

14 Academy of Pediatrics?

15   A. Yes.

16   Q. I just want to take you down to the

17 second heading on the document entitled does

18 thimerosal cause autism? Do you see that?

19   A. Yes.

20   Q. The first sentence states, and I quote,

21 there are no valid studies that show a link

Page 168

1 between thimerosal in vaccines and autistic

2 spectrum disorder, period. Did I read that

3 correctly?

4   A. Yes, sir.

5   Q. Is that statement true in your opinion?

6   A. No.

7   Q. Do you believe that statement is

8 objectively false?

9   A. Yes.

10   Q. Do you believe that the American

11 Academy of Pediatrics honestly believes that

12 statement?

13   A. No.

14   Q. Do you believe that in issuing this

15 statement and putting it out on its public

16 website, the American Academy of Pediatrics is

17 attempting to dishonestly deceive the American

18 public with regard to whether or not thimerosal

19 causes autism?

20   A. Yes.

21   Q. Do you believe that they have done that

Page 169

1 as part of any understanding or agreement with

2 any vaccine manufacturer?

3   A. I believe they are largely funded by

4 vaccine manufacturers.

5   Q. Do you believe that accounts for the

6 reason they would publicly deceive the U.S.

7 public regarding the question of whether

8 thimerosal causes autism?

9   A. I think it's only one of the reasons.

10 There are a number of others. Did you want me to

11 go into them?

12   Q. No, I want to know whether you think

13 one of the reasons is because they are provoked

14 to do so by funding from the vaccine

15 manufacturers?

16   A. Yes, I think that's one of the reasons.

17   Q. Do you believe the vaccine

18 manufacturers are aware of the deceptive nature

19 of this statement?

20   A. Yes.

21   Q. Do you believe the vaccine

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

Page 170

1 manufacturers' reason for funding the American
2 Academy of Pediatrics currently is in any part
3 related to a desire to see the American Academy
4 of Pediatrics issue false and deceptive
5 statements purporting to exonerate thimerosal in
6 regard to autism.)
7      A. I think there are other reasons that
8 manufacturers fund them, but I think that's
9 certainly one of them.
10      MR. THOMASCH: I'll ask the reporter to
11 mark as Exhibit 13 a multipage document taken
12 from the CDC National Immunization Program
13 website on November 11th, 2004.
14      (Deposition Exhibit No. 13, CDC National
15 Immunization Program website document, was
16 marked.)
17      Q. (BY MR. THOMASCH) Do you have Exhibit
18 13 in front of you, sir?
19      A. Yes, I do.
20      Q. What is the CDC?
21      A. Centers for Disease Control. It's a

Page 171

1 sub-branch of HHS, Health and Human Services of
2 the U.S. government.
3      Q. Are you aware they have a publicly
4 available website?
5      A. Yes.
6      Q. Have you ever gone to it?
7      A. Yes.
8      Q. In the course of doing research with --
9 specifically with regard to the safety or
10 potential dangers associated with the use of
11 thimerosal in vaccines, have you ever looked at
12 CDC's website?
13      A. Yes.
14      Q. If you turn to the last page of this
15 document, page nine of nine, do you see it
16 indicates that this page was last reviewed and
17 modified on May 18, 2004?
18      A. Yes.
19      Q. Do you understand this document to be
20 publicly available information provided to the
21 public by the CDC as of May 2004, which relates

Page 17[2]

1 to the subject matter of thimerosal in vaccines?
2      A. Yes.
3      Q. Would you turn, if you would, please, to
4 page 3 of 9.
5      A. Yes.
6      Q. Do you see question 5 in bold?
7      A. Yes.
8      Q. It states, "I've heard that children
9 may be getting toxic levels of mercury from
10 vaccines. Is that true?" And the first
11 paragraph of the answer reads "No. There is no
12 evidence of harm caused by the minute doses of
13 thimerosal in vaccines, except for minor effects
14 like swelling and redness of the injection site
15 due to sensitivity to thimerosal." Did I read
16 that correctly?
17      A. You read it correctly.
18      Q. Do you believe that's an accurate
19 statement?
20      A. No. It's inaccurate on its face and
21 it's inaccurate by Congressional official finding

Page 17[3]

1 that finds these gentlemen guilty of
2 institutional malfeasance and also finds that
3 there's no evidence -- I mean, again, if they go
4 to PubMed, anybody can go to PubMed and you can
5 get, you can turn up hundreds, thousands of
6 articles on this issue, and again, Congress --
7 they're presenting themselves as the official
8 position of the U.S. government, but they're not
9 the U.S. Government. They're one little small
10 blanch of the U.S. government.
11      The Congressional committee that
12 investigated this for three years said, they
13 concluded that the autism epidemic was caused by
14 thimerosal but it could have been curtailed or
15 prevented if the CDC had not been, quote, asleep
16 at the switch, this is from their own memo, and
17 they found them guilty of institutional
18 malfeasance and self-protection and protectionism
19 of the industry, and misplaced protectionism of
20 the industry.
21      This is an out and out object lie

## Page 174

1 because they're saying there's no reports of
2 thimerosal causing any problems anywhere and
3 that's patently ridiculous.
4     Q. All right. I'm going to ask you, sir --
5         MS. OWENS: Excuse, me I'm going to
6 move to strike that answer as nonresponsive to
7 the question.
8         MR. THOMASCH: I'll join in that motion.
9     Q. (BY MR. THOMASCH) You stated that
10 someone had found the CDC I believe it was,
11 quote, guilty of institutional malfeasance; did
12 you say that?
13     A. Not someone. The oversight committee
14 of the U.S. House of Representatives, the
15 official one that's in charge of them has found
16 that, and there are others. I mean we've given
17 you others. There's also --
18     Q. When did that occur?
19     A. 2003, May of 2003.
20     Q. Do you have any explanation for why
21 this statement still appears on the website

## Page 175

1 currently available to the public of the Centers
2 for Disease Control?
3     A. Sure. They're a rogue organization. If
4 they admit it they'll be fired. At best they'll
5 be fired.
6     Q. The CDC is a rogue organization?
7     A. Yes, they've committed institutional
8 malfeasance and they're sure not going to admit
9 it, if they have a choice.
10     Q. I want to look at the term
11 institutional malfeasance. Does that come in
12 part from, in your opinion, intentionally
13 deceiving the American public about the health
14 risks of thimerosal-containing vaccines?
15     A. Yes.
16     Q. So you would state that this statement
17 is not only false, but the CDC knows it to be
18 false and seeks to deceive the American public?
19     A. Absolutely. Their own memo shows that
20 they know it to be false.
21     Q. I'd like you to turn further in the

## Page 176

1 document to question No. 7, that would be page 5
2 of 9. Do you have that, sir?
3     A. Yes.
4     Q. Does the question read "does thimerosal
5 cause autism?"
6     A. Yes.
7     Q. And the answer in the first sentence
8 states, quote, "there is no conclusive evidence
9 that any vaccine or vaccine additive increases
10 the risk of developing autism or any other
11 behavior disorder. Rather," in the second
12 sentence begins, "rather, evidence is
13 accumulating of lack of any harm resulting from
14 exposure to vaccines containing thimerosal as a
15 preservative." Did I read that correctly?
16     A. You read it correctly.
17     Q. Is it your testimony, sir, that that is
18 also a knowingly false statement made for the
19 purpose of deceiving the American public?
20     A. Yeah, blatantly false, that's right.
21     Q. And if we just go back to question 6 on

## Page 177

1 the preceding page, do you see question 6
2 relating to research being conducted by the
3 federal government regarding the safety of
4 vaccines containing thimerosal?
5     A. Yes.
6     Q. And the first sentence of that answer
7 reads, quote, "there is no evidence to suggest
8 that thimerosal in vaccines causes any health
9 problems in children and adults beyond local
10 hypersensitivity reactions (like redness and
11 swelling at the injection site)." Do you see
12 that?
13     A. Yes.
14     Q. That would again be a knowingly false
15 statement made by the Centers for Disease Control
16 and Prevention in order to deceive the American
17 public about the safety of thimerosal?
18     A. Well, it's the vaccine group there, not
19 the whole group. That's so knowingly false that
20 their own paper by Verstraeten says that it
21 causes ticks which isn't in that list.

Page 178

1     MS. OWENS:  Objection, nonresponsive
2  answer, move to strike.
3     A.  Yes, it's blatantly false and they know
4  it's false.
5     Q.  (BY MR. THOMASCH)  They know it's false
6  and they're attempting to deceive?
7     A.  They're making a rather big attempt to
8  deceive.
9     MR. THOMASCH:  All right.  I'll ask the
10  court reporter to mark as our next exhibit a
11  two-page document from the European Agency for
12  the Evaluation of Medicinal Products dated March
13  24, 2004.
14     (Deposition Exhibit No. 14, statement
15  from the European Agency for the Evaluation of
16  Medicinal Products dated March 24, 2004, was
17  marked.)
18     Q. (BY MR. THOMASCH)  Let me ask you just
19  to take a quick look at Exhibit 14 and let me
20  know whether or not you recognize the document?
21     A.  I know of the agency.  I don't think

Page 179

1  I've seen this exact document.
2     Q.  All right.  The agency in reference
3  being the European Agency for the Evaluation of
4  Medicinal Products?
5     A.  Yes.
6     Q.  What do you understand that agency to
7  be?
8     A.  It's sort of like their CDC or FDA.
9  Sort of like our CDC or FDA.
10     Q.  The acronym that they go by is EMEA?
11     A.  Yes.
12     Q.  But this is a European agency that has a
13  role in Europe relatively equivalent to the FDA
14  or CDC in the United States; is that correct?
15     A.  Yes.
16     Q.  In the 1990s were thimerosal-containing
17  vaccines used in parts of Europe?
18     A.  Yes, not anymore.  They made them
19  illegal now in many parts of Europe because the
20  cause autism.
21     MS. OWENS:  Objection, nonresponsive,

Page 180

1  move to strike.
2     MR. ELLIOTT:  Same thing.
3     MR. THOMASCH:  Join in the motion.
4     Q.  (BY MR. THOMASCH)  But I will ask you,
5  is it your sworn testimony that you understand it
6  to be illegal to distribute thimerosal-containing
7  vaccines anywhere in Europe?
8     A.  I didn't say anywhere.  I said a number
9  of places in Europe.  England, Sweden, Norway, I
10  believe Austria, Russia.  I may have missed some.
11  Canada, that's not Europe.  And soon to be in
12  various parts of the United States, already in
13  some parts coming up.
14     Q.  Go back to Exhibit 14 if we could.  Are
15  you aware that in 1999 and 2000 EME issued
16  statements on the use of thimerosal in vaccines?
17     A.  Yes.
18     Q.  Were you aware prior to my showing you
19  Exhibit 14 that in 2004, EMEA issued another
20  public statement on that subject?
21     A.  No.

Page 181

1     Q.  Have you not been aware, I'd ask you
2  now to take a moment and read through the
3  slightly-longer-than-one-page document.
4     MR. SMITH-GEORGE:  There's an
5  indication at the bottom this is page -- is this
6  page two of two?
7     MR. THOMASCH:  Page two of two.
8     MR. SMITH-GEORGE:  Is there a website
9  this came off of or do you know?  There seems to
10  be some notation on the bottom public EMEA.  Is
11  that a website?
12     MR. THOMASCH:  I believe it is but I
13  don't have the website address.
14     MR. ELLIOTT:  It's on there.
15     MR. THOMASCH:  That is the website
16  address there?  Oh, the bottom of the first page
17  there's --
18     MR. SMITH-GEORGE:  Oh, emea.eu.int.
19     MR. THOMASCH:  Right.
20     MR. SMITH-GEORGE:  Thank you.
21     A.  Okay, I've read it.

Page 182

1  Q. (BY MR. THOMASCH) Okay. Now, is it
2  fair to say based on the first three paragraphs,
3  directing your attention in particular to the
4  first sentence of the third paragraph, that a
5  committee of the EMEA, the Committee for
6  Proprietary Medicinal Products, known by the
7  acronym CPMP, had looked at this issue in 1999
8  and 2000 and had advised, quote, "that although
9  there was no evidence of harm from thimerosal in
10 vaccines other than hypersensitivity (allergic)
11 reactions, it would be prudent to promote the
12 general use of vaccines without thimerosal and
13 other mercury-containing preservatives,
14 particularly for single-dose vaccines." Do you
15 see that?
16     A. Yes.
17     Q. Does that accord with your recollection
18 of the EMEA statements in 1999 and 2000?
19     A. Yeah, I think they said it would be
20 prudent.
21     Q. But they said at that time that there

Page 183

1  was no evidence of harm from thimerosal in
2  vaccines other than hypersensitivity reactions,
3  but they went on to say it would still be prudent
4  to remove; is that correct?
5      A. Yes.
6      Q. Now, it indicates in the third
7  paragraph that, quote, "the previous assessment"
8  -- and I'm reading the last sentence of the third
9  paragraph -- "of risks associated with
10 ethylmercury had been based on data on
11 methylmercury, as the toxicity profile of the two
12 compounds was assumed to be similar." Do you see
13 that?
14     A. Yes.
15     Q. Am I correct that for purposes of your
16 report in this case, you currently consider the
17 toxicity profile of ethylmercury and
18 methylmercury to be similar; is that correct?
19     A. Yeah, and that's based on, I don't know,
20 20 to 30 publications, in, ants to elephants.
21     Q. Okay.

