Page 314

1    A. It's a program that's used primarily by
2 the government but by some other epidemiologists
3 to search databases, and I'm not familiar with
4 that program so I could not program in it. So
5 after some haggling they allowed us to bring
6 someone who knew something about it. And in fact
7 now we have somebody who knows a lot more about
8 it. Because we had to write our own programs.
9 They obstructed us in every possible way and we
10 still got to see some of the data.
11    Q. Let's break it down. The first time you
12 went you did go personally, correct?
13    A. Yes.
14    Q. Your son went?
15    A. Yes.
16    Q. Did anyone else go with you?
17    A. Yes.
18    Q. Who was that?
19    A. Our programmer.
20    Q. Whose name is?
21    A. Vale Kernick, K-E-R-N-I-C-K, V-A-L-E, I

Page 315

1 believe.
2    Q. So the three of you were there and there
3 was one monitor?
4    A. Yes.
5    Q. Who did he or she work for?
6    A. CDC.
7    Q. Did that person -- was that individual
8 who was the monitor on that first occasion the
9 parent of an autistic child?
10    A. At least an affected child, yes.
11    Q. Did you discuss that with the
12 individual?
13    A. Yes. She volunteered that after they
14 locked us in the room with her.
15    Q. All right. Now what did you bring with
16 you to the room?
17    A. We were allowed to bring one A: drive
18 disk, three and a quarter A: drive disk that had
19 a little bit of our attempt to write the program.
20 Maybe we had nothing, I don't remember. We may
21 have had nothing. I think at that point we had

Page 316

1 nothing. We were not allowed any tape recorders,
2 phones, pencils.
3    Q. Okay. But there was a computer there?
4    A. There was a computer and the computer
5 had a CD-ROM drive disabled, its A: drive
6 disabled, and it had the data in I think it was
7 13 data sets that it was made up in their attempt
8 to respond to our request. They didn't make it
9 up like we asked but they made it up sort of like
10 we asked.
11    Q. Were you able to physically access the
12 data?
13    A. Yes.
14    Q. Now, were you attempting -- did you
15 seek to make copies of the data?
16    A. No. We were not allowed to nor did we
17 have any way to make copies. This database is
18 millions of records, so you would need, I don't
19 know, I think the lady who brought it had it on
20 ten DVDs or something like that.
21    Q. And were you attempting, was it your

Page 317

1 goal to manipulate the data in some way so as to
2 analyze it?
3    A. Yes. And we were able -- we were
4 allowed by rule that whatever program we wrote,
5 we could copy, they would turn on the A: drive
6 and we were allowed to copy our program back onto
7 the A: drive and take it home so we could bring
8 it back the next day. And they had promised that
9 they would not destroy the database, they
10 promised that they would not look at our
11 database. The only -- they kept records of every
12 key stroke that we made but they promised the
13 only reason for that was security, that they
14 would never go back and reanalyze our data, that
15 it was our private data, they would only look at
16 it to assure patient confidentiality, which of
17 course they broke immediately.
18    MR. ELLIOTT: Object to the response.
19    Q. (BY MR. THOMASCH) Were these promises
20 made in writing?
21    A. No, I think they were negotiated over a

Deposition of MARK R. GEIER, M.D., Ph.D. Multi-Page™    November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 3:03-cv-00141-TJW    Document 44-4    Filed 12/07/04    Page 2 of 40 PageID 7977

Page 318

1 period of a year by Weldon and Burton and their
2 staff and a Congressional liaison and a whole
3 bunch -- we had telephonic meetings and some of
4 them were written down because they had a
5 note-taker, one of their people would send
6 everybody who was on the meeting a summary.
7    Q. Were the promises made to you
8 personally or did you hear them through Weldon,
9 Burton or others?
10    A. Made to me personally in front of
11 Weldon, Burton and others.
12    Q. By whom?
13    A. By the people who were running the
14 database. CDC people.
15    Q. What are their names?
16    A. Bernier was one of them. He's one of
17 their people, one of their senior advisors.
18    Q. So they understood that they were
19 providing you with data, that you were not able
20 to copy it but you were able to write a program
21 that would allow the data to be analyzed?

Page 319

1    A. Right.
2    Q. And what were you then to -- permitted
3 to do, as you understood it, with the results of
4 your analysis?
5    A. They were to be printed out on a
6 printer, which is not in that room, but which the
7 monitor could go and get somebody who had a key
8 to give us our printouts. And the printouts
9 would be like a table, for example, you know,
10 we're counting, there were 12 people with this,
11 14 with this, one of these kind of table things,
12 and if they chose they could white out some of
13 the results if they didn't like it, and they did.
14    Q. Do you know who did that?
15    A. Yes, particularly at the second sitting
16 when we had two monitors, their monitors started
17 whiting out, they claimed that right to white out
18 any number on the table that was five or less.
19 Despite the fact that as Dr. Weldon pointed out
20 and we pointed out, the Verstraeten study, which
21 studied the same data, had 19 places where the

Page 320

1 number was five or less. Anyway, they claimed
2 that. And then they started, well, then they
3 decided that if there was a number less than five
4 they would throw away the whole page. And then
5 the final day they threw away all the pages, they
6 just didn't like the data.
7    Q. When was that?
8    A. That was the fourth day. We went two
9 times, then there was a several-week, I don't
10 know, a month or so in between, then we went two
11 more times.
12    Q. Did you ultimately reach certain
13 conclusions --
14    MS. HALPERN: Excuse me, can I just ask
15 one question. I'm going to show you this
16 document and ask if this is the printout from the
17 VSD you obtained?
18    MR. THOMASCH: Let's mark this as
19 Exhibit 22.
20    (Deposition Exhibit No. 22, VSD Raw
21 Data: Thimerosal and Autism, was marked.)

Page 321

1    MS. HALPERN: Maybe I should just ask
2 you, sir, what is that?
3    Q. (BY MR. THOMASCH) Yeah, can you review
4 Exhibit 22 and tell us what that is?
5    A. Sure. It's of the form of the type of
6 thing that we would have printed out. I don't
7 know as I sit here what it is. I'm not sure that
8 it was ours.
9    Q. Do you know when you obtained that
10 document?
11    A. I'm not sure it's ours, as I said.
12    MS. HALPERN: Dr. Geier, if I can, you
13 stated to the IOM in a document that in order to
14 allow for independent investigators to evaluate
15 our methods, you included with your report raw
16 VSD data that you used in your evaluation and you
17 submitted that document.
18    A. This must be a little piece of ours.
19 I'm sorry, it doesn't have the numbers on it for
20 me to recognize it. This is a little teeny
21 piece. We had hundreds of pages of it from the

**Page 322**

1  first session, the first two days, and the second
2  two days we had virtually none.
3    Q. (BY MR. THOMASCH) All right. Where
4  are the hundreds of pages from the first day?
5    A. I don't know if they're hundreds, but
6  we have some more pages that are unintelligible.
7  It just says that at the sense it's me at the
8  moment is unintelligible. I couldn't interpret
9  that for you although I take it's your
10  representation that that was some data that
11  probably David sent in with his analysis.
12    Q. All right. You provided this data to
13  the IOM, is that your understanding?
14    A. It looks like the kind of stuff we had.
15    Q. And you do independently recall that you
16  provided some data to the IOM that you obtained
17  from printouts from the review of the VSD
18  database?
19    A. I think David did submit a couple
20  pieces of it, yes.
21    Q. Was he permitted to do so?

**Page 323**

1    A. I believe so.
2    Q. All right.
3    A. I believe -- let me give you my
4  understanding what we were allowed. You asked me
5  before what we were allowed to do. We were
6  allowed to print that out. Once we printed that
7  out and they didn't white it out, my
8  understanding was we were allowed to do with that
9  as we chose, except that eventually when we
10  published it as a courtesy they asked us to send
11  them a copy of the paper. That's my
12  understanding currently of what happens. If it
13  goes beyond them and they don't white it out or
14  they don't throw it away, it's ours. We can use
15  it any way we want. As I said, they did ask for
16  a courtesy copy of the paper.
17    MS. HALPERN: Are all the hundreds of
18  pages in that format?
19    THE WITNESS: Yeah, there's zeros and
20  ones and numbers all over the place.
21    MS. HALPERN: So it's all what looks

**Page 324**

1  like contingency tables of some kind, two-by-two
2  contingency tables?
3    THE WITNESS: Well, they're various
4  kinds of tables. They're how many people had the
5  vaccine, how many people had this, how many
6  people had that. There is no direct patient
7  information. No names, addresses or anything
8  like that.
9    MS. HALPERN: So all your relative
10  risks that you calculated on four or more
11  vaccines or three or more vaccines came from
12  those tables, those types of tables, if not that
13  exact one?
14    THE WITNESS: Yes.
15    MS. HALPERN: Was there any adjustment
16  to your crude relative risks that you obtained?
17    THE WITNESS: The only thing we did is
18  we looked at some controls. We looked at how
19  much it was utilized by, we looked at Apgar
20  scores I think and birth ages and that kind of
21  thing to see if there was confounders, and we did

**Page 325**

1  not see significant confounders.
2    MS. HALPERN: So you looked to see if
3  there were some type of -- what's the word?
4    THE WITNESS: Confounder, or some kind
5  of skewing of the data based on some other
6  parameter like, you know, were they all premature
7  babies, were they all people who never went for
8  health care, that kind of thing. As I said,
9  there's a lot more we need to look at to do a
10  good publication. But we did look at that kind
11  of thing. We did try to correct some of the
12  obvious things. I think we looked at some race.
13    Q. (BY MR. THOMASCH) All right. The
14  subpoena marked as Exhibit 2, request 24 states
15  all materials, printouts, analyses, data sets,
16  obtained and/or analyzed from VSD data. Do you
17  understand this material captioned VSD raw data
18  to be included within that request?
19    A. No, I didn't understand it to be.
20    Q. You don't understand that this type of
21  material would be a data set from the VSD data?

Deposition of - MARK R. GEIER, M.D., Ph.D. Multi-Page™
Vera Easter v. American Home Products, Corp.

Case 1:03-cv-00114-TJW   Document 254-12   Filed 12/07/04   Page 4 of 10 PageID 2004, 2004
7979

Page 326

1    A.  I understand that type of thing is a
2  data set from the VSD data.  I didn't understand
3  it was something that I formulated my opinion on.
4    Q.  All right.  The request asked for all
5  materials, printouts, analyses, data sets
6  obtained and/or analyzed from the VSD data.  Do
7  you have other such data at your residence or in
8  your office?
9    A.  We may have some others.
10    Q.  All right.  I ask for that to be
11  produced in conformity with the subpoena that was
12  issued.
13    A.  I'm not positive that I can do that.  I
14  don't know, I'm not trying -- listen, you can
15  have all the zeros ones and sixes that you want,
16  but I'm not positive what I am and I'm not
17  allowed to do at this stage.
18    Q.  Well, this was submitted to the IOM,
19  correct?
20    A.  Yes.
21    Q.  Is there any reason why part of it could

Page 327

1  be submitted and the rest of it couldn't?
2    A.  I don't know what, if there's anything,
3  you know, that can't identify anything -- I'll,
4  subject to having our personal attorney look at
5  it, if there's no reason why I can't, if I don't
6  get in trouble for it, I'm happy to supply you
7  with some more paper.  There's nothing there.
8  But I just don't want to get in trouble with the
9  IRBs, the, you know, all the powers that be, the
10  CDC, everybody that's involved in that.
11    Q.  I believe request 24 and 25 both
12  encompass this material.  We'll renew our request
13  for it.  If there are confidentiality concerns
14  that you believe prevent production, counsel can
15  bring that to our attention.  We've already asked
16  for copies of the confidentiality agreements to
17  try and evaluate that and see where permission
18  would be necessary if that is the case.  But it
19  is data that we would --
20    A.  I personally will try to comply with
21  that if you put it in letter, if we don't have

Page 328

1  any specific reason not to.
2    Q.  Let me go back to the first time you
3  were given access to the database, and I'm still
4  trying to get your understanding as to what it
5  was that you were -- what your objective was?
6    A.  There were 13 data sets that we asked to
7  be put together.  Each one was sort of a study.
8  And each one had to be approved by the
9  appropriate IRBs as well as by the CDC.  I can't
10  off the top of my head tell you all of them, but
11  there were things like -- well, the one we
12  studied, the one we chose to study, since we
13  obviously couldn't do 13, we couldn't even do
14  one.  We studied the one that had chronic and
15  acute adverse effects of DTaP vaccine with regard
16  to various outcomes such as autism, a whole list
17  of outcomes.  And basically what we tried to do
18  is the same thing we did in theirs.  We tried to
19  compare those people who had taken the
20  thimerosal-free DTaP and see what the rate of
21  autism was compared to those people who had taken

Page 329

1  the DTaP containing DTaP, and then look to see if
2  there were confounders.
3    Q.  The 13 studies that you made reference
4  to, those were studies that were conducted by
5  who?
6    A.  They were studies proposed by us.  And
7  they basically were reanalyses of the VSD to
8  look to see if the VSD confirmed what we saw in
9  theirs.  That's the basic idea.
10    Q.  VSD contains a great deal of computer-
11  linked information, and you made 13 proposals for
12  different slices of that information that you
13  wanted to receive?
14    A.  That's right.
15    Q.  Was the population of data from which
16  you were seeking these 13 different slices
17  different from the universe of data that
18  Dr. Verstraeten and others used in the published
19  vaccine safety data link study?
20    A.  Yes, that issue came up.  We asked for,
21  in addition to our 13, nine studies that the CDC

Page 330

1 had published. We wanted their data sets to
2 reanalyze them. One of the biggest contentions
3 was we wanted the intermediate data sets and the
4 final data sets on which the Verstraeten study
5 was based. The intermediate sets are the ones on
6 which the Simpsonwood information was based, and
7 we have a letter somewhere, or Dr. Weldon has a
8 letter somewhere that those were destroyed.
9 Additionally they would not give us, I don't know
10 if they had or just would not give us the final
11 databases either. All they were willing to do
12 was give us a summary, which is basically the
13 table that was in the publications. They refused
14 to show it to us.
15    Q. Okay.
16    A. And they also say that you can't
17 reconstruct them because, of course, it's a
18 dynamic data system, which is true probably, at
19 least we can't reconstruct them.
20    Q. Were you allowed to in a sense shuffle
21 the data and run calculations on the computer and

Page 331

1 then print out the results of those calculations,
2 or were you only looking at things that had been
3 done in the past by the CDC?
4    A. No, we reshuffled. On our sets. We
5 weren't shuffling the main VSD database. But our
6 sets could be reshuffled.
7    Q. What if any limitations were placed on
8 you as to the way in which you could reshuffle
9 the data?
10    A. I don't think there were any
11 limitations on it, although they tried to bring
12 up that if we merged say race with age that would
13 help identify the patients, but obviously you
14 can't do a study unless you merge all the
15 information on the patients, and obviously there
16 was no risk to patient confidentiality, and they
17 apparently wrote to some of the IRBs and said
18 that what we did might risk patient
19 confidentiality, even though there's no names,
20 addresses or phone numbers or anything in there,
21 and since that time we've gotten back to the IRBs

Page 332

1 and they've said they don't see any risk and
2 we're back.
3    Q. Did you receive some assistance from
4 the CDC monitor on one or more of the visits that
5 allowed you to obtain information that you
6 otherwise would not have been permitted to
7 obtain?
8    A. Yes.
9    Q. And what was the nature of that
10 assistance?
11    A. Basically she was there, the first lady,
12 the one that had an affected child, I had no idea
13 she had an affected child, basically she was
14 there to watch us. So after everybody left and
15 closed the door and after they laughed they left
16 home the system, we were supposed to get the SAS
17 a system like Windows where you could point to
18 different things and it would help you do it, but
19 they accidentally left that at home, so all we
20 got was essentially like a DOS prompt. So trying
21 to run your programs without any help from

Page 333

1 Windows.
2        They had promised they would give us the
3 whole thing, but gee, they couldn't find it when
4 they got there, and they laughed and they left
5 and they locked her in, and she said basically
6 I'm here to watch you. She said I'm going to
7 tell you something, I've got an affected child,
8 and boys, you're not going to leave until you
9 know what the rest of us know, which is, of
10 course, that thimerosal causes the damage, and
11 I'm going to see to it that you can run the
12 programs. And they were laughing because nobody
13 could have made that program work in two days
14 without help.
15    MR. ELLIOTT: Objection, nonresponsive.
16    THE DEPONENT: Isn't that what you
17 asked me?
18    Q. (BY MR. THOMASCH) Who is the "they"?
19 Who was laughing?
20    A. One lady, and I've forgotten her name,
21 and also I won't disclose her name.

