November 12, 2004    Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW    Document 258-6    Filed 03/09/04    Page 2 of 44 PageID #: 8072

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

VERA EASTER, individually*

and as Next Friend of     *

JORDAN DELANEY EASTER,     *

a minor,                   * CIVIL ACTION NO.:

                           * 5:03-CV-141

            Plaintiff,     * Jury

    v.                     * Assigned to Judge Ward

AMERICAN HOME PRODUCTS     *
CORPORATION, d/b/a WYETH,*
et al.,                    *

            Defendants.    *

    *   *   *   *   *   *   *   *   *   *   *

    Videotape deposition of MARK R. GEIER, M.D.,

Ph.D, taken on Friday, November 12, 2004, at

9:52 a.m., at Orrick, Herrington & Sutcliffe,

L.L.P., 3050 K Street, NW, Washington, D.C.,

before Christine Thomas, Notary Public.

    *   *   *   *   *   *   *   *   *   *   *

Reported by:  Christine Thomas, RPR

PLAINTIFF'S
EXHIBIT
A
tabbies

Page 414

1 presentations that I've given on the subject, and
2 any subsequent depositions given by me on the
3 subject. Do you see that?
4     A. Yes.
5     Q. What does that mean?
6     A. That means that as we've discussed
7 before, I've given you my CV, and my CV contains
8 a number of publications that have to do with
9 thimerosal, and I'm relying on my publications
10 and the references thereto, and I'm also, I've
11 given you whatever I have of the talks that I've
12 given and that discusses also my opinions.
13     Q. Okay.
14     A. If in the future new things happen, and
15 this field is rapidly going, if new things I
16 haven't discussed today come out and it's felt
17 appropriate by both sides, I'll come and tell you
18 about those.
19     Q. Your report itself is 50 pages single
20 spaced; is that correct?
21     A. Yes.

Page 415

1     Q. Now the version that was provided to me
2 is so faint that in all honesty I cannot read
3 any of the footnote numbers. Can you tell me
4 from looking at page 50 what is the total number
5 of footnotes in the report?
6     A. The footnote there reads 129.
7     Q. And the footnotes appear to uniformly be
8 citations to articles or communications or
9 documents that purport to support statements made
10 in the text; is that correct?
11     A. Generally. I'd have to look to see if
12 we quoted like one of the IOM reports or
13 something, but generally what I was trying to do
14 in this report was give you the basis of my
15 opinions. So yeah, if it wasn't my opinion, then
16 you know, I probably didn't quote it. But there
17 probably are some in here I don't recall.
18     Q. I understand. But as a methodology for
19 preparing the report, you tried to explain the
20 bases for your opinions and then you cited the
21 support upon which you relied in the footnotes?

Page 416

1     A. Yes, that's correct.
2     Q. What I want to know is those 129
3 footnotes, is the material that is cited in them
4 the source material provided in the notebooks
5 that you have given us for all 129 sources?
6     A. I think so. And additionally if
7 they're not, they're in the bibliography.
8     Q. Now, in addition to those 129 sources
9 upon which you rely, am I correct that you rely
10 on the information that is contained in your
11 published papers?
12     A. Yes.
13         MR. SMITH-GEORGE: I'm going to object
14 to that question because there are multiple
15 citations to the same documents. It's not 129
16 different sources. There are 129 footnotes.
17 Some of the footnotes cite to the same document.
18         MR. THOMASCH: All right. With that
19 explanation, if counsel has a count of how many
20 different there are, but otherwise we'll just say
21 the number is to be determined.

Page 417

1         MR. SMITH-GEORGE: That would be fine.
2 I just didn't want to leave the impression there
3 were 129 different sources.
4     Q. (BY MR. THOMASCH) Do you have a copy
5 of your resume in front of you, sir?
6     A. There's one in here somewhere.
7     Q. I need you to do this is a little
8 slowly for me and for the court reporter, who's
9 heroic but human, that is to flip to the
10 publications. What I want to do is identify out
11 of your resume the particular papers that would
12 then fit into the description in the cover letter
13 to your expert report, which says the information
14 is supplemented by my published papers. So as I
15 understand it it means that you are prepared to
16 rely as a basis for your opinions on that which
17 is in the published papers, correct?
18     A. Yes.
19     Q. Okay. Which published papers?
20     A. Well, the primary ones that address
21 thimerosal, the thimerosal issue are --

Page 418

1    **Q. You can do it by reference number.**
2    A. Okay. No. 65, I believe was the first
3 one we ever published directly on thimerosal.
4 No. 66, No. 69, No. 71, No. 72, No. 73, No. 74,
5 No. 75, to some extent No. 77, No. 78, No. 81,
6 No. 82, and No. 85.
7    **Q. Can I see the resume, please?**
8    A. Sure. Those are the primary ones
9 anyway. I mean, I've got a lot of things on
10 vaccines, so if somebody asks me something about
11 another vaccine, I'm not saying I never would say
12 anything from the others, but those are
13 primarily, my work on thimerosal.
14    MR. THOMASCH: Mark as our next exhibit
15 a medical article authored by Mark Geier and
16 David Geier entitled Neurodevelopmental Disorders
17 After Thimerosal-Containing Vaccines: A Brief
18 Communication.
19    (Deposition Exhibit No. 24,
20 Neurodevelopmental Disorders After
21 Thimerosal-Containing Vaccines: A Brief

Page 419

1 Communication, was marked.)
2    **Q. (BY MR. THOMASCH) Do you have Exhibit**
3 **24?**
4    A. Yes, I do.
5    **Q. All right. And I believe that matches**
6 **up with Exhibit 65, which you said was your first**
7 **article, is that correct?**
8    A. I lost my CV or you took it.
9    **Q. We only have one so we're at a little**
10 **bit of a disadvantage, Doctor.**
11    A. Yes, that's the first one.
12    **Q. Do you know as you sit here today**
13 **whether you submitted that paper to the IOM**
14 **committee?**
15    A. I'm sure we did.
16    **Q. All right.**
17    A. I can't have a specific recollection,
18 but since it's our first paper on the topic and
19 it's in a major journal, I'm sure I did.
20    MR. THOMASCH: May I have the reporter
21 mark as Exhibit 25 another article authored by

Page 420

1 Mark Geier and David Geier entitled Thimerosal in
2 Childhood Vaccines, Neurodevelopment Disorders,
3 and Heart Disease in the United States.
4    (Deposition Exhibit No. 25, article
5 entitled Thimerosal in Childhood Vaccines,
6 Neurodevelopment Disorders, and Heart Disease in
7 the United States, was marked.)
8    **Q. (BY MR. THOMASCH) Okay. Let me, just**
9 **before you go back to that one, what I need is if**
10 **you would keep a copy of the IOM report near your**
11 **side.**
12    A. I have it.
13    **Q. And go back to page 157 where we were at**
14 **before. That's a page I'll ask you to just hold**
15 **open.**
16    A. Okay. This should be 157. I have
17 trouble seeing the page numbers.
18    **Q. You got it?**
19    A. Yes.
20    **Q. You see the Geier references there?**
21    A. Yes.

Page 421

1    **Q. I want to go back for a moment to the**
2 **Exhibit 24, the brief communication exhibit?**
3    A. Yes.
4    **Q. Can you confirm for me that that is the**
5 **second one noted which the IOM refers to as**
6 **Geier, Geier 2003-B?**
7    A. Yes.
8    **Q. All right. Because are you aware in**
9 **the text of the IOM report your studies are**
10 **discussed and they're discussed with short-hand**
11 **abbreviations and not the full name, and so when**
12 **they're discussing 2003-B, they are discussing**
13 **what we've marked as Exhibit 24, correct?**
14    A. Correct.
15    **Q. All right. Now Exhibit 25, which is**
16 **the article encaptioned Thimerosal in Childhood**
17 **Vaccines, Neurodevelopment Disorders, and Heart**
18 **Disease in the United States, that one is 2003-D**
19 **in the IOM report; is that correct?**
20    A. That's correct.
21    **Q. All right. And so that was also**

Page 410

1  A. Probably.
2  Q. Are you familiar with a paper by
3 Dr. Hibbett?
4  A. Yes.
5  Q. Did you hear Dr. Hibbett testify at the
6 IOM?
7  A. Yes. By the way, I don't think it's a
8 doctor.
9  Q. All right. Did you hear Mr. Hibbett
10 testify about his --
11  A. Yes, I did.
12  Q. Did you disagree with the conclusions he
13 reached?
14  A. Yes, and he has a tremendous conflict of
15 interest.
16  Q. And does that conflict of interest
17 indicate to you that his study was unreliable?
18  A. Yes, I think his study's unreliable, I
19 think his methodology is unreliable. I think in
20 addition, even if you discount everything I just
21 said, that study has no relevance to the United

Page 411

1 States. That country was using less thimerosal
2 than we did before we had the epidemic. I can
3 assure you that if we had the same rates as they
4 did before the epidemic, I wouldn't be here. So
5 what he's saying is, even if you accept it, they
6 didn't have an epidemic, and by the way they made
7 it illegal in that country, and the small number
8 of background they saw didn't go down. I think
9 it probably did go down, but I don't want to
10 argue about it because it's not relevant to those
11 of us that have a country-threatening epidemic.
12  Q. During the time period that vaccines
13 containing thimerosal were distributed in Sweden
14 or Denmark, do you have an understanding as to
15 what the maximum amount of thimerosal a child
16 could have received who, provided by the
17 recommended vaccine schedule?
18  A. Yes.
19  Q. How much?
20  A. In one of the countries it was 75 and
21 the other was 125.

Page 412

1  Q. Does that level of exposure to
2 thimerosal constitute an increased risk of autism
3 or neurodevelopmental delay in your mind?
4  A. Probably, but it's the level that we
5 gave before 1990, and it was a time when we had
6 too much autism but it was not epidemic. So the
7 question is what caused the massive epidemic that
8 began in 1990, 19991, and their study, even if it
9 were perfectly accurate, has nothing to say about
10 that because we went up to close to 300 and our
11 autism rate went -- we had almost the same rate
12 they did, about 1 in 2,500, when we gave the
13 same amount they did, coincidentally, and when we
14 went up, we went from one in 2,500 to 1 in 166,
15 if you like the FDA's number, 1 in 150 if you
16 like other people's numbers, and maybe even as
17 high as 1 in 40, depending on whose numbers you
18 like. That's what I'm complaining about and
19 that's what caused all this additional research.
20 So for him to say he didn't see a decline from 1
21 in 2500, I hope we go back to 1 in 2,500. He has

Page 413

1 nothing to say. That study has no relevance to
2 the situation here.
3  Q. Is it methodologically flawed?
4  A. Yes.
5  Q. Are you prepared to say that at trial?
6  A. Absolutely.
7  Q. Would you prepared to explain the
8 methodological flaws if we had more time today?
9  A. Sure.
10  Q. All right. Do you have your expert
11 report in front of you?
12  A. Yes, sir.
13  Q. All right. And the cover letter it
14 begins at, says, enclosed please find a copy of
15 my report containing my opinions regarding the
16 capability of the mercury in thimerosal to cause
17 neurologic damage in infants who have received
18 vaccines. Do you see that?
19  A. Yes.
20  Q. The next sentence says, this information
21 is supplemented by my published papers, the

Page 414

1  presentations that I've given on the subject, and
2  any subsequent depositions given by me on the
3  subject. Do you see that?
4     A. Yes.
5     Q. What does that mean?
6     A. That means that as we've discussed
7  before, I've given you my CV, and my CV contains
8  a number of publications that have to do with
9  thimerosal, and I'm relying on my publications
10 and the references thereto, and I'm also, I've
11 given you whatever I have of the talks that I've
12 given and that discusses also my opinions.
13    Q. Okay.
14    A. If in the future new things happen, and
15 this field is rapidly going, if new things I
16 haven't discussed today come out and it's felt
17 appropriate by both sides, I'll come and tell you
18 about those.
19    Q. Your report itself is 50 pages single
20 spaced; is that correct?
21    A. Yes.

Page 415

1     Q. Now the version that was provided to me
2  is so faint that in all honesty I cannot read
3  any of the footnote numbers. Can you tell me
4  from looking at page 50 what is the total number
5  of footnotes in the report?
6     A. The footnote there reads 129.
7     Q. And the footnotes appear to uniformly be
8  citations to articles or communications or
9  documents that purport to support statements made
10 in the text; is that correct?
11    A. Generally. I'd have to look to see if
12 we quoted like one of the IOM reports or
13 something, but generally what I was trying to do
14 in this report was give you the basis of my
15 opinions. So yeah, if it wasn't my opinion, then
16 you know, I probably didn't quote it. But there
17 probably are some in here I don't recall.
18    Q. I understand. But as a methodology for
19 preparing the report, you tried to explain the
20 bases for your opinions and then you cited the
21 support upon which you relied in the footnotes?

Page 416

1     A. Yes, that's correct.
2     Q. What I want to know is those 129
3  footnotes, is the material that is cited in them
4  the source material provided in the notebooks
5  that you have given us for all 129 sources?
6     A. I think so. And additionally if
7  they're not, they're in the bibliography.
8     Q. Now, in addition to those 129 sources
9  upon which you rely, am I correct that you rely
10 on the information that is contained in your
11 published papers?
12    A. Yes.
13       MR. SMITH-GEORGE: I'm going to object
14 to that question because there are multiple
15 citations to the same documents. It's not 129
16 different sources. There are 129 footnotes.
17 Some of the footnotes cite to the same document.
18       MR. THOMASCH: All right. With that
19 explanation, if counsel has a count of how many
20 different there are, but otherwise we'll just say
21 the number is to be determined.

Page 417

1       MR. SMITH-GEORGE: That would be fine.
2  I just didn't want to leave the impression there
3  were 129 different sources.
4     Q. (BY MR. THOMASCH) Do you have a copy
5  of your resume in front of you, sir?
6     A. There's one in here somewhere.
7     Q. I need you to do this is a little
8  slowly for me and for the court reporter, who's
9  heroic but human, that is to flip to the
10 publications. What I want to do is identify out
11 of your resume the particular papers that would
12 then fit into the description in the cover letter
13 to your expert report, which says the information
14 is supplemented by my published papers. So as I
15 understand it it means that you are prepared to
16 rely as a basis for your opinions on that which
17 is in the published papers, correct?
18    A. Yes.
19    Q. Okay. Which published papers?
20    A. Well, the primary ones that address
21 thimerosal, the thimerosal issue are --

Deposition of - MARK R. GEIER, M.D., Ph.D Multi-Page™ November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW   Document 256-3   Filed 12/09/04   Page 6 of 44 PageID #:
8077

Page 6

1    P R O C E E D I N G S
2    --------------------
3         MR. SMITH-GEORGE: We're here at the
4    deposition of Dr. Mark Geier, yesterday morning
5    there was a subpoena duces tecum filed in this
6    case, we filed an objection to it. I'd mark the
7    objection as the first exhibit to the deposition.
8    Despite the fact we objected to the subpoena, we
9    have produced documents here, and I wanted to
10   catalog for the record what those documents are.
11        First, we have a packet of documents,
12   starts with a letter dated November 9th, 2004
13   from Monica Furino to -- I'm sorry. Here it is,
14   from Monica Furino to Dr. Mark Geier, it's dated
15   November 2nd, 2004, which enclosed the medical
16   records pertaining to Jordan Easter. Dr. Geier
17   is not here to offer specific opinions about the
18   Easter case, but he requested to see the records
19   so we sent them to him.
20        We then have three pages which
21   consist of Dr. Geier's billing records in this

Page 7

1    case. We then have a packet of 40 or so pages,
2    which is a series of e-mails between Dr. Geier
3    and the attorneys at Waters & Kraus and myself.
4         We then have a stack, which is about
5    six inches, seven inches thick, which is the
6    various generations of his report, beginning with
7    a letter from Dr. Geier to Senator John Kerry
8    dated September 26th, 2004, which was the genesis
9    of the report. Although, we don't think that all
10   of the accompanying documents constitute drafts,
11   in the abundance of precaution we had the doctor
12   print out whatever he had related to his reports,
13   hence this stack.
14        We then have an e-mail from Robert
15   Bodily to Mr. Waters and myself attaching some
16   various reporting that Dr. Geier has reviewed.
17        We then have a series of notebooks,
18   the first notebook is entitled Thimerosal
19   Notebook No. 1, which contains the Simpsonwood
20   presentation transcript, as well as various
21   medical articles, Power Points that were

Page 8

1    presented to the -- by the CDC.
2         We then have a second Thimerosal
3    Notebook No. 2, it encloses a series of different
4    medical articles. We have Thimerosal Notebook
5    No. 3, which again has a series of medical
6    articles. We have somewhere here -- do you know
7    where No. 4 is.
8         THE DEPONENT: No, but it's one of
9    those. That's No. 5.
10        MR. SMITH-GEORGE: Oh, yeah. We have
11   Thimerosal Notebook No. 4, again contains more
12   articles. Thimerosal Notebook No. 5, which also
13   contains a series of medical articles. Is that
14   five the max?
15        THE DEPONENT: Actually, there's a
16   list right there. I tried to catalog what we're
17   doing.
18        MR. SMITH-GEORGE: So there's a
19   Mercury Notebook No. 1, that is this one. That
20   again contains some medical articles.
21        MR. THOMASCH: Is there an

Page 9

1    identification on each of these binders that
2    matches what you're now saying?
3         MR. SMITH-GEORGE: Yeah.
4         MR. THOMASCH: Okay. Thank you.
5         MR. EVALL: What did you say that
6    contains?
7         MR. SMITH-GEORGE: That was Mercury
8    Notebook No. 1. Then we have a series of DPT
9    notebooks. One and two are in the same volume,
10   three and four in the same volume, five and six
11   in the same volume. Then there's volume seven.
12   We have an Autism Epidemic Notebook No. 1. A
13   publicity notebook. And is that related to the
14   1970 --
15        THE DEPONENT: Yes.
16        MR. SMITH-GEORGE: Related to
17   Dr. Geier's work in the early 1970 --
18        MS. OWENS: Publicity?
19        MR. SMITH-GEORGE: Correct.
20   Newspaper clippings and accolades he received for
21   his early genetic work. Then we have a CDC