Page 184

1      A. I consider it to be similar, although I
2  would make the point that if you made it half as
3  toxic, if you made it a quarter as toxic, if you
4  made it a 10th as toxic, you're still so far over
5  the limit you can't make the risk go away.
6      Q. But you don't think it's half as toxic,
7  you think it's essentially the same toxicity,
8  correct?
9      A. I think it's similar, and none of the
10 papers say that it's more toxic than
11 methylmercury. Overall I think it's fair to
12 assume that it's similar, as did the American of
13 Academy of Pediatrics people in their
14 publications.
15     Q. Now, the EMEA statement marked as
16 Exhibit 14, in the 4th paragraph, states "in
17 March 2004, the CPMP reviewed the latest evidence
18 relating to the safety of thimerosal-containing
19 vaccines." Do you see that?
20     A. Yup.
21     Q. And until right now you were unaware

Page 185

1  that that happened; correct?
2      A. That's correct.
3      Q. Does it indicate that part of what they
4  reviewed were, in their words, a number of well
5  designed population-based epidemiological
6  studies documenting the safety profile of
7  thimerosal?
8      A. Yeah, that's -- that's patently wrong,
9  but yeah, that's what they reviewed. I know
10 which ones they reviewed.
11     Q. The statement goes on to say, quote,
12 "these studies show no association between the
13 vaccination with thimerosal-containing vaccines
14 and neurodevelopmental disorders such as speech
15 disorders and autism." Do you see that?
16     A. Yes.
17     Q. And the statement that they show no
18 association is even stronger than the statement
19 they show no causation; is that correct?
20     A. Yes.
21     Q. So they show by definition no causation

Page 186

1 and not even an association between vaccination
2 with thimerosal-containing vaccines and
3 neurodevelopmental disorders such as speech
4 disorders and autism is the position of the EMEA;
5 correct?
6     A.  Even though they're totally irrelevant
7 studies to this issue, yes, that's correct.
8 That's their position.
9     Q.  Do you believe that that position is
10 inaccurate?
11     A.  Yes.
12     Q.  Do you believe that EMEA knows it to be
13 inaccurate?
14     A.  Knows or should know, probably.  I mean,
15 I assume they have access to the National
16 Library of Medicine's search engine, which every
17 researcher in this world that knows what they're
18 doing uses.  Yes, if they have access and they
19 tried, it's inaccurate and they should know
20 better.  I can't sit here and tell you they did
21 the search, but boy, considering the importance

Page 187

1 of this issue, if they didn't do the search,
2 they're guilty of not doing a decent job.  No one
3 can believe this.  Any parent, any juror, anybody
4 can do this search in two seconds and you can see
5 that these are false statements.  And they're
6 not papers written by me.  They're papers written
7 by people all over the world for many, many
8 decades, and there are hundreds of them.
9     Q.  The 4th paragraph continues on, if
10 you'll follow with me, "furthermore, new data in
11 infants indicate that ethylmercury is more
12 rapidly excreted and therefore has substantially
13 different pharmacokinetics than methylmercury."
14 Do you see that statement?
15     A.  Yes.
16     Q.  You understand what they're attempting
17 to say there; correct?
18     A.  Yes, they're referring to the Lancet
19 study which is, as a scientific study it's a
20 complete joke, and in addition it's irrelevant.
21 That is, cyanide has a half life in the body of

Page 188

1 about 30 seconds.  It also kills you.  Half life
2 is not predictive.  Additionally, the half life
3 of ethylmercury and methylmercury in general are
4 somewhat similar, and even if you allow that
5 they're half as much, doesn't make any
6 difference.
7     MR. ELLIOTT:  Object, nonresponsive.
8     Q.  (BY MR. THOMASCH)  The fourth paragraph
9 concludes with the statement, and I quote, "the
10 new data suggests that ethylmercury may be less
11 toxic than previously assumed, and therefore
12 caution is needed in extrapolating the toxicity
13 profile of methylmercury to ethylmercury."  Do
14 you see that?
15     A.  Yes.
16     Q.  Now in connection with your work in
17 this case, you believe it is appropriate to
18 extrapolate the toxicity profile from
19 methylmercury to ethylmercury; is that correct?
20     A.  Yes, although we have done it by
21 allowing it to be five times less.  We've done it

Page 189

1 with ten times less.  It doesn't help.
2     MS. OWENS:  Excuse me, I'm going to
3 object.
4     THE DEPONENT:  Excuse me, I'm answering
5 his question.
6     MR. SMITH-GEORGE:  Finish your question
7 then you can make an objection.  You don't have
8 to interrupt during his response.
9     MS. OWENS:  I did not mean to interrupt
10 you.  I thought you were through.  Please finish
11 your answer.
12     THE DEPONENT:  Okay.  I'm finished.
13     MS. OWENS:  I object to the
14 responsiveness of the answer.  I also ask that he
15 answer the questions directly because I have
16 questions I want to ask.  We're time-limited.  I
17 don't want my time used up by his tendency to
18 give lengthy answers to what are yes or no
19 questions.  I'm going to ask you to extend that
20 courtesy to me.
21     MR. SMITH-GEORGE:  He's trying to

## Page 190

1 answer the questions completely. I think he's
2 doing a responsive job as he knows how to do. I
3 don't think he's unduly extending this. And if
4 you just give him the courtesy of letting him
5 finish his answer, then you make any objection
6 and we can go on.
7        MR. THOMASCH: I'll join in counsel's
8 objection.
9        MS. OWENS: I did apologize for
10 interrupting him. I did not do that
11 intentionally. My position is on the record.
12    Q. (BY MR. THOMASCH) Let's go to the
13 **fourth paragraph of Exhibit 14. Is there**
14 **anything in that paragraph that you agree with?**
15    A. Yeah, that in March 2004 they reviewed
16 it. I presume that's true.
17    Q. **What you believe, however, is that the**
18 **results of their review are inaccurate and are**
19 **the product of either gross negligence on their**
20 **part or intentional inaccuracies; is that**
21 **correct?**

## Page 191

1    A. Yes, that's correct.
2        MR. THOMASCH: It's 1 o'clock. Why
3 don't we take our lunch break now.
4        MR. SMITH-GEORGE: How long of a break?
5        MR. THOMASCH: 30 minutes okay with you
6 folks?
7        MR. SMITH-GEORGE: 30 works for me.
8        THE VIDEOGRAPHER: Time now is 1:04.
9 We're going off the record.
10        (A recess was taken.)
11        MR. SMITH-GEORGE: This is just for the
12 record, Dr. Geier has -- I have taken the final
13 draft out of the stack of drafts that we have
14 prepared and Dr. Geier has signed a cover letter
15 dated November 7th as well as page 50 of the
16 report, and we're going to mark that as a
17 separate exhibit constituting his final report in
18 this matter, because it's easier to read than
19 what was faxed to everybody on the disclosure.
20        We had some discussions earlier about
21 corporate documents, and I have discovered that

## Page 192

1 the corporate documents are actually incorporated
2 into notebook No. 5, they're hole-punched, and so
3 all the documents that Dr. Geier saw that were of
4 a corporate nature are here in the room in
5 notebook No. 5.
6        MR. THOMASCH: Thank you for that
7 clarification. One housekeeping matter, it would
8 appear that my inability to count has left us a
9 void where more competent counsel would have used
10 an Exhibit 8. And so with your permission we'll
11 mark the next exhibit as Exhibit 8.
12        MR. SMITH-GEORGE: I have no objection
13 to that.
14        MR. THOMASCH: Thanks, then we won't
15 spend the rest of our careers trying to figure
16 out what happened to Exhibit 8.
17        I concede for the stenographic record
18 that your prior references to Exhibit 8 were
19 actually to Exhibit 7, which was our supplemental
20 disclosures, and we're going to make a new
21 Exhibit 8 to clarify the chronology of the

## Page 193

1 exhibits.
2        THE VIDEOGRAPHER: The time now is 1:49.
3 We are now back on the record. This is the
4 beginning of videotape No. 3.
5        MR. THOMASCH: I'll ask the court
6 reporter to mark as Exhibit 8, because that
7 exhibit number was inadvertently skipped, our
8 next exhibit, which is a joint statement of the
9 American Academy of Pediatrics and the United
10 States Public Health Service published September
11 3rd, 1999.
12        (Deposition Exhibit No. 8, joint
13 statement of the American Academy of Pediatrics
14 and the United States Public Health Service
15 published September 3rd, 1999, was marked.)
16    Q. (BY MR. THOMASCH) **Dr. Geier, do you**
17 **have in front of you Exhibit 8?**
18    A. Yes, I do.
19    Q. **And you certainly recognize and have**
20 **testified you're familiar with the American**
21 **Academy of Pediatrics, right?**

November 11, 2004    Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D
Case 5:03-cv-00141-TJW    Document 254-11   Filed 10/27/2004   Page 11 of 7946
Vera Easter v. American Home Products, Corp

Page 194

1   A. Yes.

2    Q. What is the United States Public Health

3 Service?

4   A. It's part of the United States

5 government that does things like supply doctors

6 to our Coast Guard and some research and advises

7 the U.S. government.

8    Q. On health-related issues?

9   A. Yes.

10    Q. All right. Are you familiar with this

11 published statement?

12   A. Yes.

13    Q. And it was published in Pediatrics,

14 which you identified as the journal of the

15 American Academy of Pediatrics, correct?

16   A. Yes.

17    Q. And its publication date was September

18 3rd, 1999; is that correct?

19   A. Yes.

20    Q. Does it accord with your recollection

21 that this statement was actually issued on July

Page 195

1 7th, 1999?

2   A. Yeah, that sounds reasonable, I don't

3 remember the date but I know it was July

4 something.

5    Q. Early July 1999?

6   A. Yes.

7    Q. And you were familiar with the

8 statement at or about the time it was first

9 issued in July; is that correct?

10   A. Yeah, in fact, we have some memos

11 discussing the release before it was released.

12 I'm quite familiar with this.

13    Q. All right. Now, I want to take you to

14 the second paragraph.

15     MS. OWENS: I'm sorry, did he say he

16 knew about it when it came out, which I think was

17 your question?

18    Q. (BY MR. THOMASCH) Yes, you were aware

19 of it at or about the time it was issued?

20   A. I said I was aware of it before it was

21 issued because I have some memos and things where

Page 196

1 they discussed the idea of issuing.

2    Q. Yeah, but those memos, when did you

3 obtain those memos?

4   A. I obtained them after the fact.

5    Q. Did you in fact know that this statement

6 was going to come out before it was issued?

7   A. No.

8    Q. But you did know about it at the date it

9 was issued or shortly thereafter?

10   A. Yes.

11    Q. Looking at the second paragraph of this

12 statement, it states, and this again is July of

13 1999, quote, "there is a significant safety

14 margin incorporated into all the acceptable

15 mercury exposure limits. Furthermore, there are

16 no data or evidence of any harm caused by the

17 level of exposure that some children may have

18 encountered in following the existing

19 immunization schedule. Infants and children who

20 have received thimerosal-containing vaccines do

21 not need to be tested for mercury exposure." Did

Page 197

1 I read that accurately?

2   A. Yes.

3    Q. Now, when you read this statement for

4 the first time in 1999, were you aware of what if

5 any safety margin was incorporated into mercury

6 exposure limits?

7   A. Not at the time.

8    Q. Have you subsequently familiarized

9 yourself with that information?

10   A. Yes.

11    Q. Do you agree that there is a safety

12 margin incorporated in acceptable mercury

13 exposure limits?

14   A. I believe they attempted to put a

15 safety level in, which has been exceeded by an

16 enormous amount.

17    Q. Do you know what the intention was by

18 way of the margin? Was it intended to be a

19 tenfold safety margin?

20   A. That's the usual margin that's used. In

21 this case there actually is no safety margin.

Page 198

1 That is, the level that is approved is the level
2 at which there's demonstrable harm to cells and
3 tissue culture. In addition, even if you use a
4 tenfold, and we've tried that, it's still nowhere
5 near the level of exposure. The overexposure was
6 at least 140-fold.
7 　　Q. When you say the level at which it was
8 approved, what is the "it"?
9 　　A. I'm not sure what I meant either. The
10 level that they approve, which is, incidentally,
11 what I meant was 0.1, the FDA limit is 0.1
12 microgram per kilogram per day, and there's
13 another limit that's as high as 0.4 micrograms
14 per kilogram per day. Those levels have no
15 safety and in reality, even if you allow a
16 tenfold margin, you still vastly have exceeded
17 those levels.
18 　　Q. Okay. I need to try to go in smaller
19 pieces.
20 　　A. Okay.
21 　　Q. Are you aware that there are more than

Page 199

1 one governmentally-issued mercury exposure
2 limits?
3 　　A. Yes.
4 　　Q. Has the FDA issued one?
5 　　A. Yes.
6 　　Q. Has the EPA issued one?
7 　　A. Yes.
8 　　Q. Does the World Health Organization have
9 one?
10 　　A. Yes.
11 　　Q. Are you aware of differences between
12 them?
13 　　A. There were more differences than there
14 are now.
15 　　Q. In 1999 were there differences?
16 　　A. Yes.
17 　　Q. Do you understand in 1999 which was the
18 most stringent exposure limit, in other words,
19 putting the lowest limit on the recommended
20 exposure?
21 　　A. Yes, it was EPA.

Page 200

1 　　Q. And what was the EPA limit at that time?
2 　　A. 0.1 micrograms per kilogram per day of
3 orally ingested methylmercury.
4 　　Q. Am I correct that that exposure limit
5 was in no way prepared in connection with, for
6 the purpose of regulating vaccines?
7 　　A. That's correct.
8 　　Q. At the time that it was devised, was it
9 your understanding or is it your understanding
10 that EPA intended to use a safety margin in its
11 standard?
12 　　A. Yes.
13 　　Q. That was their goal?
14 　　A. Yes.
15 　　Q. Whether they correctly achieved it or
16 not, I'm not asking. I just want to know if that
17 is what they were trying to do?
18 　　A. Yes.
19 　　Q. And the goal they were trying for was
20 to have a tenfold safety margin, by which I mean
21 they would determine what they thought was the

Page 201

1 appropriate exposure level and reduce it to
2 one-tenth of that and make that the maximum level
3 of exposure; is that correct?
4 　　A. That's correct.
5 　　Q. At the time that the EPA created that
6 standard, do you believe that they did so in good
7 faith?
8 　　A. Yes, I do.
9 　　Q. When the American Academy of Pediatrics
10 and the United States Public Health Service
11 stated in July of 1999, there is a significant
12 safety margin incorporated into all the
13 acceptable mercury exposure limits, do you
14 believe that they believed that to be true as of
15 that time?
16 　　A. Yes.
17 　　Q. It indicated that in July of 1999 there
18 are no data or evidence of any harm caused by the
19 level of exposure that some children may have
20 encountered in following the existing
21 immunization schedules. Do you believe that that

Page 202

1  statement was intended to be truthful at the time
2  it was made?
3      A. Can you read it to me again or show it
4  to me?
5      Q. Yes, I'm in the second paragraph, in the
6  second sentence, which states, furthermore, there
7  are no data or evidence of any harm caused by the
8  level of exposure that some children may have
9  encountered in following the existing
10  immunization schedule.
11      A. It's not true, but I believe that they
12  may have intended it to be true.
13      Q. They may have thought it to be true?
14      A. Yes, at the time I think they may well
15  have thought it to be true. At least many of
16  them were not aware. There was data, the VAERS
17  database had already reported, if I recall one
18  of their internal memos, 1400 reports of
19  neurological problems with thimerosal, so to say
20  there was no data is inaccurate. But I'm not
21  sure that everybody who wrote this was aware of

Page 203

1  that. I don't think they were intentionally
2  trying to be false at that point. Their necks
3  had not yet been extended. They could have been
4  heroes at that point.
5      Q. All right. Now I want to take you over
6  to the right-hand column of Exhibit 8 on to the
7  six numbered points. In the following paragraph,
8  in moving down about halfway, can you locate a
9  sentence that begins with the words "given that
10  the risks."
11      A. I'm sorry, I must be -- the numbers one
12  through six?
13      Q. Past one through six, in the next
14  paragraph about halfway down.
15      A. Yeah, I see, given that the risks.
16      Q. All right. For the record I'll read
17  that sentence that I'm going to direct your
18  attention to, reads, quote, "given that the risks
19  of not vaccinating children far outweigh the
20  unknown and much smaller risk, if any, of
21  exposure to thimerosal-containing vaccines over