Deposition of MARK R. GEIER, M.D., Ph.D. Multi-Page™ November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW Document 164-4 Filed 12/07/04 Page 6 of 40 PageID # 7981

Page 334

1 Q. Well, do you know what her name is?
2 A. No.
3 Q. And so tell me specifically what it was
4 that the monitor did that allowed you to figure
5 the system out in a way that you wouldn't have
6 been able to figure out at least as quickly
7 without her assistance?
8 A. We'd write a program and then you try to
9 debug it, and Vale is an excellent programmer,
10 but he's not really an experienced SAS
11 programmer. He's done all kinds of research
12 things in computers but he tried to learn SAS,
13 and he learned it with that interface which they
14 didn't supply us, that he was very upset about.
15 So he tried to write a program, and it wouldn't
16 run, as occurs even to an experienced one, the
17 first time you have to debug it she'd walk over
18 and say, yeah, I can't help you, but move the
19 corner over here and move this upside down and
20 move this one over here and add the word and try
21 it now. And then if that didn't work she'd say

Page 335

1 I'll do it on my computer, she had her computer
2 on hers as well, and then for that evening she
3 gave us a whole book on how to do it and the next
4 morning we came back and were able to make it
5 run.
6 Q. So she assisted you with programming
7 help?
8 A. Yeah, with programming help as well as
9 telling us a little bit about what she did, she
10 was there a biostatistician for several years,
11 working on this exact problem. What she told me
12 was that she's running the new fast thing that
13 was developed by the Army or by the bioterrorists
14 to see if there were trans rapidly and she was
15 supposed to study whether or not as you remove
16 the thimerosal, the level of autism went down,
17 and she said I'm not allowed to tell you, but
18 remember I said, you get it, get it down, get
19 it?
20 Q. What is her name?
21 A. Same person. First I don't remember her

Page 336

1 name.
2 MS. OWENS: Do you have a document that
3 has her name on it, an e-mail?
4 THE DEPONENT: No, but ask the CDC.
5 That's documented. They know who it is. It
6 occurred to them that this happened because the
7 second time they sent two monitors, one to
8 monitor the other. They knew what happened.
9 There was no way we could hide it from happening,
10 not that we wanted to. Nobody's that smart.
11 We're pretty smart researchers but nobody could
12 have done what we did without help and they knew
13 it. And they were very upset about it.
14 Q. (BY MR. THOMASCH) Would you pull out
15 Exhibit 15, the 2004 IOM report, please?
16 A. Yes.
17 Q. Let me ask you first, have you had any
18 further communications with the individual who
19 was the CDC monitor subsequent to your 4th visit?
20 A. No, I didn't have any -- she didn't
21 come back for the third and fourth either. She

Page 337

1 was just there for the first two.
2 Q. Other than at those two visits?
3 A. Never spoken to her again.
4 Q. Would you recognize the name Lisa
5 Callaway?
6 A. That may be her name. I'm not certain.
7 I had no further communications. Dr. Weldon I
8 think tried to talk to her once but I didn't.
9 Q. How about, do you know whether your son
10 attempted to contact her?
11 A. I don't think he did.
12 Q. If you would turn to page 52 of the 2004
13 IOM report marked as Exhibit 15.
14 A. Okay.
15 Q. I want to direct your attention to the
16 first full paragraph beginning with the sentence,
17 Dr. Geier and Mr. Geier presented to the
18 committee and unpublished analysis of the VSD
19 data; do you see that?
20 A. Yes.
21 Q. VSD data is vaccine safety data link?

Case 3:03-cv-00441-TJW    Document 254-14    Filed 08/07/04    Page 7 of 40 PageID #: 7982

November 11, 2004    Multi-Page Deposition of    MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 338

1    A. Yes.
2    Q. And that was the data you were looking
3 at in these visits we just talked about, correct?
4    A. Yes.
5    Q. It said only one slide depicted this
6 information and it demonstrated an increasing
7 relationship between autism relative risk and the
8 amount of thimerosal?
9    A. Yes.
10    Q. Is that an accurate characterization of
11 the slide you provided to the IOM committee?
12    A. Yes.
13    Q. It states, the basis of this
14 calculation was not provided and additional data
15 and methods were not described, is that true?
16    A. Well, I guess if she says that that's in
17 there, then we did give them a little bit of
18 data. If that's the data. But generally it's
19 true.
20    Q. Overall the committee found the results
21 of their analyses using VSD data uninterpretable

Page 339

1 primarily due to the lack of a complete
2 description of their methods specifically in how
3 they determined whether individuals belonged to
4 the exposed -- I'm sorry, to the unexposed or
5 exposed group. Do you see that?
6    A. Yes.
7    Q. Do you think that is a fair critique of
8 your paper, of your presentation?
9    A. No, they understood that we simply
10 searched, that they had a vaccine code and we
11 searched the one without thimerosal versus the
12 one with. That doesn't take much description.
13 That's how we determined it. I think it's fair
14 that we didn't give them the level of
15 description how we did it that you'd have in a
16 fully published paper. I think that's fair.
17    Q. The vaccine safety data link project
18 actually provides data on a patient-by-patient
19 basis, correct?
20    A. Yes.
21    Q. Now, did your work look at patients on

Page 340

1 an individual-by-individual basis or on an
2 aggregate basis?
3    A. I'm not sure of your question. What we
4 did is we told the computer to go pull us all the
5 patients -- we started out and said pull all of
6 the patients that had three or more DTaP shots,
7 maybe it was four or more, we pulled all the
8 patients that had four or more DTaP shots and,
9 you know, got rid of all the other data. So now
10 we had some charts that had four or more. From
11 those we asked that, we had a vaccine code, to
12 count how many there were that had
13 thimerosal-containing vaccines and how many -- to
14 separate those from the ones that had
15 thimerosal-free vaccines and then we looked for
16 299.0, autism.
17    Q. What allowed the computer to determine
18 whether a designation of DTaP in a child's
19 medical record was DTaP with thimerosal or DTaP
20 without thimerosal?
21    A. Because they have a table and all the

Page 341

1 vaccine manufacturers, each one has a code
2 number, and we knew, from 1997 on we knew which
3 code number to give it that had no thimerosal.
4 This was from 1999 -- 1997 to the end of 2000.
5 There was one vaccine manufacturer that had no
6 thimerosal, SmithKlineBeecham. So the
7 SmithKlines were put on one side and the others
8 were put on the other side and almost every case
9 of autism fell on the other side. The ones with
10 the SmithKlineBeecham had I think one case in the
11 entire database that had autism that got that
12 vaccine. Even though there were hundreds and
13 hundreds, many, many tens of thousands of
14 children in each, oh, it was really hard to
15 analyze that.
16    Q. Well, the committee says given this lack
17 of clarity, it is unclear how the incidence rate
18 and the estimate of relative risk could be
19 calculated. The committee finds the results
20 uninterpretable and as such noncontributory with
21 respect to causality. Do you understand that to

Deposition of - MARK R. GEIER, M.D., Ph.D. Multi-Page™ November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 1:03-cv-00111-JJF Document 254-13 Filed 12/07/04 Page 8 of 40 PageID #: 7983

Page 342

1 say they couldn't figure out how you did it, you
2 didn't say how those results could be obtained,
3 and as a result they considered them of no value?
4    A. Yeah, in fact, they weren't published.
5 It was already ruled that things that were
6 unpublished were not going to be considered. And
7 you know, they couldn't understand Boyd Haley's
8 paper, as they said it later, and they couldn't
9 understand any of the other papers that were
10 here, they have a problem understanding ones that
11 they don't want to understand. But this is very
12 understandable. You're not a scientist, you
13 understood what I just said.
14    The details of which, as I said, are not
15 completely worked out. We did look to see did
16 the ones that had more autism, did they have more
17 visits. Did they have more other things. And
18 those are legitimate questions looking for
19 confounders. And we didn't find any. You know,
20 two days, we didn't search everyone that you
21 could search, but I mean, if you listen to -- if

Page 343

1 you get the official transcript of our
2 presentation, we got up and said what I just told
3 you. Anybody could understand the idea of what
4 we did. It was crystal clear. You don't need
5 much analysis when all the autistics end up with
6 the ones, all but one ended up in the group that
7 had the DTaP with thimerosal, and only one had a
8 DTaP without thimerosal. Just didn't require a
9 great deal of mathematical analysis to determine
10 that there was something going on here.
11    Of course, they found a similar thing
12 looking slightly different. Verstraeten had
13 found the same kind of thing. We have hundreds
14 of pages of their documents saying the same
15 thing. So we didn't make any great discoveries,
16 we just confirmed what they already knew.
17    Q. Is it considered important in the
18 scientific community to be able to replicate the
19 work of a scientist in order to evaluate its
20 legitimacy?
21    A. Absolutely. That's why we asked for

Page 344

1 the Verstraeten intermediate steps, and we would
2 have, if we were allowed to, gone back and
3 finished this work and we were going to make that
4 database, if they would allow us, open to
5 anybody. But of course they destroyed it.
6    Q. If in fact the IOM was unable to
7 understand your methodology and unable to
8 replicate your work in order to determine its
9 accuracy, would it have been fair in your mind
10 for them to give no weight to the conclusions
11 that you offered?
12    A. Well, gee, they couldn't replicate the
13 Verstraeten one either but they weighted that
14 one. But I do believe --
15    Q. I'm asking you a question --
16    MS. OWENS: Objection, nonresponsive.
17    Q. (BY MR. THOMASCH) I'm asking you
18 whether or not in your mind if in fact they were
19 unable to understand your methodology and unable
20 to replicate your analysis, under those
21 circumstances, would it have been fair in your

Page 345

1 opinion to disregard conclusions that you offered
2 about the data?
3    A. If they treated everybody else equally,
4 yes.
5    Q. Is it your opinion that they were
6 unable to understand your methodology and
7 replicate your work or was that a pretext that
8 they used to disregard your work?
9    A. I believe that they could understand
10 what we did. I believe they could not replicate
11 it for reasons beyond our control, that is, they
12 wouldn't let Congressman Weldon in to see the
13 data so I don't think they would let the IOM in
14 either. They couldn't replicate Verstraeten's
15 work. Unfortunately the CDC has made this
16 database secret. We would like to have it open
17 on line, like the VAERS database. I think they
18 said every single study that was presented, this
19 one I'm willing to allow them to do this, because
20 they had the rules that unpublished studies would
21 not be weighted. So they claimed they didn't

CRC-Salomon
(410) 821-4888   fax (410) 821-4889

Page 346

1 weight Miller's study. Which hadn't yet been
2 published. That's fair enough. But they went
3 down through a whole litany of people who showed
4 thimerosal caused damage and they said the same
5 thing about each one, whether it was Boyd Haley
6 or whether it was Mady Hornig, every one of them,
7 they didn't understand it, they couldn't
8 replicate it, and it didn't mean anything. It
9 doesn't play well. Those were peer-reviewed in
10 major places and the peer reviewers understood
11 them.
12     MS. OWENS: Objection to the
13 responsiveness of the answer.
14     Q. (BY MR. THOMASCH) Is it your testimony
15 that their statements that they couldn't
16 replicate it were pretextual and false?
17     A. I think it was true that they couldn't
18 replicate it. I told you that not through any
19 fault of mine.
20     Q. Well, if they couldn't replicate it,
21 then do I understand that you would agree that

Page 347

1 they didn't have to pay attention to the results,
2 it's just that they shouldn't have paid attention
3 to other results that couldn't have been
4 replicated?
5     A. Yeah, I'm not upset that they ignored
6 our results in the VSD. I told you the study's
7 not completed. I am upset that they ignored our
8 VAERS publications data, which has been published
9 all over the world in some of the world's leading
10 journals like Experimental Biology in Medicine,
11 which is a top ten journal. Their referees were
12 able to replicate, or not replicate it, but
13 understand it to the extent that they were
14 confident in it. And I am upset that they chose
15 every single one that they didn't like the
16 finding on. Which was a whole litany of them.
17 And then said every one of them was not
18 understandable, not repeatable, and didn't
19 contribute anything. It looks really silly.
20 These guys are chiefs of departments at major
21 medical schools and they don't understand their

Page 348

1 work. Isn't that something.
2     Q. They did say that about each and every
3 one of your studies; is that not correct?
4     A. Each and every one of any study that was
5 on the side that thimerosal caused any problems.
6 Every single one of them.
7     Q. Do you view that as a product of
8 deficiencies in the information that was
9 submitted to them, incompetence on the part of
10 the panel, or dishonesty on the part of the
11 panel?
12     A. They had a viewpoint to prove and they
13 proved it.
14     Q. That sounds like dishonesty on the part
15 of the panel.
16     A. Dishonesty or limitation by their
17 instruction. You can't count Boyd Haley's, for
18 example, because it's not epidemiological or
19 whatever it was. They have their reasons. But
20 there aren't any reasons, aren't any honest
21 reasons.

Page 349

1     MS. OWENS: While they're looking for
2 the next exhibit, Dr. Geier, you mentioned that
3 you had codes that told you what vaccines were
4 what that you used in your analysis of the VSD
5 data.
6     THE WITNESS: Yes.
7     MS. OWENS: Did I understand that
8 correctly?
9     THE WITNESS: Yes.
10     MS. OWENS: Did you bring those with you
11 today?
12     THE WITNESS: No. Again, let me tell
13 you about that. There's more than that, okay?
14 When we went there they give you, if I get the
15 term wrong it's not intentional, they give you
16 something like a data dictionary where they have
17 all the different codes and all the different
18 things how the VSD is encoded, it's a big
19 notebook. That's available. Ask them for that
20 and they'll give it to you, I presume. I don't
21 think it's mine to give out, but I think they

Page 350

1  have -- it's not unique to us. Anybody that uses
2  this system has these books that tells you that
3  code such and such means, 299 is the code for
4  autism, so they have that. If they think it's
5  appropriate, I'm not going to stop them, ask them
6  for it and they'll give it to you.
7      MR. ELLIOTT: Are you saying you have it
8  in your custody and control but you're not going
9  to give it to us?
10     THE DEPONENT: We have some of it. And
11 again, I'm not totally against giving it to you,
12 we have some of it. Some of it was provided by
13 them for our use in that room. I don't have any
14 problem if they supply it to you. I don't
15 guarantee that I have all of it with me. Because
16 they don't want us to take it out. But if you
17 ask for it and you have a legitimate reason, you
18 get it. But I'm telling you how it works. You
19 walk in, and they give you these notebooks that
20 have how the VSD is encoded in different numbers,
21 both in diagnosis codes, vaccine company codes,

Page 351

1  vaccine type codes, all that kind of thing, and
2  you can look it up and you ask the computer to
3  find those fields. So we didn't have to look
4  through that, we were supplied with that
5  information. But I don't believe that we were
6  allowed to take any -- maybe, they sent us a
7  little bit maybe at home before we went but we
8  were not allowed to take it all out. You know,
9  it's not ours to give you.
10     Q. (BY MR. THOMASCH) Dr. Geier, to your
11 knowledge, has any vaccine manufacturer been
12 provided access to the VSD data?
13     A. No.
14     Q. Are you aware of any basis under which
15 either experts or lawyers working with or
16 representing the vaccine manufacturers could
17 attempt to replicate your work with regard to --
18     A. Yes, Bob Davis is a professor at the
19 University of Washington who takes, according to
20 his own CV, tens of millions of dollars from the
21 vaccine companies and he has total access to it.