Deposition of - MARK R. GEIER, M.D., Ph.D. Multi-Page™ November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW   Document 236-3   Filed 12/09/04   Page 7 of 44 PageID #: 8078

Page 430

1    MR. SMITH-GEORGE: Which is what?
2    MR. THOMASCH: One of his articles.
3    Q. (BY MR. THOMASCH) Going to show you
4 what is a copy of Exhibit 18. That should be
5 No. 74.
6    A. I found 18, he found 18.
7    Q. No. 74 on your resume?
8    A. Yes.
9    Q. And at page 157 of the IOM report is
10 that referred to as Geier and Geier 2004-A?
11    A. Yes.
12    Q. And that also refers to your analysis of
13 the VAERS database; is that right?
14    A. Yes.
15    Q. Now, if you look at the IOM report at
16 page 58.
17    A. Okay.
18    Q. Do you see a section called studies of
19 passive reporting data?
20    A. Yes.
21    Q. That includes, indeed this section is

Page 431

1 pages -- from page 58 through the bottom of page
2 62 is, deals primarily with a discussion and
3 analysis of various papers that you and David
4 Geier have coauthored pertaining to the VAERS
5 database, correct?
6    A. Yes.
7    Q. Including the articles that have been
8 identified as 2003-A, B, C and D; is that also
9 correct?
10    A. Yes.
11    Q. At page 61 of the report in the first
12 full paragraph it states in the first sentence,
13 and this is in reference to studies 2003-A, B and
14 D, quote, these three studies have serious
15 methodological limitations that make their
16 results uninterpretable. Do you see that?
17    A. Yes.
18    Q. Do you disagree with that statement?
19    A. Yeah, in fact it's not even accurate,
20 that is, we relied not only on the VAERS
21 database, we relied on the Department of

Page 432

1 Education database, on the VSD reanalysis of
2 Verstraeten's work, on the biological
3 plausibility. It just sounds nice, they pick on
4 the one they want to pick on, but it's not
5 correct, and it's also not uninterpretable. I
6 mean, all the peer reviewers were able to
7 interpret it from all those different journals.
8    Q. If we were to take time to discuss
9 those studies today, do you believe you could
10 interpret them in a way that would be
11 understandable?
12    A. Yeah, as I said, they were all
13 submitted, they all went through peer review,
14 some of them were in some of the world's leading
15 journals. The reviewers understood them. It's a
16 shame these guys don't. The IOM was only
17 epidemiology so just ignore anything but
18 epidemiology.
19    Q. These are epidemiological studies or
20 purport to be; do they not?
21    A. The study part is but the discussions

Page 433

1 and the literature is not.
2    Q. Let me take you over to page 62, in the
3 third paragraph it begins, the articles also lack
4 a complete and transparent description of their
5 methods and underlying data, making it difficult
6 to confirm or evaluate their findings. Did you
7 understand that to be the view of the IOM?
8    A. Yeah.
9    Q. And in the fourth paragraph they
10 indicate that the results of their studies,
11 meaning Dr. Geier and Mr. Geier, are likewise
12 improbable. Do you see that?
13    A. Yes.
14    MR. THOMASCH: All right. Those are all
15 matters upon which I have a very significant
16 number of questions, none of which can be asked
17 today because of the time constraints. I have
18 indicated to counsel for some of our
19 co-defendants that I would stop questioning no
20 matter how far short I was of finishing so they
21 could ask a few questions before the day is out,

Deposition of MARK R. GEIER, M.D., Ph.D Multi-Page™    November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 3:03-cv-00142-TSL   Document 256-8   Filed 12/09/04   Page 8 of 44 PageID #: 8079

Page 142

1 Vaccine Compensation Act.
2    Q. And who will be paying those expenses?
3    A. There's an omnibus group that
4 represents the people that filed, there's a
5 group -- it's my understanding there's a group of
6 attorneys that together are doing discovery. And
7 they're authorized to have some experts help
8 them. And so since we have permission to go to
9 the VSD and since it costs, I don't know, $3,000
10 a day, they've agreed to pay our expense money to
11 go and do that.
12    Q. Have any of those payments occurred to
13 date?
14    A. No, I don't think so. Maybe there was
15 one that was made, I'm not sure.
16    MR. THOMASCH: All right. Might be a
17 convenient time for a break. We haven't had one
18 this morning.
19    THE VIDEOGRAPHER: Time now is 12:07.
20 We are off the record.
21    (A recess was taken from 12:07 p.m.

Page 143

1 to 12:21 p.m.)
2    THE VIDEOGRAPHER: The time now is
3 12:21. We are now back on the record.
4    MR. THOMASCH: I'll ask the reporter to
5 mark as our next exhibit a statement on
6 thimerosal at the World Health Organization
7 dated August 2003.
8    (Deposition Exhibit No. 11, statement on
9 thimerosal at the World Health Organization dated
10 August 2003, was marked.)
11    Q. (BY MR. THOMASCH) Dr. Geier, I'm going
12 to show you what has been marked as Exhibit 11, I
13 ask you to take a look at that. Have you had a
14 chance --
15    A. I believe I've seen it before.
16    Q. You've done certain searches of the
17 worldwide medical literature on thimerosal; is
18 that correct?
19    A. Yes.
20    Q. As a consequence of any of those
21 searches, have you previously seen what has been

Page 144

1 marked as Exhibit 11?
2    A. I believe I've seen this or something
3 similar to this before.
4    Q. Are you familiar with an organization
5 called the World Health Organization?
6    A. Yes.
7    Q. What is it?
8    A. It's a branch of the United Nations
9 that does, among other things, vaccines for third
10 world mostly. Has as its most famous
11 accomplishment wiping out smallpox from the face
12 of the earth.
13    Q. Through vaccinations?
14    A. For which I applaud.
15    Q. Through vaccinations?
16    A. Through vaccinations.
17    Q. The document seems to be captioned
18 Statement on Thimerosal and dated August 2003,
19 correct?
20    A. Yes.
21    Q. It refers to the Global Advisory

Page 145

1 Committee on Vaccine Safety. Have you ever heard
2 of that organization?
3    A. Vaguely.
4    Q. Do you have some sense of what they do?
5    A. They advise on vaccine policy mostly
6 for the third world.
7    Q. And advise the World Health
8 Organization?
9    A. Yes.
10    Q. The first sentence of the text of the
11 document, under the bolded captioned material,
12 states, in 1999, concerns were raised in the
13 United States about exposure to mercury following
14 immunization, do you see that?
15    A. Yes.
16    Q. Do you agree with that statement?
17    A. Yes.
18    Q. Have you reviewed the second paragraph
19 of this document with regard to data that was
20 presented to the Global Advisory Committee on
21 Vaccine Safety in June 2002?

Page 146

1    A. Yes.
2    Q. Did you per chance attend that
3 presentation?
4    A. No.
5    Q. Are you familiar with what data was
6 presented to the Global Advisory Committee on
7 Vaccine Safety in June of 2002?
8    A. No.
9    Q. Do you see in the text of Exhibit 11
10 that it indicates that such data, quote, indicate
11 that the pharmacokinetic profile of ethylmercury
12 is substantially different from that of
13 methylmercury. Do you see those words?
14    A. Yes.
15    Q. Do you understand the term
16 pharmacokinetic profile?
17    A. Yes.
18    Q. Do you understand there are differences
19 between ethylmercury and methylmercury?
20    A. Yes.
21    Q. Are the subjects, the pharmacokinetic

Page 147

1 profile of ethylmercury and the pharmacokinetic
2 profile of methylmercury, within the scope of the
3 matters on which you expect to testify in this
4 case?
5    A. Yes.
6    Q. It indicates further, quote, the
7 half-life of ethylmercury is short (less than one
8 week) compared to methylmercury (1.5 months),
9 making exposure to ethylmercury in blood
10 comparatively brief. Did I read that correctly?
11    A. Yes.
12    Q. Do you agree with that sentence?
13    A. No.
14    Q. Can you tell me as succinctly as
15 possible what references or authority you base
16 your disagreement with that sentence on?
17    A. I think in my report I have a whole
18 section that discusses the similarities between
19 ethylmercury and methylmercury. This is one of
20 the indefensible defense points that has been
21 raised against the thimerosal issue. First --

Page 148

1 there are numerous things wrong with it. First
2 of all --
3    Q. Are they captured in your report?
4    A. Yes.
5    Q. Then I'll hold off for the moment.
6    A. Sure.
7    Q. It also indicates that two
8 independently conducted epidemiological studies
9 have been conducted in the United Kingdom. Do
10 you see that?
11    A. Yes.
12    Q. Do you know what that's relating to?
13    A. I believe that's Elizabeth Miller's
14 work.
15    Q. All right. And the second paragraph of
16 Exhibit 11 concludes with a statement by the
17 World Health Organization, quote, these studies
18 further support the safety of
19 thimerosal-containing vaccines in infants in the
20 amounts used in existing vaccines. Did I read
21 that correctly?

Page 149

1    A. Yes.
2    Q. Do you agree with that statement?
3    A. No.
4    Q. Do you believe that that conclusion of
5 the Global Advisory Committee on Vaccine Safety
6 of the World Health Organization was come to
7 honestly by that group?
8    A. No.
9    Q. What do you believe accounts for the --
10 withdrawn. You disagree with the conclusion and
11 believe it's wrong, correct?
12    A. I believe it's wrong.
13    Q. And you don't believe it was honestly
14 come by; correct?
15    A. That's correct.
16    Q. What do you believe has provoked the
17 Global Advisory Committee on Vaccine Safety to
18 have dishonestly concluded that studies further
19 support the safety of thimerosal-containing
20 vaccines?
21    A. That they've been giving and poisoning

Deposition of - MARK R. GEIER, M.D., Ph.D Multi-Page™    November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW    Document 256-3    Filed 12/09/04    Page 10 of 44 PageID #: 8081

Page 150

1 children, either knowingly or unknowingly, for a
2 long time, that makes it really hard to admit
3 that you're wrong. Also their whole policy as
4 I've discussed in numerous articles, many of
5 which we've put in our report, their policy
6 requires thimerosal be maintained in the
7 vaccines they feel because of lack of
8 refrigeration for the third world.
9     They additionally have put out a memo
10 signed off by our boys at the CDC, including Dr.
11 Chen, that not only do they need thimerosal in
12 third world vaccines, they need to strongly
13 advocate that we continued to keep it in our
14 vaccines, because if we don't have it in our
15 vaccines, the third world is going to refuse to
16 take it. Therefore they're willing to damage
17 American children in order to help the third
18 world. And incidentally, I'm strongly third
19 world. I would be willing to, if I had my power,
20 I would give U.S. money to help them with their
21 vaccine program. But I will not, would not

Page 151

1 approve damaging U.S. children to help them.
2     Q. All right, we're running astray.
3     A. Well, you asked me why they had reason
4 to give incorrect information. I gave you some
5 of it.
6     MR. ELLIOTT: Object to the
7 responsiveness.
8     Q. (BY MR. THOMASCH) Let me take you to
9 the third paragraph which indicates that the
10 Global Advisory Committee on Vaccine Safety
11 reviewed certain pharmacokinetic study data on
12 June 11th and 12th of 2003; do you see that?
13     A. Yes.
14     Q. Were you at that meeting where such
15 data was presented?
16     A. No.
17     Q. Are you aware of what data was
18 presented?
19     A. Yes.
20     Q. In the 4th paragraph it states, in the
21 first sentence, on the basis of the foregoing,

Page 152

1 the GACVS concluded that the latest
2 pharmacokinetic and developmental studies do not
3 support concerns over safety of thimerosal
4 (ethylmercury) in vaccines. Do you see that?
5     A. Yes.
6     Q. And the GACVS is the Global Advisory
7 Committee on Vaccine Safety, correct?
8     A. Yes.
9     Q. Am I correct that you disagree with
10 their conclusion that the latest pharmacokinetic
11 and developmental studies do not support
12 concerns over the safety of thimerosal in
13 vaccines?
14     A. I disagree.
15     Q. Do you believe that the opinion that
16 they reached, the conclusion that they reached in
17 that regard was honestly come by?
18     A. No.
19     Q. Is it my understanding that you believe
20 that they know and understand these statements to
21 be false?

Page 153

1     A. Yes. False in the sense that they were
2 justified by saying that their vaccines in the
3 third world do more good than harm and they
4 can't admit the harm or perhaps the good would be
5 undone, but they are false.
6     Q. I'm not --
7     A. And they know they're false.
8     Q. I'm not asking about policy
9 ramifications or whether it's justifiable to be
10 inaccurate. You're stating that the conclusions
11 are inaccurate, correct?
12     A. Yes.
13     Q. And that the World Health Organization's
14 Global Advisory Committee on Vaccine Safety knows
15 that to be the case and is saying it anyway?
16     A. That's my opinion. Obviously I can't be
17 in their head. But it's my opinion that they're
18 saying it anyway, that's correct.
19     Q. Do you have an opinion as to whether
20 any part of the World Health -- withdrawn. So in
21 layman's terms, the Global Advisory Committee on

Case 1:03-cv-00741-TJW    Document 256    Filed 08/09/06    Page 11 of 44 PageID #: 8082

Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 154

1 Vaccine Safety is deceiving anyone in the public
2 that reads this statement; is that correct?
3    A. Yes.
4    Q. And you have explained some of the
5 reasons that you think they might be, in their
6 mind, justifying that deception; is that correct?
7    A. Yes.
8    Q. Do you have any opinion that there was
9 anything done by any of the vaccine
10 manufacturers to provoke this public deception
11 that you testified to?
12    A. Yes.
13    Q. And what if anything do you suggest or
14 opine that vaccine defendants did to provoke
15 this public deception?
16    A. The World Health Organization, our CDC,
17 and the vaccine manufacturers are all members of
18 the Brighton Collaboration, into which pours
19 enormous amounts of money, some from the CDC,
20 largely from the drug companies, and that
21 Brighton Collaboration is set up to control and

Page 155

1 define vaccine adverse reactions and to control
2 basically how vaccines are going to be used, and
3 I believe that they're heavily influenced by the
4 fact that they're funded and the fact that the
5 members on that group are members of the vaccine
6 producers, and that's not the only place, but
7 that's the place where the World Health
8 Organization is so heavily involved. I believe
9 they feel that they rely on the manufacturers for
10 their money and I don't think it would be looked
11 very favorable if they came up with something
12 that was very damaging to the companies.
13       So I think that those that are supposed
14 to be advising and those who are supposed to be
15 regulating are in bed with those who are being
16 regulated and taking money from those who are
17 being regulated, and that has an appearance of
18 conflict of interest, and appearance is enough.
19 We can't have appearance of conflict of interest
20 in our vaccines and that's what's happening here.
21    Q. Okay. Could you briefly explain to me

Page 156

1 your understanding of what the Brighton
2 Collaboration is?
3    A. It's a corporation, I don't have it in
4 front of me exactly, I'm not a legal thing, I
5 forgot the name of the type of corporation, but
6 it's a nongovernmental corporation which exists
7 physically inside of the CDC's location in their
8 building in Atlanta, Georgia, which has meetings
9 all over Europe and they have posted on their
10 website results of the meetings and they have
11 people -- they set up committees to define
12 vaccine -- well, I'd say the reactions but that's
13 not really true. It started out reactions, then
14 it was adverse events, and now it's just events.
15 Pretty soon it won't be anything.
16       But in any case, they have meetings with
17 and they use drug company people and vaccine
18 producing people to help define what is and isn't
19 a reaction, and therefore will control in their
20 plan which things are considered to be related to
21 vaccines, and a whole vaccine policy is

Page 157

1 controlled by that group. And it's an unethical
2 organization. The people from CDC can't take
3 money and they do take money. In fact, they take
4 salaries from this organization which is funded
5 by the drug company. They cannot take money from
6 those who they are supposed to regulate. Even if
7 it doesn't affect their opinion, it looks like it
8 affects their opinion, and there's very good
9 precedent that conflict of interest can't even
10 look like conflict of interest.
11    Q. Okay. I want to take you back now to
12 Exhibit 11 and the specific motivation for
13 deceiving the public in regard to the Global
14 Advisory Committee on Vaccine Safety's August
15 2003 statement, all right?
16    A. Okay.
17    Q. As I understand part of what you've
18 said, the World Health Organization is part of
19 this Brighton Collaboration. It received -- that
20 collaboration receives funding from
21 pharmaceutical companies and the World Health

Case 5:03-cv-00141-TJW   Document 256-3   Filed 12/09/04   Page 12 of 44 PageID #: 8083

Page 158

1 Organization has an interest in maintaining that
2 funding level; is that correct?
3     A.  Yes, and the cooperation of all the
4 people involved.
5     Q.  I further thought I heard you indicate,
6 correct me if I'm wrong, that the World Health
7 Organization may well be concerned that if they
8 were to take a position contrary to what's set
9 forth in this statement, that might affect the
10 funding?
11    A.  Yes.
12    Q.  Is it your statement that -- is it your
13 opinion that the pharmaceutical companies have
14 purposefully attempted to cause the World Health
15 Organization to deceive the public through its
16 funding?
17    A.  Yes.  I think this is a crucial issue to
18 the vaccine companies.  Their very existence is
19 on the line potentially, and I think they're
20 using their money to influence positions of these
21 organizations.