Page 204

1  the first six months of life, clinicians and
2  parents are encouraged to immunize all infants
3  even if the choice of individual vaccine products
4  is limited for any reason." Do you see that?
5      A. Yes.
6      Q. And do you understand that to mean that
7  in July of 1999, the AAP, the American Academy of
8  Pediatrics, and the United States Public Health
9  Service are saying even if you can only get a
10  thimerosal-containing vaccine, the risk/benefit
11  analysis suggests that you should be immunized
12  with that vaccine instead of not being immunized.
13  Do you understand that to be your position then?
14      A. Yeah, that was their position, and they
15  had an internal argument, which we've given you
16  the publication of it, some people in the academy
17  wanted to stop giving these vaccines to young
18  children and some didn't, and obviously from what
19  they published here those who didn't won the
20  argument.
21      MS. OWENS: Objection to

Page 205

1  responsiveness.
2      Q. (BY MR. THOMASCH) And assuming that you
3  believe this to be the product of an internal
4  dispute, the position that was published
5  indicated that the risk/benefit analysis favored
6  giving the vaccine, even if a
7  thimerosal-containing vaccine?
8      A. The dispute was not resolved over
9  risk/benefit. As their publication said, it was
10  resolved over the fear that some antivaccine
11  group, and I again wanted to divorce myself from
12  such groups, but that some antivaccine group
13  would jump on the fact that some vaccines were
14  better than others and they were afraid they
15  would do so much harm to the program that they
16  did not want to admit that they should avoid the
17  thimerosal-containing -- not a risk/benefit
18  analysis. It was a political, good for the
19  vaccine program decision, not a risk/benefit
20  decision.
21      Q. But they framed it in the publication as

Page 206

1 the benefits outweigh the risks, even if the only
2 vaccine is a thimerosal-containing vaccine;
3 correct?
4    A. That's how they termed it.
5    Q. Is it my understanding that you do not
6 believe that was believed by them at the time,
7 they had an alternative reason for wanting to
8 make that statement?
9    A. Yeah, maybe what they thought was a
10 good reason, but they had an alternative reason.
11    Q. And their alternative reason related to,
12 for whatever reason, they wanted to continue
13 vaccinations and not allow this to be used
14 against the vaccine program?
15    A. That's right.
16    Q. So they, with that goal in mind, made a
17 statement that at the time they made it they
18 understood to be false?
19    A. Well, they understood that it was
20 potentially false. I think that a lot of the
21 research, remember I agreed that people making

Page 207

1 false statements before, so I don't have any
2 problem with agreeing to that, but at this time a
3 lot of the papers and research that currently
4 shows it to be false hadn't been done. So I'd be
5 willing to soften that and say they weren't sure
6 that it was false, but they also weren't sure
7 what they wrote here was true. And in fact very
8 shortly thereafter they did discontinue giving
9 the hepatitis B to infants for a while. So you
10 can see that they did have a concern. And I
11 would like to give the people the idea that
12 they're doing it honestly. So I think that this
13 statement isn't absolutely false. They certainly
14 knew that it may well be false but I'm not sure
15 that they knew that it was false.
16    Q. All right. That statement in your mind
17 is a false statement, correct?
18    A. With the power of hindsight it's a
19 false statement, yes.
20    Q. And the question is whether or not
21 enough was known in 1999, could a reasonable

Page 208

1 person have believed this statement and you're
2 not certain about that, is that where we're at?
3    A. Yes, sir, that's where we're at.
4    Q. Now, at some point between 1999 and
5 2004, when the American Academy of Pediatrics put
6 forth the statements on its current web page that
7 we just talked about before lunch, do I
8 understand you to hold the opinion that the
9 academy recognized that the position that they
10 had taken exonerating thimerosal was false but
11 they were going to say it anyway?
12    A. Yes.
13    Q. Do you know when that occurred?
14    A. I don't think it all occurred in a
15 moment, and we have some memos and discussion
16 about it, but they had to know it was false
17 because, for example, you read to me that
18 therefore children do not have to be tested for
19 mercury exposure in this. And notice I didn't
20 stop you and say that was a lie. Maybe they
21 believed it. Can't believe it anymore because

Page 209

1 people have tested for mercury exposure and the
2 lab says they're mercury-toxic, and labs are hard
3 to argue with. These are officially approved
4 labs in multiple places.
5        So that statement was false. I hope
6 that they believed it was true at the time, but
7 it was clearly false. And therefore their
8 position now has become totally intentionally
9 false. They don't even address that issue. They
10 simply ignore it.
11    Q. All right. If you could go back to
12 Exhibit 12. That's the American Academy of
13 Pediatrics statement, What Parents Should Know
14 About Thimerosal.
15    A. Yes.
16    Q. All right. If we turn to the second
17 page, the third bolded question is, should
18 parents have their children who have received
19 vaccinations with thimerosal be tested for
20 mercury. Do you see that?
21    A. Yes.

Page 210

1    Q. So they're not currently ignoring this
2  issue, are they?
3    A. Yeah, they're just lying about it.
4    Q. All right. They state, no, infants and
5  children who have received thimerosal-containing
6  vaccines do not need to have blood, urine or hair
7  tested for mercury, the body eliminates a mercury
8  dose completely within 120 days. It doesn't stay
9  in your child's body. Do you see that?
10   A. That statement on its face is false.
11 It's also intentionally misleading because in
12 order to see the mercury after that you need to
13 do a challenge, and challenges are not exactly
14 unique in medicine. We do challenges in many,
15 many situations. But that's inherently false.
16 The mercury that gets to the brain is not gone in
17 120 days. So this is false and intentionally
18 misleading and incorrect. And disproven by
19 thousands of lab tests across the country in
20 multiple clinical centers.
21   Q. Okay. So it's the American Academy of

Page 211

1  Pediatrics lying to the American people about
2  whether or not they should have their children
3  tested who have already received the vaccination,
4  correct?
5    A. Yes. And it's a very unfortunate lie
6  because it hurts the children, because they can
7  be treated, and some of them actually respond.
8    Q. In 1999, you suggested that they may
9  have been concerned that if they had been
10 accurate about the risks, that that might have
11 been seized upon by some antivaccine groups and
12 might have prevented some children from being
13 vaccinated, correct?
14   A. Right, and I was trying to be -- say
15 that I understood their concern. I didn't agree
16 with it but they had some legitimate concern at
17 that time.
18   Q. Right. By 2004 they're addressing in
19 their public statements children who have
20 already been vaccinated, correct?
21   A. Yes.

Page 212

1    Q. What possible interest do you believe
2  they could have that would motivate them to lie
3  about whether those children should be tested for
4  mercury?
5    A. In 1999, remember I said they could
6  have been heroes, they almost were heroes, and we
7  have the documents to show it. Several of them
8  got up and argued and said we're not leaving
9  until we announce this, until everybody knows
10 about it. They were this close to being heroes.
11 But by 2004 they had already gone down the road.
12 Now it was their fault. In 1999 you could make
13 the case that they didn't know and, boy, they
14 found out and they corrected it. But by 2004
15 they had gone down the road and encouraged people
16 to vaccinate their children with poisons that
17 they knew were there when there were alternate
18 choices. Now they could no longer go back. Now
19 the die is cast. Now they have to deny it and
20 they will continue to deny it until the day they
21 die.

Page 213

1        But unfortunately the proof is
2  overwhelming for it because it's provable by
3  laboratory testing. And they've hurt children
4  because if you don't understand why these
5  children are damaged and you send them to a
6  psychiatrist for psychiatric help, you're going
7  to not remove the problem. And there are
8  hundreds of children now by thousands of doctors
9  who have responded, at least partially, some very
10 much, to removing this mercury. They caused this
11 damage and they're not able to be heroes, they
12 must lie. They have no choice.
13   Q. At all times from 1999 to the present,
14 the American Academy of Pediatrics has had
15 available to the public statements about the
16 safety of thimerosal in vaccine, correct?
17   A. Yes.
18   Q. There is always something on their
19 website that's periodically updated, but that
20 subject is a matter that they are on record on
21 continuously?

Deposition of - MARK R. GEIER, M.D., Ph.D. Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW   Document 231-2   Filed 12/07/04   Page 16 of 40 PageID
7951

November 11, 2004

Page 214

1  A. Yes.
2  Q. And the knowledge, the background
3 knowledge in the field you say has continued to
4 evolve over time; is that right?
5  A. Tremendously, yes.
6  Q. By the end of 2003, was it clear to you
7 that the statements being taken publicly by the
8 American Academy of Pediatrics at that point had
9 to be lies?
10  A. Yes. Clear to me and clear to Congress
11 and clear to investigators and clear to many,
12 many people in this field.
13  Q. By the end of 2003, which would be
14 subsequent to the August 2003 statement we looked
15 at from the WHO, was it clear to you that the WHO
16 was lying?
17  A. Yes.
18  Q. By the end of 2003, was it clear to you
19 that the Centers for Disease Control and
20 Prevention were lying when they said that there
21 was no evidence that thimerosal caused autism?

Page 215

1  A. Especially them, because we have
2 numerous memos on their part saying the opposite,
3 just numerous ones, particularly theirs.
4  MR. THOMASCH: We'll ask the reporter to
5 mark as your next exhibit Immunization Safety
6 Review Committee's report on vaccines and autism.
7  (Deposition Exhibit No. 15,
8 Immunization Safety Review Committee's report on
9 vaccines and autism, was marked.)
10  Q. (BY MR. THOMASCH) All right. Dr.
11 Geier, you have a copy of Exhibit 15, as does
12 counsel for the plaintiffs, and do you recognize
13 this document?
14  A. Absolutely.
15  Q. Let's get some terminology out of the
16 way first. What is the Institute of Medicine of
17 the National Academies?
18  A. It's a subsection of -- the National
19 Academy of Sciences is the most prestigious
20 scientific organization in the United States, and
21 the Institute of Medicine in general has been put

Page 216

1 together in order to advise the U.S. government
2 on various issues over the years.
3  Q. All right. Are you familiar with a
4 group within the Institute of Medicine called the
5 Immunization Safety Review Committee?
6  A. Yes.
7  Q. And what is the Immunization Safety
8 Review Committee?
9  A. A group that looks at vaccine problems
10 and immunization problems.
11  Q. All right. And if you would turn into
12 the document to the 5th page, counting the cover.
13 Little Roman numeral five, do you see that?
14  A. Yes.
15  Q. Does that page and the following page
16 identify the actual composition of the
17 Immunization Safety Review Committee?
18  A. Yes it does.
19  Q. And these are familiar names to you, are
20 they not?
21  A. Some of them, yes.

Page 217

1  Q. You recognize them as being part of the
2 committee?
3  A. Yes.
4  Q. And you recognize the committee
5 chairperson, Marie McCormick?
6  A. Especially the committee chairperson.
7  Q. Now, am I correct that the Immunization
8 Safety Review Committee has twice studied issues
9 relating to thimerosal-containing vaccines and
10 adverse outcomes, including autism?
11  A. Yes.
12  Q. And the first report of that committee
13 was in 2001, correct?
14  A. Yes.
15  Q. And that is not the report that's been
16 marked in front of you; correct?
17  A. That's correct.
18  Q. Is the 2001 report in your materials?
19  A. I think so.
20  Q. It's quoted at some length in your
21 report; is that not correct?

Page 218

1   A. Yes.
2   Q. And can we refer to that report as the
3 2001 IOM report?
4   A. Okay.
5   Q. And the report that is in front of you
6 now was issued on or about May 18th, 2004; is
7 that correct?
8   A. Yes.
9   Q. And we can call that either just the
10 IOM report or the 2004 IOM report; is that all
11 right?
12   A. Okay.
13   Q. Now, in advance of the 2004 IOM report
14 being issued, there was a public meeting held for
15 the presentation of certain evidence on the
16 subject matter, and that was in Washington, D.C.
17 in February of 2004, is that correct?
18   A. Yes. I went to it.
19   Q. Was there a similar meeting in advance
20 of the 2001 report?
21   A. I think so. I didn't go to that one,

Page 219

1 but I did go -- I was an invited speaker at this
2 one.
3   Q. So you were not a presenter at the
4 first one?
5   A. That's correct.
6   Q. You were a presenter at the 2004
7 meeting?
8   A. Yes.
9   Q. Now, when did you first learn that the
10 IOM was going to convene for a second time on the
11 subject of vaccines and autism?
12   A. Three, four weeks before February of
13 2004.
14   Q. How did you learn that?
15   A. One of the staff people, I think it was
16 Kathleen Straten called me.
17   Q. Staff of what?
18   A. Staff of this committee, the IOM
19 committee, and said that she would like us to
20 present, my son and I to present some of our
21 epidemiological data.

Page 220

1   Q. All right. Did she indicate the
2 subject matter that she wanted you to speak on?
3   A. Yes.
4   Q. What did she indicate it to be?
5   A. Thimerosal and autism.
6   Q. Was there anything more specific than
7 that?
8   A. Yeah, it was very specific. She only
9 wanted vaccine thimerosal epidemiological autism,
10 which I objected to. I wanted neurodevelopmental
11 disorders. Because to me this is, all of our
12 studies are on, if you read the titles, are on
13 neurodevelopmental disorders. But she only
14 wanted autism. And she only wanted
15 epidemiological, not biochemical or genetic or
16 any of the other things, the myriad of other
17 studies that are available.
18   Q. She only wanted that from you; is that
19 correct?
20   A. Yes, and she indicated that -- you
21 know, this is my fifth time of testifying before

Page 221

1 the IOM. And on all previous occasions I had
2 suggested that I would give them a copy of all of
3 our literature review since they were undoubtedly
4 interested in all the literature in the world,
5 and I offered her that here, and they refused.
6 They weren't interested in the world's
7 literature. Only on our epidemiological studies.
8   Q. Were you invited by telephone call did
9 you say?
10   A. Yes.
11   Q. Did you agree to testify at that time?
12   A. Yes. I made some requests, but I agreed
13 to testify subject to the requests.
14   Q. And what requests did you make?
15   A. I said I needed a minimum of an hour
16 and a half, that they needed to invite members of
17 the Congressional committee that's reviewing
18 this. That they allow all peer-reviewed
19 publications to be included in this presentation.
20   Q. What does that mean?
21   A. That means they had to take all the

Page 222

1 peer-reviewed publications, they couldn't just
2 take the three they wanted to hand-pick.
3    Q. You mean accept them for review and
4 consideration?
5    A. Yes.
6    Q. Did you ultimately provide the
7 committee with a paper submission in addition to
8 the oral presentation you made in February of
9 2004?
10   A. Yes, they told me they couldn't give me
11 an hour and a half because, you know, public
12 time is short. And I understood that so I said
13 how about private time, I'll come and tell you
14 what I know privately. They said that was
15 against the rules. So then I said how about I'll
16 submit all the stuff, and they said, well, we
17 can't stop you from submitting it but we're not
18 going to consider it. So when I did my
19 presentation I did indeed place that on their
20 desk so they did get a submission, which they did
21 not consider, mostly anyway.