Page 352

1  In fact, he got up and he said he reanalyzed our
2  database even though they said they wouldn't look
3  at our database. So he has access to it.
4      Q. He was part of the vaccine safety data
5  link team that published on that subject for the
6  CDC, was he not?
7      A. That's right, but he's not a CDC
8  employee. So he's an outside employee that had
9  access to it. He takes by his own admission
10 large amounts of grant money from vaccine
11 manufacturers.
12     Q. To your understanding is he at liberty
13 to provide access to any vaccine manufacturer to
14 the raw data?
15     A. I don't think so. I said no vaccine
16 manufacturer had direct access.
17     Q. All right. So there is no basis that
18 you're aware of that would allow us at this
19 juncture to replicate the analysis that you
20 purport to have done?
21     A. I don't think it can be replicated

Page 353

1  because they said the database has been
2  destroyed. They testified to that at the sixth
3  IOM meeting that I went to. They said they
4  destroyed it as soon as we left.
5      MS. HALPERN: Dr. Geier, were you there
6  when Dr. Davis gave his presentation on the VSD
7  data that is supposedly the gist of your
8  conclusions?
9      THE WITNESS: Yes.
10     MS. HALPERN: And are you aware that he
11 matched cases to control on much of your burden?
12     THE WITNESS: Yes.
13     MS. HALPERN: When he did that, all the
14 relative risks  dropped and were not
15 statistically significant?
16     THE WITNESS: Yes. He said that he
17 found -- he tried to present that he found
18 something like what we found but when he
19 corrected for it, it corrected away, and I can't
20 go back and do it because they won't let me back
21 in. But I know he's wrong because he had in his

Page 350 - Page 353

Page 354

1 chart kids that were two months old, four months
2 old, and six months old, and so he didn't
3 understand that our first cut in this data was
4 you had to have four DTaPs. And there aren't any
5 two-month-olds that have had four DTaPs.
6     MS. HALPERN: Let me just ask one
7 final --
8     THE WITNESS: So he didn't quite get
9 that part of it. So his replication of ours
10 isn't quite right.
11     MS. HALPERN: Let me just ask you one
12 final question. Are you relying for your opinion
13 in this case in any way on your VSD analysis.
14     THE WITNESS: No.
15     MS. HALPERN: Not in any way at all?
16     THE WITNESS: Not in any way, other than
17 to say I'm annoyed at what happened. But as far
18 as the science goes on this, I'm a big believer
19 that peer review is important, you go and you do
20 the publications and you get it peer-reviewed.
21 You don't publish it, it's not proved, you don't

Page 355

1 rely on it. I think that's fair game for both
2 sides.
3     MS. HALPERN: That's fine, and I
4 understand what you're saying, but you attached
5 to your expert report in this case your
6 presentation to the IOM which included your VSD
7 data, your slides which included your VSD data,
8 your testimony which included your VSD data, as
9 well as your slides to the NIP on the VSD data.
10     THE WITNESS: Well, I had to attach my
11 IOM testimony because it included the other
12 things that we had.
13     MS. HALPERN: You also included, I
14 believe your press release, talking about the
15 relative risk of 27?
16     THE WITNESS: Someone asked us because
17 this was a controversial thing what did you see
18 when you went in? We said we saw 27. As I said,
19 we haven't published it yet. I told them it was
20 unpublished at the time. It's not what I rely
21 on. I was very annoyed at what Bob Davis did

Page 356

1 before we got up. Because he first violated the
2 rule. He's not allowed to look. We agreed to
3 that. Secondly, I was going, he must be wrong,
4 he must be wrong. He is wrong. We thought about
5 it, but he knew I couldn't go back because he'd
6 already destroyed it. I didn't know I couldn't
7 go back. But that's not what I rely on for the
8 science. I believe that you should have finished
9 the papers and have them peer-reviewed and until
10 you get them peer-reviewed and accepted and
11 published, I don't believe that they become the
12 thing that a scientist should rely on.
13     MS. HALPERN: So what were your slides
14 and material that's already previously been
15 marked that speak to the VSD data, not just a
16 relative risk of 27 or 9, depending on whether
17 it's three or four vaccines you looked at, but
18 the correlation coefficient, .99, there are
19 slides like that as well, none of that do you
20 intend to rely upon or use in trial in this case?
21     THE WITNESS: That's correct, unless we

Page 357

1 get to finish it, but as it stands now, as I
2 said, the only thing I can take home now is, out
3 of this that I would be willing to talk about is
4 they've been interfering with us and they've been
5 interfering with Congress and they've been
6 attacking us for doing, attempting to do honest
7 work. That's what really bothers me about the
8 VSD. I don't need my reliance on the VSD data.
9 I have their VSD data. Their VSD data before
10 they changed it shows exactly what our VAERS data
11 shows.
12     Then I have their memos that say we got
13 to change it. Then they changed it, that's good
14 enough for me. I know what the VSD data shows.
15 But I am annoyed that they're trying to cover it
16 up and trying to say we're risking patient
17 confidentiality when we were asked -- I was in
18 Florida playing tennis and they asked, Congress
19 called me and said would you go look at the VSD
20 for us. I'm the investigator. I mean, I left
21 the tennis court. That was my only vacation in

Page 358

1 years. To go look at this damn thing. Then they
2 try to say that we did something wrong? I was
3 just trying to give an honest opinion because
4 Congress asked me to look.
5      That's the only thing I was doing and
6 I'm annoyed that they tried to ruin our
7 reputation on that. And I'd like to complete the
8 studies, maybe I will. But until things are
9 published, I don't believe anybody should rely on
10 things that are not published themselves. I rely
11 on some of their memos because they're against
12 their own interests, but I'm not willing to do
13 the VSD, to rely on the VSD study, until all the
14 controls and everything is done and please let me
15 go back and I'll try to do them.
16      MR. ELLIOTT: Objection, nonresponsive.
17      Q. (BY MR. THOMASCH) Dr. Geier, you
18 indicated in effect that you didn't need your VSD
19 data because you had, quote, their VSD data?
20      A. Yes.
21      Q. And that would be the data that was

Page 359

1 published by Verstraeten and others; is that
2 correct?
3      A. Well, I had what he published in
4 Pediatrics, but I have on the Freedom of
5 Information Act information on what he found for,
6 that was discussed at Simpsonwood, and then I
7 have earlier stuff where he massaged it and he
8 has memos. I'll try anything. Anybody have a
9 suggestion on how to make this go away?
10      Q. All right. Let me ask you
11 specifically --
12      A. Came back again and I think we gave you
13 all those.
14      Q. Let me ask you specifically, in any of
15 that data, did you find a statistically
16 significant association between
17 thimerosal-containing vaccines and autism?
18      A. Yes.
19      Q. Where was that?
20      A. And they've testified they've never
21 seen it and it's in there.

Page 360

1      Q. What was the relative risk of the
2 statistically significant data?
3      A. Off the top of my head, one of them was
4 11, one of them was eight, but we'll have to
5 look. It was statistically significant. It's
6 what's called the ground zero data. This is new
7 stuff because originally, the earliest data we
8 had seen was Simpsonwood. We thought that's the
9 way it was and they changed it to Pediatrics
10 level, but actually Simpsonwood had already been
11 massaged and there was a whole series and we put
12 it in the report. I believe we have it.
13      Q. All right. Let's go to the report.
14 I'll ask the court reporter to mark as our next
15 exhibit, No. 23, a cover letter from you to Mr.
16 Waters dated November 7, 2004 enclosing, quote, a
17 copy of my report containing my opinions, and it
18 goes on from there.
19      A. In the interest of time do you know what
20 notebook that's in?
21      (Deposition Exhibit No. 23, copy of

Page 361

1 report with cover letter dated November 7, 2004,
2 was marked.)
3      Q. (BY MR. THOMASCH) Let's start with
4 Exhibit 23. Can you identify that as your report
5 in this case?
6      A. Yes.
7      Q. And that's your signature on both the
8 cover letter and on the last page of the report,
9 correct?
10      A. Yes, sir.
11      Q. When did you begin to prepare this
12 report?
13      A. I don't know. Again, we gave you all
14 the drafts. So if you look at the earliest
15 draft.
16      Q. You gave them to us today. We have not
17 had a chance -- did you understand that we had
18 made a request of plaintiff's counsel to have
19 access to your materials, including coming to
20 your place of residence to see them in advance of
21 today's deposition?

Page 362

1   A. No.
2   Q. Did anyone ever convey to you our
3   request that we be provided with copies of the
4   materials in advance of the deposition for the
5   sake of efficiency?
6   A. Yes, I was told to assemble this
7   material and try to get it together by about a
8   week ahead of it.
9   Q. Were you told that we wanted to come
10  see it or have it provided to us before the
11  morning of the deposition itself?
12  A. I was never told that you wanted to
13  come see it. I was told that I was trying to
14  send it in, that they were going to supply it to
15  you sometime before the deposition. I think they
16  did supply you a lot of it before the deposition.
17  But not all of it.
18  Q. You brought with you 14 notebooks of
19  material that we had not been previously provided
20  with; isn't that correct?
21      MR. SMITH-GEORGE: Object to that

Page 363

1   considering you've already admitted you had the
2   DTP notebooks before. So that's at least five
3   notebooks that have been provided --
4       THE DEPONENT: That's seven of them.
5       MR. SMITH-GEORGE: Seven of them.
6       MS. WOODBURY: That might be to one
7   defendant, not to the rest of us.
8       MR. THOMASCH: That's one defendant,
9   two -- I had no idea that those files were
10  considered to be part of his file in this case.
11  No one ever indicated that whatsoever. Those
12  files are in deep storage. They're more than a
13  decade old.
14      MR. SMITH-GEORGE: You haven't asked him
15  why he produced them. If you did, you would find
16  out why we brought them. But nevertheless, most
17  of these documents that are here have been
18  provided to defense before. A lot of these
19  medical articles which are contained in these
20  notebooks have been provided to the defendant
21  well in advance of the deposition. You got his

Page 364

1   report well in advance of the deposition. A lot
2   of the documents in here you got well in advance
3   of his deposition. So I object to the
4   characterization that this was just foisted upon
5   you at the last minute.
6       MR. THOMASCH: Today's the 12th. The
7   report 50 pages, single-spaced, was produced on
8   the 8th.
9       MS. HALPERN: For the record,
10  GlaxoSmithKline has never seen any of his
11  material on the DTP.
12      MR. ELLIOTT: And I as counsel for Merck
13  haven't seen it.
14      MS. WOODBURY: And as counsel Eli Lilly
15  I don't have it either.
16  Q. (BY MR. THOMASCH) When did you
17  complete your report?
18  A. What's the date on this thing?
19  Q. Cover letter is dated November 7th.
20  A. I think that's when it was absolutely
21  completed.

Page 365

1   Q. All right. When was it begun?
2   A. The first version says September 26th.
3   Obviously, it didn't appear that day, so we
4   probably were working on it for some days before
5   that.
6   Q. And the "we" would be yourself and
7   David?
8   A. Yes, and my secretary as far as
9   assembling CDs and that kind of thing.
10  Q. Was anyone else involved in drafting
11  the report?
12  A. No.
13  Q. Prior to November 7th did anyone review
14  the report?
15  A. I think we sent these drafts to
16  plaintiff's attorneys.
17  Q. And is that indicated in the e-mail
18  correspondence that you provided to us?
19  A. Yeah, if there was a cover it would be.
20  Q. All right. I just want to touch on,
21  and time doesn't permit to go into any depth

Page 366

1 today on the subjects that are included, if you
2 want to just identify them. Am I correct that
3 among the topics included in the report include
4 prevalence of autism?
5    A. Yes.
6    Q. Do you consider that you have -- do you
7 claim expertise in the subject matter regarding
8 prevalence of autism?
9    A. Yes.
10   Q. And briefly would you describe for me
11 what the basis of your expertise in that regard
12 is?
13   A. Review of the literature, talking to
14 some people that have done studies themselves.
15   Q. Have you ever been involved in the
16 diagnosis of autistic children?
17   A. No, not directly.
18   Q. Have you ever been involved in the care
19 and treatment of autistic children?
20   A. Not before this week. Just recently,
21 but not in the distant past.

Page 367

1    Q. Your report discusses mercury poisoning
2 incidence; is that correct?
3    A. Yes.
4    Q. Do you claim expertise in the subject of
5 mercury poisoning?
6    A. Yes.
7    Q. What's the basis for that expertise?
8    A. Literature review.
9    Q. Do you have any formal training in the
10 field of toxicology?
11   A. No.
12   Q. Have you ever diagnosed an individual as
13 suffering from mercury poisoning?
14   A. Yes.
15   Q. And was that in the context of a
16 litigated claim?
17   A. No.
18   Q. Okay. When did that occur?
19   A. Since I've been looking at medical
20 charts of these many parents that I've met. Many
21 of whom have no claims. The ones that have

Page 368

1 claims, I'm not involved in the claims anyway.
2    Q. All right. Prior to 1999, have you
3 ever made a diagnosis of mercury poisoning?
4    A. No.
5    Q. Have you ever been involved in the care
6 or treatment of victims of mercury poisoning?
7    A. Not until recently.
8    Q. And what is the recent episode that
9 you're alluding to?
10   A. We're -- we presented a new idea on how
11 to treat autism and how to treat mercury
12 poisoning, because these kids aren't autistic,
13 they're mercury poisoned. And some people are
14 now trying some of these ideas on some of the
15 children. Although I'm not happy with trying it
16 on children without further research, these
17 people are desperate and there have been some
18 remarkable responses.
19   Q. What are the classic symptoms that lead
20 to a diagnosis of mercury poisoning, if you know?
21   A. Neurodevelopmental problems, flapping,

Page 369

1 failure to communicate. The best source for that
2 is let's read Lyn Redwood's paper that we gave
3 you that she listed carefully documented 100
4 symptoms of mercury poisoning, which is the same
5 symptoms as autism.
6    Q. You indicate in your report that you're
7 going to testify on the subject matter or ethyl
8 versus methylmercury; is that correct?
9    A. Yes.
10   Q. Does that include commenting on studies
11 relating to the pharmacokinetic profile of each?
12   A. Yes.
13   Q. Do you have any formal training on the
14 subject of pharmacokinetics?
15   A. I mean, I've worked with all of this
16 stuff at the bench, but I don't have a degree in
17 it, but I have significant, you know, experience
18 with working with that kind of thing. In fact,
19 I've been testing thimerosal's ability to kill
20 bacteria in my own personal lab.
21      MS. OWENS: Move to strike as

Page 370

1  nonresponsive.
2      A. I'm sorry, that's what I understood the
3  question to be. Could you re-ask it then?
4      Q. (BY MR. THOMASCH) Do you have any
5  formal training in pharmacokinetics or
6  toxicokinetics?
7      A. Just whatever courses I took in my Ph.D.
8  and medical school.
9      Q. And were there any courses in that time
10 that you took that related to pharmacokinetics or
11 toxicokinetics?
12     A. Yes.
13     Q. What were they?
14     A. Things involving biochemistry. I don't
15 remember the course titles. I'm sorry, I'm 30
16 years out now, something like that. I was
17 trained in that. I worked on things related to
18 that at NIH and I worked since then on things
19 related to that.
20     Q. Would you define what pharmacokinetics
21 is?