Page 159

1     Q.  So in your opinion the matter is not
2 simply an appearance of a conflict of interest,
3 but it is actually a conflict of interest, right?
4     A.  Yes.
5     Q.  And by conflict of interest, you are
6 saying that the pharmaceutical companies involved
7 in the manufacture of childhood vaccines have
8 made payments to the World Health Organization
9 for the purpose of having the World Health
10 Organization issue deceptive and false statements
11 about the safety of thimerosal in vaccines; is
12 that correct?
13    A.  Well, you went further than I went.  I
14 didn't say that.  I said that the pharmaceutical
15 companies and the vaccine manufacturers were
16 making payments to the Brighton organization, and
17 the Brighton organization is attempting to limit
18 the damage to -- with this, I don't know
19 specifically if any pharmaceutical company said
20 here's a payment for you to do this specific
21 thing, but I think it's fairly well understood

Page 160

1 that if you're heavily funded by companies and
2 there's something really bad for those companies
3 happening and you come out and you make a
4 statement like this, you know, saying that the
5 literature supports when, they quote like three
6 papers and there are thousands of papers on the
7 other side, it's very obvious that they're being
8 influenced.
9     Q.  All right.  The conclusion is set forth
10 in bold under the caption, correct, the
11 conclusion in this document by the World Health
12 Organization is, and I quote, the Global Advisory
13 Committee on Vaccine Safety concludes that there
14 is no evidence of toxicity in infants, children,
15 or adults exposed to thimerosal (containing
16 ethylmercury) in vaccines?
17    A.  And that's a false statement by
18 anybody's position.  Because it says -- it
19 doesn't say they didn't believe the other
20 evidence.  It says there is no evidence, implying
21 that there aren't these articles.  And you can

Page 161

1 look at the articles and they're there.  You can
2 say, well, I'm not convinced by the articles.
3 But this statement is on its face prima facie
4 false.  There are articles throughout the
5 literature from big name people around this
6 country and around the world, numerous articles
7 that make this false.
8     Q.  Right.  Let's just take this in bite
9 size increments if we can.
10    A.  Okay.
11    Q.  You would agree that the bolded
12 statement that I just read into the record was
13 accurately read and constitutes the conclusion of
14 the World Health Organization; correct?
15    A.  Yes.
16    Q.  And you would state that that is
17 objectively false; is that right?
18    A.  Yes.  No one would agree with that
19 statement or that it was objective.
20    Q.  And I understand it to be your opinion
21 that Global Advisory Committee on Vaccine Safety

CRC-Salomon
(410) 821-4888  fax (410) 821-4889

Page 162

1  knows that statement to be false, correct?
2      A.  Sure.  Those articles can be found in
3  ten seconds on PubMed.
4      Q.  Is it your testimony that in your
5  opinion that the pharmaceutical companies that
6  manufacture childhood vaccines containing
7  thimerosal know that statement to be false?
8      A.  Yes.
9      Q.  And is it your testimony that the
10 pharmaceutical companies have funded the Brighton
11 Collaboration in part to produce statements from
12 the World Health Organization that falsely state
13 that thimerosal-containing vaccines are safe?
14     A.  It's a little stronger than what I
15 would say.  They funded the Brighton organization
16 to limit the damage to the vaccine program and to
17 themselves by involving and funding World Health
18 Organization and CDC individuals and other
19 researchers around the world to try to limit the
20 damage.
21     Q.  Do you believe there's an agreement or

Page 163

1  understanding between the pharmaceutical
2  companies and the World Health Organization that
3  this is the goal, the goal being to deceive
4  people into believing there is no danger when in
5  fact there is in your opinion?
6      A.  I would put it on their behalf that the
7  goal is to limit people's concerns about
8  vaccines so they can continue the programs.  And
9  that involves -- if that involves fooling them
10 and slightly modifying and lying about the data,
11 yeah, that's fine.
12     Q.  It's more than slightly modifying.
13 You're testifying to a belief that this is
14 objectively false and they know it to be so;
15 correct?
16     A.  Yes, and it is.
17     Q.  Is this statement in your opinion the
18 product of a conspiracy or a joint agreement or
19 understanding between any pharmaceutical
20 companies that manufacture vaccines and the
21 World Health Organization?

Page 164

1      A.  I don't have a written agreement.  I
2  can't know what's in a verbal agreement.  All I
3  know is that they're funded by the companies and
4  they've taken an obviously objectively false
5  position that favors the companies.
6      Q.  I'm not asking you now about the
7  evidence you have to support it but whether or
8  not you hold the opinion that this is in fact a
9  conspiracy, among others, between the
10 pharmaceutical companies and the World Health
11 Organization to deceive the public.  Is that your
12 opinion?
13     A.  I'm not sure what you mean by
14 conspiracy.  I believe that --
15     Q.  An agreement or understanding between
16 the parties to consciously deceive the public by
17 issuing false statements about the alleged safety
18 of thimerosal when both parties know that to be
19 false in your opinion?
20     A.  Yes.
21     Q.  That is your testimony?

Page 165

1      A.  Yes.
2          MR. THOMASCH:  Let me ask the reporter
3  to mark as Exhibit 12 a document entitled "What
4  Parents Should Know About Thimerosal," from the
5  American Academy of Pediatrics.
6          (Deposition Exhibit No. 12, What
7  Parents Should Know About Thimerosal, was
8  marked.)
9      Q.  (BY MR. THOMASCH)  I'm going to show the
10 witness what has been marked as Exhibit 12 for
11 identification.  I don't need you to read through
12 this full document, but just in a sense eyeball
13 it to see if you recognize this.  And even before
14 that let me ask you, Dr. Geier, do you see that
15 the document is captioned What Parents Should
16 Know About Thimerosal from the American Academy
17 of Pediatrics?
18     A.  Yes, I do.
19     Q.  Do you recognize the entity the
20 American Academy of Pediatrics?
21     A.  Yes.

Page 166

1  Q. What is it?
2  A. It's the academy that board-certifies
3 pediatricians in the United States.
4  Q. Okay. Do they have a publication?
5  A. Yes, Pediatrics. They have a journal,
6 Pediatrics.
7  Q. All right. Do they also issue the red
8 book?
9  A. I think one of their committees does,
10 the advisory committee does, yes.
11  Q. Committee on immunization practices?
12  A. Yes.
13  Q. And does that give guidelines for
14 vaccination practices in the United States?
15  A. Yes.
16  Q. Are you aware that the American Academy
17 of Pediatrics has a website?
18  A. Yes.
19  Q. Do you see that this document appears to
20 be from that website?
21  A. Yes.

Page 167

1  Q. It's dated 11-11-2004 on the date it
2 was printed off the website. Do you see that at
3 the bottom of both pages?
4  A. Yes, I see that.
5  Q. If you return to the second page in the
6 text it says, copyright 2002 by the American
7 Academy of Pediatrics; revised August 2004. Do
8 you see that?
9  A. Yes.
10  Q. So do you understand this to be a
11 statement of the American Academy of Pediatrics
12 that was revised in 2004 and remains publicly
13 available today on the website of the American
14 Academy of Pediatrics?
15  A. Yes.
16  Q. I just want to take you down to the
17 second heading on the document entitled does
18 thimerosal cause autism? Do you see that?
19  A. Yes.
20  Q. The first sentence states, and I quote,
21 there are no valid studies that show a link

Page 168

1 between thimerosal in vaccines and autistic
2 spectrum disorder, period. Did I read that
3 correctly?
4  A. Yes, sir.
5  Q. Is that statement true in your opinion?
6  A. No.
7  Q. Do you believe that statement is
8 objectively false?
9  A. Yes.
10  Q. Do you believe that the American
11 Academy of Pediatrics honestly believes that
12 statement?
13  A. No.
14  Q. Do you believe that in issuing this
15 statement and putting it out on its public
16 website, the American Academy of Pediatrics is
17 attempting to dishonestly deceive the American
18 public with regard to whether or not thimerosal
19 causes autism?
20  A. Yes.
21  Q. Do you believe that they have done that

Page 169

1 as part of any understanding or agreement with
2 any vaccine manufacturer?
3  A. I believe they are largely funded by
4 vaccine manufacturers.
5  Q. Do you believe that accounts for the
6 reason they would publicly deceive the U.S.
7 public regarding the question of whether
8 thimerosal causes autism?
9  A. I think it's only one of the reasons.
10 There are a number of others. Did you want me to
11 go into them?
12  Q. No, I want to know whether you think
13 one of the reasons is because they are provoked
14 to do so by funding from the vaccine
15 manufacturers?
16  A. Yes, I think that's one of the reasons.
17  Q. Do you believe the vaccine
18 manufacturers are aware of the deceptive nature
19 of this statement?
20  A. Yes.
21  Q. Do you believe the vaccine

Page 166 - Page 169

November 11, 2004
Case 3:03-cv-00141-TJW    Document 256-3    Filed 02/09/04    Page 15 of 44    PageID #:
8086
Multi-Page™
Deposition of - MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 170

1 manufacturers' reason for funding the American
2 Academy of Pediatrics currently is in any part
3 related to a desire to see the American Academy
4 of Pediatrics issue false and deceptive
5 statements purporting to exonerate thimerosal in
6 regard to autism?
7   A. I think there are other reasons that
8 manufacturers fund them, but I think that's
9 certainly one of them.
10   MR. THOMASCH: I'll ask the reporter to
11 mark as Exhibit 13 a multipage document taken
12 from the CDC National Immunization Program
13 website on November 11th, 2004.
14   (Deposition Exhibit No. 13, CDC National
15 Immunization Program website document, was
16 marked.)
17   Q. (BY MR. THOMASCH) Do you have Exhibit
18 13 in front of you, sir?
19   A. Yes, I do.
20   Q. What is the CDC?
21   A. Centers for Disease Control. It's a

Page 171

1 sub-branch of HHS, Health and Human Services of
2 the U.S. government.
3   Q. Are you aware they have a publicly
4 available website?
5   A. Yes.
6   Q. Have you ever gone to it?
7   A. Yes.
8   Q. In the course of doing research with --
9 specifically with regard to the safety or
10 potential dangers associated with the use of
11 thimerosal in vaccines, have you ever looked at
12 CDC's website?
13   A. Yes.
14   Q. If you turn to the last page of this
15 document, page nine of nine, do you see it
16 indicates that this page was last reviewed and
17 modified on May 18, 2004?
18   A. Yes.
19   Q. Do you understand this document to be
20 publicly available information provided to the
21 public by the CDC as of May 2004, which relates

Page 172

1 to the subject matter of thimerosal in vaccines?
2   A. Yes.
3   Q. Would you turn, if you would, please, to
4 page 3 of 9.
5   A. Yes.
6   Q. Do you see question 5 in bold?
7   A. Yes.
8   Q. It states, "I've heard that children
9 may be getting toxic levels of mercury from
10 vaccines. Is that true?" And the first
11 paragraph of the answer reads "No. There is no
12 evidence of harm caused by the minute doses of
13 thimerosal in vaccines, except for minor effects
14 like swelling and redness of the injection site
15 due to sensitivity to thimerosal." Did I read
16 that correctly?
17   A. You read it correctly.
18   Q. Do you believe that's an accurate
19 statement?
20   A. No. It's inaccurate on its face and
21 it's inaccurate by Congressional official finding

Page 173

1 that finds these gentlemen guilty of
2 institutional malfeasance and also finds that
3 there's no evidence -- I mean, again, if they go
4 to PubMed, anybody can go to PubMed and you can
5 get, you can turn up hundreds, thousands of
6 articles on this issue, and again, Congress --
7 they're presenting themselves as the official
8 position of the U.S. government, but they're not
9 the U.S. Government. They're one little small
10 blanch of the U.S. government.
11   The Congressional committee that
12 investigated this for three years said, they
13 concluded that the autism epidemic was caused by
14 thimerosal but it could have been curtailed or
15 prevented if the CDC had not been, quote, asleep
16 at the switch, this is from their own memo, and
17 they found them guilty of institutional
18 malfeasance and self-protection and protectionism
19 of the industry, and misplaced protectionism of
20 the industry.
21   This is an out and out object lie

Case 5:03-cv-00141-FJW   Document 256-3   Filed 12/09/04   Page 16 of 44 PageID #: 8087

Page 174

1 because they're saying there's no reports of
2 thimerosal causing any problems anywhere and
3 that's patently ridiculous.
4    Q. All right. I'm going to ask you, sir --
5       MS. OWENS: Excuse, me I'm going to
6 move to strike that answer as nonresponsive to
7 the question.
8       MR. THOMASCH: I'll join in that motion.
9    Q. (BY MR. THOMASCH) You stated that
10 someone had found the CDC I believe it was,
11 quote, guilty of institutional malfeasance; did
12 you say that?
13    A. Not someone. The oversight committee
14 of the U.S. House of Representatives, the
15 official one that's in charge of them has found
16 that, and there are others. I mean we've given
17 you others. There's also --
18    Q. When did that occur?
19    A. 2003, May of 2003.
20    Q. Do you have any explanation for why
21 this statement still appears on the website

Page 175

1 currently available to the public of the Centers
2 for Disease Control?
3    A. Sure. They're a rogue organization. If
4 they admit it they'll be fired. At best they'll
5 be fired.
6    Q. The CDC is a rogue organization?
7    A. Yes, they've committed institutional
8 malfeasance and they're sure not going to admit
9 it, if they have a choice.
10    Q. I want to look at the term
11 institutional malfeasance. Does that come in
12 part from, in your opinion, intentionally
13 deceiving the American public about the health
14 risks of thimerosal-containing vaccines?
15    A. Yes.
16    Q. So you would state that this statement
17 is not only false, but the CDC knows it to be
18 false and seeks to deceive the American public?
19    A. Absolutely. Their own memo shows that
20 they know it to be false.
21    Q. I'd like you to turn further in the

Page 176

1 document to question No. 7, that would be page 5
2 of 9. Do you have that, sir?
3    A. Yes.
4    Q. Does the question read "does thimerosal
5 cause autism?"
6    A. Yes.
7    Q. And the answer in the first sentence
8 states, quote, "there is no conclusive evidence
9 that any vaccine or vaccine additive increases
10 the risk of developing autism or any other
11 behavior disorder. Rather," in the second
12 sentence begins, "rather, evidence is
13 accumulating of lack of any harm resulting from
14 exposure to vaccines containing thimerosal as a
15 preservative." Did I read that correctly?
16    A. You read it correctly.
17    Q. Is it your testimony, sir, that that is
18 also a knowingly false statement made for the
19 purpose of deceiving the American public?
20    A. Yeah, blatantly false, that's right.
21    Q. And if we just go back to question 6 on

Page 177

1 the preceding page, do you see question 6
2 relating to research being conducted by the
3 federal government regarding the safety of
4 vaccines containing thimerosal?
5    A. Yes.
6    Q. And the first sentence of that answer
7 reads, quote, "there is no evidence to suggest
8 that thimerosal in vaccines causes any health
9 problems in children and adults beyond local
10 hypersensitivity reactions (like redness and
11 swelling at the injection site)." Do you see
12 that?
13    A. Yes.
14    Q. That would again be a knowingly false
15 statement made by the Centers for Disease Control
16 and Prevention in order to deceive the American
17 public about the safety of thimerosal?
18    A. Well, it's the vaccine group there, not
19 the whole group. That's so knowingly false that
20 their own paper by Verstraeten says that it
21 causes ticks which isn't in that list.

Page 178

1    MS. OWENS: Objection, nonresponsive
2 answer, move to strike.
3    A. Yes, it's blatantly false and they know
4 it's false.
5    Q. (BY MR. THOMASCH) They know it's false
6 and they're attempting to deceive?
7    A. They're making a rather big attempt to
8 deceive.
9    MR. THOMASCH: All right. I'll ask the
10 court reporter to mark as our next exhibit a
11 two-page document from the European Agency for
12 the Evaluation of Medicinal Products dated March
13 24, 2004.
14    (Deposition Exhibit No. 14, statement
15 from the European Agency for the Evaluation of
16 Medicinal Products dated March 24, 2004, was
17 marked.)
18    Q. (BY MR. THOMASCH) Let me ask you just
19 to take a quick look at Exhibit 14 and let me
20 know whether or not you recognize the document?
21    A. I know of the agency. I don't think

Page 179

1 I've seen this exact document.
2    Q. All right. The agency in reference
3 being the European Agency for the Evaluation of
4 Medicinal Products?
5    A. Yes.
6    Q. What do you understand that agency to
7 be?
8    A. It's sort of like their CDC or FDA.
9 Sort of like our CDC or FDA.
10    Q. The acronym that they go by is EMEA?
11    A. Yes.
12    Q. But this is a European agency that has a
13 role in Europe relatively equivalent to the FDA
14 or CDC in the United States; is that correct?
15    A. Yes.
16    Q. In the 1990s were thimerosal-containing
17 vaccines used in parts of Europe?
18    A. Yes, not anymore. They made them
19 illegal now in many parts of Europe because the
20 cause autism.
21    MS. OWENS: Objection, nonresponsive,

Page 180

1 move to strike.
2    MR. ELLIOTT: Same thing.
3    MR. THOMASCH: Join in the motion.
4    Q. (BY MR. THOMASCH) But I will ask you,
5 is it your sworn testimony that you understand it
6 to be illegal to distribute thimerosal-containing
7 vaccines anywhere in Europe?
8    A. I didn't say anywhere. I said a number
9 of places in Europe. England, Sweden, Norway, I
10 believe Austria, Russia. I may have missed some.
11 Canada, that's not Europe. And soon to be in
12 various parts of the United States, already in
13 some parts coming up.
14    Q. Go back to Exhibit 14 if we could. Are
15 you aware that in 1999 and 2000 EME issued
16 statements on the use of thimerosal in vaccines?
17    A. Yes.
18    Q. Were you aware prior to my showing you
19 Exhibit 14 that in 2004, EMEA issued another
20 public statement on that subject?
21    A. No.