Page 223

1    Q. Did you agree to speak in that
2 conversation?
3    A. Yes -- well, eventually I did. I said
4 I'd get back to them and eventually they did
5 indeed invite Congressman Dr. Weldon to speak.
6 There was a move on to block the whole happening
7 by Congress and by others because this was an
8 obvious blatant attempt to sweep things under the
9 rug and not to have a hearing. In fact Dr.
10 Weldon began the hearing by addressing IOM and
11 telling them that we all knew what they were
12 doing, they got 3 and a half million dollars from
13 CDC to hold a hearing that had such defined
14 parameters. We all knew that this was not an
15 attempt to get at, to quote it, to paraphrase his
16 opening remarks, this was not an attempt to get
17 at the truth but rather just sweep it under the
18 rug. We all knew this but we all decided we
19 would present anyway so they couldn't say we
20 didn't present, even though we knew before we
21 went there that they were not going to listen to

Page 224

1 this absolutely rapidly growing information that
2 thimerosal causes problems that comes from the
3 major universities in the United States.
4       MR. ELLIOTT: Objection, nonresponsive.
5    Q. (BY MR. THOMASCH) You said it was a
6 blatant attempt to block, to sweep everything
7 under the rug and to not have a hearing. Did you
8 misspeak?
9    A. I said it was a blatant attempt to,
10 rather than to get at the truth, to sweep the
11 truth under the rug. And that's a paraphrase.
12 You can get the actual text of Dr. Weldon's
13 opening remark. That was my attempt to
14 paraphrase his opening remarks before it began.
15   Q. Did you have any role in the
16 preparation of Dr. Weldon's opening remarks?
17   A. No.
18   Q. Did you see them in advance of them
19 being delivered?
20   A. No. But I knew his general feeling,
21 but I didn't -- I'm not his writer. He can take

Page 225

1 care of himself.
2    Q. Did you hear them when he delivered
3 them?
4    A. Yes.
5    Q. Did you agree with what he said?
6    A. Yes. And in fact they're on the tape,
7 part of it's on that WXYZ tape.
8    Q. So at the time that you made your oral
9 presentation in February of '04, you had formed
10 an opinion that the body, that the Immunization
11 Safety Review Committee was not legitimately
12 attempting to get to the bottom of the scientific
13 issue, but rather was trying to reach a
14 preordained conclusion, to quote you, to sweep it
15 under the rug?
16   A. To quote Dr. Weldon, yes, I was trying
17 to quote Dr. Weldon.
18   Q. Okay, and that is your opinion?
19   A. Yes, that's my opinion.
20   Q. Did you have that opinion on the day
21 that you accepted the invitation to speak?

Page 226

1    A. I had that suspicion. That's why I
2 said let me call you back. And I called up
3 Weldon and I called up some of the other Congress
4 people that are involved in this and I said, what
5 do you know about this? I mean, for all I knew,
6 maybe they really were going to have a hearing
7 that was going to be open. And they said no,
8 this is paid for, directed by CDC, so they did
9 confirm that they knew enough about it, they had
10 enough internal information to know that this was
11 not an open hearing, that these people were from
12 CDC, that CDC was requesting it, it was 3 and a
13 half million dollars paid for. Because when I
14 first heard it, I'm not an activist, I'm a
15 scientist, so for all I knew maybe Congress had
16 assembled an independent panel, but that was not
17 the case. We all knew very quickly that was not
18 the case here.
19    MR. ELLIOTT: Objection, nonresponsive.
20    Q. (BY MR. THOMASCH) You said it was not
21 an open hearing; is that your phrase?

Page 227

1    A. If I did, I didn't mean to say that. It
2 was open to the public. But this hearing was not
3 open to any other finding than the one they made,
4 and the finding is obviously and admittedly not
5 representative of even what the people said.
6    Q. So the committee had a preordained
7 agenda that they were going to come to the
8 conclusion that there wasn't a connection between
9 thimerosal and autism; is that your testimony?
10    A. Yes, that's my belief, yes.
11    Q. And do you believe they attempted to
12 invite individuals who had taken positions
13 publicly, such as yourself, that there was such a
14 link in order to make it look as though they were
15 being fair-minded?
16    A. Yeah, they invited us there so they
17 could try to discredit the work, yes. And in
18 fact, the work was coming out so fast that they
19 couldn't even manage it. Dr. Deth from
20 Northeastern and his colleagues from Hopkins and
21 Nebraska published during that time and so they

Page 228

1 couldn't, I'm sure they would have added him too
2 so they could have trashed him as well. But they
3 couldn't quite do it. There were so many
4 articles coming out from major peer-reviewed,
5 major centers in the United States that they
6 couldn't even do it. But the attempt was to put
7 up some of ours, those that believe the
8 thimerosal caused a problem so they could then
9 trash the studies.
10    Q. Well, they could have commented on your
11 studies without inviting you to speak; could they
12 not?
13    A. That wouldn't have looked good. In my
14 opinion, that would have been poor form.
15    Q. So it wasn't simply window dressing,
16 they were looking for an opportunity in advance
17 to trash your studies and felt that to do so they
18 needed to invite you to speak; is that your
19 opinion?
20    A. Absolutely. In fact, the American
21 Academy of Pediatrics had already trashed our

Page 229

1 study on an unsigned web attack within days of
2 our studies coming out.
3    Q. I want to focus on this period between
4 when you were invited to speak and when you
5 actually spoke. As I understand your testimony,
6 during that time period, which was several weeks,
7 you spoke with some individuals connected with
8 Congress?
9    A. Yes.
10    Q. To find out what they knew about this
11 hearing, correct?
12    A. Yes.
13    Q. At some point in that process you
14 learned that in your mind this was not going to
15 be a fair hearing, correct?
16    A. Yes.
17    Q. Did you speak with anyone about whether
18 or not, in light of that fact, you should decline
19 to speak at the hearing?
20    A. Yes.
21    Q. Who did you speak to in that regard?

Page 230

1    A. Weldon's staff and Burton's staff.
2    Q. All right. And what did they advise
3 you, if anything?
4    A. They thought that although nothing we
5 said and when we spoke was going to change what
6 they were going to say, we all had to play our
7 part in the forum. That is, it would be bad form
8 for them not to invite us and it would be bad
9 form for us not to attend. So they thought it
10 would be best for us to attend and put it out in
11 the public, let the press write about it and let
12 the parents hear it. Because it still was a
13 hearing. We got up on the stage and people could
14 hear what we said even though we knew what the
15 report was going to say.
16    Q. Were you troubled by what you viewed as
17 a preordained result to trash your studies before
18 you spoke?
19    A. Yes. They continue to do it more now.
20    Q. Did you speak with other presenters in
21 advance of the date of the public hearing?

Page 231

1    A. I may have spoken to a couple of other
2 people that were speaking. I don't recall
3 whether I did or not before or afterwards.
4    Q. Do you know whether anyone who was
5 invited to speak and who had previously taken the
6 position publicly that there was a link between
7 thimerosal and autism declined to speak?
8    A. Not that I know of. We had made the
9 decision that we would all speak.
10    Q. When your say "we" made the decision,
11 that's what I'm trying to get at. Who is "we"?
12    A. Dr. Weldon and the Congressional
13 committee that had supported some of the work had
14 asked us to speak. Obviously they don't own us,
15 and I could have said no, and others could have
16 said no, but they were encouraging us to speak
17 anyway. And what they said is Weldon would get
18 up and set it straight before it begins, and he
19 did.
20    Q. Just to be clear, when you say they
21 encouraged us to speak, you're not limiting the

Page 232

1 "us" to yourself and your son, but you're
2 including Dr. Bradstreet and Dr. Hornig and
3 others who had published or who had taken the
4 position that there might be a link; is that
5 correct?
6    A. Yeah, I mean, I don't know, I don't
7 think I had met Hornig at the time in my life,
8 but I was told that Weldon, to the extent, Weldon
9 and his office and Burton and his office, to the
10 extent they had influence, they were going to
11 ask those who were asked to speak to speak.
12 Obviously they don't own any of them and maybe
13 there was one that turned it down, but as far as
14 I know, everybody did come who was asked.
15    Q. Can you turn to page 25 of Exhibit 15.
16    A. Okay. I'm there.
17    Q. All right. And do you see the caption
18 the framework for scientific assessment?
19    A. Yes.
20    Q. And under that causality?
21    A. Yes.

Page 233

1    Q. And it indicates that well in advance of
2 this particular hearing the Immunization Safety
3 Review Committee had adopted a framework for
4 assessing causality; is that correct?
5    A. Yeah, in fact, this is the same
6 framework that goes all the way back to the early
7 '0s, if you remember the other IOM hearings.
8    Q. And what they do is they agree that
9 they will ultimately conclude with one of five
10 different conclusions?
11    A. Yes.
12    Q. And they set those out at page 25,
13 correct?
14    A. Yes.
15    Q. And would you agree with me that the
16 strongest negative conclusion that the committee
17 has as a possible conclusion is conclusion 3,
18 which reads evidence favors rejection of a causal
19 relationship?
20    A. Yes.
21    Q. Now, if you turn to page 16 of the 2004

Page 234

1 IOM report marked as Exhibit 15, do you see box
2 ES-1, committee conclusions and recommendations?
3    A.  Yes.
4    Q.  And the first recommendation and first
5 conclusion is the scientific assessment
6 causality conclusion with respect to
7 thimerosal-containing vaccines, the second one
8 relates to the MMR vaccine which doesn't contain
9 thimerosal, correct?
10    A.  Correct.
11    Q.  And the first conclusion is, quote, the
12 committee concludes that the evidence favors
13 rejection of a causal relationship between
14 thimerosal-containing vaccines and autism; is
15 that correct?
16    A.  That is correct.
17    Q.  And so the conclusion they reached was
18 the strongest negative conclusion available to
19 them pursuant to their own preexisting framework
20 which goes back to the first meeting of the
21 committee on different subject matter, correct?

Page 235

1    A.  Correct.
2    Q.  Now, is it your belief, as you sit here
3 today, that they had decided to reach that
4 conclusion before they ever held the public
5 hearing?
6    A.  Yes, and not only that, it's my belief
7 that they don't believe it, based on interview of
8 Marie McCormick by the Wall Street Journal, in
9 which she said everybody on the committee knows
10 that thimerosal causes damage, immunological
11 damage, and parents should avoid it whenever
12 possible.  That's published in the Wall Street
13 Journal a couple days afterwards.
14       MS. OWENS:  Objection, nonresponsive,
15 move to strike.
16    Q.  (BY MR. THOMASCH)  This conclusion
17 specifically states that the evidence favors
18 rejection of a causal relationship between
19 thimerosal-containing vaccines and autism,
20 correct?
21    A.  Yes.

Page 236

1    Q.  And you understand that autism is
2 defined in the study to include autistic spectrum
3 disorder, correct?
4    A.  Yes.
5    Q.  And is it your belief that that finding
6 is not only false but is intentionally false?
7    A.  Oh, yeah.
8    Q.  Now, is it your statement that Marie
9 McCormick knows that finding linking
10 thimerosal-containing vaccines to autism is
11 false?
12    A.  I can't get in her head.  I'm not sure
13 about that.  I'm sure that she knows that the
14 report is false.  But then every statement in the
15 report is false.  I don't know what her beliefs
16 are, her honest beliefs are.  But I know that the
17 report says they make no recommendation to avoid
18 thimerosal, and she made the recommendation to
19 avoid, so that's clearly false.  The report says
20 there's no evidence of any damage and she said
21 there was damage.  That's false.  Whether she

Page 237

1 actually believes that she's not convinced that
2 thimerosal causes the damage, I can't say, but
3 it's amazing if she wouldn't be.
4    Q.  Okay.  And when you say she's made
5 these statements, these are statements that were
6 published in the Wall Street Journal subsequent
7 to May 18th, 2004?
8    A.  Yes, I believe they're in one of our --
9    Q.  In one of your notebooks?
10    A.  Yes.
11       MS. OWENS:  I'm sorry.
12       MR. THOMASCH:  In one of the notebooks,
13 yes.
14    Q.  (BY MR. THOMASCH)  Do you believe that
15 Marie McCormick, the chairperson of the
16 committee, was of the mind that she was going to
17 have the committee reach the strongest possible
18 negative conclusion before the date of the
19 hearing?
20    A.  Yeah, in fact, I won a case of Coke on
21 it.  I bet on it before it happened and I won.

Page 238

1    Q. Do you believe that the committee --
2    withdrawn. Do you believe that the Immunization
3    Safety Review Committee decided on its own to
4    issue a false report or were they instructed to
5    do so by someone or something else?
6        A. Let's make it a little softer. They
7    were in -- they were -- the instructions for
8    doing this from the CDC were so restrictive that
9    they could find nothing else. The CDC not only
10   gave them the 3 and a half million dollars, but
11   they gave them a sheet of parameters to use, and
12   that incidentally has been requested under the
13   Freedom of Information Act and has been refused.
14       But it's my belief that their parameters
15   were so restrictive and I can't -- since I don't
16   have it I can't tell you exactly, but it was
17   something like you can't count the clinical work,
18   you can't count the laboratory work, you can't
19   count the monkey work, you can't count the tissue
20   culture work, you can't count anybody's
21   epidemiology unless they work for the government,

Page 239

1    then go find what you find. It was something
2    like that. It was so restrictive that you
3    couldn't have possibly found anything other than
4    what they found.
5        Q. Was that in writing?
6        A. I believe it was. In fact, they
7    admitted such a thing exists to Dr. Brian Hooker,
8    who made a Freedom of Information request. But
9    they say that that piece cannot be released
10   because it would adversely affect the findings or
11   something like that.
12       Q. Who is the "they" in your last answer,
13   when you say they have admitted that such a thing
14   exists?
15       A. The answer to his Freedom of
16   Information request came back that, I don't know
17   who the officer was that answers that, but the
18   department of Freedom of Information gave him
19   everything he wanted except that sheet of paper
20   and they said it does exist, they can't release
21   it.

Page 240

1    Q. Who is Dr. Brian Hooker?
2        A. He's a federal employee who works in
3    Seattle, I think, and also parent of an autistic
4    child, who's been very interested in this, he's
5    one of the thousands of people that are very
6    interested in this.
7        Q. Have you had contacts with him
8    directly?
9        A. I've spoken to him a couple of times.
10       Q. Have you seen the Freedom of
11   Information request that he made?
12       A. I've seen the answer. I didn't see the
13   request but I saw the answer.
14       Q. Is a copy of the answer in your
15   materials here?
16       A. I don't know. If it isn't, we'll
17   provide it to you.
18       Q. You would have a copy of it?
19       A. If we can find it, we'll provide it to
20   you. It may be in there. If we still have it,
21   we'll provide it to you.