Page 371

1      A. It's the study of how the poisons or
2  drugs are distributed in bodies, how they're
3  eliminated, how long they react, what the half
4  life is, what they react to, where they go in the
5  body, what they do.
6      Q. That would generally be considered in
7  the field of toxicology; is that correct?
8      A. Yes.
9      Q. You do not hold yourself out as a
10 toxicologist, do you?
11     A. No.
12     Q. You are not in any professional society
13 of toxicologists, are you?
14     A. No, although I just recently addressed
15 the invitation of a major toxicology group and I
16 published in toxicology journals and I'm going to
17 in the spring again speak to the toxicology
18 group. So I have some expertise in a certain
19 part of their field but I'm not a -- I don't
20 spend all my time being a toxicologist. I list
21 myself actually, the best listing other than my

Page 372

1  genetics part which we've talked about before is
2  actually a vaccinologist.
3      MR. ELLIOTT: Objection, responsiveness.
4      Q. (BY MR. THOMASCH) You're going to
5  discuss in your expert report or you do discuss
6  in your expert report various epidemiological
7  studies; is that correct?
8      A. Yes.
9      Q. Are you an epidemiologist?
10     A. I'm not a board certified
11 epidemiologist, but I have extensive publications
12 and work in the field of epidemiological
13 analysis.
14     Q. Have you had any formal study in the
15 field of epidemiology?
16     A. Again, back to medical school and Ph.D.
17 times.
18     Q. Were you involved in any degree program
19 that ended with a degree in epidemiology?
20     A. No. And I've taken some courses, by the
21 way, and I've listed on my CV some NIH courses

Page 373

1  recently in vaccines and in infectious disease
2  and epidemiology. As I said, I don't have a
3  degree in epidemiology.
4      Q. I want to ask you briefly if you'd
5  locate for me in the report the ground zero data
6  you made reference to just before we marked the
7  report?
8      A. Let me see if I can find it. I don't
9  see that we included it in the report. If I did
10 -- my quick going through it didn't find it.
11     Q. All right. Is that information that,
12 the VSD data that you have seen from the work
13 done by Dr. Verstraeten and others part of the
14 basis for your opinion in this case?
15     A. Not a significant part. I mean, I've
16 included the Simpsonwood, and so they already
17 found it at Simpsonwood, but if you like I'll
18 supply you with the ground zero data. Let me
19 make a general comment. I don't know if this is
20 helpful or not. But there's a ton of stuff on
21 thimerosal in this world, and, you know, I can

Deposition of - MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.
Case 5:03-cv-00141-TJW   Document 254-12   Filed 12/07/04   Page 16 of 40 PageID #: 7991
Multi-Page™
November 11, 2004
Page 374 - Page 377

**Page 374**

1  give you a thousand-page report. My intent was
2  to testify from this report. Now, if you're
3  going to ask me questions outside of the scope of
4  this report, I'll give you my best honest answer
5  and you'll get into all kinds of neat areas, but
6  I didn't think, you're opening that can of worms,
7  not me.
8    Q. You have not read the expert witness
9  disclosure from plaintiff's counsel in this case,
10  have you?
11    A. No.
12    Q. So you haven't compared it up to see
13  areas that are in that disclosure that are not
14  touched on in your report, have you?
15    A. No, but I hope that plaintiff's counsel
16  has, because I've given him the report, and he
17  said he was satisfied with the areas that I
18  describe in the report.
19    Q. So it's your understanding that
20  notwithstanding what may be in the expert witness
21  disclosures, you're only going to testify to the

**Page 375**

1  matters raised in your expert witness report?
2    A. What I was told is under the rules of
3  this litigation, if it's not in this report and
4  we didn't disclose it to you, that I can't.
5  Now --
6    Q. Let me ask you about some of the things
7  you did disclose in your report. At page 45 you
8  make reference to a letter to Congress from the
9  U.S. Office of Special Counsel dated May 20,
10  2004?
11    A. Yes.
12    Q. What was the purpose of including that
13  in your expert report?
14    A. To -- it's important to me to
15  demonstrate that this IOM report, notwithstanding
16  that other areas of the government believe that
17  this IOM report does not put this thing to rest
18  and in fact does little -- adds very little. And
19  that I don't want anybody to go away from here
20  saying see, here's the IOM and here's the
21  government position and that's what it is,

**Page 376**

1  because that's not the government position. The
2  government has many positions depending on who
3  you ask, and I was impressed with the special
4  counsel, which is a special division under the
5  U.S. President, who said that they think there is
6  a real problem notwithstanding the IOM report.
7    MS. HALPERN: Excuse me for a minute,
8  Dr. Geier, Mr. Thomasch asked you earlier whether
9  you could point to any study other than your own
10  that demonstrated an increased statistically
11  significant relative risk for autism and
12  thimerosal-containing vaccines.
13    THE WITNESS: And I said if you wish me
14  to do so, I will supply you with copies of that
15  part of the ground zero, what we call the ground
16  zero documents.
17    MS. HALPERN: That's not my question,
18  sir. My question is is there anything in your
19  expert report that you are relying on that you
20  can show us, sitting here today, that shows an
21  increased statistically significantly relative

**Page 377**

1  risk for thimerosal and autism, other than your
2  own studies?
3    THE WITNESS: No, neurodevelopmental
4  disorders but not autism.
5    MS. HALPERN: I'm asking you about
6  autism.
7    THE WITNESS: I don't think so as I sit
8  here.
9    MS. HALPERN: Do you want to take a
10  moment and look at your report? Because if it's
11  there I would love to know where it is, because I
12  couldn't find it.
13    THE WITNESS: I just did. I didn't see
14  it.
15    MS. HALPERN: So there is nothing
16  you're going to be relying on at trial other than
17  your own data that shows an increased
18  statistically significant relative risk for
19  autism and thimerosal-containing vaccines?
20    THE WITNESS: With the epidemiology.
21    MS. HALPERN: Yes, sir.

Page 378

1  THE WITNESS: I'm going to be relying on
2  all the clinical studies.
3  MS. HALPERN: My question is clearly an
4  epidemiologic study; is that right?
5  THE WITNESS: Yes, that was my intent,
6  yes.
7  Q. (BY MR. THOMASCH) Back to page 45, what
8  opinion is it that is supported in your mind by
9  the statement of the Office of Special Counsel?
10  A. I believe that these allegations raise
11  serious continuing concerns about the
12  administration of the nation's vaccine program
13  and the government's possibly inadequate
14  response to the growing body of scientific
15  research on the public health issues of mercury
16  and vaccines.
17  Q. Can you tell me whether or not --
18  A. And let me finish. The allegations
19  also present troubling information regarding
20  children's cumulative exposure to mercury and the
21  connection of that exposure to the increase of

Page 379

1  neurological disorders such as autism and
2  autism-related conditions among U.S. children.
3  This was sent not to me, I didn't request this
4  letter, I didn't have anything, well, little to
5  do with it being done, but this was sent to the
6  House and Senate oversight on health committees.
7  Q. Are you aware whether it was solicited
8  by anyone?
9  A. It was solicited by some parents and
10  upset people that the office conduct an
11  investigation, and the conclusion was that there
12  is something here and it needs to be taken up by
13  the appropriate members of Congress.
14  Q. And what do you understand the extent of
15  the investigation to have been?
16  A. They read many, many papers on this
17  field, I think they saw the Simpsonwood
18  documents, they saw documents, I think we may
19  have even sent a couple documents ourselves, but
20  primarily they were supplied by the parents and
21  they felt that there was something significant

Page 380

1  here.
2  Q. Who is the "they," who is the "they"?
3  A. The U.S. Office of Special Counsel.
4  Q. Specifically by name who?
5  A. It's on here somewhere. I don't know.
6  I don't recall who the person there was.
7  Q. Right. Do you understand what the job
8  responsibilities of the Office of Special Counsel
9  are?
10  A. Yes, to investigate allegations of
11  misconduct within the government. And in fact I
12  understand this investigation may still be
13  continuing, they require a whistle blower to
14  continue it themselves, and at the time they
15  wrote this letter they didn't have one, so they
16  referred it to Congressional committees, but I
17  believe that, the rumor has it that they may have
18  one now. Therefore if they do have one, they
19  themselves will conduct the investigation.
20  MR. ELLIOTT: Objection, nonresponsive.
21  Q. (BY MR. THOMASCH) Do you have any

Page 381

1  information about the expertise of the
2  individuals who were involved in writing this
3  letter?
4  A. Yeah, I think these people are very
5  experienced at recognizing malfeasance when they
6  see it.
7  Q. Was this a peer-reviewed analysis?
8  A. No, it's not a scientific analysis.
9  It's an analysis of malfeasance of government
10  action, not a scientific analysis.
11  Q. And looking at the Inspector General
12  report at page 46, is that again an attempt to
13  show malfeasance on behalf of government
14  agencies?
15  A. Yes. Again, I bolded what I thought
16  was important. Upon review of the correspondence
17  you provided to the PCIE, in conjunction with
18  further research into the matter, it isn't me,
19  understand, that provided it. We have determined
20  that the above allegation represents a potential
21  conflict of interest issue which may be criminal

Page 382

1 in nature. And therefore falls within the
2 Department Health -- of HHS, Office of Inspector
3 General's authority to investigate.
4    Q. Have any criminal charges been brought?
5    A. No, but there's an investigation. I've
6 met four times with the FDA's criminal
7 investigation unit at their request. Others have
8 met with other units, I can't testify as to what
9 they are. But I personally have met I think
10 three or four times with the FDA's criminal
11 investigations unit.
12    Q. Who have you met with?
13    A. I don't know the names of the two
14 officers, but they came to our house and asked to
15 see all kinds of documents and discuss this.
16    Q. Do you have documents that may reflect
17 the names of those individuals?
18    A. I may have their cards at home.
19    Q. Ask for those to be produced.
20    A. Again, I'm not sure that that's
21 appropriate. I'm not an attorney but I think

Page 383

1 when they, you know, discuss something in private
2 with you, I'm not sure that it's mine to tell
3 you.
4    Q. I'm just asking you for the names of
5 the individuals who apparently as official
6 government business paid a call to you. There is
7 nothing confidential about that.
8        MS. OWENS: Are you a subject of the
9 investigation?
10        THE DEPONENT: No, you are.
11        MS. OWENS: I am, Diane Owens?
12        THE DEPONENT: No, not you personally.
13 What they're saying is that this unit, if I
14 understand it, does not investigate internal
15 misconduct in the FDA, although they may refer to
16 a unit that does that, but they investigate
17 allegations that drug companies have misled the
18 FDA. So when I said you I meant in the generic
19 sense. They're looking into the possibility that
20 the FDA didn't do anything wrong, they were
21 misled by the drug companies.

Page 384

1    Q. (BY MR. THOMASCH) Does that have
2 anything to do with opinions you're going to
3 offer in this case?
4    A. It has to do with counterbalancing the
5 FDA and the companies' attempt to say that the
6 government has looked into this and there's
7 nothing there, and here's the IOM report, here's
8 all the things you showed me, the website, yeah,
9 here's the official government, how you're
10 opposing the government position. That's not the
11 official government position. That's the
12 position of 12 people in the CDC or 14 people in
13 the CDC. There are many people in the government
14 asking very significant questions about what is
15 going on here and it's not an issue that I'm
16 going to allow to be presented as settled
17 because, hey, the government position is.
18        The government position is that this
19 little group who's done something very wrong and
20 who has been officially quoted as being guilty of
21 malfeasance is trying to cover it up, and there

Page 385

1 are many other honest groups in the government
2 that are trying to stop them from covering it up.
3 But it's certainly an open issue, it's not one
4 that the government position is induct the guy,
5 you're opposed to the government position. I'm
6 in favor of the government position, just not the
7 particular one you pointed to.
8    Q. Are you suggesting that there was an
9 investigation of criminal conduct on behalf of
10 vaccine manufacturers to inappropriately
11 influence government agencies on matters of
12 public health?
13    A. That's what they're investigating. I
14 don't know if they'll find that, but that's what
15 they're investigating. At least that's what they
16 told me they're investigating.
17    Q. What information if any have you
18 provided to them about the conduct of
19 manufacturers?
20    A. Well, I've shown them the tape
21 that --

Page 386

1  Q. Go ahead.
2  A. I've shown them the tape that I
3 provided you with.
4  MS. OWENS: The TV show tape?
5  THE DEPONENT: Yeah, this did not make
6 them very happy seeing people sitting there in
7 front of the government lying in front of their
8 face, and then admitting they lied and
9 apologizing for lying. This did not instill any
10 great confidence in anybody that sees the tape.
11 It didn't instill any confidence when Schwartz,
12 who was on that paper you showed me before, said
13 that there's absolutely no question that it's
14 absolutely known that this is safe when he talked
15 to the reporter. But gee, when this reporter
16 watched the testimony before Congress, they said,
17 instead of they're sure that it was safe, they
18 said we can't tell one way or the other, we don't
19 know. I think they got very upset when they
20 saw --
21  Q. I am asking you specifically about

Page 387

1 information, if any, that you provided that
2 suggested in any way that vaccine manufacturers
3 engaged in improper or criminal conduct in an
4 attempt to influence the deliberations or
5 conclusions of a federal agency?
6  A. Well, we showed them the FDA Foundation
7 site in which Eli Lilly hires fellows to work at
8 the CDC, the CDC who's supposed to be regulating
9 them, they weren't too happy about that. That
10 was on line. You can look that up if you like.
11 They weren't too thrilled about this -- since the
12 donors to the FDA Foundation are listed on the
13 site and all you guys are on it, all the vaccine
14 manufacturers are on it. They weren't too happy
15 when we showed them that the site contained
16 bringing in news reporters and training them how
17 to handle what goes on when there are problems
18 with vaccines. They had some problems but I
19 don't think I can tell you all the internal
20 details of an ongoing federal investigation. I
21 answered whatever questions and gave them

Page 388

1 whatever documents they asked for with regard to
2 this.
3  MR. THOMASCH: We're about out of time
4 on the tape. I think we need to change tapes.
5  THE VIDEOGRAPHER: The time now is
6 5:09. We are going off the record. This is the
7 end of tape No. 4.
8  (A recess was taken from 5:09 p.m.
9 to 5:21 p.m.)
10  THE VIDEOGRAPHER: The time now is
11 5:21. We are now back on the record. This is
12 the beginning of videotape No. 5.
13  Q. (BY MR. THOMASCH) Dr. Geier, at page
14 47 of your report you indicate that the state of
15 Iowa became the first state in the nation to ban
16 the administration of thimerosal-containing
17 vaccines to children under the age of 8 beginning
18 on January 1, 2006; correct?
19  A. Yup.
20  Q. So no ban is in effect at the moment; is
21 that right?

Page 389

1  A. Not in Iowa. In England but not in
2 Iowa.
3  Q. In the United States there's no ban in
4 effect anywhere; is that correct?
5  A. That's correct.
6  Q. There's never been a mandatory recall of
7 thimerosal-containing vaccines by the FDA; is
8 that correct?
9  A. No, that's the problem. You're right.
10  Q. There's never been a voluntary recall of
11 thimerosal-containing vaccines requested by the
12 FDA, correct?
13  A. It was requested by the American Academy
14 of Pediatrics and the American Public Health
15 Service. I don't think it was requested by the
16 FDA.
17  Q. Do you understand what a voluntary
18 recall is?
19  A. Yeah, they ask you voluntarily to
20 recall it.
21  Q. To recall it. Has the FDA asked for a

Page 390

1 voluntary recall in connection with
2 thimerosal-containing vaccines?
3    A. No.
4    Q. Is there anywhere in the statement of
5 the American Academy of Pediatrics in 1997 that
6 requested that the vaccine manufacturers recall a
7 product that had been distributed to the market?
8    A. No, I think it said to get rid of it as
9 quickly as possible. You showed it to me. We
10 can read it together if you want. And possible
11 doesn't seem to cover from then to 2004.
12    Q. Do you understand that this legislation
13 in Iowa will, if it stays in effect, as of 2006,
14 will require that early childhood immunizations
15 administered in the state of Iowa not contain
16 more than trace amounts of mercury?
17    A. Yes.
18    Q. Are you familiar with the phrase trace
19 amounts?
20    A. Yes.
21    Q. What does it mean?

Page 391

1    A. I helped them with that. To me, I was
2 willing to accept the manufacturer's definition,
3 which was less than .5 micrograms.
4    Q. And do trace amounts of mercury present
5 a significant health hazard to children who
6 receive vaccinations containing trace amounts of
7 mercury?
8    A. I think it does, but I think it's a
9 tremendous improvement to go from .25 to .5. And
10 I'm willing to be a reasonable person in
11 complying with, helping the companies who I want
12 to continue to make vaccine for us slide into the
13 new world. Eventually I think there should be no
14 thimerosal, but, you know, there were those who
15 argued against me. I argued for allowing the
16 trace.
17    Q. Do you think that products containing
18 trace amounts of thimerosal are defectively
19 designed products?
20    A. At the moment, no. I would allow
21 that -- defective always involves a time frame.