Page 181

1    Q. Have you not been aware, I'd ask you
2 now to take a moment and read through the
3 slightly-longer-than-one-page document.
4    MR. SMITH-GEORGE: There's an
5 indication at the bottom this is page -- is this
6 page two of two?
7    MR. THOMASCH: Page two of two.
8    MR. SMITH-GEORGE: Is there a website
9 this came off of or do you know? There seems to
10 be some notation on the bottom public EMEA. Is
11 that a website?
12    MR. THOMASCH: I believe it is but I
13 don't have the website address.
14    MR. ELLIOTT: It's on there.
15    MR. THOMASCH: That is the website
16 address there? Oh, the bottom of the first page
17 there's --
18    MR. SMITH-GEORGE: Oh, emea.eu.int.
19    MR. THOMASCH: Right.
20    MR. SMITH-GEORGE: Thank you.
21    A. Okay, I've read it.

Deposition of MARK R. GEIER, M.D., Ph.D.    Multi-Page™    November 11 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW    Document 256-3    Filed 12/09/04    Page 18 of 44 PageID #: 8089

Page 182

1    Q. (BY MR. THOMASCH) Okay. Now, is it
2  fair to say based on the first three paragraphs,
3  directing your attention in particular to the
4  first sentence of the third paragraph, that a
5  committee of the EMEA, the Committee for
6  Proprietary Medicinal Products, known by the
7  acronym CPMP, had looked at this issue in 1999
8  and 2000 and had advised, quote, "that although
9  there was no evidence of harm from thimerosal in
10  vaccines other than hypersensitivity (allergic)
11  reactions, it would be prudent to promote the
12  general use of vaccines without thimerosal and
13  other mercury-containing preservatives,
14  particularly for single-dose vaccines." Do you
15  see that?
16    A. Yes.
17    Q. Does that accord with your recollection
18  of the EMEA statements in 1999 and 2000?
19    A. Yeah, I think they said it would be
20  prudent.
21    Q. But they said at that time that there

Page 183

1  was no evidence of harm from thimerosal in
2  vaccines other than hypersensitivity reactions,
3  but they went on to say it would still be prudent
4  to remove; is that correct?
5    A. Yes.
6    Q. Now, it indicates in the third
7  paragraph that, quote, "the previous assessment"
8  -- and I'm reading the last sentence of the third
9  paragraph -- "of risks associated with
10  ethylmercury had been based on data on
11  methylmercury, as the toxicity profile of the two
12  compounds was assumed to be similar." Do you see
13  that?
14    A. Yes.
15    Q. Am I correct that for purposes of your
16  report in this case, you currently consider the
17  toxicity profile of ethylmercury and
18  methylmercury to be similar; is that correct?
19    A. Yeah, and that's based on, I don't know,
20  20 to 30 publications, in, ants to elephants.
21    Q. Okay.

Page 184

1    A. I consider it to be similar, although I
2  would make the point that if you made it half as
3  toxic, if you made it a quarter as toxic, if you
4  made it a 10th as toxic, you're still so far over
5  the limit you can't make the risk go away.
6    Q. But you don't think it's half as toxic,
7  you think it's essentially the same toxicity,
8  correct?
9    A. I think it's similar, and none of the
10  papers say that it's more toxic than
11  methylmercury. Overall I think it's fair to
12  assume that it's similar, as did the American of
13  Academy of Pediatrics people in their
14  publications.
15    Q. Now, the EMEA statement marked as
16  Exhibit 14, in the 4th paragraph, states "in
17  March 2004, the CPMP reviewed the latest evidence
18  relating to the safety of thimerosal-containing
19  vaccines." Do you see that?
20    A. Yup.
21    Q. And until right now you were unaware

Page 185

1  that that happened; correct?
2    A. That's correct.
3    Q. Does it indicate that part of what they
4  reviewed were, in their words, a number of well
5  designed population-based epidemiological
6  studies documenting the safety profile of
7  thimerosal?
8    A. Yeah, that's -- that's patently wrong,
9  but yeah, that's what they reviewed. I know
10  which ones they reviewed.
11    Q. The statement goes on to say, quote,
12  "these studies show no association between the
13  vaccination with thimerosal-containing vaccines
14  and neurodevelopmental disorders such as speech
15  disorders and autism." Do you see that?
16    A. Yes.
17    Q. And the statement that they show no
18  association is even stronger than the statement
19  they show no causation; is that correct?
20    A. Yes.
21    Q. So they show by definition no causation

---

**Page 186**

1 and not even an association between vaccination
2 with thimerosal-containing vaccines and
3 neurodevelopmental disorders such as speech
4 disorders and autism is the position of the EMEA;
5 correct?
6     A. Even though they're totally irrelevant
7 studies to this issue, yes, that's correct.
8 That's their position.
9     Q. Do you believe that that position is
10 inaccurate?
11     A. Yes.
12     Q. Do you believe that EMEA knows it to be
13 inaccurate?
14     A. Knows or should know, probably. I mean,
15 I assume they have access to the National
16 Library of Medicine's search engine, which every
17 researcher in this world that knows what they're
18 doing uses. Yes, if they have access and they
19 tried, it's inaccurate and they should know
20 better. I can't sit here and tell you they did
21 the search, but boy, considering the importance

---

**Page 187**

1 of this issue, if they didn't do the search,
2 they're guilty of not doing a decent job. No one
3 can believe this. Any parent, any juror, anybody
4 can do this search in two seconds and you can see
5 that these are false statements. And they're
6 not papers written by me. They're papers written
7 by people all over the world for many, many
8 decades, and there are hundreds of them.
9     Q. The 4th paragraph continues on, if
10 you'll follow with me, "furthermore, new data in
11 infants indicate that ethylmercury is more
12 rapidly excreted and therefore has substantially
13 different pharmacokinetics than methylmercury."
14 Do you see that statement?
15     A. Yes.
16     Q. You understand what they're attempting
17 to say there; correct?
18     A. Yes, they're referring to the Lancet
19 study which is, as a scientific study it's a
20 complete joke, and in addition it's irrelevant.
21 That is, cyanide has a half life in the body of

---

**Page 188**

1 about 30 seconds. It also kills you. Half life
2 is not predictive. Additionally, the half life
3 of ethylmercury and methylmercury in general are
4 somewhat similar, and even if you allow that
5 they're half as much, doesn't make any
6 difference.
7     MR. ELLIOTT: Object, nonresponsive.
8     Q. (BY MR. THOMASCH) The fourth paragraph
9 concludes with the statement, and I quote, "the
10 new data suggests that ethylmercury may be less
11 toxic than previously assumed, and therefore
12 caution is needed in extrapolating the toxicity
13 profile of methylmercury to ethylmercury." Do
14 you see that?
15     A. Yes.
16     Q. Now in connection with your work in
17 this case, you believe it is appropriate to
18 extrapolate the toxicity profile from
19 methylmercury to ethylmercury; is that correct?
20     A. Yes, although we have done it by
21 allowing it to be five times less. We've done it

---

**Page 189**

1 with ten times less. It doesn't help.
2     MS. OWENS: Excuse me, I'm going to
3 object.
4     THE DEPONENT: Excuse me, I'm answering
5 his question.
6     MR. SMITH-GEORGE: Finish your question
7 then you can make an objection. You don't have
8 to interrupt during his response.
9     MS. OWENS: I did not mean to interrupt
10 you. I thought you were through. Please finish
11 your answer.
12     THE DEPONENT: Okay. I'm finished.
13     MS. OWENS: I object to the
14 responsiveness of the answer. I also ask that he
15 answer the questions directly because I have
16 questions I want to ask. We're time-limited. I
17 don't want my time used up by his tendency to
18 give lengthy answers to what are yes or no
19 questions. I'm going to ask you to extend that
20 courtesy to me.
21     MR. SMITH-GEORGE: He's trying to

---

Case 5:03-cv-00141-TJW    Document 256-3    Filed 12/09/04    Page 20 of 44 PageID #:
8091

Page 190

1 answer the questions completely. I think he's
2 doing a responsive job as he knows how to do. I
3 don't think he's unduly extending this. And if
4 you just give him the courtesy of letting him
5 finish his answer, then you make any objection
6 and we can go on.
7        MR. THOMASCH: I'll join in counsel's
8 objection.
9        MS. OWENS: I did apologize for
10 interrupting him. I did not do that
11 intentionally. My position is on the record.
12     Q. (BY MR. THOMASCH) Let's go to the
13 fourth paragraph of Exhibit 14. Is there
14 anything in that paragraph that you agree with?
15     A. Yeah, that in March 2004 they reviewed
16 it. I presume that's true.
17     Q. What you believe, however, is that the
18 results of their review are inaccurate and are
19 the product of either gross negligence on their
20 part or intentional inaccuracies; is that
21 correct?

Page 191

1     A. Yes, that's correct.
2        MR. THOMASCH: It's 1 o'clock. Why
3 don't we take our lunch break now.
4        MR. SMITH-GEORGE: How long of a break?
5        MR. THOMASCH: 30 minutes okay with you
6 folks?
7        MR. SMITH-GEORGE: 30 works for me.
8        THE VIDEOGRAPHER: Time now is 1:04.
9 We're going off the record.
10        (A recess was taken.)
11        MR. SMITH-GEORGE: This is just for the
12 record, Dr. Geier has -- I have taken the final
13 draft out of the stack of drafts that we have
14 prepared and Dr. Geier has signed a cover letter
15 dated November 7th as well as page 50 of the
16 report, and we're going to mark that as a
17 separate exhibit constituting his final report in
18 this matter, because it's easier to read than
19 what was faxed to everybody on the disclosure.
20        We had some discussions earlier about
21 corporate documents, and I have discovered that

Page 192

1 the corporate documents are actually incorporated
2 into notebook No. 5, they're hole-punched, and so
3 all the documents that Dr. Geier saw that were of
4 a corporate nature are here in the room in
5 notebook No. 5.
6        MR. THOMASCH: Thank you for that
7 clarification. One housekeeping matter, it would
8 appear that my inability to count has left us a
9 void where more competent counsel would have used
10 an Exhibit 8. And so with your permission we'll
11 mark the next exhibit as Exhibit 8.
12        MR. SMITH-GEORGE: I have no objection
13 to that.
14        MR. THOMASCH: Thanks, then we won't
15 spend the rest of our careers trying to figure
16 out what happened to Exhibit 8.
17        I concede for the stenographic record
18 that your prior references to Exhibit 8 were
19 actually to Exhibit 7, which was our supplemental
20 disclosures, and we're going to make a new
21 Exhibit 8 to clarify the chronology of the

Page 193

1 exhibits.
2        THE VIDEOGRAPHER: The time now is 1:49.
3 We are now back on the record. This is the
4 beginning of videotape No. 3.
5        MR. THOMASCH: I'll ask the court
6 reporter to mark as Exhibit 8, because that
7 exhibit number was inadvertently skipped, our
8 next exhibit, which is a joint statement of the
9 American Academy of Pediatrics and the United
10 States Public Health Service published September
11 3rd, 1999.
12        (Deposition Exhibit No. 8, joint
13 statement of the American Academy of Pediatrics
14 and the United States Public Health Service
15 published September 3rd, 1999, was marked.)
16     Q. (BY MR. THOMASCH) Dr. Geier, do you
17 have in front of you Exhibit 8?
18     A. Yes, I do.
19     Q. And you certainly recognize and have
20 testified you're familiar with the American
21 Academy of Pediatrics, right?

Page 194

1    A. Yes.
2    Q. What is the United States Public Health
3 Service?
4    A. It's part of the United States
5 government that does things like supply doctors
6 to our Coast Guard and some research and advises
7 the U.S. government.
8    Q. On health-related issues?
9    A. Yes.
10    Q. All right. Are you familiar with this
11 published statement?
12    A. Yes.
13    Q. And it was published in Pediatrics,
14 which you identified as the journal of the
15 American Academy of Pediatrics, correct?
16    A. Yes.
17    Q. And its publication date was September
18 3rd, 1999; is that correct?
19    A. Yes.
20    Q. Does it accord with your recollection
21 that this statement was actually issued on July

Page 195

1 7th, 1999?
2    A. Yeah, that sounds reasonable, I don't
3 remember the date but I know it was July
4 something.
5    Q. Early July 1999?
6    A. Yes.
7    Q. And you were familiar with the
8 statement at or about the time it was first
9 issued in July; is that correct?
10    A. Yeah, in fact, we have some memos
11 discussing the release before it was released.
12 I'm quite familiar with this.
13    Q. All right. Now, I want to take you to
14 the second paragraph.
15        MS. OWENS: I'm sorry, did he say he
16 knew about it when it came out, which I think was
17 your question?
18    Q. (BY MR. THOMASCH) Yes, you were aware
19 of it at or about the time it was issued?
20    A. I said I was aware of it before it was
21 issued because I have some memos and things where

Page 196

1 they discussed the idea of issuing.
2    Q. Yeah, but those memos, when did you
3 obtain those memos?
4    A. I obtained them after the fact.
5    Q. Did you in fact know that this statement
6 was going to come out before it was issued?
7    A. No.
8    Q. But you did know about it at the date it
9 was issued or shortly thereafter?
10    A. Yes.
11    Q. Looking at the second paragraph of this
12 statement, it states, and this again is July of
13 1999, quote, "there is a significant safety
14 margin incorporated into all the acceptable
15 mercury exposure limits. Furthermore, there are
16 no data or evidence of any harm caused by the
17 level of exposure that some children may have
18 encountered in following the existing
19 immunization schedule. Infants and children who
20 have received thimerosal-containing vaccines do
21 not need to be tested for mercury exposure." Did

Page 197

1 I read that accurately?
2    A. Yes.
3    Q. Now, when you read this statement for
4 the first time in 1999, were you aware of what if
5 any safety margin was incorporated into mercury
6 exposure limits?
7    A. Not at the time.
8    Q. Have you subsequently familiarized
9 yourself with that information?
10    A. Yes.
11    Q. Do you agree that there is a safety
12 margin incorporated into acceptable mercury
13 exposure limits?
14    A. I believe they attempted to put a
15 safety level in, which has been exceeded by an
16 enormous amount.
17    Q. Do you know what the intention was by
18 way of the margin? Was it intended to be a
19 tenfold safety margin?
20    A. That's the usual margin that's used. In
21 this case there actually is no safety margin.

Deposition of MARK R. GEIER, M.D., Ph.D.  Multi-Page™  November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW   Document 256-3   Filed 12/09/04   Page 22 of 44 PageID #: 8093

## Page 198

1 That is, the level that is approved is the level
2 at which there's demonstrable harm to cells and
3 tissue culture. In addition, even if you use a
4 tenfold, and we've tried that, it's still nowhere
5 near the level of exposure. The overexposure was
6 at least 140-fold.
7     Q. When you say the level at which it was
8 approved, what is the "it"?
9     A. I'm not sure what I meant either. The
10 level that they approve, which is, incidentally,
11 what I meant was 0.1, the FDA limit is 0.1
12 microgram per kilogram per day, and there's
13 another limit that's as high as 0.4 micrograms
14 per kilogram per day. Those levels have no
15 safety and in reality, even if you allow a
16 tenfold margin, you still vastly have exceeded
17 those levels.
18     Q. Okay. I need to try to go in smaller
19 pieces.
20     A. Okay.
21     Q. Are you aware that there are more than

## Page 199

1 one governmentally-issued mercury exposure
2 limits?
3     A. Yes.
4     Q. Has the FDA issued one?
5     A. Yes.
6     Q. Has the EPA issued one?
7     A. Yes.
8     Q. Does the World Health Organization have
9 one?
10     A. Yes.
11     Q. Are you aware of differences between
12 them?
13     A. There were more differences than there
14 are now.
15     Q. In 1999 were there differences?
16     A. Yes.
17     Q. Do you understand in 1999 which was the
18 most stringent exposure limit, in other words,
19 putting the lowest limit on the recommended
20 exposure?
21     A. Yes, it was EPA.