Page 241

1    Q. I would request a copy.
2        A. Can I make one statement on this? At
3    the end of this, if anything that you request
4    that I promised like that, if you would put it on
5    a memo or something and send it to plaintiff's
6    attorney, and then he will forward it to me,
7    we'll make every attempt to answer your request.
8        Q. We will send a letter on.
9        A. Thank you.
10       MR. ELLIOTT: I want the record to be
11   clear that we have issued a subpoena that has
12   requested the documents that Merck wants you to
13   produce. I don't want you to think that we're
14   giving up our request. I have not seen your
15   objection so I don't know to what extent you have
16   said we're not going to produce something or we
17   object. But I don't want this to be read as
18   only what he requested in a follow-up letter
19   we're not going to look at the subpoena.
20       MR. SMITH-GEORGE: But we've produced 17
21   notebooks and copious amounts of loose paper. We

Page 242

1 produced -- even though we object to the subpoena
2 we produced his entire file. So we're not
3 disregarding the subpoena, though we object to
4 the breadth of the subpoena, and I think we've
5 done our best to produce everything that you all
6 are entitled to.
7     MS. OWENS: We'll argue that another
8 time, but just let me state on the record, having
9 now looked at all these notebooks, I disagree
10 with you.
11     MR. SMITH-GEORGE: You can disagree all
12 you want. If he doesn't have it, he didn't bring
13 it.
14     MR. THOMASCH: I'm not going to get in a
15 discovery fight now. But I do believe we have a
16 subpoena out, I am not in a position because I
17 haven't had a chance to look at the 17 volumes to
18 evaluate whether or not you've complied with it,
19 but to the extent you have an objection on
20 overbreadth, have materials that you're not
21 producing because you think that what we're

Page 243

1 asking is overly broad, I do think we need to
2 clarify that and have a meet and confer on it if
3 necessary. You may have an objection but you're
4 actually not withholding materials because of
5 that objection, that's a different situation.
6     MR. SMITH-GEORGE: That's what my
7 position is. We've produced everything that's in
8 his files despite our objection.
9     MR. THOMASCH: Judge Ward has just made
10 it very, very clear that we need to make clear
11 when an objection is made, whether or not things
12 were withheld because of the objection.
13     MR. SMITH-GEORGE: We're not
14 withholding any documents that I know of. You
15 can go through your subpoena request if you want
16 to, and there may be, one thing I know -- I say
17 we're not withholding anything. There was one
18 request for all documents related to any
19 rejections of articles. We did bring one
20 regarding the review --
21     MS. OWENS: Excuse me, can we do this

Page 244

1 off the video record?
2     MR. THOMASCH: We'll finish up.
3     MR. SMITH-GEORGE: Let me finish this.
4 Expert review of vaccines, we didn't produce all
5 of the rejections or modifications of every
6 publication he's ever had because he has a
7 problem with doing that because of the whole
8 double blind peer review process. And we didn't
9 produce some of the VSD data because he signed
10 confidentiality agreements with VSD, with the
11 HMOs. We didn't provide the VAERS data because
12 he signed confidentiality agreements.
13     So there are some things that we haven't
14 produced that when you go through the subpoena
15 you'll find out why we haven't produced them.
16 It's not because we're maintaining -- the reason
17 why they're not being produced is because there
18 is a confidentiality reason why we can't produce
19 them.
20     MR. THOMASCH: That I would ask, the
21 specifics of what is being withheld under the

Page 245

1 grounds of confidentiality be identified to us so
2 we know what we're talking about and then we can
3 deal with each other in the first instance and
4 the Court if necessary thereafter.
5     MR. SMITH-GEORGE: Let me just clarify
6 for the record, I have no objection to producing
7 that material if the defendants get the agreement
8 from the VSD, the HMOs, the IRBs, and all the
9 people that he signed confidentiality agreements
10 with saying he wouldn't produce that material.
11     MS. OWENS: Excuse me, has he brought
12 with him today those confidentiality agreements?
13     MR. THOMASCH: That was my question.
14     MR. SMITH-GEORGE: No, he has none.
15     MR. THOMASCH: All right. I would ask
16 for the production of those confidentiality
17 agreements so we understand what restrictions
18 there may be and what process one may need to go
19 through.
20     Q. (BY MR. THOMASCH) Do you have any
21 understanding or opinion as to who at the CDC

Deposition of MARK R. GEIER, M.D., Ph.D. — Multi-Page™

Vera Easter, et al. v. American Home Products, Corp.    Case 5:02-cv-01440-FB    Document 254-11    Filed 12/07/04    Page 24 of 40 PageID #: 7959    November 11, 2004

Page 246

1  made the decision to put restrictions on the type
2  of evidence that the Immunization Safety Review
3  Committee could and could not accept?
4     A.  Yeah, it's this vaccine group at the
5  CDC, the immunization group at the CDC.  It's a
6  group of relatively small number of people, I
7  don't know, 15, that -- and when I say CDC
8  throughout this deposition, that's who I mean.
9     Q.  Okay, can you --
10    A.  I don't have a problem with the CDC in
11  general.  In fact, there are many, many people in
12  the CDC who agree with me.  I have a problem with
13  this small group of vaccine -- the vaccine
14  immunization group at the CDC.
15    Q.  All right.  Now, there is a national
16  immunization program at the CDC; are you familiar
17  with that?
18    A.  Yeah, that's who I mean.
19    Q.  That's who you mean?
20    A.  Yes.
21    Q.  Are there any individuals there who you

Page 247

1  can identify by name that you believe are
2  involved in this?
3     A.  Robert Chen, Brenier, Destefano, those
4  are the three that come to mind immediately from
5  that program.
6     Q.  And --
7     A.  A little more peripherally, Robert
8  Davis.
9     Q.  Now, going back to Exhibit 15, and
10  looking at the committee, you have indicated that
11  you know of Marie McCormick.  Who else do you
12  know of?
13    A.  Well, on the second page of the thing is
14  Richard Johnston, he's a particularly
15  interesting person to have on the committee.  He
16  was at Simpsonwood.  He's the gentleman who on
17  the Simpsonwood transcript said that he wouldn't
18  give the vaccine to his children, a
19  thimerosal-containing vaccine to his children,
20  but he didn't want to tell the rest of the world
21  about it.  I think that would disqualify him if I

Page 248

1  were putting together a committee that was
2  supposed to have no previous knowledge of this.
3  He sat through two days of the Simpsonwood
4  hearings where they discussed their own findings
5  that showed an association and discussed how they
6  were going to make this association go away and
7  how this should never get out and how there
8  should be a secret meeting.  I don't think he can
9  be qualified.
10    Q.  This committee, you indicated you have
11  testified before this committee on five
12  occasions, correct?
13    A.  Six now, I believe.  This was the fifth
14  one.
15    Q.  Six, and only one of those pertained to
16  thimerosal and autism; is that correct?
17    A.  Well, the sixth one had sort of an odd
18  pertaining to thimerosal.  The sixth one, which
19  happened after the February one, was on why are
20  they going to come out and why are they going to
21  say we can't see the VSD data.  We all know -- it

Page 249

1  hasn't come out but I'll make a prediction on the
2  record, they're going to come out with some
3  excuse why we should not be allowed to see their
4  data, and there's a 7th one that going to come
5  out that says why we can't use the intermediate
6  data sets and all those memos inside that say
7  that they agree with us.  They really are busy
8  beavers trying to use the IOM to cover their tail
9  and it doesn't work.
10    MS. OWENS:  Motion to strike.  The
11  answer is nonresponsive to the question.
12    Q.  (BY MR. THOMASCH) All right.  The -- so
13  the two times that you've had testimony that
14  somehow relates to the question of
15  thimerosal-containing vaccines and autism are
16  both in 2004, correct?
17    A.  Yes.
18    Q.  The preceding times related to other
19  issues?
20    A.  Yes, DTP and other -- and VAERS, other
21  issues, other vaccine issues.

Page 250

1    Q. And the committee goes back how far, do
2 you know?
3    A. With me or -- the earliest one I know on
4 vaccines was in 1985 when they recommended
5 removal of whole-cell DTP. That's the first one
6 I'm aware of. There may have been others before
7 that.
8    Q. Do you know whether some of the
9 individuals currently on the committee were
10 previously on the committee in connection with
11 those other reports?
12    A. Other than staffers, I think this is a
13 new committee.
14    Q. Do you know when this committee was
15 appointed?
16    A. Yeah, about three or four years ago.
17 They've had a whole series of hearings on
18 vaccines, all of which say the same thing.
19 Vaccines cause nothing, vaccines cause nothing,
20 and you know what else, vaccines cause nothing.
21    Q. Do you think that these individuals were

Page 251

1 selected because they had that point of view or
2 were they fair-minded individuals who were then
3 either constrained to come to out with that view
4 or told to come out with that view?
5    A. I don't know which of the two, but one
6 of the two. Because the things they've come out
7 with, in addition to this, things that I'm not
8 even necessarily related to are outrageous and
9 have later been shown by numerous subsequent work
10 to be wrong.
11    Q. So for whatever the reason, in your
12 opinion, the current composition of the
13 Immunization Safety Review Committee is not a
14 group of fair-minded objective scientists whose
15 work product reflects their honest beliefs as
16 scientists; is that correct?
17    A. Yeah, it hasn't worked. We haven't
18 gotten an honest hearing. Which is not what I
19 would say about some of the earlier ones.
20    Q. All right. Now, that position is a
21 position that you haven't been shy about telling

Page 252

1 them about; is that correct?
2    A. I've not been shy about it, nor has the
3 Congressman nor has the Office of Independent
4 Counsel, nor has the Inspector General. They've
5 all been very vocal about saying this report
6 notwithstanding, we better investigate for
7 possible criminal action as well as complete
8 mishandling of the vaccines, and we gave you
9 those memos.
10    MS. OWENS: Objection to the
11 responsiveness.
12    Q. I want to read to you one sentence out
13 of the February 9th, 2004 transcripts of your
14 remarks, and ask you if you remember making the
15 statement. The statement at page 182 of the
16 transcript is, quote, what is occurring here is a
17 cover-up under the guise of protecting the
18 vaccine program. Do you recall that?
19    A. Yeah, and I'm for the vaccine program,
20 and if you keep covering it up you're not going
21 to have a vaccine program. And I'm pleading with

Page 253

1 them don't kill the vaccine program, come out,
2 come clean. That's what I'm saying.
3    Q. I'm trying to understand, the cover-up
4 is the product of direction from the national
5 immunization program of the CDC?
6    A. Funded and influenced by the vaccine
7 companies as well as the American Academy of
8 Pediatrics funded and influenced by the vaccine
9 manufacturers as well as the Brighton members
10 funded and influenced by the vaccine
11 manufacturers, yes.
12    Q. And do you view the European agency, the
13 EMEC, as part of the same cover-up or simply
14 involved in its own separate cover-up that
15 happens to have the same result?
16    A. There's an overlap. I mean,
17 historically they actually came to the CDC and we
18 have -- we've provided you with documents with
19 that saying they were the reason why the 1999
20 recall, the announcement that you showed me came
21 about was the Europeans said you better do this,

**Page 254**

1 and they got them going on it. So they know
2 about it.
3        But on the other hand, they also have
4 some culpability. Even though a lot of their
5 members have outlawed thimerosal, they still have
6 a problem that some of their members still have
7 thimerosal and they're not going to come out and
8 say that thimerosal caused damage. They have a
9 parallel, an overlapping causation reasons.
10    Q.  You referred to yourself as a, quote,
11 independent researcher, correct?
12    A.  Yes.
13    Q.  Do you recognize the name Margaret
14 Bauman?
15    A.  Yes.
16    Q.  Who is Margaret Bauman?
17    A.  She's a pediatrician, I believe, who
18 published a paper in Pediatrics. When we
19 published our paper in the Journal of American
20 Physicians and Surgeons, the American Academy of
21 Pediatrics attacked us viciously in an unsigned

**Page 255**

1 website piece, and one of the things they quoted
2 was her paper, and one of the things they said in
3 the attack on us was why we didn't comment, if
4 we're so knowledgeable in the field, why didn't
5 we comment on her paper. It was published after
6 ours. I don't have a time machine is the reason.
7 She basically in that piece said there is no
8 autism epidemic and ethylmercury and
9 methylmercury, ethylmercury bad, ethylmercury
10 good. Those are both indefensible from
11 scientific literature.
12    MS. OWENS:  Objection to the
13 responsiveness of the answer. Please confine
14 yourself to --
15    THE DEPONENT:  That's what he asked me.
16 And I tried to answer it.
17    Q.  (BY MR. THOMASCH)  Is Margaret Bauman
18 affiliated with the child's -- children's
19 neurology service of Harvard Medical School?
20    A.  I believe so.
21    Q.  Do you recognize Karen B. Nelson?

**Page 256**

1    A.  That's the other author, Nelson and
2 Bauman were the two that wrote those, yes.
3    Q.  All right.  Do you understand her to be
4 from the neuroepidemiology branch of the
5 National Institute of Neurological Disorders and
6 Stroke?
7    A.  Yes.
8    Q.  Do you need a break?
9    A.  Sorry.
10    Q.  Would you like some water?
11    A.  I've got my Diet Coke.
12        MR. THOMASCH:  Let me have marked as
13 Exhibit 16 an article coauthored by Drs. Nelson
14 and Bauman.
15        (Deposition Exhibit No. 16, article
16 by Drs. Nelson and Bauman entitled thimerosal and
17 Autism, was marked.)
18    Q.  (BY MR. THOMASCH)  Now, in asking you
19 if you knew who Margaret Bauman was, you made
20 reference to an article.  Is Exhibit 16 the
21 article to which you were referring?

**Page 257**

1    A.  Is this one from Pediatrics?
2    Q.  Yes.
3    A.  Yes, this is it.  I believe this is
4 correct, yes, sir.
5    Q.  Do you know how long Dr. Bauman has
6 been involved in the scientific study of autism?
7    A.  For some time.  I don't know how long.
8 But many years.
9    Q.  Do you consider her a, quote,
10 independent researcher?
11    A.  I don't know.  I don't know enough
12 about her funding sources at the moment to make a
13 comment on that.  I can only comment that her
14 opinions as expressed in this paper are
15 laughable.  There's no epidemic, it's increased
16 diagnosis?  That's absurd.
17    Q.  All right.  You indicated that they
18 were laughable.  At the time they were published,
19 and this indicates that it was accepted for
20 publication December 2, 2002, and copyrighted in
21 2003, do you see that on the first page?

Page 258

1  A. Yes.
2  Q. At that time, do you believe that these
3 opinions could have been the product of an
4 honest review of the medical literature and a
5 fair analysis according to this individual
6 author's opinions?
7    A. Could have been honest. I don't know
8 her motivation. I just know the opinion is, you
9 know, not supported by the scientific fact, and
10 in fact, you could take a nonscientist off the
11 street and know that it's not true, go to any
12 school and see it's not true.
13  Q. Looked at this way, if this is an
14 honest opinion as of this date as set forth in
15 Exhibit 16, does it reflect severe incompetence
16 on the part of the author?
17    A. Yes.
18  Q. So either the author is severely
19 incompetent but honest, dishonest, or a
20 combination of the two?
21    A. Yes.

Page 259

1  Q. But a competent, fair-minded and expert
2 author could not come to these conclusions at the
3 date of this article; is that your testimony?
4    A. Yeah, you could not come to the
5 conclusion there's no autism epidemic. It's been
6 published out of the state of California by their
7 own services. It's been published in JAMA. It's
8 been published in Pediatrics. And you don't have
9 to publish because you can look at any education
10 department statistics, you can go to any school,
11 there are schools now reporting more buses with
12 handicapped children than normal children. This
13 epidemic cannot be swept under the rug. This is
14 the greatest iatrogenic epidemic that has ever
15 occurred and it will not be swept under the rug.
16 And you can't take that position.
17    MR. ELLIOTT: Objection, nonresponsive.
18  Q. (BY MR. THOMASCH) All right. The
19 article goes well beyond a discussion of whether
20 there is or is not an epidemic of autism, does it
21 not?