Page 392

1 It depends on your technology. At the moment I
2 would accept that as long as the manufacturers
3 would use some time in which we allow the trace
4 to improve to zero. You can see that .5 in a
5 vaccine can be a problem, because you can give it
6 in several vaccines and using the EPA limit of .1
7 microgram per kilogram, a newborn weighs 3
8 kilograms, they're allowed .3, you can see that
9 .5 is already over, but, you know, it's not 40
10 times over. It's a big improvement.
11       So I've tried to be, wherever asked as a
12 consultant, I've tried to take the middle ground
13 and be reasonable. But ultimately it's got to be
14 no mercury in any human product, vaccine or
15 otherwise. Human beings should not be exposed to
16 any kind of mercury. It's one of -- it's the
17 deadliest known element other than plutonium.
18    Q. Who is the individual or individuals
19 that asked you to consult with them regarding the
20 drafting of legislation in Iowa?
21    A. I actually went and met with the Iowa

Page 393

1 House of Representatives, I can't recall all of
2 the names. I've met with virtually every single
3 one of them. They have a system where you go
4 there when they're in session, it's kind of neat,
5 I've never seen this, and a constituent can what
6 they call call them out. They can go to the door
7 and they can say I'm from your district, and the
8 guy comes out, and he has to come out by law.
9 Unless he's in the middle of a vote or something.
10 So they called out all of them and I talked to
11 them one by one.
12       Then they had already, the Senate had
13 already voted 30 to 19, if I get the numbers
14 wrong, it's unintentional, but that's my
15 recollection. So the House was going to vote on
16 it so I saw virtually everybody from the House.
17 Then they gave me the capitol to use that night
18 for a big lecture, which I did, and then I said I
19 want to see the senators. They said why the
20 senators, they already voted. I said it can't be
21 30 to 19, it's got to be 100 percent. So the

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

November 11, 2004    Case 1:00-cv-01141-TJW    Document 254-12    Filed 12/07/04    Page 21 of 40 PageID #: 7996

Multi-Page Deposition of    MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 394

1 House passed it something like 92 to 4. There
2 were slightly different versions so it went back
3 to the Senate. After I talked to them it was
4 unanimous. And I also talked to the governor's
5 aide who then signed it.
6    Q. All I asked you was who solicited you?
7    A. I'm sorry.
8    Q. Let me ask you, Dr. Geier, in your
9 opinion, which poses a greater risk to a child
10 today in the state of Iowa, immunization with a
11 thimerosal-containing DTP vaccine, or
12 nonimmunization with any vaccine intended to
13 protect children against the diseases of
14 diphtheria, tetanus and pertussis?
15    A. I'm terrified of not vaccinating
16 children. And I go, everywhere I speak --
17    Q. I just want to know the answer to that
18 question.
19    A. I need to answer this honestly.
20    Q. I don't need an explanation. I have a
21 very short amount of time. Do you have an

Page 395

1 opinion as to which poses a greater risk to a
2 child, immunization with a thimerosal-containing
3 DTP vaccine or nonimmunization?
4    A. I think nonimmunization poses a greater
5 risk, but I'm beginning to worry about it with
6 the numbers that are coming up.
7    Q. Let me ask you the same question with
8 regard to the Hib vaccine, would your answer be
9 the same?
10    A. No. Even though I still recommend the
11 Hib vaccine, hepatitis B is not a significant
12 threat to young children, could easily be -- I'm
13 not saying we should do this, but we could easily
14 postpone the Hib vaccine to --
15    Q. I'm asking Hib, H-i-b?
16    A. No, Hib I agree with. Hepatitis B you
17 could postpone.
18    Q. So if I understand it, you think that
19 nonimmunization with Haemophilus influenzae type
20 B vaccine poses a greater risk than immunization
21 with thimerosal-containing Haemophilus influenzae

Page 396

1 B vaccine?
2    A. Yes, but it's beginning to worry me.
3    Q. But you think that immunization with a
4 thimerosal-containing hepatitis B vaccine is
5 more dangerous to a child and poses a greater
6 risk than nonimmunization against?
7    A. I suggest that you can immunize them
8 later when they're bigger. Because the risk of
9 hepatitis B is very small until you get to be a
10 teenager.
11    Q. How about for influenza vaccine, which
12 is more dangerous for a six-month-old child, to
13 be immunized with a thimerosal-containing
14 influenza vaccine or not to be immunized against
15 influenza?
16    A. More dangerous to immunize them.
17 There's almost no risk to a six-month-old child.
18 The latest statistics were that six children died
19 in 2001 under the age of 1 from influenza. The
20 influenza vaccine doesn't work. By your own
21 numbers, it didn't work last year, and it works

Page 397

1 very poorly, and a recent study just came out
2 that showed, as I suspected, that influenza is
3 not something that's easy to make antibodies to,
4 and children under 1 don't make good antibodies,
5 and I don't believe anybody who looks at this
6 issue believes that young children need
7 influenza, other than to get them under part of
8 the Vaccine Compensation Act, to protect you from
9 liability from your adults. That's an
10 unreasonable decision and there's no reason to
11 reintroduce thimerosal into the infant
12 population.
13    MS. OWENS: Objection to the answer as
14 nonresponsive.
15    Q. (BY MR. THOMASCH) I ask you to turn to
16 page four of your expert report.
17    A. I'm there.
18    Q. You indicate in the middle of the top
19 paragraph, I have been invited to give numerous
20 talks on vaccine issues. Actually I want to go
21 back to the sentence before that, so let me

Page 398

1 strike that. The sentence preceding that you
2 were asked, it indicates, in addition I have been
3 invited to speak out on vaccine issues to
4 numerous U.S. senators and representatives and
5 their senior health staffs as well as to numerous
6 state attorneys general. Do you see that?
7    A. Yes.
8    Q. What state attorney generals have you
9 spoken to about the issue of
10 thimerosal-containing vaccines?
11    A. Many.
12    Q. Identify for me by state or name of
13 attorney general, please?
14    A. I don't think it's appropriate.
15    Q. Well, I'm going to ask you to do so
16 anyway?
17    A. Get a court order.
18    Q. You're refusing to answer the question?
19    A. That was confidential between me and an
20 attorney.
21    Q. You have indicated in your report as

Page 399

1 part of your expertise that --
2        MR. ELLIOTT: There is a protective
3 order in place which protects the confidentiality
4 of your testimony so --
5        THE DEPONENT: What prevents you from
6 going and starting to lobby those state's
7 attorney generals?
8    Q. Dr. Geier, I'm not here to debate with
9 you. There are public officials who in their
10 public capacity you visited; correct?
11    A. Yes.
12    Q. What is confidential about that; sir?
13    A. They asked me in confidence to go talk
14 to them.
15    Q. Did they tell you that you were not
16 allowed to disclose to anyone that you had seen
17 them?
18    A. They said not to discuss what we talked
19 about.
20    Q. Why is it that you chose to put this in
21 as a credential in your report, that you have

Page 400

1 been asked to speak to numerous state attorney
2 generals?
3    A. Because I have.
4    Q. All right. And I want to test that, so
5 I would like to know who did you speak to.
6        THE WITNESS: Is it appropriate if it's
7 an attorney?
8        MR. SMITH-GEORGE: As long as it's
9 within the confidentiality parameters of this
10 deposition that that information can't be used
11 for anything else but within the parameters of
12 this case, I think it's okay for you to answer
13 that question.
14        THE WITNESS: That is the case?
15        MR. SMITH-GEORGE: That's the case.
16 Will we agree that this is subject to the
17 confidentiality provisions that would apply to
18 the Vestraeten deposition that we took?
19        MR. THOMASCH: If the designation, if
20 the witness's testimony is designated
21 confidential, then the terms of the

Page 401

1 confidentiality will apply. I'm not going
2 to paraphrase what those terms are as I sit here.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 402

1    MR. SMITH-GEORGE: I'm going to
2 designate this portion of the deposition as
3 confidential given the witness' statements about
4 that and then I'll ask him if he'd reveal that
5 information.
6    A. Okay. If I leave some out, it's memory
7 lapse, it's not intentional. I've visited with
8 the Assistant Attorney General of California, the
9 Attorney General who was Mike Hatch of Minnesota,
10 several times with the office of Elliott Spitzer,
11 attorney generals of North Carolina, South
12 Carolina, Virginia, Delaware, Nebraska. I'm sure
13 I've left one or two out but those are the ones I
14 recall at the moment. And others that are
15 expressing interest in the future.
16    Q. Iowa?
17    A. No, I don't think I visited Iowa.
18    Q. Kansas?
19    A. Yes, Kansas.
20
21

Page 403

1    Q. In the course of that -- those meetings,
2 did you recommend to those attorneys general that
3 they file litigation against vaccine
4 manufacturers seeking to recoup costs associated
5 with either the care or treatment or education of
6 autistic children in their state?
7    A. I wasn't there to recommend. That's
8 their legal thing. I was there to give them some
9 data and be a scientific advisor that I think it
10 caused, yes, but you know, what kind of
11 litigation, I'm -- that's out of my field of
12 expertise.
13    Q. Did you understand those attorneys
14 general to be considering the question of whether
15 to bring a lawsuit against manufacturers of
16 thimerosal-containing vaccines?
17    A. Yeah, but each of them had various
18 ideas of what they might consider to do. Some on
19 behalf of their health departments, some on
20 behalf of maybe their education departments, some
21 on just writing a letter to their doctors

Page 404

1 encouraging them to use thimerosal-free, others
2 maybe to encourage that they be outlawed in their
3 state. Various ones had various ideas.
4    Q. And --
5    A. And I don't, you know, I don't do that
6 kind of thing, I just was there as a scientific
7 advisor.
8    Q. And you provided them with information
9 regarding what you considered to be the link
10 between thimerosal-containing vaccines and autism
11 and other neurodevelopmental delays; is that
12 correct?
13    A. Yes.
14    Q. Did you provide them with Power Point
15 slide shows on occasion?
16    A. Yes.
17    Q. Did you recommend to them that lawsuits
18 against vaccine manufacturers would be
19 scientifically well founded?
20    A. I mean, they asked me that and I said
21 yes. I think they're scientifically well

Page 405

1 founded.
2    Q. Have any of those attorneys general
3 filed any such lawsuits?
4    A. I don't know.
5    Q. You're not aware of any, are you?
6    A. No.
7    Q. Are you aware of published
8 epidemiological studies and other papers that
9 seek to address the question of whether or not
10 there is a causal link between the administration
11 of thimerosal-containing vaccines and autism or
12 neurodevelopmental delay and conclude that no
13 such link has been established?
14    A. Yes.
15    Q. Are you intending at a trial of this
16 action to comment on either the methodology of
17 those studies, the objectivity of the
18 researchers, or the accuracy of the conclusions?
19    A. Yes.
20    Q. And that would be in an attempt to
21 discount the impact or effect of those studies;

Page 406

1 is that correct?
2    A. Or to put them where I think they
3 belong. Most of them in my view have no
4 relevance to the issue here at all. The only --
5 because they were in nonAmerican children at
6 doses that were preepidemic in the United States.
7 The only one that I know of that has some
8 relevance is the Verstraeten study because it was
9 done in the United States and, you know, first I
10 have a letter, I read a letter from Verstraeten
11 that he published that says his study doesn't
12 disprove it, it's neutral, and secondly I have
13 all this information about Simpson and Wood and
14 all their attempts to change the data.
15    So I don't think there's a relevant
16 standing study that any neutral person would find
17 significantly argues against the epidemiology.
18 In addition, I think if there's ever a question
19 of epidemiology, go look at the patients. I
20 think if you go look at the patients you don't
21 have any more question about who's right.

Page 407

1    Q. There's been a study published by
2 Verstraeten and others; is that correct?
3    A. Yes.
4    Q. And you're prepared to examine either
5 the methodology, the objectivity of the research,
6 or the accuracy of the conclusions; is that
7 correct?
8    A. Yes, and also point out that the head
9 author doesn't think that it disproves anything
10 and he's published a letter to that effect.
11    Q. Do you understand that the head author
12 doesn't think that it offers any evidence that
13 supports the length that you're advocating?
14    A. He says it's neutral. It doesn't offer
15 evidence for or against.
16    Q. Do you agree with that?
17    A. The study as published I agree with.
18 His earlier work that has been manipulated and
19 discussed privately and illegally at Simpsonwood
20 did indicate that there was a link.
21    MS. HALPERN: Objection.

Page 408

1    Q. (BY MR. THOMASCH) Is it your statement
2 that any illegal activity occurred at
3 Simpsonwood?
4    A. Absolutely. It violated the Sunshine
5 Laws. The vaccine manufacturers were invited,
6 the CDC and the FDA was invited, there was no
7 public notice, there was no public comment, there
8 was no charter, there's a whole litany of laws
9 that it violated that you have to do if you're
10 going to have a meeting between manufacturers, a
11 policy kind of meeting between manufacturers and
12 CDC and FDA. I won't go into all of them but
13 they were all violated. It was an illegal
14 meeting. Intentionally illegal. It begins by
15 saying we have to keep this secret.
16    MS. HALPERN: Objection to form.
17    Q. (BY MR. THOMASCH) Are you familiar with
18 a paper by Dr. Stehr-Green?
19    A. Yes.
20    Q. Are you prepared to talk about the
21 methodology of that paper or otherwise dispute

Page 409

1 the accuracy of its conclusions or the relevance
2 of it to this case?
3    A. Yeah, I don't think it's particularly
4 relevant.
5    Q. Do you have objections to the
6 methodology that was used?
7    A. Yes.
8    Q. Do you have an opinion that the
9 researcher who --
10    A. Do you have that paper, by the way, so
11 I don't get confused?
12    Q. I have lots of papers. No, I don't have
13 time to go through them. If you don't remember
14 them, that's fine.
15    A. That one I'm not clear on.
16    Q. Let's move on. Do you remember a paper
17 by Dr. Mattson?
18    A. Yes, something.
19    Q. Is that a paper that was cited by the
20 IOM as an epidemiological study providing
21 evidence against a causal link?

Page 410

1  A. Probably.

2  Q. Are you familiar with a paper by

3  Dr. Hibbett?

4  A. Yes.

5  Q. Did you hear Dr. Hibbett testify at the

6  IOM?

7  A. Yes. By the way, I don't think it's a

8  doctor.

9  Q. All right. Did you hear Mr. Hibbett

10  testify about his --

11  A. Yes, I did.

12  Q. Did you disagree with the conclusions he

13  reached?

14  A. Yes, and he has a tremendous conflict of

15  interest.

16  Q. And does that conflict of interest

17  indicate to you that his study was unreliable?

18  A. Yes, I think his study's unreliable, I

19  think his methodology is unreliable. I think in

20  addition, even if you discount everything I just

21  said, that study has no relevance to the United

Page 411

1  States. That country was using less thimerosal

2  than we did before we had the epidemic. I can

3  assure you that if we had the same rates as they

4  did before the epidemic, I wouldn't be here. So

5  what he's saying is, even if you accept it, they

6  didn't have an epidemic, and by the way they made

7  it illegal in that country, and the small number

8  of background they saw didn't go down. I think

9  it probably did go down, but I don't want to

10  argue about it because it's not relevant to those

11  of us that have a country-threatening epidemic.

12  Q. During the time period that vaccines

13  containing thimerosal were distributed in Sweden

14  or Denmark, do you have an understanding as to

15  what the maximum amount of thimerosal a child

16  could have received who, provided by the

17  recommended vaccine schedule?

18  A. Yes.

19  Q. How much?

20  A. In one of the countries it was 75 and

21  the other was 125.

Page 412

1  Q. Does that level of exposure to

2  thimerosal constitute an increased risk of autism

3  or neurodevelopmental delay in your mind?

4  A. Probably, but it's the level that we

5  gave before 1990, and it was a time when we had

6  too much autism but it was not epidemic. So the

7  question is what caused the massive epidemic that

8  began in 1990, 19991, and their study, even if it

9  were perfectly accurate, has nothing to say about

10  that because we went up to close to 300 and our

11  autism rate went -- we had almost the same rate

12  they did, about 1 in 2,500, when we gave the

13  same amount they did, coincidentally, and when we

14  went up, we went from one in 2,500 to 1 in 166,

15  if you like the FDA's number, 1 in 150 if you

16  like other people's numbers, and maybe even as

17  high as 1 in 40, depending on whose numbers you

18  like. That's what I'm complaining about and

19  that's what caused all this additional research.

20  So for him to say he didn't see a decline from 1

21  in 2500, I hope we go back to 1 in 2,500. He has

Page 413

1  nothing to say. That study has no relevance to

2  the situation here.

3  Q. Is it methodologically flawed?

4  A. Yes.

5  Q. Are you prepared to say that at trial?

6  A. Absolutely.

7  Q. Would you prepared to explain the

8  methodological flaws if we had more time today?

9  A. Sure.

10  Q. All right. Do you have your expert

11  report in front of you?

12  A. Yes, sir.

13  Q. All right. And the cover letter it

14  begins at, says, enclosed please find a copy of

15  my report containing my opinions regarding the

16  capability of the mercury in thimerosal to cause

17  neurologic damage in infants who have received

18  vaccines. Do you see that?