## Page 200

1     Q. And what was the EPA limit at that time?
2     A. 0.1 micrograms per kilogram per day of
3 orally ingested methylmercury.
4     Q. Am I correct that that exposure limit
5 was in no way prepared in connection with, for
6 the purpose of regulating vaccines?
7     A. That's correct.
8     Q. At the time that it was devised, was it
9 your understanding or is it your understanding
10 that EPA intended to use a safety margin in its
11 standard?
12     A. Yes.
13     Q. That was their goal?
14     A. Yes.
15     Q. Whether they correctly achieved it or
16 not, I'm not asking. I just want to know if that
17 is what they were trying to do?
18     A. Yes.
19     Q. And the goal they were trying for was
20 to have a tenfold safety margin, by which I mean
21 they would determine what they thought was the

## Page 201

1 appropriate exposure level and reduce it to
2 one-tenth of that and make that the maximum level
3 of exposure; is that correct?
4     A. That's correct.
5     Q. At the time that the EPA created that
6 standard, do you believe that they did so in good
7 faith?
8     A. Yes, I do.
9     Q. When the American Academy of Pediatrics
10 and the United States Public Health Service
11 stated in July of 1999, there is a significant
12 safety margin incorporated into all the
13 acceptable mercury exposure limits, do you
14 believe that they believed that to be true as of
15 that time?
16     A. Yes.
17     Q. It indicated that in July of 1999 there
18 are no data or evidence of any harm caused by the
19 level of exposure that some children may have
20 encountered in following the existing
21 immunization schedules. Do you believe that that

November 11, 2004 Deposition of MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Case 3:03-cv-00141-TJW    Document 256-3    Filed 12/09/04    Page 23 of 44    PageID #: 8094

---

**Page 202**

1 statement was intended to be truthful at the time
2 it was made?
3    A.  Can you read it to me again or show it
4 to me?
5    Q.  Yes, I'm in the second paragraph, in the
6 second sentence, which states, furthermore, there
7 are no data or evidence of any harm caused by the
8 level of exposure that some children may have
9 encountered in following the existing
10 immunization schedule.
11    A.  It's not true, but I believe that they
12 may have intended it to be true.
13    Q.  They may have thought it to be true?
14    A.  Yes, at the time I think they may well
15 have thought it to be true.  At least many of
16 them were not aware.  There was data, the VAERS
17 database had already reported, if I recall one
18 of their internal memos, 1400 reports of
19 neurological problems with thimerosal, so to say
20 there was no data is inaccurate.  But I'm not
21 sure that everybody who wrote this was aware of

---

**Page 203**

1 that.  I don't think they were intentionally
2 trying to be false at that point.  Their necks
3 had not yet been extended.  They could have been
4 heroes at that point.
5    Q.  All right.  Now I want to take you over
6 to the right-hand column of Exhibit 8 on to the
7 six numbered points.  In the following paragraph,
8 in moving down about halfway, can you locate a
9 sentence that begins with the words "given that
10 the risks."
11    A.  I'm sorry, I must be -- the numbers one
12 through six?
13    Q.  Past one through six, in the next
14 paragraph about halfway down.
15    A.  Yeah, I see, given that the risks.
16    Q.  All right.  For the record I'll read
17 that sentence that I'm going to direct your
18 attention to, reads, quote, "given that the risks
19 of not vaccinating children far outweigh the
20 unknown and much smaller risk, if any, of
21 exposure to thimerosal-containing vaccines over

---

**Page 204**

1 the first six months of life, clinicians and
2 parents are encouraged to immunize all infants
3 even if the choice of individual vaccine products
4 is limited for any reason."  Do you see that?
5    A.  Yes.
6    Q.  And do you understand that to mean that
7 in July of 1999, the AAP, the American Academy of
8 Pediatrics, and the United States Public Health
9 Service were saying even if you can only get a
10 thimerosal-containing vaccine, the risk/benefit
11 analysis suggests that you should be immunized
12 with that vaccine instead of not being immunized.
13 Do you understand that to be your position then?
14    A.  Yeah, that was their position, and they
15 had an internal argument, which we've given you
16 the publication of it, some people in the academy
17 wanted to stop giving these vaccines to young
18 children and some didn't, and obviously from what
19 they published here those who didn't won the
20 argument.
21        MS. OWENS:  Objection to

---

**Page 205**

1 responsiveness.
2    Q.  (BY MR. THOMASCH)  And assuming that you
3 believe this to be the product of an internal
4 dispute, the position that was published
5 indicated that the risk/benefit analysis favored
6 giving the vaccine, even if a
7 thimerosal-containing vaccine?
8    A.  The dispute was not resolved over
9 risk/benefit.  As their publication said, it was
10 resolved over the fear that some antivaccine
11 group, and I again wanted to divorce myself from
12 such groups, but that some antivaccine group
13 would jump on the fact that some vaccines were
14 better than others and they were afraid they
15 would do so much harm to the program that they
16 did not want to admit that they should avoid the
17 thimerosal-containing -- not a risk/benefit
18 analysis.  It was a political, good for the
19 vaccine program decision, not a risk/benefit
20 decision.
21    Q.  But they framed it in the publication as

---

Case 5:03-cv-00141-TJW   Document 256-35   Filed 12/09/04   Page 24 of 44 PageID #: 8095

Page 206

1  the benefits outweigh the risks, even if the only
2  vaccine is a thimerosal-containing vaccine;
3  correct?
4      A. That's how they termed it.
5      Q. Is it my understanding that you do not
6  believe that was believed by them at the time,
7  they had an alternative reason for wanting to
8  make that statement?
9      A. Yeah, maybe what they thought was a
10 good reason, but they had an alternative reason.
11     Q. And their alternative reason related to,
12 for whatever reason, they wanted to continue
13 vaccinations and not allow this to be used
14 against the vaccine program?
15     A. That's right.
16     Q. So they, with that goal in mind, made a
17 statement that at the time they made it they
18 understood to be false?
19     A. Well, they understood that it was
20 potentially false. I think that a lot of the
21 research, remember I agreed that people making

Page 207

1  false statements before, so I don't have any
2  problem with agreeing to that, but at this time a
3  lot of the papers and research that currently
4  shows it to be false hadn't been done. So I'd be
5  willing to soften that and say they weren't sure
6  that it was false, but they also weren't sure
7  what they wrote here was true. And in fact very
8  shortly thereafter they did discontinue giving
9  the hepatitis B to infants for a while. So you
10 can see that they did have a concern. And I
11 would like to give the people the idea that
12 they're doing it honestly. So I think that this
13 statement isn't absolutely false. They certainly
14 knew that it may well be false but I'm not sure
15 that they knew that it was false.
16     Q. All right. That statement in your mind
17 is a false statement, correct?
18     A. With the power of hindsight it's a
19 false statement, yes.
20     Q. And the question is whether or not
21 enough was known in 1999, could a reasonable

Page 208

1  person have believed this statement and you're
2  not certain about that, is that where we're at?
3      A. Yes, sir, that's where we're at.
4      Q. Now, at some point between 1999 and
5  2004, when the American Academy of Pediatrics put
6  forth the statements on its current web page that
7  we just talked about before lunch, do I
8  understand you to hold the opinion that the
9  academy recognized that the position that they
10 had taken exonerating thimerosal was false but
11 they were going to say it anyway?
12     A. Yes.
13     Q. Do you know when that occurred?
14     A. I don't think it all occurred in a
15 moment, and we have some memos and discussion
16 about it, but they had to know it was false
17 because, for example, you read to me that
18 therefore children do not have to be tested for
19 mercury exposure in this. And notice I didn't
20 stop you and say that was a lie. Maybe they
21 believed it. Can't believe it anymore because

Page 209

1  people have tested for mercury exposure and the
2  lab says they're mercury-toxic, and labs are hard
3  to argue with. These are officially approved
4  labs in multiple places.
5          So that statement was false. I hope
6  that they believed it was true at the time, but
7  it was clearly false. And therefore their
8  position now has become totally intentionally
9  false. They don't even address that issue. They
10 simply ignore it.
11     Q. All right. If you could go back to
12 Exhibit 12. That's the American Academy of
13 Pediatrics statement, What Parents Should Know
14 About Thimerosal.
15     A. Yes.
16     Q. All right. If we turn to the second
17 page, the third bolded question is, should
18 parents have their children who have received
19 vaccinations with thimerosal be tested for
20 mercury. Do you see that?
21     A. Yes.

November 03, 2004 1:41-TJW     Document 256-3 Filed 12/05/04     Page 25 of 44 PageID #: 8096

Multi-Page™     Deposition of MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 210

1   Q. So they're not currently ignoring this
2   issue, are they?
3   A. Yeah, they're just lying about it.
4   Q. All right. They state, no, infants and
5   children who have received thimerosal-containing
6   vaccines do not need to have blood, urine or hair
7   tested for mercury, the body eliminates a mercury
8   dose completely within 120 days. It doesn't stay
9   in your child's body. Do you see that?
10  A. That statement on its face is false.
11  It's also intentionally misleading because in
12  order to see the mercury after that you need to
13  do a challenge, and challenges are not exactly
14  unique in medicine. We do challenges in many,
15  many situations. But that's inherently false.
16  The mercury that gets to the brain is not gone in
17  120 days. So this is false and intentionally
18  misleading and incorrect. And disproven by
19  thousands of lab tests across the country in
20  multiple clinical centers.
21  Q. Okay. So it's the American Academy of

Page 211

1   Pediatrics lying to the American people about
2   whether or not they should have their children
3   tested who have already received the vaccination,
4   correct?
5   A. Yes. And it's a very unfortunate lie
6   because it hurts the children, because they can
7   be treated, and some of them actually respond.
8   Q. In 1999, you suggested that they may
9   have been concerned that if they had been
10  accurate about the risks, that that might have
11  been seized upon by some antivaccine groups and
12  might have prevented some children from being
13  vaccinated, correct?
14  A. Right, and I was trying to be -- say
15  that I understood their concern. I didn't agree
16  with it but they had some legitimate concern at
17  that time.
18  Q. Right. By 2004 they're addressing in
19  their public statements children who have
20  already been vaccinated, correct?
21  A. Yes.

Page 212

1   Q. What possible interest do you believe
2   they could have that would motivate them to lie
3   about whether those children should be tested for
4   mercury?
5   A. In 1999, remember I said they could
6   have been heroes, they almost were heroes, and we
7   have the documents to show it. Several of them
8   got up and argued and said we're not leaving
9   until we announce this, until everybody knows
10  about it. They were this close to being heroes.
11  But by 2004 they had already gone down the road.
12  Now it was their fault. In 1999 you could make
13  the case that they didn't know and, boy, they
14  found out and they corrected it. But by 2004
15  they had gone down the road and encouraged people
16  to vaccinate their children with poisons that
17  they knew were there when there were alternate
18  choices. Now they could no longer go back. Now
19  the die is cast. Now they have to deny it and
20  they will continue to deny it until the day they
21  die.

Page 213

1   But unfortunately the proof is
2   overwhelming for it because it's provable by
3   laboratory testing. And they've hurt children
4   because if you don't understand why these
5   children are damaged and you send them to a
6   psychiatrist for psychiatric help, you're going
7   to not remove the problem. And there are
8   hundreds of children now by thousands of doctors
9   who have responded, at least partially, some very
10  much, to removing this mercury. They caused this
11  damage and they're not able to be heroes, they
12  must lie. They have no choice.
13  Q. At all times from 1999 to the present,
14  the American Academy of Pediatrics has had
15  available to the public statements about the
16  safety of thimerosal in vaccine, correct?
17  A. Yes.
18  Q. There is always something on their
19  website that's periodically updated, but that
20  subject is a matter that they are on record on
21  continuously?

Page 214

1    A. Yes.
2    Q. And the knowledge, the background
3  knowledge in the field you say has continued to
4  evolve over time; is that right?
5    A. Tremendously, yes.
6    Q. By the end of 2003, was it clear to you
7  that the statements being taken publicly by the
8  American Academy of Pediatrics at that point had
9  to be lies?
10    A. Yes. Clear to me and clear to Congress
11 and clear to investigators and clear to many,
12 many people in this field.
13    Q. By the end of 2003, which would be
14 subsequent to the August 2003 statement we looked
15 at from the WHO, was it clear to you that the WHO
16 was lying?
17    A. Yes.
18    Q. By the end of 2003, was it clear to you
19 that the Centers for Disease Control and
20 Prevention were lying when they said that there
21 was no evidence that thimerosal caused autism?

Page 215

1    A. Especially them, because we have
2  numerous memos on their part saying the opposite,
3  just numerous ones, particularly theirs.
4    MR. THOMASCH: We'll ask the reporter to
5  mark as your next exhibit Immunization Safety
6  Review Committee's report on vaccines and autism.
7    (Deposition Exhibit No. 15,
8  Immunization Safety Review Committee's report on
9  vaccines and autism, was marked.)
10    Q. (BY MR. THOMASCH) All right. Dr.
11 Geier, you have a copy of Exhibit 15, as does
12 counsel for the plaintiffs, and do you recognize
13 this document?
14    A. Absolutely.
15    Q. Let's get some terminology out of the
16 way first. What is the Institute of Medicine of
17 the National Academies?
18    A. It's a subsection of -- the National
19 Academy of Sciences is the most prestigious
20 scientific organization in the United States, and
21 the Institute of Medicine in general has been put

Page 216

1  together in order to advise the U.S. government
2  on various issues over the years.
3    Q. All right. Are you familiar with a
4  group within the Institute of Medicine called the
5  Immunization Safety Review Committee?
6    A. Yes.
7    Q. And what is the Immunization Safety
8  Review Committee?
9    A. A group that looks at vaccine problems
10 and immunization problems.
11    Q. All right. And if you would turn into
12 the document to the 5th page, counting the cover.
13 Little Roman numeral five, do you see that?
14    A. Yes.
15    Q. Does that page and the following page
16 identify the actual composition of the
17 Immunization Safety Review Committee?
18    A. Yes it does.
19    Q. And these are familiar names to you, are
20 they not?
21    A. Some of them, yes.

Page 217

1    Q. You recognize them as being part of the
2  committee?
3    A. Yes.
4    Q. And you recognize the committee
5  chairperson, Marie McCormick?
6    A. Especially the committee chairperson.
7    Q. Now, am I correct that the Immunization
8  Safety Review Committee has twice studied issues
9  relating to thimerosal-containing vaccines and
10 adverse outcomes, including autism?
11    A. Yes.
12    Q. And the first report of that committee
13 was in 2001, correct?
14    A. Yes.
15    Q. And that is not the report that's been
16 marked in front of you; correct?
17    A. That's correct.
18    Q. Is the 2001 report in your materials?
19    A. I think so.
20    Q. It's quoted at some length in your
21 report; is that not correct?

Page 218

1    A. Yes.
2    Q. And can we refer to that report as the
3 2001 IOM report?
4    A. Okay.
5    Q. And the report that is in front of you
6 now was issued on or about May 18th, 2004; is
7 that correct?
8    A. Yes.
9    Q. And we can call that either just the
10 IOM report or the 2004 IOM report; is that all
11 right?
12    A. Okay.
13    Q. Now, in advance of the 2004 IOM report
14 being issued, there was a public meeting held for
15 the presentation of certain evidence on the
16 subject matter, and that was in Washington, D.C.
17 in February of 2004, is that correct?
18    A. Yes. I went to it.
19    Q. Was there a similar meeting in advance
20 of the 2001 report?
21    A. I think so. I didn't go to that one,

Page 219

1 but I did go -- I was an invited speaker at this
2 one.
3    Q. So you were not a presenter at the
4 first one?
5    A. That's correct.
6    Q. You were a presenter at the 2004
7 meeting?
8    A. Yes.
9    Q. Now, when did you first learn that the
10 IOM was going to convene for a second time on
11 subject of vaccines and autism?
12    A. Three, four weeks before February of
13 2004.
14    Q. How did you learn that?
15    A. One of the staff people, I think it was
16 Kathleen Straten called me.
17    Q. Staff of what?
18    A. Staff of this committee, the IOM
19 committee, and said that she would like us to
20 present, my son and I to present some of our
21 epidemiological data.

Page 220

1    Q. All right. Did she indicate the
2 subject matter that she wanted you to speak on?
3    A. Yes.
4    Q. What did she indicate it to be?
5    A. Thimerosal and autism.
6    Q. Was there anything more specific than
7 that?
8    A. Yeah, it was very specific. She only
9 wanted vaccine thimerosal epidemiological autism,
10 which I objected to. I wanted neurodevelopmental
11 disorders. Because to me this is, all of our
12 studies are on, if you read the titles, are on
13 neurodevelopmental disorders. But she only
14 wanted autism. And she only wanted
15 epidemiological, not biochemical or genetic or
16 any of the other things, the myriad of other
17 studies that are available.
18    Q. She only wanted that from you; is that
19 correct?
20    A. Yes, and she indicated that -- you
21 know, this is my fifth time of testifying before

Page 221

1 the IOM. And on all previous occasions I had
2 suggested that I would give them a copy of all of
3 our literature review since they were undoubtedly
4 interested in all the literature in the world,
5 and I offered her that here, and they refused.
6 They weren't interested in the world's
7 literature. Only on our epidemiological studies.
8    Q. Were you invited by telephone call did
9 you say?
10    A. Yes.
11    Q. Did you agree to testify at that time?
12    A. Yes. I made some requests, but I agreed
13 to testify subject to the requests.
14    Q. And what requests did you make?
15    A. I said I needed a minimum of an hour
16 and a half, that they needed to invite members of
17 the Congressional committee that's reviewing
18 this. That they allow all peer-reviewed
19 publications to be included in this presentation.
20    Q. What does that mean?
21    A. That means they had to take all the

Deposition of MARK R. GEIER, M.D., Ph.D. Multi-Page™     November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-RAW   Document 256-3   Filed 12/09/04   Page 28 of 44 PageID #: 8099

Page 222

1 peer-reviewed publications, they couldn't just
2 take the three they wanted to hand-pick.
3     Q. You mean accept them for review and
4 consideration?
5     A. Yes.
6     Q. Did you ultimately provide the
7 committee with a paper submission in addition to
8 the oral presentation you made in February of
9 2004?
10    A. Yes, they told me they couldn't give me
11 an hour and a half because, you know, public
12 time is short. And I understood that so I said
13 how about private time, I'll come and tell you
14 what I know privately. They said that was
15 against the rules. So then I said how about I'll
16 submit all the stuff, and they said, well, we
17 can't stop you from submitting it but we're not
18 going to consider it. So when I did my
19 presentation I did indeed place that on their
20 desk so they did get a submission, which they did
21 not consider, mostly anyway.