Page 260

1  A. Yes.
2  Q. In particular the article indicates
3 that the symptoms of autism and the symptoms of
4 mercury poisoning are dissimilar; is that
5 correct?
6    A. In three of them or something, they
7 argue with three or four out of the hundred.
8 They don't dispute the other 96 that Redwood and
9 her authors reported. In fact, I use that in my
10 talk, in fact, I try to be fair. When I show the
11 hundred or so symptoms I always say that if
12 Pediatrics was here, American Academy, they would
13 say they dispute four of them, so I'll buy that
14 and say it's only similar 96 out of a hundred.
15 It's part of my talk. I don't think they're
16 right, but it's overwhelming the similarities
17 between the two. That incidentally doesn't prove
18 it. I've always said that. But they're
19 overwhelming.
20  Q. Does their observation to the contrary
21 reflect either dishonesty or incompetence?

Page 261

1    A. No, I think they may honestly believe
2 that those four are slightly different, and maybe
3 they are, as I said.
4  Q. They weren't purporting to limit their
5 analysis to those, were they?
6    A. What they're trying to do in this paper
7 is convince you that the autism epidemic was not
8 caused by the vaccines. That is incompetent or
9 bought off or a combination thereof. The
10 evidence of the association between the two is so
11 overwhelming, as I said in the statement you
12 quoted before, it's not -- there's no scientific
13 dispute here. All that's going on here is just
14 the cover-up. And you guys are protecting the
15 vaccine program and if you keep covering it up,
16 you're not going to have a vaccine program.
17    MR. ELLIOTT: Objection, nonresponsive.
18  Q. (BY MR. THOMASCH) Are you aware of the
19 discussion in the Bauman and Nelson paper with
20 respect to similarities or differences between
21 ethylmercury and methylmercury?

Page 262

1  A. Yes.

2  Q. Is it your view that the statements in
3  that regard and the conclusions reached by the
4  authors are patently inaccurate?

5  A. Yeah, they either didn't look them up on
6  Medline or they didn't read them or they didn't
7  want to hear about it. Because, again, papers
8  are papers. I didn't publish them. They've been
9  published all over the world in all sorts of
10  animal and human systems. It doesn't hold up.
11  There are just so many papers that it doesn't
12  hold up. You can't just simply declare that
13  they're different when there are 20 to 30 papers
14  in pigs and cows and sheep and mice and rats and
15  monkeys and humans and anything else I'm sure I
16  left out, like I like to call it, ants to
17  elephants, it's been shown.

18  Q. Are you familiar with the phrase
19  peer-reviewed literature?

20  A. Yes, I am.

21  Q. And peer-reviewed journals?

Page 263

1  A. Yes, I am.

2  Q. Is Pediatrics, within which the Bauman
3  and Nelson article was published, a peer-reviewed
4  journal?

5  A. Yes, it is.

6  Q. What does that mean?

7  A. It means that the articles are
8  submitted double blind, if they do it correctly,
9  to people that the journal picks out to be
10  experts, and they recommend changes and/or
11  whether the article should be accepted with
12  changes, without changes, whatever. I'm not
13  sure, incidentally, if this is a peer-reviewed
14  article. I'm not saying it isn't. But many
15  journals' commentary are not peer-reviewed. They
16  may be editorial reviewed. So I don't know if it
17  is or isn't. Some journals peer-review
18  commentary, some journals don't peer-review
19  commentary. I'm not criticizing that, by the
20  way, but just for the point, I'm not sure this
21  was a peer-reviewed article.

Page 264

1  Q. Let me briefly go back to the IOM 2004
2  report, Exhibit 15, page little Roman numeral 7,
3  do you see there, the reviewers?

4  A. Yes.

5  Q. Do you understand that those
6  individuals were asked to review the report
7  before it issued?

8  A. Yes.

9  Q. And in fact played the role in a sense
10  of the peer reviewers?

11  A. Yes, and I have problems with who's on
12  that list as well.

13  Q. And what problems do you have in that
14  regard, just briefly?

15  A. Well, we've got Neil Halsey, he's the
16  gentleman who in the, what I call the hepatitis
17  review -- hepatitis control article said he's not
18  leaving until the companies and the CDC and the
19  FDA agree to announce the damage they've done to
20  the children and to announce to every
21  pediatrician and every doctor. He's also the one

Page 265

1  that said in the New York Times, if I had been
2  able to calculate the amount of thimerosal in
3  micrograms, I would have never let this happen.
4  He's also the one that attacked the Verstraeten
5  article. But he's also the one that on many
6  occasions has defended and tried to hide what's
7  going on here.

8  So he's sort of a fence-sitter, but he's
9  not a disinterested party. He's the head of an
10  institute at Johns Hopkins that's supposed to be
11  vaccine safety which he claims is independent,
12  but was set up totally on money provided by the
13  vaccine manufacturers, as he said in his sworn
14  testimony. I happened to have been there at the
15  time.

16  Q. Do you know who selected these
17  reviewers to peer-review the IOM report before it
18  was issued?

19  A. No.

20  Q. Do you believe these individuals were
21  picked because of preexisting views that were

Page 266

1 consistent with the preordained results that you
2 testified the CDC wanted to have?
3    A. I have no idea. Peter Meyers I believe
4 is from George Washington, he's an attorney. I
5 don't know all of these people, I don't know why
6 they were picked. But the report is highly
7 controversial and has been challenged on the
8 floor of Congress and has been challenged by, as
9 I said, the IG, the Inspector General of HHS
10 itself and the President's Office of Independent
11 Counsel and everyone else because it contains
12 things that no scientific report can contain such
13 as no further studies should be done along these
14 lines. I've never read that in my entire life.
15 It contains that children should not be treated
16 for mercury toxicity even though the labs say
17 they're mercury-toxic. It's an outrageous
18 report. In fact, it coalesced the fence-sitters
19 to oppose the vaccine manufacturers. This was a
20 mistake.
21    MR. ELLIOTT: Objection, nonresponsive.

Page 267

1    Q. (BY MR. THOMASCH) You're aware, are you
2 not, that the AAP statement, the CDC statement,
3 and the EMEA statement that we previously looked
4 at from 2004 all make reference to the IOM report
5 as supporting their position?
6    A. Oh, sure.
7    Q. Do you believe that the IOM was
8 attempting to influence those agencies or
9 organizations in that way?
10    A. No, I think that the organizations,
11 particularly the CDC, had this IOM report
12 specifically tailored to cover their tail, and it
13 had the opposite effect. In reality it's going
14 to ultimately have the opposite effect. It's so
15 outrageous that nobody's going to ever buy it.
16    Q. Do you know an individual by the name of
17 Dr. Andrew Zimmerman?
18    A. No.
19    Q. Do you know an individual by the name of
20 Dr. Sarah Parker?
21    A. No, at least not off the top of my

Page 268

1 head.
2    Q. Have you ever -- withdrawn.
3    MR. THOMASCH: Ask the reporter to mark
4 as Exhibit 17 an article captioned
5 Thimerosal-Containing Vaccines in Autistic
6 Spectrum Disorder: A Critical Review of
7 Published Original Data, the lead author of which
8 is Sarah K. Parker, M.D., accepted for
9 publication May 19, 2004, and appearing in the
10 September 3, 2004 journal of Pediatrics.
11    (Deposition Exhibit No. 17, article
12 entitled Thimerosal-Containing Vaccines in
13 Autistic Spectrum Disorder: A Critical Review of
14 Published Original Data, was marked.)
15    A. I'm familiar with this article. I'm
16 very familiar with this article. And there's
17 going to be a withdrawal, a retraction agreed to
18 by the journal.
19    Q. (BY MR. THOMASCH) All right. Well,
20 let's cover that briefly then. You have read
21 this before?

Page 269

1    A. Very -- in very minute detail, yes,
2 especially the section as related to our work.
3    Q. And this article, as I understand it,
4 reviews and comments on all of the published
5 epidemiological data that addresses the issue of
6 whether or not thimerosal-containing vaccines may
7 potentially cause autistic spectrum disorders and
8 neurodevelopmental disorders; is that correct?
9    A. That's correct.
10    Q. And included among the articles that
11 are reviewed and methodologies which are
12 discussed are articles that you are an author of;
13 is that correct?
14    A. That's correct.
15    Q. Would it be fair to say that the
16 position published in this article is highly
17 critical of the methodologies employed in your
18 articles?
19    A. Yeah, it's more than that. It calls us
20 liars. It says that we don't have the data.
21 See, they went too far this time. So our lawyer

Page 270

1 has sent to the journal a threat to sue them and
2 they are retracting that because it looks silly
3 when they say we don't have the data, he sent
4 them a copy of it on their own letterhead with a
5 cover letter saying how we are allowed to use it.
6 These people have slandered us and the journal
7 has agreed, I think it's in the January issue, to
8 issue a retraction. They got a little
9 overzealous this time. It's one thing to say you
10 don't like somebody's article, you don't believe
11 they did it right. It's another thing to call
12 them liars. That's what they did here and we're
13 not liars. We have the data, we have everything
14 that we said we have.
15    Q. Who is your lawyer?
16    A. Cliff Shoemaker represented us in this,
17 writing a letter to them telling them that we
18 were going to sue them for slander, both the
19 journal and the individual office. And it's open
20 and shut because he sent them a copy of what they
21 said we didn't have.

Page 271

1    Q. Where in the article is the slanderous
2 statement in your opinion?
3    MR. ELLIOTT: Dan, could you add that
4 letter to your request for documents?
5    Q. (BY MR. THOMASCH) Withdraw that prior
6 question momentarily and let me ask you, the
7 letter that you sent, did it go to the named
8 authors or did it go to Pediatrics?
9    A. It went to the named authors and
10 Pediatrics and I believe the universities.
11    Q. Is that letter, to your knowledge,
12 within the materials that you have brought here
13 today?
14    A. I don't think so.
15    Q. All right.
16    A. And I don't know if I'm allowed to
17 release it or not.
18    Q. Is this article within the materials
19 that you have brought here today?
20    A. I don't know. I don't think so.
21    Q. All right. This is an article you're

Page 272

1 familiar with, and it specifically comments on
2 your studies on the very issue of general
3 causation that you're an expert to testify about,
4 correct?
5    A. Yes.
6    Q. Now, I need to get an understanding of
7 what types of rules you follow as to when
8 something goes in your file or not in your file.
9 Why would this article not be in your file if
10 it's commenting specifically on your articles
11 that are in your file?
12    A. I think I brought you papers, you asked
13 me, if I understand in your subpoena, you asked
14 me to bring papers on which I relied for my
15 opinion. I don't rely on this paper for my
16 opinion.
17    Q. Okay. Do you have any additional
18 materials that you feel are unreliable, you
19 disagree with and have not produced for that
20 reason, but addressed the subject matter of
21 general causation and have been reviewed by you

Page 273

1 in the time that you're interested in this
2 matter?
3    A. That's not fair. I have articles that
4 not only disagree with me but agree with me that
5 I didn't rely on. You're trying to imply that I
6 throw out everything that I disagree with, and
7 that is of course false.
8    Q. I'm implying nothing. I'm asking you
9 questions to see if I can find out facts. I need
10 to understand the parameters of what we're
11 calling your complete file which you brought with
12 you and what else may exist that has bearing on
13 the issue of general causation and which you have
14 reviewed, even if you don't rely on it?
15    A. I have reviewed thousands of articles,
16 both pro and con, mostly pro, because there
17 aren't thousands of con on thimerosal. Some of
18 them I've kept copies of, some of them I don't
19 have copies of. If I didn't consider it to be
20 part of what I relied upon -- for example, if you
21 want a list of some of them, if you look in my

Page 274

1 peer-reviewed publications, you'll see, you can
2 take any one you want, you'll see a list of
3 references, typically, I don't know, 30, 40
4 references in an average paper, 50 references.
5 I've looked and read all those papers. I haven't
6 brought you all of those papers. But I have read
7 them and they do relate to that article.
8    Q. But do you have copies of them?
9    A. Some of them maybe, some of them not.
10    Q. I want to make clear that we will not be
11 asking you to go retrieve from libraries copies
12 of papers you've read in the past but don't
13 possess, but to the extent that you have read
14 papers and reviewed papers in the process that
15 has led to your reaching conclusions that you're
16 going to testify here, we would like to see
17 copies of those papers, whether or not you,
18 quote, rely, end quote, on them.
19        MR. SMITH-GEORGE: I'm going to object
20 to that request. First of all, it was not in
21 your subpoena. And secondly, I don't think he

Page 275

1 has to produce everything he's ever read in his
2 life. If he says it's not forming the basis of
3 an opinion, I don't think you're entitled to it.
4        THE DEPONENT: In addition I've --
5        MR. THOMASCH: We'll take up discovery
6 disputes off the record.
7        THE DEPONENT: I've identified them for
8 you. I don't have to copy them. You can look
9 those up in any library. The ones that I
10 reference in my papers as references to my paper
11 are available in any public library. I don't see
12 that I have to go find them for you. If there's
13 one you can't find, I'll find it for you. But
14 you send your staff to look up the three or four
15 hundred papers that I've referenced. I told you
16 what they are. I've even told you what is
17 important to me about them. Because you know, it
18 says such and such reference 7. I told you what
19 that says. Go look it up if you want to see it.
20    Q. (BY MR. THOMASCH) Let me take you back
21 to Exhibit 17, is that the article in front of

Page 276

1 you?
2    A. Yes.
3    Q. And now ask you again if you could
4 identify which part of it you say says that you
5 lied and is slanderous?
6    A. Yes, I'll try to find it for you. Okay.
7 If you're on page 796, are you with me?
8    Q. I am.
9    A. It's the -- the paragraph sort of in
10 the middle. Subsequential -- substantial
11 questions regarding the accuracy of the
12 denominated data for the incidence calculation
13 also exist. The denominator requires the total
14 number of children in the United States --
15    Q. Slowly.
16    A. -- who received thimerosal-containing
17 DTaP (exposed) and the total number who received
18 thimerosal-free DTaP (unexposed). The authors
19 indicated the source of these data as the
20 Biological Surveillance Summaries of the CDC.
21 However, CDC reports only aggregate doses

Page 277

1 distributed for DTaP and other vaccines and
2 provides no manufacturer-specific data. It is
3 unclear how the authors estimated manufacturer-
4 specific data because, on the basis of agreements
5 with manufacturers, CDC does not release these
6 data. No source is cited in the publication.
7 The authors provide no detail on how DTaP doses
8 distributed were translated into number of
9 children vaccinated.
10        Well, our papers do say where we got
11 them, and they do say specifically that we were
12 precluded from giving you the company names and
13 the numbers by our agreement with the CDC. I
14 have those numbers on letterhead from the CDC
15 under cover of their employee. Those who read
16 this section will believe that we were lying, we
17 could not have done the work that we did, and
18 they're right. If we did not have those numbers,
19 we could not have done the work that we did. And
20 they damn well knew we had those numbers.
21        And the Academy of Pediatrics website

Page 278

1 also said this, but that was unpublished and
2 unsigned and we let it go. This one's published
3 and it's signed and it's not going to go. And in
4 fact, the journal has already sent us a memo
5 saying they're going to withdraw that part.
6 Whether we're going to take that as enough to not
7 sue them, I don't know, but clearly they're
8 wrong, and it's prima facie wrong. I mean, we
9 sent them a copy of the paper. How can they say
10 we don't have it? Here they are. How dare they
11 say that we're lying.
12     MS. OWENS: I'm sorry, do you mean to
13 tell me that you sent them a copy of the data?
14     THE DEPONENT: We sent the CDC, and in
15 with our lawyer's letter he sent them a copy of
16 the piece of paper that proves that we have what
17 we said we have, and proves that they slandered
18 us. The journal looked at it, asked for more
19 time, and now says they're going to print a
20 retraction because it's obvious on this piece of
21 paper that we have what they say we don't have.