19  A. Yes.

20  Q. The next sentence says, this information

21  is supplemented by my published papers, the

Page 414

1 presentations that I've given on the subject, and
2 any subsequent depositions given by me on the
3 subject. Do you see that?
4    A. Yes.
5    Q. What does that mean?
6    A. That means that as we've discussed
7 before, I've given you my CV, and my CV contains
8 a number of publications that have to do with
9 thimerosal, and I'm relying on my publications
10 and the references thereto, and I'm also, I've
11 given you whatever I have of the talks that I've
12 given and that discusses also my opinions.
13    Q. Okay.
14    A. If in the future new things happen, and
15 this field is rapidly going, if new things I
16 haven't discussed today come out and it's felt
17 appropriate by both sides, I'll come and tell you
18 about those.
19    Q. Your report itself is 50 pages single
20 spaced; is that correct?
21    A. Yes.

Page 415

1    Q. Now the version that was provided to me
2 is so faint that in all honesty I cannot read
3 any of the footnote numbers. Can you tell me
4 from looking at page 50 what is the total number
5 of footnotes in the report?
6    A. The footnote there reads 129.
7    Q. And the footnotes appear to uniformly be
8 citations to articles or communications or
9 documents that purport to support statements made
10 in the text; is that correct?
11    A. Generally. I'd have to look to see if
12 we quoted like one of the IOM reports or
13 something, but generally what I was trying to do
14 in this report was give you the basis of my
15 opinions. So yeah, if it wasn't my opinion, then
16 you know, I probably didn't quote it. But there
17 probably are some in here I don't recall.
18    Q. I understand. But as a methodology for
19 preparing the report, you tried to explain the
20 bases for your opinions and then you cited the
21 support upon which you relied in the footnotes?

Page 416

1    A. Yes, that's correct.
2    Q. What I want to know is those 129
3 footnotes, is the material that is cited in them
4 the source material provided in the notebooks
5 that you have given us for all 129 sources?
6    A. I think so. And additionally if
7 they're not, they're in the bibliography.
8    Q. Now, in addition to those 129 sources
9 upon which you rely, am I correct that you rely
10 on the information that is contained in your
11 published papers?
12    A. Yes.
13       MR. SMITH-GEORGE: I'm going to object
14 to that question because there are multiple
15 citations to the same documents. It's not 129
16 different sources. There are 129 footnotes.
17 Some of the footnotes cite to the same document.
18       MR. THOMASCH: All right. With that
19 explanation, if counsel has a count of how many
20 different there are, but otherwise we'll just say
21 the number is to be determined.

Page 417

1       MR. SMITH-GEORGE: That would be fine.
2 I just didn't want to leave the impression there
3 were 129 different sources.
4    Q. (BY MR. THOMASCH) Do you have a copy
5 of your resume in front of you, sir?
6    A. There's one in here somewhere.
7    Q. I need you to do this is a little
8 slowly for me and for the court reporter, who's
9 heroic but human, that is to flip to the
10 publications. What I want to do is identify out
11 of your resume the particular papers that would
12 then fit into the description in the cover letter
13 to your expert report, which says the information
14 is supplemented by my published papers. So as I
15 understand it it means that you are prepared to
16 rely as a basis for your opinions on that which
17 is in the published papers, correct?
18    A. Yes.
19    Q. Okay. Which published papers?
20    A. Well, the primary ones that address
21 thimerosal, the thimerosal issue are --

Page 418

1    Q. You can do it by reference number.

2    A. Okay. No. 65, I believe was the first

3 one we ever published directly on thimerosal.

4 No. 66, No. 69, No. 71, No. 72, No. 73, No. 74,

5 No. 75, to some extent No. 77, No. 78, No. 81,

6 No. 82, and No. 85.

7    Q. Can I see the resume, please?

8    A. Sure. Those are the primary ones

9 anyway. I mean, I've got a lot of things on

10 vaccines, so if somebody asks me something about

11 another vaccine, I'm not saying I never would say

12 anything from the others, but those are

13 primarily, my work on thimerosal.

14       MR. THOMASCH: Mark as our next exhibit

15 a medical article authored by Mark Geier and

16 David Geier entitled Neurodevelopmental Disorders

17 After Thimerosal-Containing Vaccines: A Brief

18 Communication.

19       (Deposition Exhibit No. 24,

20 Neurodevelopmental Disorders After

21 Thimerosal-Containing Vaccines: A Brief

Page 419

1 Communication, was marked.)

2    Q. (BY MR. THOMASCH) Do you have Exhibit

3 24?

4    A. Yes, I do.

5    Q. All right. And I believe that matches

6 up with Exhibit 65, which you said was your first

7 article, is that correct?

8    A. I lost my CV or you took it.

9    Q. We only have one so we're at a little

10 bit of a disadvantage, Doctor.

11   A. Yes, that's the first one.

12   Q. Do you know as you sit here today

13 whether you submitted that paper to the IOM

14 committee?

15   A. I'm sure we did.

16   Q. All right.

17   A. I can't have a specific recollection,

18 but since it's our first paper on the topic and

19 it's in a major journal, I'm sure I did.

20       MR. THOMASCH: May I have the reporter

21 mark as Exhibit 25 another article authored by

Page 420

1 Mark Geier and David Geier entitled Thimerosal in

2 Childhood Vaccines, Neurodevelopment Disorders,

3 and Heart Disease in the United States.

4       (Deposition Exhibit No. 25, article

5 entitled Thimerosal in Childhood Vaccines,

6 Neurodevelopment Disorders, and Heart Disease in

7 the United States, was marked.)

8    Q. (BY MR. THOMASCH) Okay. Let me, just

9 before you go back to that one, what I need is if

10 you would keep a copy of the IOM report near your

11 side.

12   A. I have it.

13   Q. And go back to page 157 where we were at

14 before. That's a page I'll ask you to just hold

15 open.

16   A. Okay. This should be 157. I have

17 trouble seeing the page numbers.

18   Q. You got it?

19   A. Yes.

20   Q. You see the Geier references there?

21   A. Yes.

Page 421

1    Q. I want to go back for a moment to the

2 Exhibit 24, the brief communication exhibit?

3    A. Yes.

4    Q. Can you confirm for me that that is the

5 second one noted which the IOM refers to as

6 Geier, Geier 2003-B?

7    A. Yes.

8    Q. All right. Because are you aware in

9 the text of the IOM report your studies are

10 discussed and they're discussed with short-hand

11 abbreviations and not the full name, and so when

12 they're discussing 2003-B, they are discussing

13 what we've marked as Exhibit 24, correct?

14   A. Correct.

15   Q. All right. Now Exhibit 25, which is

16 the article encaptioned Thimerosal in Childhood

17 Vaccines, Neurodevelopment Disorders, and Heart

18 Disease in the United States, that one is 2003-D

19 in the IOM report; is that correct?

20   A. That's correct.

21   Q. All right. And so that was also

Page 422

1 submitted by you to the IOM panel, considered by
2 the panel and commented on in this report, isn't
3 that true?
4 　A.　Yes.
5 　　MR. THOMASCH:　Ask you to mark as
6 Exhibit 26 an article by David A. Geier and Mark
7 R. Geier entitled an assessment of the impact of
8 thimerosal on childhood neurodevelopmental
9 disorders.
10 　　(Deposition Exhibit No. 26, article
11 entitled an assessment of the impact of
12 thimerosal on childhood neurodevelopmental
13 disorders, was marked.)
14 　Q.　(BY MR. THOMASCH)　Am I correct that
15 the IOM refers to that as Geier and Geier 2003-A?
16 　A.　Yes.
17 　Q.　And that is another article you
18 submitted to the IOM and the IOM discusses in the
19 text of the report marked as Exhibit 15; is that
20 correct?
21 　A.　Yes.

Page 423

1 　　MR. THOMASCH:　Ask the reporter to mark
2 as Exhibit 27 correspondence in the Journal of
3 American Physicians and Surgeons from summer
4 2003.
5 　　(Deposition Exhibit No. 27,
6 correspondence in the Journal of American
7 Physicians and Surgeons from summer 2003, was
8 marked.)
9 　A.　Okay.
10 　Q.　(BY MR. THOMASCH)　All right.　And do
11 you see that appearing beginning on page 68 is a
12 response to critics on the adverse effects of
13 thimerosal in childhood vaccine?
14 　A.　Yes.
15 　Q.　And that's authored by yourself and
16 your son?
17 　A.　Yes.
18 　Q.　And it describes among other things in
19 some depth a study you did with the VAERS
20 database; is that correct?
21 　A.　Yes, this is in answer to the criticism

Page 424

1 primarily -- totally of the -- of Exhibit 25,
2 because Exhibit 24, although it was accepted and
3 it was our first paper, was not out yet.　And 25,
4 which is our second paper, happened to come out
5 first.　And so this is an answer to the vicious
6 attack on the American Academy of Pediatrics
7 website and the editors asked us to write this
8 answer because they attacked not only us, they
9 attacked the journal, and the journal asked them
10 to write their letter to the journal and sign it
11 so that we could answer it and they refused to do
12 so.　So they said they were going to have us
13 answer it even though they won't write a letter
14 to the journal.
15 　Q.　Let me see if I can get this straight.
16 You did an analysis of certain data in the what's
17 called the VAERS database, correct?
18 　A.　That's, in the paper at question, which
19 is the Exhibit 25, we analyzed the VAERS
20 database, the Department of Education database,
21 and a little bit of the unpublished VSD data from

Page 425

1 Simpsonwood, as well as the analysis of how many
2 times over the limits we were, when we were
3 giving the childhood vaccines, and a review of
4 the PubMed to see what else had been published.
5 That's what this paper's on.
6 　Q.　So 25 is a particularly important paper,
7 is it not, in connection with the opinions that
8 you have in this case?
9 　A.　It's a personal landmark paper, because
10 24, even though it was published in a more
11 important journal, we weren't quite sure, we
12 weren't convinced, although we were sure that
13 what we observed was right in the paper, we
14 weren't totally convinced of the epidemic.
15 Because we didn't want to believe the epidemic
16 was caused by thimerosal.
17 　　By the time we got to 25 we had been
18 sent the internal documents on the VSD and we
19 said oh, god, the CDC has seen this effect too,
20 we better go back and do a more detailed analysis
21 and see what's going on.　This is our more

Page 426

1 detailed analysis. This is the first time that
2 we said causation. If you notice on 24 our
3 conclusion was there was a statistical
4 association, because there was a statistical
5 association. That's what we found. We don't
6 like signal because I don't know what signal
7 means, but statistical association means
8 statistical association.
9     We do not give cause, we never give
10 cause by a simple study. But now we had the
11 association in three different databases done in
12 three different ways, and we had the amount that
13 it was over was 140 times, and we also had
14 hundreds of papers already in the peer-reviewed
15 literature that agreed with it. So for the first
16 time we actually determined that we thought it
17 was actually caused by thimerosal, much to our
18 chagrin.
19     Q. And then after that paper was published,
20 the American Academy of Pediatrics issued a
21 statement posted on its website that repeatedly

Page 427

1 critiqued the methodology of your study; is that
2 correct?
3     A. Yeah, in fact, there was a panic answer
4 that, you know, on simple examination shows that
5 they didn't even do the research. For example,
6 they critiqued that if it was such an important
7 announcement it would have to be made in a major
8 journal. Why put it in the Journal of American
9 Physicians and Surgeons, which is not one of the
10 major journals in the world.
11     Q. I'll get to that article in a moment.
12 Let me just go back to yours, I just want to get
13 them into the record.
14     MS. OWENS: 30 minutes.
15     MR. THOMASCH: Understood. I'm going to
16 ask to be marked as Exhibit 28, an article by
17 Drs. Bradstreet, Mr. Geier, Dr. Kartzinel --
18     THE WITNESS: Kartzinel I think it is.
19     Q. -- Dr. Adams and Dr. Mark Geier,
20 entitled A Case-Control Study of Mercury Burden
21 in Children With Autistic Spectrum Disorders.

Page 428

1     (Deposition Exhibit No. 28, article
2 entitled A Case-Control Study of Mercury Burden
3 in Children With Autistic Spectrum Disorders, was
4 marked.)
5     A. Okay. I have it.
6     Q. (BY MR. THOMASCH) Showing you what was
7 marked as Exhibit 28. In the IOM report, am I
8 correct that that is referred to as Bradstreet
9 2003. That would be on page 154, second from the
10 bottom.
11     A. Yes.
12     Q. And that article is -- was submitted to
13 the IOM and is discussed in the IOM report,
14 right?
15     A. Yes.
16     MR. THOMASCH: Ask the reporter to mark
17 as Exhibit 29 an article by David and Mark Geier
18 entitled Response to Comments by J.R. Mann.
19     (Deposition Exhibit No. 29, article
20 entitled Response to Comments by J.R. Mann, was
21 marked.)

Page 429

1     Q. (BY MR. THOMASCH) I'll give you the
2 resume back. Isn't it correct that that's on
3 your resume reference No. 73, which you cited
4 previously as one of the articles upon which you
5 rely for your opinions in this case?
6     A. Yes.
7     MR. THOMASCH: Ask the reporter to mark
8 as Exhibit 30 a publication by David and Mark
9 Geier entitled A Review of the Vaccine Adverse
10 Event Reporting System Database.
11     (Deposition Exhibit No. 30,
12 publication entitled A Review of the Vaccine
13 Adverse Event Reporting System Database, was
14 marked.)
15     Q. (BY MR. THOMASCH) I ask you to confirm
16 that Exhibit 30 is the same as reference 77 in
17 your resume?
18     A. Yes. Here.
19     Q. Thank you. Do you have Exhibit 15? I'm
20 sorry, Exhibit 18.
21     A. I see 19.

Page 430

1    MR. SMITH-GEORGE: Which is what?

2    MR. THOMASCH: One of his articles.

3    Q. (BY MR. THOMASCH) Going to show you
4 what is a copy of Exhibit 18. That should be
5 No. 74.

6    A. I found 18, he found 18.

7    Q. No. 74 on your resume?

8    A. Yes.

9    Q. And at page 157 of the IOM report is
10 that referred to as Geier and Geier 2004-A?

11    A. Yes.

12    Q. And that also refers to your analysis of
13 the VAERS database; is that right?

14    A. Yes.

15    Q. Now, if you look at the IOM report at
16 page 58.

17    A. Okay.

18    Q. Do you see a section called studies of
19 passive reporting data?

20    A. Yes.

21    Q. That includes, indeed this section is

Page 431

1 pages -- from page 58 through the bottom of page
2 62 is, deals primarily with a discussion and
3 analysis of various papers that you and David
4 Geier have coauthored pertaining to the VAERS
5 database, correct?

6    A. Yes.

7    Q. Including the articles that have been
8 identified as 2003-A, B, C and D; is that also
9 correct?

10    A. Yes.

11    Q. At page 61 of the report in the first
12 full paragraph it states in the first sentence,
13 and this is in reference to studies 2003-A, B and
14 D, quote, these three studies have serious
15 methodological limitations that make their
16 results uninterpretable. Do you see that?

17    A. Yes.

18    Q. Do you disagree with that statement?

19    A. Yeah, in fact it's not even accurate,
20 that is, we relied not only on the VAERS
21 database, we relied on the Department of

Page 432

1 Education database, on the VSD reanalysis of
2 Verstraeten's work, on the biological
3 plausibility. It just sounds nice, they pick on
4 the one they want to pick on, but it's not
5 correct, and it's also not uninterpretable. I
6 mean, all the peer reviewers were able to
7 interpret it from all those different journals.

8    Q. If we were to take time to discuss
9 those studies today, do you believe you could
10 interpret them in a way that would be
11 understandable?

12    A. Yeah, as I said, they were all
13 submitted, they all went through peer review,
14 some of them were in some of the world's leading
15 journals. The reviewers understood them. It's a
16 shame these guys don't. The IOM was only
17 epidemiology so just ignore anything but
18 epidemiology.

19    Q. These are epidemiological studies or
20 purport to be; do they not?

21    A. The study part is but the discussions

Page 433

1 and the literature is not.

2    Q. Let me take you over to page 62, in the
3 third paragraph it begins, the articles also lack
4 a complete and transparent description of their
5 methods and underlying data, making it difficult
6 to confirm or evaluate their findings. Did you
7 understand that to be the view of the IOM?