Page 223

1     Q. Did you agree to speak in that
2 conversation?
3     A. Yes -- well, eventually I did. I said
4 I'd get back to them and eventually they did
5 indeed invite Congressman Dr. Weldon to speak.
6 There was a move on to block the whole happening
7 by Congress and by others because this was an
8 obvious blatant attempt to sweep things under the
9 rug and not to have a hearing. In fact Dr.
10 Weldon began the hearing by addressing IOM and
11 telling them that we all knew what they were
12 doing, they got 3 and a half million dollars from
13 CDC to hold a hearing that had such defined
14 parameters. We all knew that this was not an
15 attempt to get at, to quote it, to paraphrase his
16 opening remarks, this was not an attempt to get
17 at the truth but rather just sweep it under the
18 rug. We all knew this but we all decided we
19 would present anyway so they couldn't say we
20 didn't present, even though we knew before we
21 went there that they were not going to listen to

Page 224

1 this absolutely rapidly growing information that
2 thimerosal causes problems that comes from the
3 major universities in the United States.
4     MR. ELLIOTT: Objection, nonresponsive.
5     Q. (BY MR. THOMASCH) You said it was a
6 blatant attempt to block, to sweep everything
7 under the rug and to not have a hearing. Did you
8 misspeak?
9     A. I said it was a blatant attempt to,
10 rather than to get at the truth, to sweep the
11 truth under the rug. And that's a paraphrase.
12 You can get the actual text of Dr. Weldon's
13 opening remark. That was my attempt to
14 paraphrase his opening remarks before it began.
15    Q. Did you have any role in the
16 preparation of Dr. Weldon's opening remarks?
17    A. No.
18    Q. Did you see them in advance of them
19 being delivered?
20    A. No. But I knew his general feeling,
21 but I didn't -- I'm not his writer. He can take

Page 225

1 care of himself.
2     Q. Did you hear them when he delivered
3 them?
4     A. Yes.
5     Q. Did you agree with what he said?
6     A. Yes. And in fact they're on the tape,
7 part of it's on that WXYZ tape.
8     Q. So at the time that you made your oral
9 presentation in February of '04, you had formed
10 an opinion that the body, that the Immunization
11 Safety Review Committee was not legitimately
12 attempting to get to the bottom of the scientific
13 issue, but rather was trying to reach a
14 preordained conclusion, to quote you, to sweep it
15 under the rug?
16    A. To quote Dr. Weldon, yes, I was trying
17 to quote Dr. Weldon.
18    Q. Okay, and that is your opinion?
19    A. Yes, that's my opinion.
20    Q. Did you have that opinion on the day
21 that you accepted the invitation to speak?

Page 226

1    A. I had that suspicion. That's why I
2 said let me call you back. And I called up
3 Weldon and I called up some of the other Congress
4 people that are involved in this and I said, what
5 do you know about this? I mean, for all I knew,
6 maybe they really were going to have a hearing
7 that was going to be open. And they said no,
8 this is paid for, directed by CDC, so they did
9 confirm that they knew enough about it, they had
10 enough internal information to know that this was
11 not an open hearing, that these people were from
12 CDC, that CDC was requesting it, it was 3 and a
13 half million dollars paid for. Because when I
14 first heard it, I'm not an activist, I'm a
15 scientist, so for all I knew maybe Congress had
16 assembled an independent panel, but that was not
17 the case. We all knew very quickly that was not
18 the case here.
19    MR. ELLIOTT: Objection, nonresponsive.
20    **Q. (BY MR. THOMASCH) You said it was not**
21 **an open hearing; is that your phrase?**

Page 227

1    A. If I did, I didn't mean to say that. It
2 was open to the public. But this hearing was not
3 open to any other finding than the one they made,
4 and the finding is obviously and admittedly not
5 representative of even what the people said.
6    **Q. So the committee had a preordained**
7 **agenda that they were going to come to the**
8 **conclusion that there wasn't a connection between**
9 **thimerosal and autism; is that your testimony?**
10    A. Yes, that's my belief, yes.
11    **Q. And do you believe they attempted to**
12 **invite individuals who had taken positions**
13 **publicly, such as yourself, that there was such a**
14 **link in order to make it look as though they were**
15 **being fair-minded?**
16    A. Yeah, they invited us there so they
17 could try to discredit the work, yes. And in
18 fact, the work was coming out so fast that they
19 couldn't even manage it. Dr. Deth from
20 Northeastern and his colleagues from Hopkins and
21 Nebraska published during that time and so they

Page 228

1 couldn't, I'm sure they would have added him too
2 so they could have trashed him as well. But they
3 couldn't quite do it. There were so many
4 articles coming out from major peer-reviewed,
5 major centers in the United States that they
6 couldn't even do it. But the attempt was to put
7 up some of ours, those that believe the
8 thimerosal caused a problem so they could then
9 trash the studies.
10    **Q. Well, they could have commented on your**
11 **studies without inviting you to speak; could they**
12 **not?**
13    A. That wouldn't have looked good. In my
14 opinion, that would have been poor form.
15    **Q. So it wasn't simply window dressing,**
16 **they were looking for an opportunity in advance**
17 **to trash your studies and felt that to do so they**
18 **needed to invite you to speak; is that your**
19 **opinion?**
20    A. Absolutely. In fact, the American
21 Academy of Pediatrics had already trashed our

Page 229

1 study on an unsigned web attack within days of
2 our studies coming out.
3    **Q. I want to focus on this period between**
4 **when you were invited to speak and when you**
5 **actually spoke. As I understand your testimony,**
6 **during that time period, which was several weeks,**
7 **you spoke with some individuals connected with**
8 **Congress?**
9    A. Yes.
10    **Q. To find out what they knew about this**
11 **hearing, correct?**
12    A. Yes.
13    **Q. At some point in that process you**
14 **learned that in your mind this was not going to**
15 **be a fair hearing, correct?**
16    A. Yes.
17    **Q. Did you speak with anyone about whether**
18 **or not, in light of that fact, you should decline**
19 **to speak at the hearing?**
20    A. Yes.
21    **Q. Who did you speak to in that regard?**

Case 5:03-cv-00141-TJW    Document 256-3    Filed 12/09/04    Page 30 of 44 PageID #: 8101

Page 230

1    A. Weldon's staff and Burton's staff.
2    Q. All right. And what did they advise
3 you, if anything?
4    A. They thought that although nothing we
5 said and when we spoke was going to change what
6 they were going to say, we all had to play our
7 part in the forum. That is, it would be bad form
8 for them not to invite us and it would be bad
9 form for us not to attend. So they thought it
10 would be best for us to attend and put it out in
11 the public, let the press write about it and let
12 the parents hear it. Because it still was a
13 hearing. We got up on the stage and people could
14 hear what we said even though we knew what the
15 report was going to say.
16    Q. Were you troubled by what you viewed as
17 a preordained result to trash your studies before
18 you spoke?
19    A. Yes. They continue to do it more now.
20    Q. Did you speak with other presenters in
21 advance of the date of the public hearing?

Page 231

1    A. I may have spoken to a couple of other
2 people that were speaking. I don't recall
3 whether I did or not before or afterwards.
4    Q. Do you know whether anyone who was
5 invited to speak and who had previously taken the
6 position publicly that there was a link between
7 thimerosal and autism declined to speak?
8    A. Not that I know of. We had made the
9 decision that we would all speak.
10    Q. When your say "we" made the decision,
11 that's what I'm trying to get at. Who is "we"?
12    A. Dr. Weldon and the Congressional
13 committee that had supported some of the work had
14 asked us to speak. Obviously they don't own us,
15 and I could have said no, and others could have
16 said no, but they were encouraging us to speak
17 anyway. And what they said is Weldon would get
18 up and set it straight before it begins, and he
19 did.
20    Q. Just to be clear, when you say they
21 encouraged us to speak, you're not limiting the

Page 232

1 "us" to yourself and your son, but you're
2 including Dr. Bradstreet and Dr. Hornig and
3 others who had published or who had taken the
4 position that there might be a link; is that
5 correct?
6    A. Yeah, I mean, I don't know, I don't
7 think I had met Hornig at the time in my life,
8 but I was told that Weldon, to the extent, Weldon
9 and his office and Burton and his office, to the
10 extent they had influence, they were going to
11 ask those who were asked to speak to speak.
12 Obviously they don't own any of them and maybe
13 there was one that turned it down, but as far as
14 I know, everybody did come who was asked.
15    Q. Can you turn to page 25 of Exhibit 15.
16    A. Okay. I'm there.
17    Q. All right. And do you see the caption
18 the framework for scientific assessment?
19    A. Yes.
20    Q. And under that causality?
21    A. Yes.

Page 233

1    Q. And it indicates that well in advance of
2 this particular hearing the Immunization Safety
3 Review Committee had adopted a framework for
4 assessing causality; is that correct?
5    A. Yeah, in fact, this is the same
6 framework that goes all the way back to the early
7 '0s, if you remember the other IOM hearings.
8    Q. And what they do is they agree that
9 they will ultimately conclude with one of five
10 different conclusions?
11    A. Yes.
12    Q. And they set those out at page 25,
13 correct?
14    A. Yes.
15    Q. And would you agree with me that the
16 strongest negative conclusion that the committee
17 has as a possible conclusion is conclusion 3,
18 which reads evidence favors rejection of a causal
19 relationship?
20    A. Yes.
21    Q. Now, if you turn to page 16 of the 2004

Page 234

1 IOM report marked as Exhibit 15, do you see box
2 ES-1, committee conclusions and recommendations?
3    A. Yes.
4    Q. And the first recommendation and first
5 conclusion is the scientific assessment
6 causality conclusion with respect to
7 thimerosal-containing vaccines, the second one
8 relates to the MMR vaccine which doesn't contain
9 thimerosal, correct?
10    A. Correct.
11    Q. And the first conclusion is, quote, the
12 committee concludes that the evidence favors
13 rejection of a causal relationship between
14 thimerosal-containing vaccines and autism; is
15 that correct?
16    A. That is correct.
17    Q. And so the conclusion they reached was
18 the strongest negative conclusion available to
19 them pursuant to their own preexisting framework
20 which goes back to the first meeting of the
21 committee on different subject matter, correct?

Page 235

1    A. Correct.
2    Q. Now, is it your belief, as you sit here
3 today, that they had decided to reach that
4 conclusion before they ever held the public
5 hearing?
6    A. Yes, and not only that, it's my belief
7 that they don't believe it, based on interview of
8 Marie McCormick by the Wall Street Journal, in
9 which she said everybody on the committee knows
10 that thimerosal causes damage, immunological
11 damage, and parents should avoid it whenever
12 possible. That's published in the Wall Street
13 Journal a couple days afterwards.
14    MS. OWENS: Objection, nonresponsive,
15 move to strike.
16    Q. (BY MR. THOMASCH) This conclusion
17 specifically states that the evidence favors
18 rejection of a causal relationship between
19 thimerosal-containing vaccines and autism,
20 correct?
21    A. Yes.

Page 236

1    Q. And you understand that autism is
2 defined in the study to include autistic spectrum
3 disorder, correct?
4    A. Yes.
5    Q. And is it your belief that that finding
6 is not only false but is intentionally false?
7    A. Oh, yeah.
8    Q. Now, is it your statement that Marie
9 McCormick knows that finding linking
10 thimerosal-containing vaccines to autism is
11 false?
12    A. I can't get in her head. I'm not sure
13 about that. I'm sure that she knows that the
14 report is false. But then every statement in the
15 report is false. I don't know what her beliefs
16 are, her honest beliefs are. But I know that the
17 report says they make no recommendation to avoid
18 thimerosal, and she made the recommendation to
19 avoid, so that's clearly false. The report says
20 there's no evidence of any damage and she said
21 there was damage. That's false. Whether she

Page 237

1 actually believes that she's not convinced that
2 thimerosal causes the damage, I can't say, but
3 it's amazing if she wouldn't be.
4    Q. Okay. And when you say she's made
5 these statements, these are statements that were
6 published in the Wall Street Journal subsequent
7 to May 18th, 2004?
8    A. Yes, I believe they're in one of our --
9    Q. In one of your notebooks?
10    A. Yes.
11    MS. OWENS: I'm sorry.
12    MR. THOMASCH: In one of the notebooks,
13 yes.
14    Q. (BY MR. THOMASCH) Do you believe that
15 Marie McCormick, the chairperson of the
16 committee, was of the mind that she was going to
17 have the committee reach the strongest possible
18 negative conclusion before the date of the
19 hearing?
20    A. Yeah, in fact, I won a case of Coke on
21 it. I bet on it before it happened and I won.

Deposition of MARK R. GEIER, M.D., Ph.D. Multi-Page™                    November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-00141-TJW   Document 256-3   Filed 12/09/04   Page 32 of 44 PageID #: 8103

Page 238

1    Q. Do you believe that the committee --
2  withdrawn. Do you believe that the Immunization
3  Safety Review Committee decided on its own to
4  issue a false report or were they instructed to
5  do so by someone or something else?
6    A. Let's make it a little softer. They
7  were in -- they were -- the instructions for
8  doing this from the CDC were so restrictive that
9  they could find nothing else. The CDC not only
10 gave them the 3 and a half million dollars, but
11 they gave them a sheet of parameters to use, and
12 that incidentally has been requested under the
13 Freedom of Information Act and has been refused.
14       But it's my belief that their parameters
15 were so restrictive and I can't -- since I don't
16 have it I can't tell you exactly, but it was
17 something like you can't count the clinical work,
18 you can't count the laboratory work, you can't
19 count the monkey work, you can't count the tissue
20 culture work, you can't count anybody's
21 epidemiology unless they work for the government,

Page 239

1  then go find what you find. It was something
2  like that. It was so restrictive that you
3  couldn't have possibly found anything other than
4  what they found.
5    Q. Was that in writing?
6    A. I believe it was. In fact, they
7  admitted such a thing exists to Dr. Brian Hooker,
8  who made a Freedom of Information request. But
9  they say that that piece cannot be released
10 because it would adversely affect the findings or
11 something like that.
12   Q. Who is the "they" in your last answer,
13 when you say they have admitted that such a thing
14 exists?
15   A. The answer to his Freedom of
16 Information request came back that, I don't know
17 who the officer was that answers that, but the
18 department of Freedom of Information gave him
19 everything he wanted except that sheet of paper
20 and they said it does exist, they can't release
21 it.

Page 240

1    Q. Who is Dr. Brian Hooker?
2    A. He's a federal employee who works in
3  Seattle, I think, and also parent of an autistic
4  child, who's been very interested in this, he's
5  one of the thousands of people that are very
6  interested in this.
7    Q. Have you had contacts with him
8  directly?
9    A. I've spoken to him a couple of times.
10   Q. Have you seen the Freedom of
11 Information request that he made?
12   A. I've seen the answer. I didn't see the
13 request but I saw the answer.
14   Q. Is a copy of the answer in your
15 materials here?
16   A. I don't know. If it isn't, we'll
17 provide it to you.
18   Q. You would have a copy of it?
19   A. If we can find it, we'll provide it to
20 you. It may be in there. If we still have it,
21 we'll provide it to you.

Page 241

1    Q. I would request a copy.
2    A. Can I make one statement on this? At
3  the end of this, if anything that you request
4  that I promised like that, if you would put it on
5  a memo or something and send it to plaintiff's
6  attorney, and then he will forward it to me,
7  we'll make every attempt to answer your request.
8    Q. We will send a letter on.
9    A. Thank you.
10       MR. ELLIOTT: I want the record to be
11 clear that we have issued a subpoena that has
12 requested the documents that Merck wants you to
13 produce. I don't want you to think that we're
14 giving up our request. I have not seen your
15 objection so I don't know to what extent you have
16 said we're not going to produce something or we
17 object. But I don't want this to be read as
18 only what he requested in a follow-up letter
19 we're not going to look at the subpoena.
20       MR. SMITH-GEORGE: But we've produced 17
21 notebooks and copious amounts of loose paper. We

November 11, 2004

Case 5:03-cv-00141-TJW    Document 256-3    Filed 12/08/04    Page 33 of 44 PageID #:
8104

Multi-Page Deposition of - MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 242

1  produced -- even though we object to the subpoena
2  we produced his entire file. So we're not
3  disregarding the subpoena, though we object to
4  the breadth of the subpoena, and I think we've
5  done our best to produce everything that you all
6  are entitled to.
7      MS. OWENS: We'll argue that another
8  time, but just let me state on the record, having
9  now looked at all these notebooks, I disagree
10 with you.
11     MR. SMITH-GEORGE: You can disagree all
12 you want. If he doesn't have it, he didn't bring
13 it.
14     MR. THOMASCH: I'm not going to get in a
15 discovery fight now. But I do believe we have a
16 subpoena out, I am not in a position because I
17 haven't had a chance to look at the 17 volumes to
18 evaluate whether or not you've complied with it,
19 but to the extent you have an objection on
20 overbreadth, have materials that you're not
21 producing because you think that what we're

Page 243

1  asking is overly broad, I do think we need to
2  clarify that and have a meet and confer on it if
3  necessary. You may have an objection but you're
4  actually not withholding materials because of
5  that objection, that's a different situation.
6      MR. SMITH-GEORGE: That's what my
7  position is. We've produced everything that's in
8  his files despite our objection.
9      MR. THOMASCH: Judge Ward has just made
10 it very, very clear that we need to make clear
11 when an objection is made, whether or not things
12 were withheld because of the objection.
13     MR. SMITH-GEORGE: We're not
14 withholding any documents that I know of. You
15 can go through your subpoena request if you want
16 to, and there may be, one thing I know -- I say
17 we're not withholding anything. There was one
18 request for all documents related to any
19 rejections of articles. We did bring one
20 regarding the review --
21     MS. OWENS: Excuse me, can we do this

Page 244

1  off the video record?
2      MR. THOMASCH: We'll finish up.
3      MR. SMITH-GEORGE: Let me finish this.
4  Expert review of vaccines, we didn't produce all
5  of the rejections or modifications of every
6  publication he's ever had because he has a
7  problem with doing that because of the whole
8  double blind peer review process. And we didn't
9  produce some of the VSD data because he signed
10 confidentiality agreements with VSD, with the
11 HMOs. We didn't provide the VAERS data because
12 he signed confidentiality agreements.
13     So there are some things that we haven't
14 produced that when you go through the subpoena
15 you'll find out why we haven't produced them.
16 It's not because we're maintaining -- the reason
17 why they're not being produced is because there
18 is a confidentiality reason why we can't produce
19 them.
20     MR. THOMASCH: That I would ask, the
21 specifics of what is being withheld under the

Page 245

1  grounds of confidentiality be identified to us so
2  we know what we're talking about and then we can
3  deal with each other in the first instance and
4  the Court if necessary thereafter.
5      MR. SMITH-GEORGE: Let me just clarify
6  for the record, I have no objection to producing
7  that material if the defendants get the agreement
8  from the VSD, the HMOs, the IRBs, and all the
9  people that he signed confidentiality agreements
10 with saying he wouldn't produce that material.
11     MS. OWENS: Excuse me, has he brought
12 with him today those confidentiality agreements?
13     MR. THOMASCH: That was my question.
14     MR. SMITH-GEORGE: No, he has not.
15     MR. THOMASCH: All right. I would ask
16 for the production of those confidentiality
17 agreements so we understand what restrictions
18 there may be and what process one may need to go
19 through.
20     Q. (BY MR. THOMASCH) Do you have any
21 understanding or opinion as to who at the CDC