Page 279

1 In fact, what they said we couldn't have.
2     MS. OWENS: Excuse me, the journal of
3 Pediatrics, you sent that material to Pediatrics?
4     THE DEPONENT: We sent that to each of
5 the people we're threatening to sue, Pediatrics,
6 each of the authors, and the CDC and their
7 universities.
8     MS. OWENS: The confidential
9 information that you were not supposed to give
10 out?
11     THE DEPONENT: The confidential
12 information that we're not supposed to have.
13 See, you get an agreement and then you go tell
14 people you have it, you don't have an agreement
15 anymore. As our letter said, we're not holding
16 to that anymore. You go tell the world that we
17 don't have it, then we don't have it. Good for
18 you. Are you going to come after me for
19 releasing data that you published that I don't
20 have to call me a liar? Come on. Bring it on.
21 You're not going to do that.

Page 280

1     MS. OWENS: So as you say --
2     THE DEPONENT: We sent it from our
3 lawyer to their lawyer, we sent that information
4 to prove to them that they were lying, not us.
5 By the way, they had the information, it's their
6 information. I haven't given it to the public,
7 but I may.
8     MS. OWENS: They and all of those
9 statements, assume the CDC --
10     THE DEPONENT: To each of these authors
11 on this paper, that signed off on this paper that
12 we were lying, to each of the universities from
13 which they listed, to the journal that approved
14 this trash, and to each member of the CDC whose
15 name is on here. That's who we sent it to. They
16 all have it anyway.
17     MR. THOMASCH: All right. I'd like to
18 mark the next exhibit a document from Medical
19 Science Monitor authored by Mark R. Geier and
20 David A. Geier, and published in 2004.
21         (Deposition Exhibit No. 18, document

Page 281

1 from Medical Science Monitor authored by Mark R.
2 Geier and David A. Geier, was marked.)
3     Q. (BY MR. THOMASCH) Do you recognize
4 Exhibit 18?
5     A. Yes. It's one of our papers on
6 thimerosal.
7     Q. Now, what I need to ask you is whether
8 this paper is the paper that is the subject of
9 what you say is the lie that appears on page 796
10 of Dr. Parker's paper marked as Exhibit 17?
11     A. 796? I'm sorry, I closed that one up
12 already.
13     Q. All right. Go to 796 about the data in
14 the biological surveillance summaries of the CDC.
15     MS. OWENS: Page 796?
16     MR. THOMASCH: Yes.
17     Q. Of Exhibit 17, contains a paragraph on
18 it that you said was slanderous, correct?
19     A. Yes.
20     Q. It is referring to questions of
21 accuracy of denominator data, the data being

Page 282

1 biological surveillance summaries of the CDC;
2 right?
3    A. Yes.
4    Q. Exhibit 18 is a document that is a
5 medical article that you authored; correct?
6    MR. SMITH-GEORGE:  The paragraph here's
7 talking about DTaP and DTP?  And what you handed
8 to him is an article about MMR.
9    MR. THOMASCH:  I think it's part about
10 the MMR, but also in part about
11 thimerosal-containing vaccines.  It's both.
12    THE DEPONENT:  I interpreted that
13 comment, that slanderous comment to apply to all
14 of our papers, all of our papers involving
15 comparing thimerosal-containing vaccines, DTaPs,
16 to nonthimerosal-containing, so that would be the
17 paper in Experimental Biology and Medicine, the
18 paper in the Journal of American Physicians and
19 Surgeons, I think this one, the Journal of
20 Pediatric Rehabilitation.  There may be some
21 more.  If you want more I'll look at my CV.  I

Page 283

1 think it applied to all of them.  It's certainly
2 true of all of them.  If I did not have that
3 information I could not have done the
4 calculations on any of those.
5    Q. (BY MR. THOMASCH)  Let me take you back
6 to Exhibit 15, which is the 2004 IOM report.
7    A. Okay.
8    Q. Would you turn to page 55, please?
9    A. Okay.
10    Q. Within the section of epidemiologic
11 studies that begins at page 53, do you see where
12 on page 55 there is a discussion of studies from
13 the United States?
14    A. Yes.
15    Q. The first study referenced is Geier and
16 Geier, 2004-A, correct?
17    A. Yes.
18    Q. Now, if you turn to page 157 of the
19 exhibit, of the IOM report?
20    A. Okay.
21    Q. You will see about a third of the way

Page 284

1 down the page, Geier, DA, Geier, MR, 2004-A.  Do
2 you see that reference on page 157 of the IOM
3 report?  The page numbers are on the upper
4 right-hand column.
5    MR. SMITH-GEORGE:  Just to make your
6 life easier.
7    Q. (BY MR. THOMASCH)  Happy to show you
8 the book if you want.
9    A. Okay.
10    Q. 157, in the Geier and Geier articles, it
11 would be the fifth one.
12    A. Okay.
13    Q. Do you see what is being referred to
14 there as 2004-A there?
15    A. Yes.
16    Q. That article is what has now been marked
17 as Exhibit 18, is it not?
18    A. Yes.
19    Q. All right.  Now let's go back to page 55
20 of the IOM report discussing Exhibit 18?
21    A. Okay.

Page 285

1    Q. The IOM report says that Geier and
2 Geier examined the hypothesized association
3 between exposure to TCVs -- that's
4 thimerosal-containing vaccines, correct?
5    A. Yes.
6    Q. -- and autism using data on distributed
7 vaccine doses from the CDC's biological
8 surveillance surveys (BSS) and case loads of
9 children with autism who are enrolled in special
10 education programs in the U.S. Department of
11 Education (DOE) reports, do you see that?
12    A. Yes.
13    Q. Now it discusses that article and the
14 results that you have there, correct?
15    A. Yes.
16    Q. And on the carry-over discussion on
17 page 56, at the end of the paragraph that carried
18 over from 55, it states, does it not, that
19 because the BSS only provides aggregate data on
20 doses distributed, it is not possible to
21 determine individual level exposures.  Do you see

Page 286

1 that?

2    A. Yes.

3    Q. Criticism was made about that data and
4 your use of that surveillance data by the IOM as
5 well as by Dr. Parker; is that correct?

6    A. I don't read it that way. I read that
7 you can say that you don't know the individual
8 exposures. But that's not what they said. They
9 said we don't have the denominators. Maybe they
10 meant to say that. Maybe I should be angry at
11 the IOM too. But I didn't read it that way. I
12 read it they wanted individual exposures, like
13 you go and look at each case. And that's true,
14 we didn't look at each case. What the Pediatrics
15 paper says is we didn't have the denominators.

16    Q. Okay. So that you consider to be a lie?

17    A. That's a straight out lie.

18    Q. Bear with me. If we go to page 57 of
19 the IOM report, the first full paragraph relating
20 to your studies says, the IOM says, these studies
21 are characterized by serious methodological

Page 287

1 problems; do you see that?

2    A. Yes.

3    Q. Are you familiar with that criticism of
4 your work?

5    A. Yes.

6    Q. Do you believe that criticism was
7 dishonest?

8    A. Yes.

9    Q. All right. We're running out of time on
10 the tape.

11    A. But not slanderous. They're entitled
12 to the opinion that our methods are not very
13 good. They're not entitled to tell people we're
14 lying. There's a difference, as I tried to
15 explain to you before you showed me this. You
16 can say that you don't agree with it, that you
17 think that there are flaws in our methods but --

18    Q. Do you think --

19    A. -- you can't say that we don't have that
20 data we said we have.

21    Q. The question I have for you is on the

Page 288

1 IOM, do you understand them to be reasonably
2 disputing the methodology as they understand it,
3 or attempting to disparage you and not have
4 people pay attention to you by claiming there are
5 methodological problems that they know are not
6 true?

7    A. I don't take that personally. They said
8 that about every single person that caused a
9 link. That's another thing that's ridiculous in
10 this. They said it about Haley, they said it
11 about Bradstreet, they just went down the whole
12 list of everybody that came and they said their
13 methodology has problems and over here we have
14 the studies sponsored by the drug companies, and
15 those are fine, and by the way, they have
16 methodological problems that are unbelievable.
17 We counted inpatient, outpatient they lost
18 people out of the link, the registry.

19    MR. THOMASCH: We're losing the tape.

20    MR. ELLIOTT: Objection, nonresponsive.

21    THE VIDEOGRAPHER: The time is now 3:20

Page 289

1 p.m. We are now off the record.

2    (A recess was taken from 3:20 p.m.

3 to 3:38 p.m.)

4    MR. THOMASCH: Before we go on the
5 videographic record I want to note something on
6 the stenographic record. While we took a brief
7 break counsel for all of the other defendants
8 approached me with regard to the timing issues
9 we're faced with. None have asked me to stop
10 examining the witness on the subject matter. It
11 is subject matter that they also believe we need
12 to examine the witness on.

13    On the other hand, they have all made
14 clear to me that they have individual areas of
15 concern particular questions on studies and on
16 matters referenced in Dr. Geier's report that
17 they are extremely interested in asking and then
18 indeed they wish to review manufacturers'
19 specific documents and ask documents that relate
20 to their particular client. We are in something
21 of a dilemma because from our perspective there

Page 290

1 is woefully insufficient time to thoroughly
2 examine or even appropriately in any way examine
3 this witness given the scope of the expert
4 deposition and the amount of materials at issue
5 before us.
6        We will at the conclusion of the seven
7 hours of course break for the day. We will ask
8 for plaintiff's counsel's stipulation to
9 continue and we will seek a remedy from the Court
10 if we can't reach an agreement. But I do want at
11 least to put on the record that in moving
12 forward, I do so cognizant of the fact that our
13 co-defendants, my co-defendants have not yet had
14 an opportunity to question, and I am not
15 intending, that they have not delegated to me the
16 right to ask questions about their clients or
17 their particular concerns whatsoever. And so
18 we're simply faced with a time crush at the
19 moment that I'll note on the record without
20 expecting that we'll solve it as we sit here
21 today.

Page 291

1        MR. SMITH-GEORGE: I can guarantee we
2 will not solve it. It is the plaintiff's
3 position that the rules of court allow you seven
4 hours. It's up to the defendants how you
5 allocate that time. If you want additional time,
6 I suggest you need to ask the Court for it,
7 because the plaintiffs are not going to
8 stipulate.
9        MR. THOMASCH: We will ask the Court.
10 All right. Let's go back on the record.
11        MR. SMITH-GEORGE: And we'll oppose.
12        THE VIDEOGRAPHER: The time is now
13 3:41. We are now on the record. This is the
14 beginning of videotape No. 4.
15        MR. THOMASCH: Ask the reporter to mark
16 as our next exhibit a document bearing the
17 caption Michael Skevofilax versus Aventis
18 Pasteur, Inc., plaintiff's expert witness
19 designation.
20        (Deposition Exhibit No. 19,
21 plaintiff's expert's witness designation in

Page 292

1 Skevofilax vs. Aventis Pasteur case, was
2 marked.)
3        Q. (BY MR. THOMASCH) Dr. Geier, you've
4 been provided what has been marked as Exhibit 19,
5 which is plaintiff's expert witness designation
6 in the Skevofilax case pending in the Circuit
7 Court for Baltimore City. I will represent to
8 you that this document was served upon the
9 defendants more than a month ago, specifically on
10 the 7th of October 2004. When were you first
11 retained by Mr. Waters in any case?
12        A. I think we established that before on
13 that cover letter.
14        Q. What was the date on that?
15        A. I don't recall. I don't even know
16 where it is. I don't want to waste your precious
17 time looking for it.
18        Q. Well, that's fine. I think
19 that's --
20        MR. SMITH-GEORGE: Let me clarify for
21 the record that the document that was handed to

Page 293

1 me, the certificate of service is October 7th,
2 2004.
3        MR. THOMASCH: I intended to say that.
4 Did I say something different?
5        MR. SMITH-GEORGE: You said September.
6        MR. THOMASCH: October 7th, more than
7 one month ago.
8        MS. WOODBURY: It's the stack of
9 e-mails, I think it's over there, it's the thing
10 that has the bibliography, I think that's it.
11        MR. SMITH-GEORGE: That's it in your
12 hand.
13        Q. (BY MR. THOMASCH) What exhibit is
14 that, sir?
15        A. Five.
16        Q. Exhibit 5, what is the date on the
17 e-mail?
18        A. This doesn't seem to be the e-mail for
19 asking me to be a witness. Am I reading it
20 wrong?
21        MR. SMITH-GEORGE: Yeah, that's it.

Page 294

1    A. Okay. Yeah, okay, you're right. So
2 it's September 9th, 2004.
3    Q. (BY MR. THOMASCH) All right. And at
4 that time when you agreed to be a witness it was
5 on, as you understood it, general causation; is
6 that correct?
7    A. Yes.
8    Q. Did you understand what case you would
9 be asked to testify in?
10    A. As I said before, I understood that
11 they had a number of cases, that they had two
12 that they were considering, one in Baltimore, one
13 in Texas. I don't even think I got the names. I
14 basically said when you decide on which one, I
15 want to see the medical records before I agree to
16 testify.
17    Q. And ultimately am I right you never saw
18 medical records relating to Michael Skevofilax?
19    A. I have not to this day, that's correct.
20    Q. And prior to me showing it to you, have
21 you ever seen plaintiff's expert witness

Page 295

1 designation, their first expert witness is Mark
2 R. Geier, M.D., Ph.D.
3    A. No.
4    Q. So you've never read this document?
5    A. No.
6    Q. Were you aware that for some number of
7 week there was an agreement between the parties
8 that are here today that you would be produced to
9 testified today in the Michael Skevofilax case?
10    A. As I told you, they asked me for some
11 dates so that they could be provided to you.
12 This was one of them. I held the date. I didn't
13 know which case I was coming from or even if we
14 would come today until a couple days ago for
15 sure.
16    MR. THOMASCH: Let me ask the reporter
17 to mark as our next exhibit a one-page document,
18 this is a printout from the Wall Street Journal
19 online May 19, 2004.
20    (Deposition Exhibit No. 20, printout
21 from the Wall Street Journal online May 19,

Page 296

1 2004, was marked.)
2    Q. (BY MR. THOMASCH) Show you what has
3 been marked as Exhibit 20 in this deposition, and
4 ask you if you would just look that over.
5    MR. SMITH-GEORGE: For the record,
6 there's a box in the bottom of this, and I don't
7 know what was there at the time it was on the
8 site, it looks like it was some sort of graphic,
9 it doesn't appear on this printout. To that
10 extent it's not an accurate representation what
11 was on the website.
12    A. Okay.
13    Q. (BY MR. THOMASCH) All right. You see
14 the date on this, May 19, 2004?
15    A. Yes.
16    Q. That is the day following the issuance
17 of the 2004 IOM report; correct?
18    A. Yes.
19    Q. This is a review and outlook piece in
20 the, from the Wall Street Journal online; is
21 that right?