8    A. Yeah.

9    Q. And in the fourth paragraph they
10 indicate that the results of their studies,
11 meaning Dr. Geier and Mr. Geier, are likewise
12 improbable. Do you see that?

13    A. Yes.

14    MR. THOMASCH: All right. Those are all
15 matters upon which I have a very significant
16 number of questions, none of which can be asked
17 today because of the time constraints. I have
18 indicated to counsel for some of our
19 co-defendants that I would stop questioning no
20 matter how far short I was of finishing so they
21 could ask a few questions before the day is out,

Page 434

1 and we have to seek judicial intervention.
2 Marie, would you like to start?
3      MS. HALPERN: I'm going first.
4      E X A M I N A T I O N
5 BY MS. HALPERN:
6    Q. Good evening, Dr. Geier. My name is
7 Tamar Halpern. I have about ten hours worth of
8 questions I'm going to try to squeeze into ten
9 minutes, the most significant ones for what I
10 hope to be a continuation of your deposition
11 sometime very soon.
12      I'd like to have what I've just shown
13 you marked, please, I think that's Exhibit 31.
14      (Deposition Exhibit No. 31, affidavit
15 of Dr. Mark Geier for Canadian litigation, was
16 marked.)
17    Q. (BY MS. HALPERN) For the record could
18 you please tell us what that document is?
19    A. This was part of that Canadian
20 litigation that I mentioned to you.
21    Q. That's an affidavit, sir, that you

Page 435

1 signed; is that correct?
2    A. Yes.
3    Q. And it's your signature on the last
4 page?
5    A. Yes.
6    Q. And it's dated just less than a year
7 ago; is that right?
8    A. Yes.
9    Q. And when you signed that, was
10 everything in that affidavit, to the best of your
11 belief, true and accurate statements of your
12 opinions?
13    A. Yes.
14    Q. And do you have any reason to doubt that
15 they're not true and accurate as you sit here
16 today?
17    A. No.
18    Q. I'd like to show you another document,
19 if we could mark this one next.
20      (Deposition Exhibit No. 32, 47 pages
21 of tables, was marked.)

Page 436

1    Q. (BY MS. HALPERN) For the record,
2 Dr. Geier, I have extracted that from your
3 thimerosal notebook number 3, it's a series of 47
4 pages, and I've taken the liberty of writing the
5 numbers of the pages in the upper right-hand
6 corner, 1 through 47. Do you see that? For ease
7 of identification. Upper right-hand corner.
8      MR. SMITH-GEORGE: Could I have a
9 clarification, is that a copy of what's in his
10 notebook?
11      MS. HALPERN: Yes, it's a copy.
12    Q. (BY MS. HALPERN) I numbered it in the
13 upper right-hand corner, right above where it
14 says raw data, on page 1?
15    A. Not on mine.
16    Q. I'm sorry, let's switch. I did do two
17 copies.
18    A. I don't mean to be troublesome but it
19 wasn't on mine.
20    Q. No, sorry, I must have put it somewhere
21 else.

Page 437

1    A. Okay, now these have numbers.
2    Q. Okay. What I want to ask you, I'd like
3 to ask you in detail about them but because of
4 the limitation of time, I'm going to ask you is
5 there anything contained in -- any raw data
6 contained in those 47 pages that you utilized in
7 your published articles, your reporting on the
8 VAERS database or the DOE study?
9    A. I think some of this data may have been
10 used in the Department of Education.
11    Q. Can you tell me which pages, utilizing
12 the numbers I've written on the upper right-hand
13 corner?
14    A. I'm not sure. Some of these involve
15 how many cases there were in each state. I don't
16 think our analysis was state by state in general.
17 So some of these involve -- we use, I think the
18 state by state was used in some of my Power Point
19 slides, but in the analysis, some of these may
20 have been used in the ecological analysis that
21 went back to each age group.

Page 438

1    Q. And you said the ecological analysis,
2  are you referring to your VAERS study?
3    A. No.
4    Q. Well, what study?
5    A. Well, the only VAERS data that's in
6  here was the -- well, if you look at page 37 --
7    Q. Yes?
8    A. -- through 47.
9    Q. Is that the BSS data, sir?
10   A. This is the confidential one that's a
11  breakdown by company.
12   Q. So is that the data that you sent to
13  the journal when you were claiming that you had
14  been slandered?
15   A. Yes. That demonstrates that they're
16  lying, not us, that we do have this data.
17   Q. And did you get this, how did you get
18  this data?
19   A. We requested it from the CDC and we
20  have -- there's a cover letter, I forget the
21  lady's name, said you can have it, we verbally

Page 439

1  discussed that we would generally not identify
2  the company name when we published, and she sent
3  us an e-mail saying here it is subject to what we
4  verbally agreed to, and we have not identified
5  the company name as you look through in our
6  publications.
7    Q. There is some data that you got
8  inappropriately. Is this that data?
9    A. Why do you see it's inappropriately?
10   Q. You said it, sir, actually at the VSD,
11  that there was some data that somebody gave you
12  in error?
13      MR. SMITH-GEORGE: Object to the form of
14  the question. That wasn't his testimony.
15   Q. (BY MS. HALPERN) Did you receive data
16  that you were not supposed to get?
17   A. No.
18   Q. Through some oversight by someone at
19  the CDC?
20   A. This was no oversight.
21   Q. I'm not asking about this data. Did

Page 440

1  you receive any data in the process of your
2  studies and interactions with the CDC that they
3  sent you in error that they were not supposed to
4  have sent you?
5    A. Well, the Verstraeten intermediate data
6  is stamped do not release. I think, personal
7  opinion, I don't think they meant to release it.
8  They didn't send it to us, by the way. They sent
9  it to Lyn Redwood who sent it to us. If it's
10  produced under the Freedom of Information Act,
11  it's the person who gets it's job to determine if
12  it's appropriate. I think they didn't intend to
13  release it. This data was intended to be
14  released that I have. The other stuff here is
15  the biological surveillance summaries.
16   Q. What page are you referring to?
17   A. This is page 30, let me get the
18  beginning. Page 27 to 36 is what we call the
19  biological surveillance data. This also was sent
20  to us by the CDC intentionally. Originally I
21  think we didn't have an agreement but they sort

Page 441

1  of helped us. It was personal. But they have
2  since in recent years published most of this
3  data.
4    Q. I'm sorry, I'm very short on time. So I
5  want to ask the question, pages 25 through 36,
6  which of your studies did you utilize that data
7  in?
8    A. That's been utilized in a number of the
9  different studies, not just thimerosal ones.
10  We've done hepatitis B, various vaccines.
11   Q. I'm only interested in thimerosal. Did
12  you use it in both your VAERS and your DOE
13  analyses?
14   A. No.
15   Q. Just the VAERS?
16   A. This is only VAERS data. This has no
17  relevance to DOE.
18   Q. Pages 37 through 47, did you utilize
19  that data in any of your published thimerosal
20  analyses?
21   A. Yes, this is also VAERS data. To

Page 442

1 analyze one company against the other you need to
2 know the denominators. These are the
3 denominators.
4    Q. So you were utilizing this in your VAERS
5 studies?
6    A. Yes. Both of these are VAERS. They're
7 confidential VAERS, which is by company, and the
8 earlier ones you just mentioned are by year.
9    Q. And is there anything in here that you
10 used in your DOE analyses?
11    A. I think that some of the early pages in
12 this may have been part of the DOE study, but
13 I'm not positive.
14    Q. Do you have any other data, analyses,
15 data sets, computer programs, pertinent to your
16 published either thimerosal VAERS or DOE studies
17 in your possession still, on your computer,
18 anywhere?
19    A. We have some snapshots of VAERS. You
20 understand why I said snapshots, the VAERS is a
21 live database. Tomorrow they may add more things

Page 443

1 so it may change. We choose a day, we say okay,
2 we're going to work with it the way it is today.
3 And we may have made a copy of it that way. And
4 then another time we may say it's two years
5 later, look at it again. Those are publicly
6 available and you can get them off the web.
7    Q. Does your son have any of the material
8 in his possession that you don't have?
9    A. No, we jointly share the same
10 computers.
11    MS. HALPERN: I am requesting
12 production of all of that material so we can
13 understand how Dr. Geier performed his published
14 studies.
15    MR. SMITH-GEORGE: Object to your
16 request.
17    Q. (BY MS. HALPERN) Another question, sir,
18 do you have an opinion about the scientific
19 literature written by Eric Flambone that speaks
20 to the incidence and prevalence of autism and
21 whether or not there's an epidemic?

Page 444

1    A. Yes.
2    Q. Is your opinion in part going to be to
3 critique the methodology of that study or
4 studies?
5    A. Yes, I think any study that concludes
6 there's no autism epidemic is like a weatherman
7 not looking out the window.
8    Q. For the record, I need to have
9 additional time to question about that. Same
10 question about Dr. Jick's GPRD study. Are you
11 familiar with that?
12    A. I may be, but not by that name.
13    Q. Are you familiar with the GPRD database?
14    A. That's the general practitioners
15 database from England?
16    Q. Yes.
17    A. I'm familiar with the database. I would
18 love to have access to the database.
19    Q. You do not presently have access to that
20 database?
21    A. No, they want $500,000 and unfortunately

Page 445

1 I don't have $500,000.
2    Q. Do you know what percentage of the
3 population has a polymorphism of Sod-2 enzyme?
4    A. Not as I sit here, but that's probably
5 published in one of these studies.
6    Q. But you don't know?
7    A. Not as I sit here.
8    Q. Or the COMT?
9    A. No, I don't have any of those memorized.
10    Q. Would you agree that it's not generally
11 accepted to test a child who has autism
12 genetically for a polymorphism of the GSTM1
13 enzyme?
14    A. For what purpose?
15    Q. That's what I'm asking you, it's not
16 generally accepted, is it?
17    A. The general acceptance now is that these
18 children have refrigerator moms that have no
19 biochemical disorder.
20    Q. That's not my question.
21    A. So therefore, you're right, the average

Page 446

1  pediatrician wouldn't even know what those were.

2  **Q. Dr. Geier, you're a geneticist, right?**

3  A. Correct.

4  **Q. And you test children for genetic**

5  **polymorphisms and abnormalities?**

6  A. Yes.

7  **Q. Is it generally accepted in the genetic**

8  **community to test children who have autism for**

9  **GSTM1 polymorphisms, is that generally accepted**

10  **practice?**

11  A. Absolutely not.

12  **Q. How about a GSTP1 enzyme?**

13  A. No genetic testing is currently

14  accepted by mainland, by medicine who continues

15  to insist that these children are not

16  mercury-toxic and simply a product of

17  refrigerator moms. And they need to get their

18  head out of the sand.

19  **Q. One more question then I'm done. Dr.**

20  **Geier, can you cite a single peer-reviewed**

21  **published article that says that the GSTM1 null**

Page 447

1  causes autism?

2  A. I'd have to look at it, but look at

3  Borris's publication. I think that's the --

4  **Q. So if it's in the Borris publication,**

5  **which is in press, is that the one you're**

6  **referring to?**

7  A. Yes. I don't know if it's out yet but

8  it will be out shortly.

9  **Q. You cite it in your expert report as in**

10  **press. Do you have a copy of that publication?**

11  A. I think so.

12  **Q. I'd like to have a copy of that as well.**

13  **I don't believe it's in your material.**

14  A. Again, I'm not trying to be

15  obstructionary, I'd be happy to give it to you,

16  but I don't know if I'm not allowed to give it to

17  you. It was given to me in confidence by Borris

18  before it comes out. I'm not sure he'd be happy

19  for me to give it to you before it comes out.

20  Otherwise I have no reason not to give it to you.

21  **Q. You're relying on it for your opinion in**

Page 448

1  this case, correct?

2  A. Yes.

3  MS. HALPERN: Then we have an

4  opportunity to review that, please, counsel.

5  Thank you.

6  MS. OWENS: I have just a couple. I

7  have more than just a couple. I have just a

8  couple I'll ask.

9  E X A M I N A T I O N

10  BY MS. OWENS:

11  **Q. Why did you bring the seven DTP volumes**

12  **with you?**

13  A. Because there's an issue of cooperation

14  by the companies who constantly claim that they

15  cooperate with CDC and FDA in every possible way

16  in order to help them monitor the problems, and

17  those notebooks can be used, I don't know exactly

18  what questions will be asked, but there are a

19  number of examples in there where the companies

20  clearly did not cooperate, in fact, were

21  obstructionary.

Page 449

1  **Q. And you brought seven of those with you**

2  **today?**

3  A. Yes. That's just my standard

4  collection as the people who were in DTP

5  litigation know.

6  **Q. And in connection with your analysis of**

7  **other epidemiological studies, have you reviewed**

8  **the study that Elizabeth Miller has published**

9  **regarding findings in the United Kingdom?**

10  A. Yeah, I've even written a letter, I

11  believe it's probably in the CV, about

12  complaining she didn't disclose a conflict of

13  interest and she takes millions of dollars from

14  the drug companies.

15  **Q. Do you intend to offer a critique of**

16  **her methodology or her findings?**

17  A. I certainly would critique her findings.

18  Her methodology I would love to critique, but I

19  don't have the, she's very withholding. She

20  hasn't given us any data so it's hard to critique

21  it. But she's tremendously conflicted and she

Page 450

1 comes from a country to tell us that it's safe
2 who has just outlawed it.
3     Q. Thank you, sir. I appreciate your
4 answer. I'm trying to move very quickly here.
5     A. I'm sorry.
6     Q. Have you received any funding from
7 SAFEMINDS?
8     A. No.
9     Q. Have you received any funding from any
10 plaintiff's attorney or group of attorneys for
11 any of your research?
12     A. My expenses, when I go back to the VSD,
13 I have been promised to me for paying for the
14 days at the VSD and paying for -- they're hiring
15 the programmer.
16     Q. Whom?
17     A. That group is the Autism -- it's a
18 group of attorneys that represent children with
19 autism in the Vaccine Compensation Act and it
20 will be compensated by the U.S. government. And
21 they've approved discovery and this is part of

Page 451

1 the discovery.
2     Q. In connection with your trip you told
3 us about, the various attorneys generals, who has
4 reimbursed you for your time and/or expenses in
5 connection with those trips?
6     A. Generally it's either some parent group
7 or the attorney general's office, or sometimes I
8 get no reimbursement, sometimes I was there for a
9 conference and I go over.
10     Q. What parent groups have reimbursed you?
11     A. Some parents individually, I don't
12 think there are any groups. Maybe some of them
13 are members of groups, I don't know. Usually
14 what happens is they've talked to the attorney
15 generals. I don't go, I don't approach attorney
16 generals. I'm a scientist.
17     Q. Sir, the question is what groups or
18 parents have paid you?
19     A. I don't know the answer to that.
20     Q. Do you have a listing or could you
21 determine a listing of what parent or parent

Page 452

1 groups you have received moneys for?
2     A. I haven't received moneys. What they
3 do is pay a ticket. They don't pay me to do it.
4 But they pay, they'll send me an airline ticket
5 or something like that.
6     Q. Do you have a list?
7     A. No, I don't have a list.
8     MS. OWENS: I have further questions.
9 I'll yield to Ms. Woodbury at this time.
10     E X A M I N A T I O N
11 BY MS. WOODBURY:
12     Q. Doctor, my name is Marie Woodbury, and I
13 represent Eli Lilly. I have a lot of questions
14 but I'm going to try to ask just a few today.
15 Could you pull out Exhibit 23, which I think is
16 your report. Can you turn to pages 12 and 13 of
17 your report, the section beginning brief history
18 of thimerosal; do you see that?
19     A. Yes.
20     Q. All right. The text that you've
21 written on pages 12 and 13, what research did you

Page 453

1 do to provide the material for you to write that
2 section of your report?
3     A. I read the Institute of -- the Mercury
4 in Medicine report from the U.S. government.
5     Q. Okay, which is?
6     A. From the Congressional Committee of the
7 U.S. Congress.
8     Q. Which is footnoted there?
9     A. Yes.
10     Q. Is that a peer-reviewed report?
11     A. No, but it contains many peer-review
12 cites. And then I went and looked up some of the
13 peer-reviewed cites like the Smithburn.
14     Q. Do you know who authored that report?
15     A. The --
16     Q. The subcommittee report?
17     A. Yeah, it was -- I don't know who,
18 different people wrote different sections, but it
19 was signed off by the, it was a report of the
20 whole committee.
21     Q. Is the report signed?