Page 246

1 made the decision to put restrictions on the type
2 of evidence that the Immunization Safety Review
3 Committee could and could not accept?
4    A. Yeah, it's this vaccine group at the
5 CDC, the immunization group at the CDC. It's a
6 group of relatively small number of people, I
7 don't know, 15, that -- and when I say CDC
8 throughout this deposition, that's who I mean.
9    Q. Okay, can you --
10    A. I don't have a problem with the CDC in
11 general. In fact, there are many, many people in
12 the CDC who agree with me. I have a problem with
13 this small group of vaccine -- the vaccine
14 immunization group at the CDC.
15    Q. All right. Now, there is a national
16 immunization program at the CDC; are you familiar
17 with that?
18    A. Yeah, that's who I mean.
19    Q. That's who you mean?
20    A. Yes.
21    Q. Are there any individuals there who you

Page 247

1 can identify by name that you believe are
2 involved in this?
3    A. Robert Chen, Brenier, Destefano, those
4 are the three that come to mind immediately from
5 that program.
6    Q. And --
7    A. A little more peripherally, Robert
8 Davis.
9    Q. Now, going back to Exhibit 15, and
10 looking at the committee, you have indicated that
11 you know of Marie McCormick. Who else do you
12 know of?
13    A. Well, on the second page of the thing is
14 Richard Johnston, he's a particularly
15 interesting person to have on the committee. He
16 was at Simpsonwood. He's the gentleman who on
17 the Simpsonwood transcript said that he wouldn't
18 give the vaccine to his children, a
19 thimerosal-containing vaccine to his children,
20 but he didn't want to tell the rest of the world
21 about it. I think that would disqualify him if I

Page 248

1 were putting together a committee that was
2 supposed to have no previous knowledge of this.
3 He sat through two days of the Simpsonwood
4 hearings where they discussed their own findings
5 that showed an association and discussed how they
6 were going to make this association go away and
7 how this should never get out and how there
8 should be a secret meeting. I don't think he can
9 be qualified.
10    Q. This committee, you indicated you have
11 testified before this committee on five
12 occasions, correct?
13    A. Six now, I believe. This was the fifth
14 one.
15    Q. Six, and only one of those pertained to
16 thimerosal and autism; is that correct?
17    A. Well, the sixth one had sort of an odd
18 pertaining to thimerosal. The sixth one, which
19 happened after the February one, was on why are
20 they going to come out and why are they going to
21 say we can't see the VSD data. We all know -- it

Page 249

1 hasn't come out but I'll make a prediction on the
2 record, they're going to come out with some
3 excuse why we should not be allowed to see their
4 data, and there's a 7th one that going to come
5 out that says why we can't use the intermediate
6 data sets and all those memos inside that say
7 that they agree with us. They really are busy
8 beavers trying to use the IOM to cover their tail
9 and it doesn't work.
10    MS. OWENS: Motion to strike. The
11 answer is nonresponsive to the question.
12    Q. (BY MR. THOMASCH) All right. The -- so
13 the two times that you've had testimony that
14 somehow relates to the question of
15 thimerosal-containing vaccines and autism are
16 both in 2004, correct?
17    A. Yes.
18    Q. The preceding times related to other
19 issues?
20    A. Yes, DTP and other -- and VAERS, other
21 issues, other vaccine issues.

Page 250

1    Q. And the committee goes back how far, do
2 you know?
3    A. With me or -- the earliest one I know on
4 vaccines was in 1985 when they recommended
5 removal of whole-cell DTP. That's the first one
6 I'm aware of. There may have been others before
7 that.
8    Q. Do you know whether some of the
9 individuals currently on the committee were
10 previously on the committee in connection with
11 those other reports?
12    A. Other than staffers, I think this is a
13 new committee.
14    Q. Do you know when this committee was
15 appointed?
16    A. Yeah, about three or four years ago.
17 They've had a whole series of hearings on
18 vaccines, all of which say the same thing.
19 Vaccines cause nothing, vaccines cause nothing,
20 and you know what else, vaccines cause nothing.
21    Q. Do you think that these individuals were

Page 251

1 selected because they had that point of view or
2 were they fair-minded individuals who were then
3 either constrained to come to out with that view
4 or told to come out with that view?
5    A. I don't know which of the two, but one
6 of the two. Because the things they've come out
7 with, in addition to this, things that I'm not
8 even necessarily related to are outrageous and
9 have later been shown by numerous subsequent work
10 to be wrong.
11    Q. So for whatever the reason, in your
12 opinion, the current composition of the
13 Immunization Safety Review Committee is not a
14 group of fair-minded objective scientists whose
15 work product reflects their honest beliefs as
16 scientists; is that correct?
17    A. Yeah, it hasn't worked. We haven't
18 gotten an honest hearing. Which is not what I
19 would say about some of the earlier ones.
20    Q. All right. Now, that position is a
21 position that you haven't been shy about telling

Page 252

1 them about; is that correct?
2    A. I've not been shy about it, nor has the
3 Congressman nor has the Office of Independent
4 Counsel, nor has the Inspector General. They've
5 all been very vocal about saying this report
6 notwithstanding, we better investigate for
7 possible criminal action as well as complete
8 mishandling of the vaccines, and we gave you
9 those memos.
10    MS. OWENS: Objection to the
11 responsiveness.
12    Q. I want to read to you one sentence out
13 of the February 9th, 2004 transcripts of your
14 remarks, and ask you if you remember making the
15 statement. The statement at page 182 of the
16 transcript is, quote, what is occurring here is a
17 cover-up under the guise of protecting the
18 vaccine program. Do you recall that?
19    A. Yeah, and I'm for the vaccine program,
20 and if you keep covering it up you're not going
21 to have a vaccine program. And I'm pleading with

Page 253

1 them don't kill the vaccine program, come out,
2 come clean. That's what I'm saying.
3    Q. I'm trying to understand, the cover-up
4 is the product of direction from the national
5 immunization program of the CDC?
6    A. Funded and influenced by the vaccine
7 companies as well as the American Academy of
8 Pediatrics funded and influenced by the vaccine
9 manufacturers as well as the Brighton members
10 funded and influenced by the vaccine
11 manufacturers, yes.
12    Q. And do you view the European agency, the
13 EMEC, as part of the same cover-up or simply
14 involved in its own separate cover-up that
15 happens to have the same result?
16    A. There's an overlap. I mean,
17 historically they actually came to the CDC and we
18 have -- we've provided you with documents with
19 that saying they were the reason why the 1999
20 recall, the announcement that you showed me came
21 about was the Europeans said you better do this,

Case 5:03-cv-09161-DTN Document 262 Filed 12/09/04 Page 36 of 44 Page ID #: 8107

Deposition of MARK R. GEIER, M.D., Ph.D. — November 11, 2004
Vera Easter v. American Home Products, Corp.

## Page 254

1 and they got them going on it. So they know
2 about it.
3        But on the other hand, they also have
4 some culpability. Even though a lot of their
5 members have outlawed thimerosal, they still have
6 a problem that some of their members still have
7 thimerosal and they're not going to come out and
8 say that thimerosal caused damage. They have a
9 parallel, an overlapping causation reasons.
10     Q. You referred to yourself as a, quote,
11 independent researcher, correct?
12     A. Yes.
13     Q. Do you recognize the name Margaret
14 Bauman?
15     A. Yes.
16     Q. Who is Margaret Bauman?
17     A. She's a pediatrician, I believe, who
18 published a paper in Pediatrics. When we
19 published our paper in the Journal of American
20 Physicians and Surgeons, the American Academy of
21 Pediatrics attacked us viciously in an unsigned

## Page 255

1 website piece, and one of the things they quoted
2 was her paper, and one of the things they said in
3 the attack on us was why we didn't comment, if
4 we're so knowledgeable in the field, why didn't
5 we comment on her paper. It was published after
6 ours. I don't have a time machine is the reason.
7 She basically in that piece said there is no
8 autism epidemic and ethylmercury and
9 methylmercury, ethylmercury bad, ethylmercury
10 good. Those are both indefensible from
11 scientific literature.
12     MS. OWENS: Objection to the
13 responsiveness of the answer. Please confine
14 yourself to --
15     THE DEPONENT: That's what he asked me.
16 And I tried to answer it.
17     Q. (BY MR. THOMASCH) Is Margaret Bauman
18 affiliated with the child's -- children's
19 neurology service of Harvard Medical School?
20     A. I believe so.
21     Q. Do you recognize Karen B. Nelson?

## Page 256

1     A. That's the other author, Nelson and
2 Bauman were the two that wrote those, yes.
3     Q. All right. Do you understand her to be
4 from the neuroepidemiology branch of the
5 National Institute of Neurological Disorders and
6 Stroke?
7     A. Yes.
8     Q. Do you need a break?
9     A. Sorry.
10     Q. Would you like some water?
11     A. I've got my Diet Coke.
12     MR. THOMASCH: Let me have marked as
13 Exhibit 16 an article coauthored by Drs. Nelson
14 and Bauman.
15        (Deposition Exhibit No. 16, article
16 by Drs. Nelson and Bauman entitled thimerosal and
17 Autism, was marked.)
18     Q. (BY MR. THOMASCH) Now, in asking you
19 if you knew who Margaret Bauman was, you made
20 reference to an article. Is Exhibit 16 the
21 article to which you were referring?

## Page 257

1     A. Is this one from Pediatrics?
2     Q. Yes.
3     A. Yes, this is it. I believe this is
4 correct, yes, sir.
5     Q. Do you know how long Dr. Bauman has
6 been involved in the scientific study of autism?
7     A. For some time. I don't know how long.
8 But many years.
9     Q. Do you consider her a, quote,
10 independent researcher?
11     A. I don't know. I don't know enough
12 about her funding sources at the moment to make a
13 comment on that. I can only comment that her
14 opinions as expressed in this paper are
15 laughable. There's no epidemic, it's increased
16 diagnosis? That's absurd.
17     Q. All right. You indicated that they
18 were laughable. At the time they were published,
19 and this indicates that it was accepted for
20 publication December 2, 2002, and copyrighted in
21 2003, do you see that on the first page?

---

Page 282

1 biological surveillance summaries of the CDC;
2 right?
3    A. Yes.
4    Q. Exhibit 18 is a document that is a
5 medical article that you authored; correct?
6       MR. SMITH-GEORGE: The paragraph here's
7 talking about DTaP and DTP? And what you handed
8 to him is an article about MMR.
9       MR. THOMASCH: I think it's part about
10 the MMR, but also in part about
11 thimerosal-containing vaccines. It's both.
12       THE DEPONENT: I interpreted that
13 comment, that slanderous comment to apply to all
14 of our papers, all of our papers involving
15 comparing thimerosal-containing vaccines, DTaPs,
16 to nonthimerosal-containing, so that would be the
17 paper in Experimental Biology and Medicine, the
18 paper in the Journal of American Physicians and
19 Surgeons, I think this one, the Journal of
20 Pediatric Rehabilitation. There may be some
21 more. If you want more I'll look at my CV. I

---

Page 283

1 think it applied to all of them. It's certainly
2 true of all of them. If I did not have that
3 information I could not have done the
4 calculations on any of those.
5    Q. (BY MR. THOMASCH) Let me take you back
6 to Exhibit 15, which is the 2004 IOM report.
7    A. Okay.
8    Q. Would you turn to page 55, please?
9    A. Okay.
10    Q. Within the section of epidemiologic
11 studies that begins at page 53, do you see where
12 on page 55 there is a discussion of studies from
13 the United States?
14    A. Yes.
15    Q. The first study referenced is Geier and
16 Geier, 2004-A, correct?
17    A. Yes.
18    Q. Now, if you turn to page 157 of the
19 exhibit, of the IOM report?
20    A. Yes.
21    Q. You will see about a third of the way

---

Page 284

1 down the page, Geier, DA, Geier, MR, 2004-A. Do
2 you see that reference on page 157 of the IOM
3 report? The page numbers are on the upper
4 right-hand column.
5       MR. SMITH-GEORGE: Just to make your
6 life easier.
7    Q. (BY MR. THOMASCH) Happy to show you
8 the book if you want.
9    A. Okay.
10    Q. 157, in the Geier and Geier articles, it
11 would be the fifth one.
12    A. Okay.
13    Q. Do you see what is being referred to
14 there as 2004-A there?
15    A. Yes.
16    Q. That article is what has now been marked
17 as Exhibit 18, is it not?
18    A. Yes.
19    Q. All right. Now let's go back to page 55
20 of the IOM report discussing Exhibit 18?
21    A. Okay.

---

Page 285

1    Q. The IOM report says that Geier and
2 Geier examined the hypothesized association
3 between exposure to TCVs -- that's
4 thimerosal-containing vaccines, correct?
5    A. Yes.
6    Q. -- and autism using data on distributed
7 vaccine doses from the CDC's biological
8 surveillance surveys (BSS) and case loads of
9 children with autism who are enrolled in special
10 education programs in the U.S. Department of
11 Education (DOE) reports, do you see that?
12    A. Yes.
13    Q. Now it discusses that article and the
14 results that you have there, correct?
15    A. Yes.
16    Q. And on the carry-over discussion on
17 page 56, at the end of the paragraph that carried
18 over from 55, it states, does it not, that
19 because the BSS only provides aggregate data on
20 doses distributed, it is not possible to
21 determine individual level exposures. Do you see

---

Deposition of 5:03-cv-06141-FR, M.D., Ph.D. Multi-Page™    November 11, 2004
Vera Easter v. American Home Products, Corp.

Case 5:03-cv-06141-FR   Document 256-3   Filed 12/09/04   Page 38 of 44 PageID #: 8109

Page 262

1    A. Yes.
2    Q. Is it your view that the statements in
3  that regard and the conclusions reached by the
4  authors are patently inaccurate?
5    A. Yeah, they either didn't look them up on
6  Medline or they didn't read them or they didn't
7  want to hear about it. Because, again, papers
8  are papers. I didn't publish them. They've been
9  published all over the world in all sorts of
10  animal and human systems. It doesn't hold up.
11  There are just so many papers that it doesn't
12  hold up. You can't just simply declare that
13  they're different when there are 20 to 30 papers
14  in pigs and cows and sheep and mice and rats and
15  monkeys and humans and anything else I'm sure I
16  left out, like I like to call it, ants to
17  elephants, it's been shown.
18    Q. Are you familiar with the phrase
19  peer-reviewed literature?
20    A. Yes, I am.
21    Q. And peer-reviewed journals?

Page 263

1    A. Yes, I am.
2    Q. Is Pediatrics, within which the Bauman
3  and Nelson article was published, a peer-reviewed
4  journal?
5    A. Yes, it is.
6    Q. What does that mean?
7    A. It means that the articles are
8  submitted double blind, if they do it correctly,
9  to people that the journal picks out to be
10  experts, and they recommend changes and/or
11  whether the article should be accepted with
12  changes, without changes, whatever. I'm not
13  sure, incidentally, if this is a peer-reviewed
14  article. I'm not saying it isn't. But many
15  journals' commentary are not peer-reviewed. They
16  may be editorial reviewed. So I don't know if it
17  is or isn't. Some journals peer-review
18  commentary, some journals don't peer-review
19  commentary. I'm not criticizing that, by the
20  way, but just for the point, I'm not sure this
21  was a peer-reviewed article.