Page 297

1    A. Appears to be.
2    Q. And it was at page A-18 of the written
3 version of the Wall Street Journal; do you see
4 that under the heading vaccine vindication?
5    A. Yes.
6    Q. The first sentence says, kudos to the
7 Institute of Medicine which yesterday brought
8 science back into the emotional debate over
9 vaccine. It goes on, its definitive report
10 disavowing any link between childhood shots and
11 autism will provide welcome reassurance to
12 millions of parents, and should also head off a
13 growing liability mess; do you see that?
14    A. Yes.
15    Q. Do you recall reading this piece in the
16 Wall Street Journal?
17    A. I've read several, many pieces in the
18 Wall Street Journal on this site. I don't know
19 if I read this specific one, but I know the Wall
20 Street Journal has been very supportive of saying
21 there's nothing to this and it's all over.

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

Page 298

1  Q. Now, you mentioned a comment by
2 Dr. McCormick in the Wall Street Journal earlier
3 in your testimony today; do you recall that?
4  A. Yeah, that's why I chose her comment in
5 the Wall Street Journal because I don't think
6 anybody could say the journal was favorable to
7 SAFEMINDS, let's say. But she still was quoted
8 in the Wall Street Journal as saying everybody in
9 the committee knew that it causes at least
10 neurological damage, and parents should avoid the
11 vaccine when possible.
12  Q. Looking at the third paragraph of the
13 article that we have in front of us, it states,
14 quote, part of the National Academy of Sciences,
15 the IOM was asked to investigate all of this and
16 yesterday rendered its verdict. "The
17 overwhelming evidence from several well designed
18 studies indicates that childhood vaccines are not
19 associated with autism," said Marie McCormick,
20 the Harvard doctor who led the review committee.
21 Do you see that?

Page 299

1  A. Yeah, I see it.
2  Q. Is that the same Marie McCormick which
3 you think was quoted to the contrary in the Wall
4 Street Journal?
5  A. Yes.
6  Q. Can you tell me when she was quoted to
7 the contrary?
8  A. I don't know the exact date. It's among
9 our papers I'm sure that we've given you. It was
10 within that time frame, within a couple weeks, I
11 don't know, but it's in there. She had to get
12 her story straight.
13  Q. Okay. In your notebook you have an
14 article from the Wall Street Journal from the
15 same date headed Vaccine-Autism Link Is
16 Discounted. And I can show it to you but I'll
17 read to you because I think this may be the quote
18 you're now referring to.
19  MS. OWENS: And for the record, Dan,
20 it's notebook A.
21  MR. THOMASCH: Thank you, Diane.

Page 300

1  Q. (BY MR. THOMASCH) It says, quote, the
2 committee doesn't dispute that mercury-containing
3 compounds can be damaging to the immune system
4 said Dr. McCormick. She said parents should
5 choose a thimerosal-free vaccine if one is
6 available, but if it isn't, parents should have
7 their children vaccinated anyway. Is that the
8 quote that you recall?
9  A. Yes, and that's what we asked the
10 report to say, but the report says that no
11 preference should be shown, and that thimerosal,
12 there's no evidence thimerosal causes any damage,
13 yes, that's the quote.
14  Q. All right. This doesn't indicate, does
15 it, that thimerosal in vaccines causes
16 neurologic injury, it says the committee doesn't
17 dispute that mercury-containing compounds can be
18 damaging to the immune system?
19  A. Then it says to avoid the thimerosal in
20 the vaccines.
21  Q. All right. Let's take it one sentence

Page 301

1 at a time.
2  A. Let's take it as the whole quote.
3  Q. I'll ask the questions if you don't
4 mind.
5  A. Go ahead.
6  Q. The question here is as follows:
7 Dr. Mechanic was quoted as saying the committee
8 doesn't dispute that mercury-containing compounds
9 can be damaging to the immune system. Do you
10 believe that is inconsistent with what was stated
11 in the Immunization Safety Review Committee?
12  A. In the context of her next statement,
13 yes. And the next statement is in direct
14 contradiction to what the report said. The
15 report specifically says no preference should be
16 shown for thimerosal-containing versus
17 thimerosal-free vaccines. You can't spin the
18 second one. She said the parents should avoid
19 them when possible. I agree in some
20 circumstances, if you have no choice, I told you,
21 some parents may well give them ones with

Deposition ot – MARK R. GEIER, M.D., Ph.D. Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW    Document 254-11    Filed 12/07/04    Page 38 of 40 PageID 7973    November 11, 2004

Page 302

1  thimerosal. But that's not what that report
2  says.
3      Q. She didn't in her quote say in some
4  circumstances, did she? She said if one is
5  available, but if it isn't, parents should have
6  their children vaccinated anyway?
7      A. Yes. But that's not what the report
8  says. The report says it makes no difference.
9  And she's telling them to avoid it when possible.
10  And that's a very big difference. That would
11  have made the report to those of us, the
12  overwhelming majority of the independent
13  scientists in this country, it would have made us
14  much more receptive to that report if at least
15  she had said that, because in Congress there was
16  a bill that said when available we should buy
17  thimerosal-free vaccines. If not available, buy
18  either. And it was turned down because that
19  report says it doesn't make any difference. But
20  she said you should do that.
21      MR. ELLIOTT: Objection, nonresponsive.

Page 303

1      Q. Am I correct that in the article she
2  does not say anything about the alleged link
3  between thimerosal-containing vaccines and
4  autism?
5      A. I think it's implied that it's the
6  vaccines because the next statement says you
7  should avoid the vaccines, when possible.
8      Q. How do you explain the comment in the
9  same day's Wall Street Journal by Dr. McCormick,
10  quote, the overwhelming evidence from several
11  well designed studies indicates that childhood
12  vaccines are not associated with autism?
13      A. The quote is that she's inconsistent,
14  she's a little bit worried that, you know, if
15  there was any justice in the world, she's damaged
16  some children, so she tells the parents to avoid
17  it when possible. That's not the person that
18  wrote that report. That report says no
19  possibility, no further research, do not care
20  whether it's in there, no further looking into
21  it. That's not the same person talking. That

Page 304

1  makes her to me totally disingenuous as the head
2  of the institute.
3      MR. ELLIOTT: Object to the response.
4      Q. (BY MR. THOMASCH) Is it consistent with
5  the report to say to the Wall Street Journal, the
6  overwhelming evidence from several well designed
7  studies indicates that childhood vaccines are not
8  associated with autism? Is that comment
9  consistent with the findings of this report?
10      A. Yes.
11      Q. When you were asked to make a
12  presentation to the IOM, you were specifically
13  asked to discuss epidemiology; is that correct?
14      A. Yes.
15      Q. Were -- was the person that asked you
16  to make the presentation aware, to your
17  knowledge, that you had done an analysis of the
18  vaccine safety data link study?
19      A. I don't know. I'm sure they were aware
20  of our VAERS analysis and our Department of
21  Education. I don't know if they knew what we had

Page 305

1  done on the VSD or whether we would comment on
2  it.
3      Q. Was it your initial or original
4  intention to comment on your analysis of the
5  vaccine safety data link during your presentation
6  on February 9th, 2004 to the IOM committee?
7      A. No, I was -- my initial thought was I
8  was reticent to do that.
9      Q. Did you ever indicate to anyone, prior
10  to February 9, 2004, that you were going to
11  include a discussion of the VSD data in your
12  presentation?
13      A. Well, there may have been a slide that
14  we submitted. The slides that we were going to
15  show were submitted some days before, I don't
16  know exactly how much before.
17      MR. THOMASCH: We'll ask our reporter to
18  mark as our next exhibit a one-page document
19  indicating a press release for immediate release,
20  February 9, 2004, with the caption CDC Vaccine
21  Data Leads Scientists to Shocking Discovery.

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

Page 306

1    (Deposition Exhibit No. 21, February
2 9, 2004 press release, was marked.)
3    MS. OWENS: Is this Exhibit 20?
4    MR. THOMASCH: 21.
5    Q. (BY MR. THOMASCH) Dr. Geier, you're
6 being shown Exhibit 21; do you see that?
7    A. Yes.
8    Q. Now, when did you first submit any
9 written materials to the IOM committee?
10    A. I don't know. Several days or maybe
11 weeks before, but I don't know the exact date,
12 unless it's on one of the things.
13    Q. Do you know whether as early as January
14 2004 you submitted written information to the
15 committee?
16    A. Seems like that's too long ahead, but I
17 don't recall.
18    Q. Do you remember whether any of the
19 written materials you submitted to the IOM
20 committee contained relative risks that you
21 derived from your analysis with your son David on

Page 307

1 the vaccine safety data link data?
2    A. I don't know.
3    Q. Have you seen the press release marked
4 as Exhibit 21 before?
5    A. I don't think so. I've seen things
6 like this before. I don't know if I've seen this
7 one. It's not a remarkable discovery. Since --
8    Q. There's no question pending, Doctor.
9    A. Sorry.
10    Q. The subheadline, if it can be called
11 the same, states children 27 times more likely to
12 develop autism with exposure to mercury-
13 containing vaccines, findings reviewed at today's
14 IOM meeting in D.C. Do you see that?
15    A. Yes.
16    Q. The first sentence indicates that the
17 IOM will hold a meeting. So this press release
18 was obviously in the morning of February 9,
19 correct?
20    A. I guess so.
21    Q. Well, it's written that way, isn't it,

Page 308

1 that the Institute of Medicine will hold a
2 meeting today?
3    A. Yes.
4    Q. Says one of the larger studies under
5 review comes from the CDC's own vaccine safety
6 data link. Now, you're familiar with that study
7 and that data, correct?
8    A. I'm familiar with that data.
9    Q. It says under independent investigation
10 CDC's data concludes children are 27 times more
11 likely to develop autism after exposure to three
12 thimerosal-containing vaccines (TCVs) than those
13 who receive thimerosal-free versions. Do you see
14 that?
15    A. Yes.
16    Q. The third paragraph says Dr. Mark Geier
17 is the lead investigator in the discovery. Do
18 you see that?
19    A. Yes.
20    Q. Did you, quote, discover that CDC's
21 data indicates that children are 27 times more

Page 309

1 likely to develop autism after exposure to three
2 thimerosal-containing vaccines than those
3 children who receive thimerosal-free versions?
4    A. Yes, I don't know if I'd call it
5 discover. That's what our findings were. As I
6 said, it's not a big discovery. CDC's own what's
7 called ground zero data shows that.
8    Q. You have published on the subject of
9 the vaccine safety data link data, correct?
10    A. No. I don't think we've ever published
11 that data.
12    Q. Not that finding. Have you made --
13 have you had any publications that use as source
14 material information from the vaccine safety data
15 link?
16    A. As I recall, I don't think we have
17 anything published yet that has that source.
18 Maybe I'm wrong, but my recollection is that we
19 don't.
20    Q. Have you submitted any -- have you
21 prepared any articles that show that, this 27

Page 310

1 times more likely to develop autism accusation?
2    A. Well, there was a little bit of VSD
3 data in the expert review article that we
4 discussed that was accepted and then pulled. It
5 was about, I don't know, 2 percent of the whole
6 article. There was one brief piece on that. I
7 don't know if it said 27 because it depends on
8 how you look at it, whether you look at it
9 overall or you look at it in segments. But
10 that's what we found. The reason --
11    Q. Why have you not published it?
12    A. The reason I'm reticent to publish it is
13 I'd like to complete the study. And since the
14 CDC chose to destroy our database and chose to
15 have us kicked out, even though we were there at
16 the request of Congress, I like to do complete
17 studies, I have a reputation of doing complete
18 studies, I publish all over the world, and I
19 don't really, although I was pushed to make a
20 comment at the IOM, because they wanted to know
21 what did you see, what did you see, I wasn't

Page 311

1 ready to publish it really in a form, a complete
2 study. And I hope to publish it in the future
3 when I get to see the rest of it. And I am
4 promised that I will be able to see the rest of
5 it to see if it's true or not.
6    Q. So at this point in time you don't have
7 enough information from the vaccine safety data
8 link project to allow you to reach conclusions on
9 that subject?
10    A. Not at the level of publishing it as a
11 study, that's right. Not that particular look
12 anyway. There was some comments made by Dr.
13 Davis at the IOM criticizing what we looked at.
14 We know his comments were wrong but we wanted to
15 see if there was some validity to them and if we
16 should, you know, every time someone brings up a
17 new way, you want to go back and look at it. So
18 we were going to go back and look and see if
19 there was any tendency to what he said. Of
20 course, they wouldn't let us back in and they
21 destroyed the database. But I'm open to honest

Page 312

1 construction, that's what you do in peer review.
2 A    peer reviewer may say go back and run this
3 thing, run that thing. Part of his was an attack
4 on us. Part of it was a constructive suggestion,
5 and went back to look and lo and behold, they
6 locked us out and destroyed the database. I
7 couldn't do it yet. But now after a year's
8 fighting I may well be able to do it again.
9    Q. Let me ask you, there were certain
10 restrictions that were placed on you in order to
11 have any access to the vaccine safety data link
12 data; is that correct?
13    A. Yes.
14    Q. Where did you physically review the
15 data?
16    A. In a suburb of Maryland, Hyattsville,
17 Maryland, they have a data center there.
18    Q. When did you review it?
19    A. In November, December time period of
20 2003.
21    Q. Can you explain approximately how much

Page 313

1 time you had with the data?
2    A. Yeah, we were there a total of four
3 days. I can't tell you the exact hours, but like
4 nine to five for four days or nine to four or
5 nine to three for four days.
6    Q. So you were working in a room?
7    A. Yes.
8    Q. How was the data presented to you, in
9 electronic form or in paper?
10    A. No, electronic.
11    Q. And who was with you?
12    A. The first time we had one monitor, and
13 the second time we had two monitors. After all
14 we are dangerous people.
15    Q. "We" being yourself and your son?
16    A. The second time actually I was unable to
17 attend so it was my son and Karl Vale -- Karl
18 Vale -- Vale Kernick is an SAS, has some
19 knowledge of SAS. It's in an unusual program
20 language called SAS.
21    Q. What is SAS?