Page 454

1    A. I don't know.

2    Q. Do you know?

3    A. I don't know. It's the official report
4  of the committee published in the Congressional
5  Record. It's a three-year hearing it says of the
6  reporting committee.

7    Q. Doctor, if you could just answer my
8  questions, we don't have very much time. Do you
9  know what methodology was used to prepare the
10  report?

11    A. Yeah, they probably typed it on a
12  computer.

13    Q. So you don't know what methodology was
14  used?

15    A. Yeah, they had a hearing. They had
16  hearings. I was part of the hearings. I don't
17  understand your question then. They had a series
18  of hearings with experts from all over the world
19  and that was their conclusion.

20    Q. Is the report that you have footnoted
21  here on page 12 of your expert report, you

Page 455

1  believe that's a summary of the hearing that
2  took place in front of the subcommittee?

3    A. It's in the Congressional Record. It
4  says this is the report of a three-day hearing,
5  that's how it begins, on the subcommittee on
6  human wellness of the government reform committee
7  submitted on May something or other 2000, and
8  there's the whole report.

9    Q. Okay.

10    A. That's what I know about it.

11    Q. All right. I cut you off earlier.

12    A. Except I helped, I was one of the
13  people who testified. I was a minor testifier.

14    Q. You also cited on pages 12 and 13 a
15  report or an article reported authored by
16  Smithburn, correct?

17    A. Yes.

18    Q. And an article authored by Drs. Powell
19  and Jamieson?

20    A. Correct.

21    Q. Did you do any research on the history

Page 456

1  of medicine in the 1920s and 1930s in preparing
2  this section of your report?

3    A. I looked up those articles.

4    Q. Did you do anything beyond that?

5    A. I'm not sure what you're looking for.
6  We've published some on history of vaccines. We
7  won an award for ancient history of vaccines.

8    Q. Does anything on page 12 and 13 have to
9  do with the history of vaccines that comes out of
10  your publications?

11    A. No.

12    Q. I'm asking you, what I'm interested in
13  discovering, Doctor, is what you did to prepare
14  the section on page 12 that begins a brief
15  history of thimerosal problems and continues
16  through the end of page 13.

17      MR. SMITH-GEORGE: Object, asked and
18  answered.

19    A. I read the subcommittee report. I
20  looked up some of the things that they
21  referenced. I looked up some other articles that

Page 457

1  I could find from the time. I looked at the
2  company document about the dogs.

3    Q. (BY MS. WOODBURY) I don't think the
4  dogs document is referenced on page 13, that's
5  not until page 14. I'm trying --

6    A. I'm sorry, I didn't mean to go an extra
7  page on you.

8    Q. All right. Doctor, you said you looked
9  at some other articles. Are there articles
10  beyond the Powell and Jamieson article and the
11  Smithburn article that you looked at to prepare
12  your material on pages 12 and 13 of your report?

13    A. My general knowledge of the toxicity of
14  mercury we've traced back to the 1800s, then to
15  the 800s, and then to I think it's 400 B.C. to
16  the Greeks. I didn't put it in here because I
17  didn't think it's directly relevant, but my
18  knowledge of what humans knew about the dangers
19  of mercury, particularly organomercuries, tried
20  to read what was known, it was known by the Arabs
21  in 6 or 800 that organic mercuries were terribly

Page 458

1  poisonous and had to be kept out of bodies.
2      Q.  Other than that, Doctor, anything else?
3      A.  That's what comes to mind.  I've given
4  you in the report what I did and what I
5  referenced it to.
6      Q.  All right.  You have quoted some
7  sections from Dr. Smithburn's article.  You see
8  that at the top of page 13?
9      A.  Yes.
10     Q.  And you have made, you've drawn the
11 conclusion that the antiseptic solution that he
12 discusses and you quote in the first paragraph on
13 the top of page 13 was merthiolate?
14     A.  Yes.
15     Q.  What's the basis for that conclusion on
16 your part?
17     A.  It's from the quote.
18     Q.  Does the article identify that
19 particular antiseptic solution as merthiolate?
20     A.  I think so.  My recollection is it does.
21     Q.  Would you pull out the articles tabbed

Page 459

1  there in notebook, thimerosal notebook 5, it's
2  the second red tabbed article there.
3          MR. SMITH-GEORGE:  Counsel, finish this
4  line of questioning, but we have reached the
5  seven-hour mark.  So finish this line of
6  questioning but then we're done.
7      A.  Okay.
8      Q.  (BY MS. WOODBURY) All right.
9  Doctor, would you agree with me that the quoted
10 section you have there, which is in the first
11 column of the page you're looking at, does not
12 identify the specific antiseptic solution?
13     A.  Am I on the right page, 779, is that
14 where you wanted me?
15     Q.  I want you to be at the part you
16 quoted, Doctor, over here.
17     A.  It identifies --
18     Q.  Over here, Doctor, intravenous
19 administration of an antiseptic solution was
20 tried and found wanting despite the in vitro
21 activity of the agent?

Page 460

1      A.  Over here it tells you what the agent
2  was, merthiolate.  On the other side.
3      Q.  Doctor, the section over here, is
4  talking about the intranasal administration of
5  merthiolate?
6      A.  Yes.
7      Q.  And that is different than the
8  intravenous administration, correct?
9      A.  Yes, but it still identifies
10 merthiolate.
11     Q.  Doctor, are you familiar with the
12 Powell and Jamieson article that you cited?
13     A.  Yes.
14     Q.  Can you tell me any specific statement
15 in the Powell and Jamieson article that is
16 false?
17     A.  Not as I sit here.  That's not the
18 problem.  The problem is mercury --
19     Q.  Doctor, my question was a simple one.
20 You've answered it.
21         MR. SMITH-GEORGE:  At this point --

Page 461

1      A.  I haven't finished my answer.
2          MR. SMITH-GEORGE:  Let's shut it down.
3  We've hit the seven-hour mark.  I think tempers
4  are flaring.  We're done.  We've met our
5  obligation.
6          MS. WOODBURY:  I want it on the record
7  to say I'm not finished questioning Dr. Geier.
8          MR. SMITH-GEORGE:  You guys have all
9  made that all on the record.  I understand that.
10 The Court order is for seven hours.  We've met
11 our obligation.  We've been here, we've answered
12 seven hours of questioning.  At this point in
13 time it's time to stop.
14         MS. OWENS:  For the record, Jonathan,
15 are you telling us that if we come to you and ask
16 you tomorrow or the next day to consider our
17 request for additional time, that you will not
18 agree to that?
19         MR. SMITH-GEORGE:  That is correct.  I'm
20 going to follow the court order, which is seven
21 hours.  If you need additional time, my

Page 462

1 suggestion is you ask the judge for it.
2    MR. THOMASCH: We're going to. The
3 judge has asked for a meet and confer which I
4 think we're now doing on the record.
5    MS. OWENS: That was my intent, yes.
6    MR. THOMASCH: The rules require we be
7 provided a --
8    MR. SMITH-GEORGE: You know what I
9 suggest you do is you call Andrew up and you meet
10 and confer with him, since he's the lead counsel
11 on this, Mr. Waters. I don't have the authority.
12    MR. THOMASCH: You don't have the
13 authority to deal with this deposition which
14 you're defending?
15    MR. SMITH-GEORGE: Correct. At this
16 point in time that's absolutely correct.
17    MR. THOMASCH: All right. You cleared
18 that up. I think certainly counsel for Wyeth is
19 not complete with the deposition.
20    MR. SMITH-GEORGE: I think you've all
21 made that abundantly clear on the record.

Page 463

1    MR. THOMASCH: Each one of the
2 defendants feels that way.
3    MR. SMITH-GEORGE: I understand that.
4 I'm saying that we've adhered to what the Court
5 has required us to do. If you want additional
6 time, you want to meet and confer, I suggest you
7 talk to Mr. Waters about that. We can go off, I
8 just want to stay on the stenographic record just
9 to make sure we've got everything --
10    MR. THOMASCH: I want to make sure that
11 on the record we have an agreement that
12 everything that was brought here today is being
13 copied and furnished back to us with a letter
14 indicating that the Bates numbers beginning with
15 Geier 1 and continuing to Geier X are the
16 documents that were brought to the deposition on
17 November 12th.
18    MR. SMITH-GEORGE: And that's why I
19 want to stay on the record, I want to make sure
20 we have everything documented at this point in
21 time what you're going to be provided. Okay.

Page 464

1 Settled.
2    MS. OWENS: Before you do that, may I
3 just say one thing briefly.
4    MR. SMITH-GEORGE: Say whatever you
5 want.
6    MS. OWENS: Thank you. I do not agree
7 with your representation.
8    MR. SMITH-GEORGE: I understand you
9 don't agree with anything.
10    MS. OWENS: Can I finish, please. Thank
11 you. I do not agree with your representation
12 that you've complied with the court order. I
13 want that stated on the record.
14    MR. SMITH-GEORGE: You never agree with
15 anything I say so that doesn't really matter. So
16 let's finish so I can go home. We have in front
17 of me exhibits 1 through 32, 32 is the one that
18 has been marked without the numbers on it. Do
19 you want it with the page numbers or without the
20 page numbers?
21    MS. HALPERN: With the page numbers. If

Page 465

1 you're willing to switch it.
2    THE VIDEOGRAPHER: The time now is
3 6:35. We are now going off the record.
4    MR. SMITH-GEORGE: So I'll take that
5 and put it here. Now, these --
6    MR. THOMASCH: 1 to 32.
7    MR. SMITH-GEORGE: These, as I
8 understand it, are all documents that are either
9 copies of or documents that we provided, so that
10 I would entrust these to the court reporter,
11 since these are not Dr. Geier's original
12 documents. So I have no problem with her taking
13 these.
14    MR. THOMASCH: That's correct.
15    MR. SMITH-GEORGE: Make sure we put
16 that one in there back, which is 23, I would give
17 this to counsel. I want you to go through these
18 and make sure I have correctly turned over to you
19 1 through 32 and there are no documents missing.
20    Now, with that being done, I want to
21 catalog what we have here so we have an accurate

Page 466

1 rendition of what has been produced and that you
2 want a copy of. I know we did this in the
3 beginning but I just want to be sure so when I go
4 back and look at this record and try to
5 reconstruct what we did, we have everything we
6 need. What I suggest we do, at least for these
7 loose documents, is let's mark them on the first
8 page as exhibits and then I'll get them copied.
9     THE DEPONENT: I don't mind these.
10    MR. SMITH-GEORGE: We're going to mark
11 this one as 33, this 33 is the various
12 renditions of Dr. Geier's report from which
13 Exhibit 23 was taken. Can you mark that please
14 as 33.
15    (Deposition Exhibit No. 33, various
16 renditions of Dr. Geier's report, was marked.)
17    MR. SMITH-GEORGE: As Exhibit 34, we
18 are putting forth the billing statements, these
19 again are documents that I'm going to entrust the
20 court reporter that don't need to be copied, at
21 least for Dr. Geier to copy.

Page 467

1     (Deposition Exhibit No. 34, billing
2 statements, was marked.)
3     MR. SMITH-GEORGE: Exhibit 35 --
4 Exhibit 35 is a letter from Monica Furino to
5 Dr. Mark Geier dated November 2nd, 2004, contains
6 multiple pages, I believe lots of pages, it's the
7 medical records on Jordan Easter. Mark that as
8 35.
9     (Deposition Exhibit No. 35, letter
10 from Monica Furino to Dr. Mark Geier dated
11 November 2nd, 2004 and attached medical records
12 of Jordan Easter, was marked.)
13    MR. SMITH-GEORGE: 36 is the copy of
14 correspondence between Dr. Geier and Elizabeth
15 Manzotti of the journal Expert Review of
16 Vaccines. And it discusses the issue of the
17 publication of that article. This is Exhibit 35.
18 I mean, sorry, 36.
19    (Deposition Exhibit No. 36,
20 correspondence between Dr. Geier and Elizabeth
21 Manzotti and attached manuscript, was

Page 468

1 marked.)
2     MR. THOMASCH: Has that been produced
3 previously?
4     MR. SMITH-GEORGE: I don't know, it's
5 being produced now. Exhibit 37 is an e-mail
6 from Robert Bodily to Waters@awpk.com containing
7 an attachment that has various Geiers' reports
8 regarding autism.
9     (Deposition Exhibit No. 37, e-mail
10 dated 10/20/04 and attachments containing Geier
11 reports regarding autism, was marked.)
12    MR. SMITH-GEORGE: 38 is a two-page
13 document containing Dr. Geier's cases which run
14 from February 12th of '99 to September 27th of
15 2004.
16    (Deposition Exhibit No. 38, list of
17 Dr. Geier's cases, 2/12/99 to 9/27/04, was
18 marked.)
19    MR. SMITH-GEORGE: All right. So what
20 does that leave us with? As I understand it, the
21 only thing that has not been placed as an exhibit

Page 469

1 to this deposition are 13 notebooks, 14
2 notebooks, 15 notebooks -- 14 notebooks that are
3 all listed on Exhibit 4 by title. And those 14
4 notebooks will be copied.
5     THE DEPONENT: Can I see 14, what's 14?
6 That's why I made that list.
7     MR. SMITH-GEORGE: Those exhibits will
8 be copied in totality. I will attempt to
9 instruct the copying entity to Bates stamp them.
10 We'll do them sequentially from hopefully --
11 well, does it really matter?
12    MR. THOMASCH: It doesn't matter, other
13 than groups should be kept together and the first
14 page needs to indicate what's on the binder of
15 the notebook.
16    MR. SMITH-GEORGE: Okay. I understand
17 what you're saying.
18    MR. THOMASCH: So we know which
19 notebook is which. And then you're going to --
20    THE DEPONENT: Then we have the
21 videotape.

Deposition of - MARK R. GEIER, M.D., Ph.D. Multi-Page™ November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TBR   Document 156-4   Filed 12/07/04   Page 40 of 40 PageID #: 8015

**Page 470**

1    MR. SMITH-GEORGE:  We have the
2  videotape.  Do you need a copy of these?
3    MR. THOMASCH:  Yes.  And we'll need a
4  divider between each of the notebooks.
5    MR. SMITH-GEORGE:  I'll produce them to
6  you as 15 separate volumes.
7    MR. THOMASCH:  All right.  Just to
8  reconfirm what you said, Exhibits 1 through 32
9  were marked at this deposition and used.
10 Exhibits 33 through the end are all documents
11 that were brought today to the deposition by
12 Dr. Geier.
13    MR. SMITH-GEORGE:  Correct.
14    MR. THOMASCH:  All right.
15    MS. OWENS:  And the court reporter's
16 taking all of those to put with the transcript.
17    MR. THOMASCH:  33 up, everything except
18 the 14 notebooks are going to be with the
19 transcript.  The 14 notebooks will come
20 separately from counsel.
21    THE DEPONENT:  What happens with the

**Page 471**

1  transcript of this?  Do I read it?  Do I not read
2  it?
3    MR. SMITH-GEORGE:  Yes, you will be
4  provided with a copy for signature.
5    (The deposition concluded at 6:42 p.m.)
6    -------------------------------
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

**Page 472**

1    CERTIFICATE OF DEPONENT
2
3
4    I hereby certify that I have read and
5  examined the foregoing transcript, and the same
6  is a true and accurate record of the testimony
7  given by me.
8    Any additions or corrections that I
9  feel are necessary, I will attach on a separate
10 sheet of paper to the original transcript.
11
12
13
14
15    _____
15    MARK R. GEIER, M.D., Ph.D.
16
17
18
19
20
21

**Page 473**

1  STATE Of MARYLAND    SS:
2    l, Christine Thomas, a Notary Public for the
3  state of Maryland, do hereby certify that the
4  within named, MARK R. GEIER, M.D., Ph.D.,
5  personally appeared before me at the time and
6  place herein set out, and after having been duly
7  sworn by me, was interrogated by counsel.
8    I further certify that the examination was
9  recorded stenographically by me and this
10 transcript is a true record of the proceedings.
11    I further certify that I am not of
12 counsel to any of the parties nor an employee of
13 counsel nor related to any of the parties nor in
14 any way interested in the outcome of this action.
15    As witness my hand and notarial seal this
16 16th day of November, 2004.
17
18 My commission expires  _____
19 June 21, 2008        Notary Public
20
21