Page 264

1    Q. Let me briefly go back to the IOM 2004
2  report, Exhibit 15, page little Roman numeral 7,
3  do you see there, the reviewers?
4    A. Yes.
5    Q. Do you understand that those
6  individuals were asked to review the report
7  before it issued?
8    A. Yes.
9    Q. And in fact played the role in a sense
10  of the peer reviewers?
11    A. Yes, and I have problems with who's on
12  that list as well.
13    Q. And what problems do you have in that
14  regard, just briefly?
15    A. Well, we've got Neil Halsey, he's the
16  gentleman who in the, what I call the hepatitis
17  review -- hepatitis control article said he's not
18  leaving until the companies and the CDC and the
19  FDA agree to announce the damage they've done to
20  the children and to announce to every
21  pediatrician and every doctor. He's also the one

Page 265

1  that said in the New York Times, if I had been
2  able to calculate the amount of thimerosal in
3  micrograms, I would have never let this happen.
4  He's also the one that attacked the Verstraeten
5  article. But he's also the one that on many
6  occasions has defended and tried to hide what's
7  going on here.
8      So he's sort of a fence-sitter, but he's
9  not a disinterested party. He's the head of an
10  institute at Johns Hopkins that's supposed to be
11  vaccine safety which he claims is independent,
12  but was set up totally on money provided by the
13  vaccine manufacturers, as he said in his sworn
14  testimony. I happened to have been there at the
15  time.
16    Q. Do you know who selected these
17  reviewers to peer-review the IOM report before it
18  was issued?
19    A. No.
20    Q. Do you believe these individuals were
21  picked because of preexisting views that were

Page 286

1  that?
2      A.  Yes.
3      Q.  Criticism was made about that data and
4  your use of that surveillance data by the IOM as
5  well as by Dr. Parker; is that correct?
6      A.  I don't read it that way.  I read that
7  you can say that you don't know the individual
8  exposures.  But that's not what they said.  They
9  said we don't have the denominators.  Maybe they
10  meant to say that.  Maybe I should be angry at
11  the IOM too.  But I didn't read it that way.  I
12  read it they wanted individual exposures, like
13  you go and look at each case.  And that's true,
14  we didn't look at each case.  What the Pediatrics
15  paper says is we didn't have the denominators.
16      Q.  Okay.  So that you consider to be a lie?
17      A.  That's a straight out lie.
18      Q.  Bear with me.  If we go to page 57 of
19  the IOM report, the first full paragraph relating
20  to your studies says, the IOM says, these studies
21  are characterized by serious methodological

Page 287

1  problems; do you see that?
2      A.  Yes.
3      Q.  Are you familiar with that criticism of
4  your work?
5      A.  Yes.
6      Q.  Do you believe that criticism was
7  dishonest?
8      A.  Yes.
9      Q.  All right.  We're running out of time on
10  the tape.
11      A.  But not slanderous.  They're entitled
12  to the opinion that our methods are not very
13  good.  They're not entitled to tell people we're
14  lying.  There's a difference, as I tried to
15  explain to you before you showed me this.  You
16  can say that you don't agree with it, that you
17  think that there are flaws in our methods but --
18      Q.  Do you think --
19      A.  -- you can't say that we don't have that
20  data we said we have.
21      Q.  The question I have for you is on the

Page 288

1  IOM, do you understand them to be reasonably
2  disputing the methodology as they understand it,
3  or attempting to disparage you and not have
4  people pay attention to you by claiming there are
5  methodological problems that they know are not
6  true?
7      A.  I don't take that personally.  They said
8  that about every single person that caused a
9  link.  That's another thing that's ridiculous in
10  this.  They said it about Haley, they said it
11  about Bradstreet, they just went down the whole
12  list of everybody that came and they said their
13  methodology has problems and over here we have
14  the studies sponsored by the drug companies, and
15  those are fine, and by the way, they have
16  methodological problems that are unbelievable.
17  We counted inpatient, outpatient they lost
18  people out of the link, the registry.
19      MR. THOMASCH:  We're losing the tape.
20      MR. ELLIOTT:  Objection, nonresponsive.
21      THE VIDEOGRAPHER:  The time is now 3:20

Page 289

1  p.m.  We are now off the record.
2          (A recess was taken from 3:20 p.m.
3  to 3:38 p.m.)
4      MR. THOMASCH:  Before we go on the
5  videographic record I want to note something on
6  the stenographic record.  While we took a brief
7  break counsel for all of the other defendants
8  approached me with regard to the timing issues
9  we're faced with.  None have asked me to stop
10  examining the witness on the subject matter.  It
11  is subject matter that they also believe we need
12  to examine the witness on.
13          On the other hand, they have all made
14  clear to me that they have individual areas of
15  concern particular questions on studies and on
16  matters referenced in Dr. Geier's report that
17  they are extremely interested in asking and then
18  indeed they wish to review manufacturers'
19  specific documents and ask documents that relate
20  to their particular client.  We are in something
21  of a dilemma because from our perspective there

November 08, 2004
Document 256-3    Filed 12/29/04    Page 40 of 44 PageID #: 8111

Deposition of - MARK R. GEIER, M.D., Ph.D.
Vera Easter v. American Home Products, Corp.

Page 290

1 is woefully insufficient time to thoroughly
2 examine or even appropriately in any way examine
3 this witness given the scope of the expert
4 deposition and the amount of materials at issue
5 before us.
6        We will at the conclusion of the seven
7 hours of course break for the day. We will ask
8 for plaintiff's counsel's stipulation to
9 continue and we will seek a remedy from the Court
10 if we can't reach an agreement. But I do want at
11 least to put on the record that in moving
12 forward, I do so cognizant of the fact that our
13 co-defendants, my co-defendants have not yet had
14 an opportunity to question, and I am not
15 intending, that they have not delegated to me the
16 right to ask questions about their clients or
17 their particular concerns whatsoever. And so
18 we're simply faced with a time crush at the
19 moment that I'll note on the record without
20 expecting that we'll solve it as we sit here
21 today.

Page 291

1        MR. SMITH-GEORGE: I can guarantee we
2 will not solve it. It is the plaintiff's
3 position that the rules of court allow you seven
4 hours. It's up to the defendants how you
5 allocate that time. If you want additional time,
6 I suggest you need to ask the Court for it,
7 because the plaintiffs are not going to
8 stipulate.
9        MR. THOMASCH: We will ask the Court.
10 All right. Let's go back on the record.
11        MR. SMITH-GEORGE: And we'll oppose.
12        THE VIDEOGRAPHER: The time is now
13 3:41. We are now on the record. This is the
14 beginning of videotape No. 4.
15        MR. THOMASCH: Ask the reporter to mark
16 as our next exhibit a document bearing the
17 caption Michael Skevofilax versus Aventis
18 Pasteur, Inc., plaintiff's expert witness
19 designation.
20        (Deposition Exhibit No. 19,
21 plaintiff's expert's witness designation in

Page 292

1 Skevofilax vs. Aventis Pasteur case, was
2 marked.)
3        Q. (BY MR. THOMASCH) Dr. Geier, you've
4 been provided what has been marked as Exhibit 19,
5 which is plaintiff's expert witness designation
6 in the Skevofilax case pending in the Circuit
7 Court for Baltimore City. I will represent to
8 you that this document was served upon the
9 defendants more than a month ago, specifically on
10 the 7th of October 2004. When were you first
11 retained by Mr. Waters in any case?
12        A. I think we established that before on
13 that cover letter.
14        Q. What was the date on that?
15        A. I don't recall. I don't even know
16 where it is. I don't want to waste your precious
17 time looking for it.
18        Q. Well, that's fine. I think
19 that's --
20        MR. SMITH-GEORGE: Let me clarify for
21 the record that the document that was handed to

Page 293

1 me, the certificate of service is October 7th,
2 2004.
3        MR. THOMASCH: I intended to say that.
4 Did I say something different?
5        MR. SMITH-GEORGE: You said September.
6        MR. THOMASCH: October 7th, more than
7 one month ago.
8        MS. WOODBURY: It's the stack of
9 e-mails, I think it's over there, it's the thing
10 that has the bibliography, I think that's it.
11        MR. SMITH-GEORGE: That's it in your
12 hand.
13        Q. (BY MR. THOMASCH) What exhibit is
14 that, sir?
15        A. Five.
16        Q. Exhibit 5, what is the date on the
17 e-mail?
18        A. This doesn't seem to be the e-mail for
19 asking me to be a witness. Am I reading it
20 wrong?
21        MR. SMITH-GEORGE: Yeah, that's it.

Case 5:03-cv-00141-TJW    Document 256    Filed 11/14/2005    Page 41 of 44
8112

November 11, 2004                                    Multi-Page Deposition of MARK R. GEIER, M.D., Ph.D.
                                                     Vera Easter v. American Home Products, Corp.

Page 290

1 is woefully insufficient time to thoroughly
2 examine or even appropriately in any way examine
3 this witness given the scope of the expert
4 deposition and the amount of materials at issue
5 before us.
6        We will at the conclusion of the seven
7 hours of course break for the day.  We will ask
8 for plaintiff's counsel's stipulation to
9 continue and we will seek a remedy from the Court
10 if we can't reach an agreement.  But I do want at
11 least to put on the record that in moving
12 forward, I do so cognizant of the fact that our
13 co-defendants, my co-defendants have not yet had
14 an opportunity to question, and I am not
15 intending, that they have not delegated to me the
16 right to ask questions about their clients or
17 their particular concerns whatsoever.  And so
18 we're simply faced with a time crush at the
19 moment that I'll note on the record without
20 expecting that we'll solve it as we sit here
21 today.

Page 291

1        MR. SMITH-GEORGE:  I can guarantee we
2 will not solve it.  It is the plaintiff's
3 position that the rules of court allow you seven
4 hours.  It's up to the defendants how you
5 allocate that time.  If you want additional time,
6 I suggest you need to ask the Court for it,
7 because the plaintiffs are not going to
8 stipulate.
9        MR. THOMASCH:  We will ask the Court.
10 All right.  Let's go back on the record.
11        MR. SMITH-GEORGE:  And we'll oppose.
12        THE VIDEOGRAPHER:  The time is now
13 3:41.  We are now on the record.  This is the
14 beginning of videotape No. 4.
15        MR. THOMASCH:  Ask the reporter to mark
16 as our next exhibit a document bearing the
17 caption Michael Skevofilax versus Aventis
18 Pasteur, Inc., plaintiff's expert witness
19 designation.
20        (Deposition Exhibit No. 19,
21 plaintiff's expert's witness designation in

Page 292

1 Skevofilax vs. Aventis Pasteur case, was
2 marked.)
3        Q. (BY MR. THOMASCH)  Dr. Geier, you've
4 been provided what has been marked as Exhibit 19,
5 which is plaintiff's expert witness designation
6 in the Skevofilax case pending in the Circuit
7 Court for Baltimore City.  I will represent to
8 you that this document was served upon the
9 defendants more than a month ago, specifically on
10 the 7th of October 2004.  When were you first
11 retained by Mr. Waters in any case?
12        A. I think we established that before on
13 that cover letter.
14        Q. What was the date on that?
15        A. I don't recall.  I don't even know
16 where it is.  I don't want to waste your precious
17 time looking for it.
18        Q. Well, that's fine.  I think
19 that's --
20        MR. SMITH-GEORGE:  Let me clarify for
21 the record that the document that was handed to

Page 293

1 me, the certificate of service is October 7th,
2 2004.
3        MR. THOMASCH:  I intended to say that.
4 Did I say something different?
5        MR. SMITH-GEORGE:  You said September.
6        MR. THOMASCH:  October 7th, more than
7 one month ago.
8        MS. WOODBURY:  It's the stack of
9 e-mails, I think it's over there, it's the thing
10 that has the bibliography, I think that's it.
11        MR. SMITH-GEORGE:  That's it in your
12 hand.
13        Q. (BY MR. THOMASCH)  What exhibit is
14 that, sir?
15        A. Five.
16        Q. Exhibit 5, what is the date on the
17 e-mail?
18        A. This doesn't seem to be the e-mail for
19 asking me to be a witness.  Am I reading it
20 wrong?
21        MR. SMITH-GEORGE:  Yeah, that's it.

Page 258

1    A. Yes.

2    Q. At that time, do you believe that these
3 opinions could have been the product of an
4 honest review of the medical literature and a
5 fair analysis according to this individual
6 author's opinions?

7    A. Could have been honest. I don't know
8 her motivation. I just know the opinion is, you
9 know, not supported by the scientific fact, and
10 in fact, you could take a nonscientist off the
11 street and know that it's not true, go to any
12 school and see it's not true.

13    Q. Looked at this way, if this is an
14 honest opinion as of this date as set forth in
15 Exhibit 16, does it reflect severe incompetence
16 on the part of the author?

17    A. Yes.

18    Q. So either the author is severely
19 incompetent but honest, dishonest, or a
20 combination of the two?

21    A. Yes.

Page 259

1    Q. But a competent, fair-minded and expert
2 author could not come to these conclusions at the
3 date of this article; is that your testimony?

4    A. Yeah, you could not come to the
5 conclusion there's no autism epidemic. It's been
6 published out of the state of California by their
7 own services. It's been published in JAMA. It's
8 been published in Pediatrics. And you don't have
9 to publish because you can look at any education
10 department statistics, you can go to any school,
11 there are schools now reporting more buses with
12 handicapped children than normal children. This
13 epidemic cannot be swept under the rug. This is
14 the greatest iatrogenic epidemic that has ever
15 occurred and it will not be swept under the rug.
16 And you can't take that position.

17    MR. ELLIOTT: Objection, nonresponsive.

18    Q. (BY MR. THOMASCH) All right. The
19 article goes well beyond a discussion of whether
20 there is or is not an epidemic of autism, does it
21 not?

Page 260

1    A. Yes.

2    Q. In particular the article indicates
3 that the symptoms of autism and the symptoms of
4 mercury poisoning are dissimilar; is that
5 correct?

6    A. In three of them or something, they
7 argue with three or four out of the hundred.
8 They don't dispute the other 96 that Redwood and
9 her authors reported. In fact, I use that in my
10 talk, in fact, I try to be fair. When I show the
11 hundred or so symptoms I always say that if
12 Pediatrics was here, American Academy, they would
13 say they dispute four of them, so I'll buy that
14 and say it's only similar 96 out of a hundred.
15 It's part of my talk. I don't think they're
16 right, but it's overwhelming the similarities
17 between the two. That incidentally doesn't prove
18 it. I've always said that. But they're
19 overwhelming.

20    Q. Does their observation to the contrary
21 reflect either dishonesty or incompetence?

Page 261

1    A. No, I think they may honestly believe
2 that those four are slightly different, and maybe
3 they are, as I said.

4    Q. They weren't purporting to limit their
5 analysis to those, were they?

6    A. What they're trying to do in this paper
7 is convince you that the autism epidemic was not
8 caused by the vaccines. That is incompetent or
9 bought off or a combination thereof. The
10 evidence of the association between the two is so
11 overwhelming, as I said in the statement you
12 quoted before, it's not -- there's no scientific
13 dispute here. All that's going on here is just
14 the cover-up. And you guys are protecting the
15 vaccine program and if you keep covering it up,
16 you're not going to have a vaccine program.

17    MR. ELLIOTT: Objection, nonresponsive.

18    Q. (BY MR. THOMASCH) Are you aware of the
19 discussion in the Bauman and Nelson paper with
20 respect to similarities or differences between
21 ethylmercury and methylmercury?

Page 262

1    A. Yes.
2    Q. Is it your view that the statements in
3  that regard and the conclusions reached by the
4  authors are patently inaccurate?
5    A. Yeah, they either didn't look them up on
6  Medline or they didn't read them or they didn't
7  want to hear about it. Because, again, papers
8  are papers. I didn't publish them. They've been
9  published all over the world in all sorts of
10 animal and human systems. It doesn't hold up.
11 There are just so many papers that it doesn't
12 hold up. You can't just simply declare that
13 they're different when there are 20 to 30 papers
14 in pigs and cows and sheep and mice and rats and
15 monkeys and humans and anything else I'm sure I
16 left out, like I like to call it, ants to
17 elephants, it's been shown.
18   Q. Are you familiar with the phrase
19 peer-reviewed literature?
20   A. Yes, I am.
21   Q. And peer-reviewed journals?

Page 263

1    A. Yes, I am.
2    Q. Is Pediatrics, within which the Bauman
3  and Nelson article was published, a peer-reviewed
4  journal?
5    A. Yes, it is.
6    Q. What does that mean?
7    A. It means that the articles are
8  submitted double blind, if they do it correctly,
9  to people that the journal picks out to be
10 experts, and they recommend changes and/or
11 whether the article should be accepted with
12 changes, without changes, whatever. I'm not
13 sure, incidentally, if this is a peer-reviewed
14 article. I'm not saying it isn't. But many
15 journals' commentary are not peer-reviewed. They
16 may be editorial reviewed. So I don't know if it
17 is or isn't. Some journals peer-review
18 commentary, some journals don't peer-review
19 commentary. I'm not criticizing that, by the
20 way, but just for the point, I'm not sure this
21 was a peer-reviewed article.

Page 264

1    Q. Let me briefly go back to the IOM 2004
2  report, Exhibit 15, page little Roman numeral 7,
3  do you see there, the reviewers?
4    A. Yes.
5    Q. Do you understand that those
6  individuals were asked to review the report
7  before it issued?
8    A. Yes.
9    Q. And in fact played the role in a sense
10 of the peer reviewers?
11   A. Yes, and I have problems with who's on
12 that list as well.
13   Q. And what problems do you have in that
14 regard, just briefly?
15   A. Well, we've got Neil Halsey, he's the
16 gentleman who in the, what I call the hepatitis
17 review -- hepatitis control article said he's not
18 leaving until the companies and the CDC and the
19 FDA agree to announce the damage they've done to
20 the children and to announce to every
21 pediatrician and every doctor. He's also the one

Page 265

1  that said in the New York Times, if I had been
2  able to calculate the amount of thimerosal in
3  micrograms, I would have never let this happen.
4  He's also the one that attacked the Verstraeten
5  article. But he's also the one that on many
6  occasions has defended and tried to hide what's
7  going on here.
8       So he's sort of a fence-sitter, but he's
9  not a disinterested party. He's the head of an
10 institute at Johns Hopkins that's supposed to be
11 vaccine safety which he claims is independent,
12 but was set up totally on money provided by the
13 vaccine manufacturers, as he said in his sworn
14 testimony. I happened to have been there at the
15 time.
16   Q. Do you know who selected these
17 reviewers to peer-review the IOM report before it
18 was issued?
19   A. No.
20   Q. Do you believe these individuals were
21 picked because of preexisting views that were

---

Page 478

1          INDEX OF EXHIBITS
2  EXHIBIT NO.        DESCRIPTION              PAGE
3  No. 29  Article entitled Response to
4      Comments by J.R. Mann............428
5  No. 30  Publication entitled A Review of
6      the Vaccine Adverse Event Reporting
7      System Database ...................    429
8  No. 31  Affidavit of Dr. Mark Geier for
9      Canadian litigation.................    434
10 No. 32  47 pages of tables..................435
11 No. 33  Various renditions of Dr. Geier's
12     report...............................    466
13 No. 34  Billing statements..................467
14 No. 35  Letter from Monica Furino to Dr. Mark
15     Geier dated November 2nd, 2004 and
16     attached medical records of Jordan
17     Easter...............................    467
18 No. 36  Correspondence between Dr. Geier
19     and Elizabeth Manzotti and attached
20     manuscript...........................    467
21

---

Page 479

1          INDEX OF EXHIBITS
2  EXHIBIT NO.        DESCRIPTION              PAGE
3  No. 37  E-mail dated 10/20/04 and attachments
4      containing Geier reports regarding
5      autism...............................    468
6  No. 38  List of Dr. Geier's cases, 2/12/99
7      to 9/27/04...........................    468
8
9
10
11
12
13
14
15
16
17
18
19
20
21

---